```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
 2                 TALLAHASSEE DIVISION

 3

 4

 5   VIRGINIA E. HARRELL,

 6        Plaintiff,

 7   vs.                      CASE NO. 4:20-cv-30-AW-CAS

 8   MHM HEALTH PROFESSIONALS,
     LLC, f/k/a MHM HEALTH
 9   PROFESSIONALS, INC., and
     CENTURION OF FLORIDA, LLC,

10

          Defendants.
11   _____/

12

13

14   DEPOSITION OF:          SARAH BRUS
                             Volume 1, Pages 1 - 113
15   AT THE INSTANCE OF:      Plaintiff

16   DATE:                    August 18, 2020

17   TIME:                    Commenced: 1:00 p.m.
                             Concluded: 5:57 p.m.
18
     LOCATION:                VIDEOCONFERENCE
19
     REPORTED BY:             ANDREA KOMARIDIS WRAY
20                            Court Reporter and
                             Notary Public in and for the
21                            State of Florida at Large

22

                       PREMIER REPORTING
23                     114 W. 5TH AVENUE
                     TALLAHASSEE, FLORIDA
24                       (850) 894-0828

25
```

**Page 2**

APPEARANCES:

REPRESENTING THE PLAINTIFF:

BRIAN O. FINNERTY
The Law Office of Brian O. Finnerty, P.A.
541 Beverly Court
Tallahassee, FL 32301

REPRESENTING THE DEFENDANTS:

CAYLA M. PAGE
Greenberg Traurig, P.A.
101 East Kennedy Boulevard, Suite 1900
Tampa, FL 33602

**Page 3**

INDEX TO WITNESS

SARAH BRUS                              PAGE

    Examination by Mr. Finnerty          5

INDEX TO EXHIBITS

NO.          DESCRIPTION            MARKED

2 - Plaintiff's notice of taking Rule 30(b)(6)     14
       deposition
3 - First amended complaint              14
4 - Defendants' answer and affirmative defenses    14
       to first amended complaint
5 - Defendants' responses and objections to first  16
       set of interrogatories
6 - E-mail chain Re:  Involuntary Termination      18
       Request
7 - Involuntary termination report         25
8 - Employee counseling form - termination     43
9 - Employee counseling form - final warning       51
11 - List of e-mails sent from work account to     34
       personal account
12 - NWFRC shift assignments             47
14 - Narcotic accounting log and key exchange dated 103
       March 29, 2018
16 - 33.208.002 Rules of conduct           52
19 - E-mail from Lori Cook to Virginia Harrell      36
21 - E-mail chain Re:  Camera footage       79
24 - E-mail from Kathi Douin Re: McDaniel complaint  89
25 - E-mail chain Re: "Sorry to bother you"        70
26 - E-mail chain Re:  Long-Montenez        91
27 - E-mail chain Re:  McDaniel complaint        92
28 - E-mail chain Re:  West/Cook narc key        94
       incident
38 - Plaintiff's amended notice of taking        13
       videotaped depositions
42 - E-mail from Tara Johnson Re: Final written     64
       issued

*Huh-uh is a negative response
*Uh-huh is a positive response

**Page 4**

STIPULATIONS

    The attorneys participating in this deposition acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely.  This arrangement is pursuant to the Florida Supreme Court Administrative Order AOSC-20-16.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

**Page 5**

D E P O S I T I O N

Whereupon,

    SARAH BRUS

was called as a witness, having been first duly sworn to speak the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

    EXAMINATION

BY MR. FINNERTY:

    Q    Good afternoon, Ms. Brus.  My name is Brian Finnerty and I represent the -- represent Virginia Harrell -- she goes by Jinny Harrell -- in a lawsuit she has filed against MHM Health Professionals, LLC, and Centurion of Florida, LLC.

        And you've been noticed for deposition today.  And I appreciate you attending by Zoom during these uncertain times.

        Have you -- could you please state your full name for the record.

    A    Sarah Brus.

    Q    And you were just informed by the court reporter that this is going to be recorded.  There was also a notice for your deposition today verifying that it would be by video.  So, I want to make sure I -- that, on the record, you're aware that this is going to be recorded today; is that right?

8/18/2020
Deposition of Sarah Brus - Volume 1
18-CA-77
3 (6 - 9)

Case 4:20-cv-00030-AW-MJF  Document 37-4  Filed 10/14/20  Page 3 of 58
M3 E. H. ###### Utility Presentation Inc. ########

Page 6

1   A   Yes, sir.
2   Q   Okay.  And have you ever given a deposition
3   before?
4   A   Yes, I have.
5   Q   And how many times, approximately, would you
6   say you've had your deposition taken?
7   A   Five or six.
8   Q   And were those in relation to your -- your
9   employment or your job?
10  A   Yes.
11  Q   Okay.  And when was the last deposition that
12  you gave?  If you can recall.
13  A   I don't recall the date.  It was several
14  months back.
15  Q   Okay.  And the -- the depositions that you've
16  given -- were they in cases that were initiated by
17  employees or former employees of Centurion?
18  A   Not all of them.
19  Q   Okay.  Were they employees or former employees
20  of MHM Health -- or I'm sorry -- MHM Health
21  Professionals, LLC?
22  A   Not all of them.
23  Q   Okay.  So -- but you have -- you do have some
24  experience with depositions, but just to briefly go over
25  some of the rules --

Page 7

1   A   Yes, sir.
2   Q   -- and -- and it's more difficult because
3   we're -- we're doing this by Zoom, but you know, try
4   to -- try to let me finish my question before you
5   answer.  I think, you know, a lot of times, you may know
6   exactly what I'm about to ask, but just try to make it
7   easier for court reporter.  Just try to wait for me to
8   finish speaking before you start, and I will certainly
9   try to extend the same courtesy to you.  Fair enough?
10  A   Yes.
11  Q   Okay.  And then -- and I -- you're doing a
12  good job of this already, but a lot of times, in normal
13  face-to-face conversation, we do a lot of uh-huh and
14  huh-uh and head nodding, head shaking.
15      For the deposition, to try to make it easier
16  for the court reporter, could you just try to answer
17  everything verbally and, you know, answer yes and no,
18  instead of huh-uh and uh-huh?
19  A   Certainly.
20  Q   Okay.  Thank you.
21      Who is your current employer?
22  A   MHM Health Professionals.
23  Q   And do you also work for Centurion of Florida,
24  LLC?
25  A   Well, Centurion of Florida holds the contract

Page 8

1   with the Florida Department of Corrections; MHM Health
2   Professionals staffs that contract.
3   Q   Okay.  Would it be fair to say that your job
4   is only -- you only have your job because of the
5   contract between Centurion and the state of Florida?
6   A   Yes.
7   Q   Okay.  And where is your -- are you working
8   from home right now?
9   A   Yes.
10  Q   Okay.  Where did -- do you have an actual
11  office where you go into work?
12  A   I've been working from home since April of
13  2016.
14  Q   Okay.  Do you have an office where you can go
15  into work?
16  A   Currently, no.  There --
17  Q   Okay.
18  A   There is a regional office in Florida, but I
19  don't work out of that office.  I work from home.
20  Q   And where is that regional office?
21  A   1203 Governor's Square Boulevard in
22  Tallahassee.
23  Q   Okay.  And do you still have an office space
24  available there?
25  A   There's space that I could work out of, but

Page 9

1   it's not dedicated to me.
2   Q   Okay.  When you're asked for your -- your work
3   address, what address do you provide?
4   A   1203 Governor's Square Boulevard in
5   Tallahassee.
6   Q   Okay.  What is your job title?
7   A   Human resources business partner.
8   Q   And how long have you had that position?
9   A   Since April of 2016.
10  Q   And is that when Centurion got the contract
11  with the state of Florida?
12  A   Yes.
13  Q   Okay.  And where did you work prior to April
14  of 2016?
15  A   I worked at Doctors' Memorial Hospital in
16  Perry, Florida.
17  Q   And what did you do for Doctors' Memorial?
18  A   I was the HR director.
19  Q   Okay.  How many years of experience would you
20  say you have in -- in HR?
21  A   31.
22  Q   Okay.  And as an HR business partner for
23  Centurion of Florida, what are your job duties and
24  responsibilities?
25  A   They vary somewhat.  My primary responsibility

Page 10

1 is related to employee relations. I also do some things
2 related to leaves of absences, little bit touch on
3 benefits now and again, but employee relations are my
4 primary duty.
5    Q    What is your -- your work e-mail address?
6    A    Sbrus@teamcenturion.com.
7    Q    Okay. And as part of your job duties as an HR
8 business partner, do you receive and investigate
9 complaints submitted by employees?
10    A    Yes, I do.
11    Q    Okay. And do you investigate those
12 complaints?
13    A    Of course.
14    Q    Okay. And then if -- if your investigation
15 shows that there was an -- a violation of policy or --
16 or some sort of issue, do you do anything to try to
17 rectify the issues that are complained of?
18    A    I -- I would need to know specifically what
19 the issue is. It's -- it's hard to answer a vague
20 question. Can you be more specific?
21    Q    And it's -- I'm just trying to ask, just
22 generally, if you are involved in trying to correct
23 whatever an employee may complain of if you do determine
24 that there is an issue that's going on or a policy
25 violation that's occurring.

Page 11

1    A    Of course, we make efforts to correct issues
2 when they occur.
3    Q    And are you involved in discipline or
4 counseling of employees when that's -- becomes
5 necessary?
6    A    Can you elaborate on what you mean by
7 involved?
8    Q    So, for instance, do you review and approve
9 final-warning counselings?
10    A    Yes, I do.
11    Q    Okay. Do you review and approve terminations?
12    A    I review terminations. I certainly am not the
13 final approval on any termination.
14    Q    Okay. And who -- who do you report to? Who
15 is your direct supervisor?
16    A    Lisa Lynch.
17    Q    Okay. And what is Lisa Lynch's job title?
18    A    She is the statewide HR manager for Florida.
19    Q    Okay. Okay. And have -- have you, yourself,
20 ever received any counseling or discipline since you've
21 worked with Centurion?
22        MS. PAGE:  Form.
23    A    I have no counseling on file, no. I've
24 certainly had conversations with my supervisor.
25    Q    Okay. Relating to what?

Page 12

1    A    I can't think of anything specific --
2    Q    Okay.
3    A    -- at this moment.
4    Q    So, last week, I took the depositions of
5 Victoria Love, Lisa Lynch, Kathi Douin, and Lisa Barton.
6        Have you spoken with any of those four
7 individuals about their depositions?
8    A    Briefly, mostly just as to the length.
9    Q    And who -- did you speak with all four of
10 them?
11    A    No. I spoke to Lisa Lynch and to Kathi Douin.
12    Q    Okay. With -- with Ms. Lynch, what -- what
13 specifically did y'all talk about?
14    A    We'd -- actually, the only thing we discussed
15 was that her deposition was about three-and-a-half hours
16 long and that I --
17    Q    Okay.
18    A    -- needed to be prepared for this not to be an
19 hour- or hour-and-a-half-long deposition.
20    Q    And then your conversation with Ms. Douin --
21 what did y'all speak about?
22    A    I believe hers was a similar length. I don't
23 recall anything else that we discussed other than the
24 length of the deposition.
25    Q    Did you discuss any of the specific testimony

Page 13

1 that was given by Ms. Lynch or Ms. Douin?
2    A    I don't recall discussing any specific
3 testimony with either of them.
4    Q    Okay. And how did you speak with them; by
5 phone or e-mail or -- how did y'all --
6    A    By phone.
7        MS. PAGE:  Form.
8    Q    By phone. Okay.
9        So, have you -- we put together, like, 48
10 exhibits or documents for your deposition. Have you
11 received those?
12    A    Yes, I have.
13    Q    And have you had a chance to look over those
14 48 documents?
15    A    Yes.
16    Q    Okay. And aside from the 48 documents that
17 were sent to you, have you reviewed anything else in
18 preparation for your deposition today?
19    A    No.
20        (Exhibit No. 38 marked for identification.)
21 BY MR. FINNERTY:
22    Q    Okay. And I referenced earlier that there was
23 an amended notice for your deposition today, which is --
24 it's Exhibit 38. Initially there was Exhibit 1 for
25 the -- the initial deposition notice, but you did

Page 14

1  receive Exhibit 38, the amended notice that was for
2  video; is that right?
3       A   Yes.
4           (Exhibit No. 2 marked for identification.)
5  BY MR. FINNERTY:
6       Q   Okay.  And then -- so, Exhibit 2 was a
7  30(b)(6) deposition notice.  Have you -- had you been --
8  had you seen that prior to it being sent to you for
9  preparation for your deposition?
10      A   I -- I don't recall seeing it prior to the
11 preparation for the deposition, but it's possible.
12          (Exhibit No. 3 marked for identification.)
13 BY MR. FINNERTY:
14      Q   Okay.  And then Exhibit 3 is the -- the first
15 amended complaint in this action.  When was the first
16 time you -- you would have seen the first amended
17 complaint?
18      A   I really don't recall.
19      Q   Would it have been prior to it being sent to
20 you for today's deposition?
21      A   It's possible.
22      Q   Okay.  And have you read over the first
23 amended complaint?
24      A   Yes.
25          (Exhibit No. 4 marked for identification.)

Page 15

1  BY MR. FINNERTY:
2       Q   Okay.  And then Exhibit 4 is the answer to the
3  first amended complaint that was filed by your counsel.
4  Have you had a chance to see that?
5       A   Yes.
6       Q   And was that just in preparation for today's
7  deposition or was that something you would have reviewed
8  prior?
9       A   I don't recall seeing it prior to preparing
10 for the deposition.
11      Q   Okay.  And in the -- in the answer to the
12 first amended complaint, your -- your counsel admitted
13 that -- well, strike that.
14          As I'm sure you're aware, Ms. Harrell's
15 complaint includes a lot of com- -- written complaints
16 that she asserts that she would have submitted to her
17 supervisor or to you or people that she worked with
18 while she was at Northwest Florida Reception Center.
19          And you're the -- the answer that was filed by
20 your attorneys -- my understanding is that they -- there
21 is no dispute that Ms. Harrell actually submitted those
22 written complaints that she says she submitted.
23          Would you agree with that?
24          MS. PAGE:  Form.
25      A   I would agree with that.

Page 16

1           (Exhibit No. 5 marked for identification.)
2  BY MR. FINNERTY:
3       Q   Okay.  All right.  And then Exhibit 5 are the
4  answers to interrogatories that were served by your
5  counsel.  And at the top of -- or in -- in response to
6  the first interrogatory, you were listed as someone who
7  assisted in answering those interrogatories; is that
8  right?
9       A   I -- I would presume that -- that by answering
10 to them -- meaning, providing them information to do the
11 answering.  So, I guess I'd have to say yes.
12      Q   Okay.  So, would you have been provided the
13 request or the interrogatory questions sometime shortly
14 after they were served?
15      A   I don't believe I was given those questions
16 or, if I was, I don't recall it.
17      Q   Okay.  And so, what -- have you provided
18 information to your counsel to respond to this case or
19 the complaint that Ms. Harrell has filed?
20      A   Yes, I've provided information.
21      Q   And so, did -- how did -- just kind of explain
22 what you -- the process you would have gone through to
23 try to search and -- and pull together information that
24 may be relative to -- to this case.
25          MS. PAGE:  Form.

Page 17

1       A   As far as how did I search?  I certainly would
2  have searched through e-mail.  I would have searched
3  through, in this case, depending on when the questions
4  came, possibly through archived e-mails; would have
5  certainly looked in the employee's personnel file; would
6  have looked for whatever records that were requested.
7       Q   Do you have the ability to search e-mails that
8  weren't sent to you?  Like, just --
9       A   Yes.
10      Q   -- as an example, could you have gone through
11 Ms. Johnson's e-mails?
12          MS. PAGE:  Form.
13      Q   Tara Johnson.
14      A   I can't search anything other than what was
15 sent to me.
16      Q   Okay.  So, would -- is that something that
17 your IT department would be able to do?
18      A   Yes.
19      Q   Okay.
20      A   I believe so.
21      Q   Okay.  So, based on the -- the documents that
22 have been produced in this case, it's my understanding
23 that you would have sent a request to terminate
24 Ms. Harrell or an approval or request for approval --
25 you would have e-mailed that to Ms. Lynch; is that

Page 18

1  right?
2      A    Yes.
3          (Exhibit No. 6 marked for identification.)
4  BY MR. FINNERTY:
5      Q    Okay.  And then those -- Exhibit 6 is the
6  e-mails that I'm referring to.  If -- if you could take
7  a look at that, ma'am.
8      A    Unfortunately, my computer is giving me some
9  problems and is not opening documents for me.  If you
10  can give me just a second, I can try to get it to let me
11  access things.
12      Q    Okay.  And I think we can -- we can share --
13      A    Uh-huh.
14      Q    -- documents with you.  So, that should be
15  able to help.
16      A    I'm -- I'm just closing the program that's
17  pulling them.  I think there's just too much open.  So,
18  I'll just have to reopen from there.
19          Okay.  Now, I can access.
20      Q    Okay.  And Exhibit 6 is actually on the screen
21  right now as well.  So, starting with -- with this
22  e-mail chain -- and I'm sure you're familiar, when
23  e-mails are printed out, you have to start with the last
24  page of the -- the e-mail chain and then work your way
25  up.

Page 20

1  have been included in your e-mail?
2      A    I'm thinking it probably would have included
3  the list of e-mails that Ms. Harrell sent to her home.
4      Q    Okay.
5      A    Possibly relevant policies.
6      Q    Okay.  And do you know why this e-mail chain
7  doesn't show any attachments?
8      A    I have no idea.  They would have been
9  attached.
10      Q    Okay.  And so, when you sent this e-mail
11  initially on April 20th to Lisa Lynch, would that have
12  been because Ms. Harrell's supervisors had come to you
13  and said, hey, I want Ms. Harrell terminated?
14      MS. PAGE:  Form.
15      A    I -- how can I explain how -- I guess if you
16  explain the way that it starts, there would have been
17  discussion about Ms. Harrell, certainly, and whether
18  termination was appropriate.  And, if that was what they
19  wanted, we would have put together the documents to
20  submit, yes.
21      Q    And you said there would have been discussion.
22  Who -- who would that have -- discussion been with?
23      A    It would have involved Ms. Harrell's HSA, Tara
24  Johnson; the regional director, Kathi Douin; and I
25  believe myself.

Page 19

1      A    Yep.
2      Q    So, if you look at the very bottom -- is
3  this -- so, is this an e-mail you would have sent to
4  Lisa Lynch on April 20th, 2018?
5      A    Yes.
6      Q    And the subject is "Involuntary-termination
7  request-Virginia Harrell, NWFRC;" that right?
8      A    Yes.
9      Q    Okay.  And what would have been included in
10  this e-mail?  If you recall.
11      A    Would have attached the termination document,
12  any supporting documentation related to it.
13      Q    Okay.  So, would it have included the
14  involuntary-termination report?
15      A    Yes.
16      Q    And would it have included the termination
17  counseling form?
18      A    Yes.
19      Q    And would it have included the final-warning
20  counseling form?
21      A    Yes.
22      Q    And how about the verbal-counseling form from
23  December of 2017?
24      A    It should have, yes.
25      Q    Anything else that you can recall that may

Page 21

1      Q    Would you agree that it was -- the initial
2  decision to -- to seek approval for Ms. Harrell's
3  termination would have come from Tara Johnson and Lori
4  Cook?
5      A    They would have been a part of that.  I don't
6  know specifically who would have made the -- the
7  request, but they would have been a part of it.  It may
8  very well have been a joint decision, might have come
9  from Kathi Douin.
10      Q    Okay.  And so, do you know why Ms. Douin isn't
11  included in this e-mail chain?
12      A    Because the -- she would have already given
13  her approval to terminate.  Then it comes to me to
14  basically take a good look at all the documentation, put
15  everything together.  And then I send it on to Lisa
16  Lynch for her approval from there.
17          But Kathi would already have either talked to
18  me about it and agreed that we wanted to proceed with
19  termination before I submitted anything to Lisa.
20      Q    And Ms. Douin has -- to your knowledge, has
21  she ever worked with Ms. Harrell?  Has she ever worked
22  at Northwest -- Northwest Florida Reception Center?
23      MS. PAGE:  Form.
24      A    I -- I don't have knowledge of Kathi's full
25  career.  So, I'm not aware of her having worked with

Page 22

1  Ms. Harrell specifically at NWFRC in any capacity other
2  than her current position as a regional director.
3      Q   So, would it be fair to say that, as it
4  relates to your involvement, Ms. Douin's involvement,
5  Lisa Lynch, and Vicki Love, that their involvement was
6  essentially approving a decision made by Lori Cook and
7  Tara Johnson to terminate Ms. Harrell?
8      A   Again, I'm not sure who made the initial
9  decision that termination was appropriate to
10 Ms. Harrell, but they would have been giving the final
11 approval of termination, yes.
12     Q   So, your initial e-mail was sent on
13 April 20th, 2018.  And then it looks like, on
14 April 26th, you send a follow-up e-mail to Lisa Lynch.
15 And you say:  Lisa, any idea where this one is at?
16 Still needing the approval.
17         Do you know why -- the re- -- what was the
18 reason for the six-day delay in you following up with
19 Ms. Lynch?
20     A   Well, terminations aren't always approved on
21 the first day that they're submitted.  It -- sometimes
22 it has to do with someone being out of the office.
23 Sometimes it has to do with the time needed to review
24 all of the documentation, time spent in conversation in
25 regards to, you know, the termination recommendation.

Page 23

1      So, as far as exactly why there was the six-
2  days delay, I really don't know.  It could have been any
3  number of things.  It's not uncommon for it to take
4  several days for a termination to be approved.
5      Q   All right.  So, then after you follow up with
6  Ms. Lynch on April 26th, she then forwards it up to
7  Vicki Love and asks -- Ms. Lynch asks Vicki if she needs
8  any addition- -- additional information; is that right?
9      A   Yes.
10     Q   Would you have also sent the termination-
11 approval request to Ms. Love directly or just to
12 Ms. Lynch?
13     A   No, I send it to Ms. Lynch.  Ms. Lynch
14 forwards on to Ms. Love.
15     Q   And between April 20th and April 26th, would
16 you have had any other e-mail correspondence with anyone
17 relating to the request to terminate Ms. Harrell?
18     A   Not that I recall.
19     Q   Okay.  Do you know whether Ms. Harrell
20 continued to work at Northwest Florida Reception Center
21 between April 20th and April 26th?
22     A   I would need to check the record, but I don't
23 believe she did.
24     Q   Would you be surprised if she did, in fact,
25 continue to work during the -- that six-day period?

Page 24

1      MS. PAGE:  Form.
2      A   I -- I guess I wouldn't be a hundred-percent
3  surprised.  It's not that uncommon.
4      Q   Okay.  And is there a way for -- if there's an
5  employee that, for whatever reason, Centurion doesn't
6  want them back, pending approval for a termination
7  request, could Centurion put that employee, like, on
8  administrative leave or suspend them until the -- the
9  termination is finally approved?
10     A   In some cases, we suspend an employee prior to
11 termination, but not all.
12     Q   And did that happen in Ms. Harrell's case?
13     A   I honestly don't know.
14     Q   Okay.
15     A   I would need to review the record.
16     Q   Okay.  And so, prior to Ms. Harrell filing a
17 lawsuit, she filed a complaint with the Florida
18 Commission on Human Relations.  Were you involved at all
19 when Ms. Harrell's case was pending before the FCHR?
20     A   I may have provided information to legal
21 counsel.
22     Q   And do you have -- like, in other -- in other
23 cases, have you participated in whistleblower cases
24 against MHM or Centurion while they were pending with
25 the FCHR?

Page 25

1      A   I honestly -- when you're ask- -- again, it's
2  kind of a vague question.  I don't know specifically --
3  I can't think of any specific cases and in that specific
4  circumstance.  So, I would have to say I'm really not
5  sure.  It's possible.
6      Q   Are you aware of any internal policies within
7  MHM or Centurion that a -- an employee who feels that
8  they were wrongfully terminated -- that they would have
9  to exhaust prior to either proceeding with a complaint
10 with the FCHR or submitting a -- filing a lawsuit?
11     MS. PAGE:  Form.
12     A   I'm -- I guess I'm not understanding your
13 question.  Can you rephrase?
14     Q   Do you know whether there are any -- like, in
15 grievance procedures or internal rules that a -- an
16 employee, before they are able to pursue a lawsuit or
17 pursue a complaint with the Florida Commission on
18 Human -- Human Relations that they are required to go
19 through before doing that?
20     MS. PAGE:  Form.
21     A   I'm not aware of any, no.
22     (Exhibit No. 7 marked for identification.)
23 BY MR. FINNERTY:
24     Q   Okay.  If we look at Exhibit 7, it -- so, this
25 is the involuntary-termination report dated April 20th,

Page 26

1   2018. Did you prepare this report?

2    A   Yes, sir.

3    Q   Okay. And where would you have gotten the

4 information that is contained in this report?

5    A   Well, it depends on which section. Some of it

6 simply came from our electronic employee records; you

7 know, information about her job title, supervisor, that

8 sort of information, the information in regards to, you

9 know, performance-counseling history -- I would have

10 received that information from the site.

11     The information that's listed under reason for

12 termination is information that I would have garnered

13 through the course of investigating the concerns that

14 the site had presented regarding Ms. Harrell.

15    Q   Okay. So, you said -- when you said that you

16 would have gotten information from the site, who -- who

17 would the -- who would have provided that information?

18    A   For the most part, it would have been

19 Ms. Johnson.

20    Q   And did you speak with Ms. Johnson on the

21 phone or via e-mail prior to preparing the

22 involuntar- -- involuntary-termination report?

23     MS. PAGE: Form.

24    A   Probably some of both. I couldn't say a

25 hundred percent without looking back to see what e-mails

Page 27

1 there might be, but I know I, for sure, talked to her on

2 the phone.

3    Q   Okay. So, at the top of the involuntary-

4 termination report, it says "Contract: Florida Gap."

5 What's -- what's Florida Gap?

6    A   That's the name of the contract because when

7 we initially received the contract from the state of

8 Florida, it was -- it was a temporary contract. And so,

9 it was referred to as Florida Gap. It was filling a gap

10 between the former contractor and, as they were getting

11 bids for a new contractor, we were selected to fill that

12 gap.

13    Q   Okay. And is that referring to the contract

14 between Centurion and the state of Florida?

15    A   Yes.

16    Q   Okay. And who -- in the top section, it says,

17 "Is the employee eligible for rehire?"

18     It says, "No, employee is not eligible for

19 rehire." Who would have made that decision?

20    A   If -- I can't say for sure. That can come

21 from a couple of different areas. Could be the regional

22 director. It could have been a joint decision between

23 the regional director, myself, and Ms. Johnson.

24 Ms. Johnson could have recommended it, and -- you know,

25 Ms. -- Ms. Douin and I approved. So, it could have come

Page 28

1 from a number of different places.

2    Q   Okay. And then as it relates to contesting

3 unemployment, who -- who made the decision that the

4 company will contest unemployment if the employee sought

5 it?

6    A   We almost always contest unemployment. So,

7 that's kind of a given. It's -- it's not common for us

8 not to contest unemployment.

9    Q   All right. Then, there's the performance-

10 counseling history. And the -- there lists a verbal

11 counseling on December 13, 2017. And is that something

12 that you would be able to access, yourself, that

13 counseling form, or would you have had to request that

14 from someone at Northwest Florida?

15    A   I would have requested that from either Lori

16 Cook or Tara Johnson.

17    Q   Okay. And did you review the December 13,

18 2017, verbal counseling prior to preparing this form?

19    A   Yes.

20    Q   And then it -- it lists a -- a final

21 written counseling issued on April 9th, 2018. Same

22 question: That would have been provided to you under

23 request?

24    A   Yes.

25    Q   Okay. So, then, under the comments section,

Page 29

1 it says, "Prior counseling for inappropriate contact

2 with an inmate and for time and attendance." Where --

3 where did you get that information?

4    A   From the prior counseling documents.

5    Q   Okay. All right. And then at the bottom of

6 the page, it's -- there's a summary of the event that

7 precipitated termination. Did you prepare this summary?

8    A   Yes.

9    Q   Okay. And aside from information that was

10 contained in the prior counseling as well as the

11 termination form that was filled out -- did you get

12 information from any other source besides that -- those

13 forms?

14     MS. PAGE: Form.

15    A   Yes. I would have spoken to Ms. Douin and

16 Ms. Johnson.

17    Q   All right. So, on the second one-sentence-

18 long statement under the summary, it says: On 4/14/18,

19 Ms. Harrell failed to account for the narcotic keys

20 during her shift and did not do the narcotic count as

21 required.

22     Where is -- where did you get that

23 information?

24    A   I believe from Ms. Johnson.

25    Q   Okay. Were you provided any documents from

Page 30

1  4/14 that would have substantiated this statement?

2  A  I may have been.

3  Q  So, then, on the -- I'm going to jump around a

4  little bit, so I apologize.  On the -- on the second

5  page of the involuntary-termination report, under the --

6  the section that says, "Provide a summary of the

7  termination meeting," and it says, "Per Ms. Johnson" --

8  and can we assume that whatever is stated after "Per

9  Ms. Johnson," in this top paragraph, this is information

10  coming from Tara Johnson?

11  A  That's correct.

12  Q  Okay.  So, then, like, four lines down, it

13  says:  Ms. Cook explained that she -- Ms. Harrell -- was

14  assigned to the pill room, and the assignment sheet

15  indicated she was to conduct a shift count for

16  narcotics.

17  So, is that something that Ms. Cook would have

18  reported to Ms. Johnson, who, then, reported this to

19  you?  Is that accurate?

20  MS. PAGE:  Form.

21  A  That's possible.

22  Q  Okay.  So, it says that she was assigned to

23  the pill room, and the assignment sheet indicated she

24  was to conduct a shift count.  Did you ask to see the

25  assignment sheet that's referenced in this document?

Page 31

1  A  I really don't recall.

2  Q  Is that something you -- I mean, you -- that's

3  something you would want -- want to see, right, in order

4  to substantiate what's being alleged?

5  MS. PAGE:  Form.

6  A  In some case- -- in some cases, yes.  When

7  we're dealing with clinical issues, I certainly rely

8  upon my clinical experts.  I might not know what I'm

9  looking at when it comes to something clinical.  I don't

10  have clinical expertise.

11  Q  Okay.  But you would be able to read a

12  document and determine whether or not it says an

13  employee is supposed to do something.  Can you agree

14  with that?

15  A  Yes, possibly.

16  Q  Okay.  And -- and do you know if that

17  assignment sheet was sent to you by Ms. Cook or

18  Ms. Johnson?

19  A  I don't specifically know whether that

20  document was sent to me.

21  Q  Okay.  All right.  So, back to the first page,

22  it says:  On or about 4/6/18, Ms. Johnson, HSA, received

23  a verbal report that Ms. Harrell had sent information

24  from her work e-mail to her personal e-mail.

25  Do you know who would have made that verbal

Page 32

1  report to Ms. Johnson?

2  A  I do not.

3  Q  Did you ask Ms. Johnson who had made that

4  verbal report to her?

5  A  I don't know if I did or not.  I probably did.

6  Q  Okay.  And did you do anything to

7  independently investigate the allegation that

8  Ms. Harrell violated the public-records-request

9  procedure, 102.008, or the user-security-for-

10  information-systems procedure, 206.007?

11  A  I -- I'm sorry.  Can you rephrase the

12  question?

13  Q  Did you do anything to independently

14  investigate whether what's alleged -- what Ms. Harrell

15  is alleged to have done actually constituted a violation

16  of Procedure 102.008, public-records request, or

17  Procedure 206.007, user security for information

18  systems?

19  A  I can't tell you exactly what I did.  I do

20  believe that I spoke to Ms. Douin about this.  When it

21  comes to policies that are relative to the Department of

22  Corrections, I do rely on the regional director's

23  expertise.

24  I probably reviewed the policy specifically,

25  but I can't say that with a hundred-percent certainty.

Page 33

1  Q  And so, you don't know for sure if you would

2  have looked at those two procedures?

3  A  I more than likely did.

4  Q  Okay.  Can you --

5  A  But I can't say that with a hundred-percent

6  certainty.

7  Q  And can you -- can you point to any provision

8  within Procedure 102.008, the public-records-request

9  procedure, that Ms. Harrell would have violated?

10  A  I would need to see the actual policy.  The

11  last time I looked at it was probably back in 2018.  So,

12  it was a long time ago.

13  Q  Okay.  And as it relates to the Procedure

14  206.007, user security for information systems, can you

15  point to any specific provision of that procedure that

16  Ms. Harrell would have violated?

17  A  If I could see it, I might be able to, but

18  without looking at it, no.  I don't have those

19  memorized.

20  Q  And if there was a particular provision that

21  Ms. Harrell, in your -- in your belief, violated, is

22  that something that you would have made sure to put in

23  this involuntary-termination report?

24  MS. PAGE:  Form.

25  A  Not necessarily.  Knowing that she violated

Page 34

1  the specific procedures, I don't need to put all of the
2  specific sections, necessarily.  So, no, not
3  necessarily.  There wouldn't be anything more specific
4  than listing what procedures she violated.
5      Sometimes it might be, if it's a super-lengthy
6  one or if it's a very specific piece of it.  So, no, not
7  necessarily.
8      Q   So, you said knowing that she violated those
9  procedures -- what evidence do you -- are you aware of
10 that Ms. Harrell violated these procedures?
11     A   The evidence that I received was the listing
12 of the e-mails that she sent from her home and the
13 summary of what those contained.
14     (Exhibit No. 11 marked for identification.)
15 BY MR. FINNERTY:
16     Q   Okay.  And those e-mails are Exhibit 11.  If
17 you could, take a look at that.
18     A   I'm sorry.  I'm having a hard time hearing you
19 when you turn away from your screen.
20     Q   I'm sorry.  It should be right here on my --
21     A   Yes.
22     Q   -- my headphones, but -- so, Exhibit 11 is up
23 on the screen now.
24     Can you tell me -- there's 19 different -- or
25 there's a summary, I guess, of 19 e-mails that

Page 35

1  Ms. Harrell was alleged to have sent from her work
2  e-mail to her private e-mail.
3      From that list of 19 e-mails, can you tell me
4  which ones you believe would have violated the -- the
5  public-records procedure, 102.008?
6      MS. PAGE:  Form.
7      A   Looking through the list, probably No. 10.  It
8  contained incident reports that likely contained
9  confidential information.
10     No. 19 references an incident report; again,
11 very likely had confidential information that, had she
12 gone through the public-records request, would have had
13 those confidential pieces of information redacted.
14     Q   And is it your understanding that Ms. Harrell
15 actually drafted those incident reports that are
16 referenced in No. 10 and No. 19?
17     A   I don't know specifically which infor- --
18 which incident reports those are.  So, I couldn't tell
19 you that.  And it wouldn't matter whether she was the
20 one who initiated them or not.  That information -- the
21 information on the incident reports was business-
22 related.  It was information to be used for business
23 purposes, not for her personal purposes.
24     Also, it is a violation of our company policy
25 to utilize our company equipment for -- for personal

Page 36

1  reasons.  So, sending those e-mails would be a violation
2  of that policy as well.
3      Q   Okay.
4      A   No. 12, even -- pill-window incident with T.
5  Johnson's response -- I'm not sure what was in that, but
6  it sounds like a specific incident that may have
7  contained confidential information.
8      Q   Were you provided with any copies of these 19
9  e-mails that are referenced in this document?
10     A   Actually, I don't believe that I was given
11 detailed copies of them.  I'm -- I don't recall
12 specifically.  Some of them I may have seen; some of
13 them I may not have.
14     Q   Wouldn't you have wanted to see the -- the
15 e-mails?
16     A   If it contained an incident report, it would
17 have contained potential confidential information.  And
18 the incident-report label, alone, certainly would give
19 me concern for what was sent.
20     Q   Do you know who prepared this list of 19
21 e-mails?
22     A   I'm not a hundred-percent sure who that was,
23 no.
24     (Exhibit No. 19 marked for identification.)
25     ///

Page 37

1  BY MR. FINNERTY:
2      Q   So, as it relates to the -- to Exhibits 10 and
3  19, that reference the incident reports -- do you know
4  whether those incident reports, prior to Ms. Harrell
5  e-mailing them -- do you -- do you know whether she had
6  submitted those incident reports yet?
7      A   Without seeing what those incidents reports
8  were right now, I couldn't answer that question.
9      Q   And would you agree, if they were just drafts
10 that she had not yet submitted to anyone, that they
11 couldn't constitute a public record?
12     MS. PAGE:  Form.
13     A   If they were drafts that contained strictly
14 work-related information, they still should not have
15 been sent to her home e-mail address.
16     Q   That -- my question was a little different.
17 How can they be a public-records violation if she had
18 not yet submitted those documents?
19     A   If it was part of her work product, I would
20 believe it could potentially still be considered public
21 information.
22     Q   And do you know whether she even used her work
23 computer to draft those incident reports?
24     A   I would assume she did, but, of course, I
25 would not know a hundred percent for sure.  Especially

Page 38

1  since she was sending them from her work computer to her
2  home --
3     **Q**   And --
4     A   -- the assumption would be that she -- that's
5  where they came from.
6     **Q**   But you're also assuming that that actually
7  **happened, correct; that she actually sent these e-mails**
8  **from her work computer to her private computer?**
9     A   Well, she sent them from her work e-mail to
10  her private e-mail.
11     **Q**   But how do you know that if you haven't seen
12  **the actual e-mails?**
13     A   Because the people who did the research -- and
14  I can't -- I can't see her personal e-mail account, her
15  work e-mail account, but the people who can would have
16  seen them.
17     **Q**   So, is it fair to say you were relying on
18  **Ms. Johnson or Ms. Cook that this -- what is being**
19  **described in the -- in this involuntary-termination**
20  **report was accurate?**
21     A   I would have relied on a number of people. I
22  would have relied on Ms. Johnson, Ms. Cook. I would
23  have relied on information from Ms. Douin. And in the
24  case of the e-mails, I believe it was Louis Clark from
25  our IT department -- he's our IT -- I think his title is

Page 39

1  IT manager -- that he would have gathered this
2  information.
3     So, yes, I relied on information from other
4  people. I didn't make the final termination decision,
5  though.
6     **Q**   But you -- you approved the termination,
7  **correct?**
8     A   No, the approval of the termination is from
9  Vicki Love.
10     **Q**   But you would have done -- you would have made
11  **sure that you were okay with the termination before you**
12  **sent it up to Ms. Lynch and before Ms. Lynch sent it up**
13  **to Ms. Love, correct?**
14     A   Yes.
15     MS. PAGE: Form.
16     **Q**   Okay. And would you agree that the -- the
17  **public-records laws would only apply to the extent that**
18  **Ms. Harrell was preparing these records as a result of**
19  **her employment with a public agency or an independent**
20  **contractor of a public agency?**
21     MS. PAGE: Form.
22     A   Again, I would need to -- I would need to
23  review the policy to be able to answer that question. I
24  don't have that policy to review.
25     **Q**   Okay. And then, based on this list of 19

Page 40

1  **e-mails, can you point to any of them that would have**
2  **contained information that Ms. Harrell would have had to**
3  **have gotten from DOC's information systems?**
4     A   I don't work with the DOC information systems,
5  so I don't feel comfortable that I can answer that
6  question.
7     **Q**   Okay. So, would it be fair to say that you
8  **don't have any independent evidence that Ms. Harrell**
9  **violated either the public-records procedure or the**
10  **user-security-for-information-systems procedure?**
11     MS. PAGE: Form.
12     A   Without reviewing those policies, I can't
13  answer that question.
14     **Q**   But I -- but you would have relied on what was
15  **reported to you by others as opposed to your independent**
16  **investigation as to the -- the e-mail issue.**
17     A   The inv-- investigation would have included
18  information from a number of different sources.
19     **Q**   And who -- who would have done that
20  **investigation?**
21     A   I would have coordinated the investigation
22  and, again, requested information from a number of
23  different people. In this case, probably Lori Cook,
24  Tara Johnson, Kathi Douin and also, in this case, from
25  Louis Clark.

Page 41

1     **Q**   And I -- I'm sorry to keep -- keep -- I want
2  **to move on, but just to ask it one more time, do you**
3  **have any independent knowledge of any violation by**
4  **Ms. Harrell of those two procedures, public-records,**
5  **user-security-information --**
6     A   I'm -- I'm sorry. There was a noise that went
7  over you. I couldn't understand what you said.
8     **Q**   Do you have any personal knowledge or evidence
9  **that Ms. Harrell violated any of these procedures?**
10     MS. PAGE: Form.
11     A   Me, personally, all the information I have
12  came from others.
13     **Q**   Okay.
14     A   So, the answer to that is no.
15     **Q**   Okay. Fair enough.
16     And -- and, again, you didn't ask who made
17  that verbal report.
18     MS. PAGE: Form.
19     A   I -- I didn't hear that.
20     **Q**   I've already asked that. That's -- that's
21  fine.
22     **So, did you do an independent investigation to**
23  **determine whether Ms. Harrell violated any policies as**
24  **relates to the narcotic counting on 4/14/18?**
25     A   I investigated that by getting information

Page 42

1  from the people at the site who were directly involved.

2      Q   Do you know when this -- when the alleged

3  incident of 4/14 was discovered?

4      A   I do not.

5      Q   Do you know why there was a -- a six-day gap

6  between when this alleged incident happened on

7  4/14/18 and 4/20, when you would have prepared the

8  involuntary-termination report?

9          MS. PAGE:  Form.

10     A   I may have -- I may have known that at the

11  time, but two and a half years later, I don't know

12  exactly what precipitated the delay.

13     Q   And do you know who allegedly discovered the

14  incident that happened on 4/14/18?

15     A   At this point in time, no, I do not.

16     Q   And do you have any -- any reason to dispute

17  the statement on the second page of your -- of this

18  report that we just went over that Ms. Cook reported to

19  Ms. Johnson that it was Ms. Harrell's duty to count

20  narcotics?

21         MS. PAGE:  Form.

22     A   I have no reason to dispute that, no.

23     Q   Okay.  As it relates to your statement about

24  the -- the prior counseling for the inappropriate

25  contact with an inmate, is that -- is that based on the

Page 43

1  final-warning counseling that Ms. Harrell received?

2      A   The final warning was the result of her

3  actions, if I'm understanding you correctly.

4      Q   Well, I mean, I guess my question was just

5  where did you get the information that Ms. Harrell had

6  inappropriate contacts with an inmate?

7      A   That information, I believe, came from Tara

8  Johnson after she reviewed video footage while

9  investigating one of Ms. Harrell's complaints.

10     Q   And did you ever actually see the video

11  footage that Ms. Harrell reviewed -- or that -- sorry --

12  Ms. Johnson reviewed?

13     A   No.  I almost never am able to see video from

14  the prison sites.

15     Q   The -- would you have requested to see the

16  video?

17         MS. PAGE:  Form.

18     A   I have not done so, no.

19     Q   Do you know whether a copy of the footage that

20  Ms. Johnson reviewed was burned to a disc or -- or saved

21  in any manner?

22     A   Not that I'm aware of.

23         (Exhibit No. 8 marked for identification.)

24  BY MR. FINNERTY:

25     Q   Okay.  All right.  So, looking at Exhibit 8,

Page 44

1  which is the -- the termination counseling -- and so,

2  there's no date at the top of this form, but if you look

3  down to the third page, it looks like it was signed on

4  April 26th, 2018.

5          Would -- would you agree that, based on the --

6  the date that this was signed, that -- that 4/26 was the

7  date that Ms. Harrell was actually terminated?

8      A   It -- yes.

9      Q   Okay.  So, when this termination-counseling

10  form would have been sent to you, it would not have --

11  yet have been provided or presented to Ms. Harrell,

12  right?

13     A   I'm not sure what -- I wouldn't have received

14  it until after -- I wouldn't have received the signed

15  version until after it was signed.  The version without

16  signatures is something that probably would have gone

17  back and forth for a day or two before the termination

18  was submitted for approval.

19     Q   Sure.  And -- and I'm -- I'm definitely not --

20  not trying to trip you up at all.  And I think the --

21  the explan- -- the reasonable explanation as to why

22  there's no date on the first page is that it wasn't

23  presented to Ms. Harrell until after it was sent to you

24  and then went up your chain, got approved.  After

25  approval, it was, then, given to Ms. Harrell; is that a

Page 45

1  fair assumption?

2      A   Yes.

3      Q   Okay.  So, in this termination-counseling

4  form -- are you required to -- to approve a termination-

5  counseling form before it's presented to an employee?

6      A   Well, terminations all have to be approved all

7  the way up to the program director, in that case, Vicki

8  Love.

9      Q   Okay.  So, in the -- the bottom paragraph on

10  the first page of the termination counseling, it says:

11  On 4/9/18, when Ms. Cook met with Ms. Harrell --

12  Ms. Johnson and Ms. Cook met with Ms. Harrell to deliver

13  the final warning, that she was presented with a -- the

14  list of e-mails.  Do you see that?

15     A   Yes.

16     Q   Do you know why the e-mail issue was not

17  included in Ms. Harrell's final warning if she, in fact,

18  was presented that -- that list of e-mails and -- and

19  was -- was asked questions about it?

20     A   If -- if I recall correctly, the final warning

21  was ready to be presented at the time that we got the

22  list of e-mails.  And we would have wanted to give her a

23  chance to give us a response and an explanation as to

24  what happened and why those e-mails would have been

25  sent.

Page 46

1    So, it wasn't included in here because that
2    information would have come in after the final warning
3    was already prepared.  And we didn't have a chance to
4    get her account as to why she would have been sending
5    those e-mails to herself.
6    Q   Okay.  So, just to make sure I -- I'm
7    following you, the e-mail issue was not in the final
8    warning dated 4/9/18 because you wanted Ms. Harrell's
9    response to the e-mail issue.
10   A   Yes, that's correct.
11   Q   Okay.  So, then, as it relates to the -- the
12   allegation about Ms. Harrell being late to work -- do
13   you know why that was not addressed in the final warning
14   of 4/9/18?
15   A   I don't re-- I don't know.  It could have
16   been that they did an attendance search sometime in
17   between when the final warning was presented and the
18   termination was presented and the tardiness came up
19   then.
20   Q   Okay.  So, would you agree that the main
21   reason that Ms. Harrell was terminated on April 26th,
22   2018, was because of the narcotic-accounting allegation?
23       MS. PAGE:  Form.
24   A   Her termination was for everything listed in
25   the document.  It was for time and attendance, it was

Page 47

1    for the narcotic keys, and it was for the -- the e-mails
2    as well.
3    Q   Would you agree, though, that if -- that
4    Ms. Harrell would not been terminated when she was, if
5    it weren't for the narcotic issue?
6    A   No, I wouldn't agree with that.
7       (Exhibit No. 12 marked for identification.)
8    BY MR. FINNERTY:
9    Q   Okay.  So, take a look at Exhibit 12.  Okay.
10   So, this is a shift-assignment sheet for Northwest
11   Florida Reception Center.  And we just went over the
12   allegations in the termination counseling and the
13   involuntary-termination report that stated that
14   Ms. Harrell was assigned to the pill room and that
15   the -- according to the assignment sheets, she was
16   required to count narcotics.
17       Do you know why the description for pill room,
18   which is right in the middle of this sheet, makes no
19   reference to narcotics?
20   A   I -- this is not a document that I'm familiar
21   with, so I can't answer that question.
22   Q   Well -- and it's -- I guess it's not a
23   document that you reviewed prior to preparing the
24   termination report, correct?
25   A   Correct.

Page 48

1    Q   And I just -- I guess, you know, why wouldn't
2    you want to see, you know, if -- if the involuntary-
3    termination report is saying, according to the
4    assignment sheet, she was supposed to count narcotics --
5    why wouldn't you say, well, show me the assignment
6    sheet?
7       MS. PAGE:  Form.
8    A   Because there are other assignments besides
9    what's listed on this assignment sheet.  If you look at
10   this, it's very, very minimal descriptions.  You can't
11   give the full description of any position in a couple of
12   sentences.
13   Q   Well, let me break that down.  First you said
14   that you're not familiar with this sheet.  So, how can
15   you say that there's other things that they may -- are
16   supposed to do that aren't included?  I mean, how can
17   you make that statement?
18   A   Because, as I'm looking at this document, I --
19   I recognize that you cannot describe any position in a
20   matter of a couple of sent-- of sentences.  These may
21   be some general duties and I -- again, I'm just looking
22   at this and saying these are some -- I would say those
23   are some general duties, and there's always the all
24   other duties as assigned.
25       So, I mean, I can't say a hundred percent that

Page 49

1    this is a complete description of everything that would
2    be done.  That would be like trying to describe my job
3    in one or two sentences, and all I can do is give a
4    summary of what it is, but there are a lot of individual
5    duties that you're not going to able to list in just a
6    sentence or two.
7    Q   Okay.  Assuming that that's correct, that
8    still doesn't explain, does it, ma'am, the statement on
9    Page 2 of the involuntary-termination report that says
10   she was assigned to the pill room, and the assignment
11   sheet indicated she was to conduct a shift count for
12   narcotics.  That's simply not true, is it?
13   A   It depends on how you read that.  I could read
14   that to say she was assigned to the pill room, per the
15   assignment sheet, and one of the duties of the pill room
16   is to count narcotics.  It doesn't necessarily mean that
17   that duty is spelled out on the assignment sheet.  It
18   depends on how you read that document.  I could read it
19   either way.
20   Q   Well, the -- the involuntary-termination
21   report says that the assignment sheet indicated she was
22   to conduct a shift count, but it -- the assignment sheet
23   for the pill room does not say that.  I mean, I --
24   that's something you can agree with, right?
25       MS. PAGE:  Form.

Page 50

1  A   Well, I -- I can agree that this particular
2  sheet that you're looking at that does not state that.
3  Q   Okay.  But -- so, if you look up, like, a
4  quarter of the way down from the top of this assignment
5  sheet under -- for infirmary nurse, the first thing
6  after infirmary nurse is count narcotics.  We can agree
7  that that's clearly spelled out, right, ma'am?
8  A   On this sheet, yes, it is.
9  Q   Okay.  And then for the evening-shift
10 infirmary nurse, third line down, again, it says count
11 narcotics, correct?
12 A   Yes.
13 Q   So, if -- then one more time, under night
14 shift for RN, it says count narcotics.  Do you see that?
15 A   Yes.
16 Q   So, clearly, if you can -- if it can be
17 specified for other assignments that could have been
18 specified under pill room and it's not just because you
19 can't possibly include all the assignments on a sheet --
20 I mean, clearly, it could have said "count narcotics"
21 out beside pill room, right?
22 MS. PAGE:  Form.
23 A   It could, if that was a standard piece of the
24 duties, I suppose.
25 Q   Okay.  And is it -- is it fair to say that you

Page 51

1  just relied on what Ms. Cook and Ms. Johnson told you
2  about what the assignment sheet said for 4/14/18?
3  A   Yes.
4     (Exhibit No. 9 marked for identification.)
5  BY MR. FINNERTY:
6  Q   Okay.  All right.  Look at Exhibit 9, the
7  final warning.  As part of your duties as the HR
8  business partner, are you required to review and approve
9  final-warning counseling before it's issued to an
10 employee?
11 A   Yes.
12 Q   Okay.  And would you have done that in this
13 case?
14 A   Yes.
15 Q   Okay.  So, the issue of -- or the allegation
16 in this final warning is that -- and I'm going to
17 paraphrase, but essentially Ms. Johnson reviewed some
18 camera footage and she felt that Ms. Harrell violated
19 the inmate-relations paragraph of Chapter 33-208.002; is
20 that accurate?
21 A   Yes.
22 Q   Did you -- during your review and approval of
23 the final warning, did you take a look at
24 Chapter 33-208.002?
25 A   Possibly.  Probably.

Page 52

1  Q   That -- that's something you would want to do
2  in reviewing and approving a counseling form, right?
3  A   Yes.
4     (Exhibit No. 16 marked for identification.)
5  BY MR. FINNERTY:
6  Q   Okay.  And take a look at that actual -- the
7  33-208.2 -- .002, which is Exhibit 16.  Take a look at
8  that.  And in Paragraph 26 -- which states:  Employee
9  shall maintain a professional relationship with all
10 persons in the custody or under supervision of the
11 Department and their immediate family or visitors.  No
12 personal or business relationships are permitted.
13 Marriage between employees and inmates not permitted.
14    So, could you explain to me how what's
15 described in the counseling, the final warning,
16 constituted a violation of Paragraph 26 of this rule?
17 A   The fact that she spent several minutes in
18 discussion with an inmate would be indication that there
19 was more than him emptying the trash in her office, and
20 that would be indicative of some kind of a personal
21 relationship.
22 Q   So, you're saying talking to an inmate
23 constitutes a personal relationship?
24 A   Potentially, yes.
25 Q   Potentially --

Page 53

1  A   She doesn't --
2  Q   -- but --
3  A   She doesn't supervise the inmate.  If he's
4  coming in there to get her trash, it's seconds.  Pick up
5  the trash, bring it back with a new liner, and leave.
6  There's no need for them to have any kind of discussion
7  of even a few minutes.
8  Q   Do you know whether anyone else received
9  counseling for an inmate emptying their trash on
10 3/28/18?
11 A   I don't recall that specifically, no.
12 Q   And is it a -- is it your testimony that it
13 would -- it's a violation of policy for an employee to
14 speak to an inmate orderly?
15 A   It's not a violation to speak to them.  It's a
16 violation to speak to them in -- in a manner that would
17 indicate that there's more than a, here's-my-trash kind
18 of a discussion.  They don't have a need to have
19 discussions with inmates that last for minutes.  Seconds
20 yes; minutes, no.
21 Q   Okay.  So, based on this final warning, it
22 looks like when the inmate first came in, he was there
23 for 30 seconds.  And then when he returned with the
24 empty trash, he was there for another one minute.  So,
25 you're saying a minute and a half would indicate a

8/18/2020 Case 4:20-cv-00030-AW-MJF Julia E. Propst vs Warden of Northwest Flo... Inc. Document 37-4 Filed 10/14/20 Page 15 of 58

Deposition of Sarah Brus - Volume 1                18-CA-77                    15 (54 - 57)

Page 54

1  personal relationship?
2      A   Potentially, yes.
3      Q   Okay.  But when you say potentially, you don't
4  know for sure that Ms. Harrell had a personal
5  relationship with an inmate, right?
6          MS. PAGE:  Form.
7      A   There was -- the time that she spent speaking
8  to the inmate would be indicative of a -- a potential
9  personal relationship with an inmate.
10     Q   Okay.  May -- indicative of a potential
11 personal relationship, but you don't have any evidence
12 to support that Ms. Harrell, in fact, was having a
13 personal relationship with an inmate, correct?
14     A   I believe that there was enough indication, in
15 the amount of time she spent speaking to the inmate,
16 that would be indicative that she was having a personal
17 discussion with an inmate.  In -- any other discussion
18 about taking out of the trash would be seconds, not in
19 the minute and a half.
20     Q   But a personal discussion isn't the same as a
21 personal relationship.  Can you agree with that?
22     A   No.
23     Q   You don't agree with that?
24     A   No, I don't agree with that.  You don't
25 generally have personal discussions with people that

Page 55

1  you -- that you don't have some type of a personal
2  relationship with.
3      Q   But you don't even know that it was a personal
4  discussion, do you, ma'am?
5      A   There's no video on the call.  So, no, I
6  couldn't say exactly what was discussed, but I can't
7  think of a single thing that she would have needed to
8  discuss with an inmate that would take more than a few
9  seconds.
10         The inmates do not report to Ms. Harrell.  The
11 inmates were not supposed to have any sort of discussion
12 with them other than, you know, hello, thank you.
13     Q   Okay.  And you didn't review the video, right?
14     A   Correct.
15     Q   And do you know if the video has audio?
16     A   I don't think so.  The vast majority of the
17 videos do not have audio, that we see.  Or, a lot of
18 times, when they do have audio, it's difficult to
19 understand, but I was not aware of any video on this
20 particular footage that was seen.
21     Q   Okay.  And do you know whether -- so, you --
22 you indicated earlier that the reason that the e-mail
23 incident was not included in this final warning --
24 because Ms. Harrell not yet had a chance -- or to
25 provide an explanation; is that right?

Page 56

1      A   Correct.
2      Q   Was Ms. Harrell given a chance to explain what
3  she may have been talking to the inmate about before she
4  was issued this final warning?
5      A   I don't recall.
6          MS. PAGE:  Can we take a quick --
7      Q   And --
8          MS. PAGE:  I'm sorry.  Can I take two minutes
9  real quick?  I have someone at my door.
10         MR. FINNERTY:  Sure.
11         (Discussion off the record.)
12         (Brief recess.)
13 BY MR. FINNERTY:
14     Q   So, we were talking about the -- the final
15 warning and the violation for -- the alleged violation
16 for Ms. Harrell appearing to speak with an inmate on --
17 on camera.
18         So, the final warning indicates that this
19 alleged incident happened on March 28th, 2018.  Do you
20 know why Ms. Harrell wasn't presented this final warning
21 until 12 days later on April 9th, 2018?
22     A   Actually, I believe it was because it wasn't
23 discovered right away.  The -- the video was discovered
24 when they were investigating one of Ms. Harrell's other
25 complaints.  They were looking for video of someone else

Page 57

1  and this just happened to -- to pop in there.
2          So, I believe that was the reason for the
3  delay.  They weren't, you know, looking for it at that
4  time; they were responding to a complaint of
5  Ms. Harrell's.
6      Q   Okay.  And we'll -- we'll look at a document
7  later that shows that Ms. Johnson actually reviewed that
8  document on Ap-- April 2nd.  So, do you know why there
9  would have been the seven-day delay between the video
10 being viewed on April 2nd and the final warning being
11 issued on April 9th?
12         MS. PAGE:  Form.
13     A   Well, I would need to look at a calendar to
14 know if there was a weekend in the middle of there.
15 Could have been that somebody that needed to be involved
16 in the discussion about what we were going to do after
17 seeing the video, you know, needed to be available and
18 they weren't.  There's any number of reasons why there
19 would be a delay.
20     Q   Okay.  Well, would you agree that, if it were
21 a serious concern, that this would be immediately
22 addressed?
23     A   No.
24         MS. PAGE:  Form.
25     Q   Okay.  And -- well, would you agree that, as

Page 58

1  of April 9th, 2018, if there was a serious concern with
2  Ms. Harrell continuing to work -- I think you -- you
3  testified earlier that her termination would have been
4  warranted as of April 9th.
5       Do you know why she continued to work from
6  April 9th all the way through April 26th?
7       A   Can -- I'm sorry.  Can you rephrase?  That's a
8  very long question.
9       Q   So, you -- you testified earlier that you felt
10  that Ms. Harrell could have been terminated for issues
11  unrelated to the narcotic-counting issue on -- on
12  April 14th.  You -- you recall that?
13      A   Yes.
14      Q   So, do you know why -- if that's the case, why
15  Ms. Harrell continued to work between April 9th, the
16  date of this counseling, and April 26th, when she was
17  finally terminated?
18      A   Because we hadn't made a decision that
19  termination was -- was the right answer because we
20  hadn't gotten her response yet on the e-mails.  We were
21  investigating and we were looking into things further
22  before we made that decision.
23          Termination is a big decision.  We don't take
24  it lightly.  We particularly wouldn't have taken it
25  lightly in Ms. Harrell's case because she had declared

Page 59

1  herself to be a whistleblower.  So, we would have taken
2  a lot of time to investigate and examine the information
3  before making that decision.  It was not taken lightly.
4       Q   So, you -- you said Ms. Harrell declared
5  herself a whistleblower.  Is there a particular document
6  that you're -- you're thinking of when you say that she
7  declared herself a whistleblower?
8       A   I can't think of a specific document, but I do
9  believe that she had used that terminology at some
10  point, yes.
11      Q   Did you ever grant Ms. Harrell a whistleblower
12  status?
13      A   Officially, I don't believe so.
14      Q   Okay.  So, as it relates to what you were --
15  were testifying about earlier, about the potential for
16  there being a personal relationship based on the --
17  Ms. Harrell being seen on video, apparently, speaking
18  with an inmate, would you agree that that wouldn't
19  constitute -- you know, assu-- even assuming the worst
20  as to what was seen on that video, how could that
21  constitute inappropriate contact with an inmate?
22          MS. PAGE:  Form.
23      A   The -- the inappropriate contact with the
24  inmate would have to do with -- as I understand it, the
25  inmate was between her and the door.  And he was the one

Page 60

1  who would have had control over that door.  And that's
2  actually a pretty serious safety concern.
3       Q   What could Ms. Harrell have done to keep that
4  inmate from walking in her office?
5       A   Well, she certainly --
6          MS. PAGE:  Form.
7       A   -- could have told him not to walk into the
8  office.  She would have had a body alarm if she felt
9  uncomfortable, she could pull the body alarm.  She
10  certainly could have, you know, tried to step out of the
11  office.  She could have called for a security officer.
12  There's a number of things, I believe, she could have
13  done.
14      Q   Okay.  But do you have any way of knowing
15  whether she did any of those things?
16      A   I do not.
17      Q   And how do you know Ms. Harrell didn't tell
18  the inmate not to come in her office and he came in
19  anyway?
20      A   I do not know that.  You -- you've asked for
21  examples of what she could have done, and I gave you
22  examples.  I'm not saying that she didn't do those
23  things, but she could have done those things.
24      Q   Okay.  So, just to kind of --
25      A   Again, if she felt -- you know, she does carry

Page 61

1  a personal body alarm that she could pull.
2       Q   Okay.  All right.  So --
3       A   Also, if I remember correctly, at some point,
4  he walked towards her desk.  She could have gotten up
5  and left the office at that point.
6       Q   Is -- was there two doors to her office?
7       A   I don't know.  I've never seen her specific
8  office.
9       Q   Okay.  All right.  So, just to kind of wrap up
10  this -- the inmate-relations allegation, you agree you
11  don't have any evidence to suggest that she actually was
12  having a personal conversation with this e- -- inmate.
13          MS. PAGE:  Form.  Form.
14      A   The evidence would be, in the amount of time
15  that she went in speaking to the inmate, that it would
16  have needed to have been a personal discussion.  There
17  is no business reason for to have had that lengthy
18  of a discussion with him.
19      Q   But that's an assumption there, right, ma'am?
20          MS. PAGE:  Form.
21      A   There -- you know, I can't think of a single
22  business reason why she would need to just -- to have
23  that lengthy of a discussion with an inmate.
24      Q   Okay.  So, you -- you stated a couple of times
25  that the reason Ms. Johnson reviewed the camera footage

8/18/2020 Case 4:20-cv-00030-AW-MJF Maria E. Harrell v. Whole Foods 37-4... [Corrections] Inc. Et Al.... Filed 10/14/20 Page 17 of 58

Deposition of Sarah Brus - Volume 1      18-CA-77      17 (62 - 65)

Page 62

1  on -- on March -- or in relation to what happened on
2  March 28th is because Ms. Harrell had complained about
3  other employees; is that right?
4       A   Correct.
5       Q   I mean, did that cause you some concern that,
6  you know, why is Ms. Johnson using Ms. Harrell's
7  complaint to look for something to write Ms. Harrell up
8  for?
9       MS. PAGE: Form.
10      A   I don't believe she was looking for something
11 to write Ms. Harrell up for. She stumbled across that
12 video no differently than if she had, you know, been
13 looking for the one particular employee and saw a
14 different employee, other than Ms. Harrell, with an
15 inmate in their office. She can't just ignore it just
16 because it's not what she was looking for.
17      Q   I mean, do you have any -- any evidence to
18 suggest that she just stumbled across this incident and
19 wasn't looking to try to find something on -- on
20 Ms. Harrell?
21      A   I'm not sure what --
22      Q   Or is that just another -- is that just
23 another assumption?
24      MS. PAGE: Form.
25      A   I'm not sure what evidence I could have had

Page 63

1  that she didn't just stumble across it. She didn't view
2  the video alone, though. She had a witness with her who
3  viewed the video with her.
4       Q   Did you ever ask Ms. Johnson, you know, how is
5  it that you came to discover what you felt was a
6  potential policy violation as it relates to Ms. Harrell?
7  Did you ever ask her that?
8       A   Yes --
9       Q   You did?
10      A   -- and she explained -- and she explained
11 that, as she was viewing the video, looking to find the
12 employee that Ms. Harrell had filed the complaint about,
13 she happened to notice an inmate walking into
14 Ms. Harrell's office. And so, she slowed down the video
15 and looked up at what she saw.
16      And I would expect she would have done that
17 regardless of what employee's office she saw an inmate
18 entering.
19      Q   Do you know whether she looked to see if that
20 inmate entered anyone else's office on that date?
21      A   I don't know if she did or not.
22      Q   Okay. And --
23      A   I would assume that, if she noticed it while
24 she was scanning the video, she would have stopped and
25 reviewed it for anybody else. Again, my understanding

Page 64

1  is it was purely accidental.
2       (Exhibit No. 42 marked for identification.)
3  BY MR. FINNERTY:
4       Q   Okay. Can you take a look at Exhibit 42.
5  Okay. If you look at the last two sentences of the
6  first paragraph of this e-mail that was sent on
7  April 9th, 2018, from Tara Johnson to you, Ms. Douin,
8  and Lori Cook -- and it says, you know: Ms. Harrell
9  stated, "I'm being accused of inmate relations." I
10 corrected Ms. Harrell and told her that nothing in the
11 counseling form stated that she was having a
12 relationship with an inmate, but instead, documented the
13 violation of policy and procedure.
14      You were copied on this e-mail. And I'm
15 assuming you would have read this, right, ma'am?
16      A   Yes.
17      Q   So, based on this statement from Ms. Johnson,
18 how is it that you could say, in your involuntary-
19 termination report, that Ms. Harrell was having
20 inappropriate contact? I mean, those -- that just
21 doesn't jive, does it?
22      MS. PAGE: Form.
23      A   The policy that was violated was in regard to
24 relationships with inmates. And I would look to the
25 policy that was stated as the violation as opposed to

Page 65

1  what was stated in this email.
2       Q   The policy prohibits personal relationships
3  between an inmate and an employee, correct?
4       A   Yes.
5       Q   We just went over that policy.
6       A   Yes.
7       Q   So, here's Ms. Johnson saying, I'm not
8  accusing you of having a relationship with an inmate --
9  I mean, just point-blank tells you.
10      So, how is what Ms. Harrell is alleged to have
11 done -- how does that violate policy, if Ms. Johnson is
12 telling you right here, point-blank, that's not what it
13 says, that's not what I'm accusing you of?
14      MS. PAGE: Form.
15      A   I don't -- I don't understand why Ms. Johnson
16 would have said exactly what she said here. I wasn't
17 there for that discussion. So, I really can't answer
18 what -- as to what she was thinking, but again, the
19 policy that was cited in the final warning was a policy
20 in regards to relationships with inmates.
21      And, again, the length of time that was spent
22 in discussion with that inmate would be indicative of
23 some sort of an inappropriate relationship with the
24 inmate and, again, the issue of the positive control of
25 the door -- of the inmate being in a position where he

Page 66

1  was in control of the door.

2      Q   And -- and I understand your -- your testimony

3  that there could have been a -- a security issue, but

4  that's not what she was written up for.

5      A   No, you're correct.

6      Q   She was written up for violating a policy that

7  prohibits relationships with an inmate.  And, you know,

8  you're -- how -- how could you approve this termination,

9  then talk about inappropriate conduct -- conduct with an

10  inmate when, right here, Ms. Johnson is saying, that's

11  not what I'm saying happened?  I mean, you would have --

12  you would have considered that, right?

13      MS. PAGE:  Form.

14      A   I considered everything that had to do -- that

15  was involved in the -- the reasons for the termination.

16  So, yes, that was considered and, again, the policy that

17  was cited is a little bit different than what

18  Ms. Johnson stated in that particular moment.  That

19  doesn't necessarily mean that what she stated in that

20  moment with Ms. Harrell was a hundred percent correct.

21      Q   So, are you saying you -- you don't believe

22  what Ms. Harrell -- or what Ms. Johnson is saying in

23  this e-mail.

24      A   Well, I would say there's a little bit of a

25  contradiction because she cited a policy in regards to

Page 67

1  relationships with an inmate as the reason for the

2  warning, and then she states that it wasn't about

3  relationship with an inmate.  She does state that it's a

4  violation of policy and procedure, which is correct.

5      Q   Well, what policy and procedure would that be?

6      A   It's the same policy and procedure that we

7  discussed earlier.  There's also training that's

8  given -- and I'm not sure if there's a policy to it

9  because it's DOC training -- that does discuss not

10  allowing inmates to have -- to be in a position where

11  inmate has control over the door.

12      Q   Okay.  But the policy -- the inmate-relations

13  policy makes no reference to inmates having control of

14  the door, correct?

15      A   That particular policy does not, you're

16  correct.

17      Q   Okay.  All right.  So, a couple of lines up

18  from that statement we just went over, you see where

19  Ms. Harrell states that, you know, after she's read a --

20  the list of the e-mails that she's, apparently, sent to

21  herself, or allegedly sent to herself, Ms. Harrell

22  states:  This is not funny.  This is retaliation because

23  of all the incident reports I've filled out.

24      Retaliation is a serious complaint; would you

25  agree, ma'am?

Page 68

1      A   Yes.

2      Q   And surely you would have looked into

3  Ms. Harrell's complaint of retaliation at this time,

4  right?

5      MS. PAGE:  Form.

6      A   Well, Ms. Harrell didn't complain to me

7  officially about retaliation, but yes, I certainly would

8  have discussed with Ms. Douin concerns about her

9  statement that this was retaliation.

10      Also, because I was involved in, you know,

11  everything that went on here, I knew that this wasn't

12  being done to retaliate because of the reports she had

13  filed.  This was -- you know, the warning came because

14  of what was found while reviewing, you know, something

15  related to the reports she filed, but it wasn't

16  retaliation.

17      Q   How do you know that it wasn't -- that

18  Ms. Johnson didn't harbor some retaliatory animus

19  against Ms. Harrell?

20      MS. PAGE:  Form.

21      A   Based on discussions with her, based on

22  discussions with Ms. Douin, based upon, you know, the

23  knowledge that this wasn't some- -- she didn't review

24  that video alone, it's -- there -- I mean, there's a

25  number of factors that went into, you know, expecting

Page 69

1  that this was not retaliatory.

2      Q   Did you ever talk to Frank Zurica, the

3  individual that reviewed the footage with Ms. Harrell?

4      A   I don't -- I did not speak to him.  I

5  probably -- and I -- I can't say for sure.  It's two and

6  a half years ago -- probably requested a statement from

7  him.  We rarely are able to get statements from Florida

8  Department of Corrections' employees.  Rarely, if ever.

9      Q   Do you know -- why is that?

10      A   I presume it's a policy of the Department of

11  Corrections.

12      Q   Do you know whether the Department of

13  Corrections was notified of this incident where it's

14  alleged that an inmate was going into it -- an

15  employee's office without supervision?  Was that

16  reported to DOC?

17      A   I would not be privy to knowing what's

18  reported to DOC.  So, I can't say whether it was or

19  wasn't.

20      Q   Okay.  So, in the bottom paragraph on the

21  first page of Exhibit 42, four lines down, Ms. Harrell

22  again complains:  This is retaliation because of

23  incident reports I've submitted.

24      So, twice in here Ms. Johnson is reporting to

25  you and others that Ms. Harrell complained of

Page 70

1  retaliation.
2  A   She reported -- she complained to Tara.  She
3  did not report to me that she felt she was being
4  retaliated against.
5  Q   Well, wouldn't you still look into it,
6  nonetheless?
7  A   Again, as I was party to, you know, the final
8  warning, I was party to the termination, I saw no reason
9  to believe that there was retaliation as any component
10 of it.
11 Q   Okay.  Did you -- was there -- did you ever
12 have any concern that Ms. Cook, Lori Cook, may have
13 harbored retaliatory animus towards Ms. Harrell?
14 A   None that I'm aware of.  None that I can think
15 of.
16    (Exhibit No. 25 marked for identification.)
17 BY MR. FINNERTY:
18 Q   Okay.  Let's take a look at Exhibit 25.  Okay.
19 So, this is an e-mail from Tara Johnson dated
20 March 30th, 2018, that was sent to you, Ms. Douin, and
21 Ms. Barton.
22    So, if you look at the second paragraph, it
23 says that Ms. Johnson and Lori Cook instructed
24 Ms. Harrell that, if there are issues and you've got
25 evidence of a policy violation, that you need to submit

Page 71

1  an incident report or a statement.  Do you see that?
2  A   Yes.
3  Q   Okay.  And then it goes on to say that they --
4  Ms. Cook and Ms. Johnson are aware that there was an
5  issue with gossip at the main unit.  They were working
6  to put a -- a stop to it.
7     Do you know what they were referring to as it
8  relates to the gossip?
9  A   I do not.  That was not something I was a part
10 of.
11 Q   Okay.  So, then, the second-to-last sentence
12 of the second paragraph says:  Ms. Cook stepped out and
13 Ms. Harrell shut the door.  She proceeded to tell me she
14 did not feel comfortable speaking in front of Ms. Cook
15 and she felt Ms. Cook was out to get her.
16    So, again, did you feel there was any reason
17 for Ms. Cook to harbor retaliatory animus against
18 Ms. Harrell, especially in light of this e-mail that was
19 sent to you?
20    MS. PAGE:  Form.
21 A   I was not aware of any animus that Ms. Cook
22 had towards Ms. Harrell.
23 Q   But you were aware that Ms. Cook -- that
24 Ms. Harrell had -- had concerns that her supervisor,
25 Ms. Cook, was out to get her.  You were at least aware

Page 72

1  of that, right?
2  A   Based on this e-mail, yes.
3  Q   And that's something you would have certainly
4  considered prior to approving the termination of
5  Ms. Harrell, right?
6  A   I believe so, yes.
7  Q   Okay.  So, then there's a list of ten
8  different items that Ms. Harrell reported to Ms. Cook --
9  or to Ms. Johnson:  Complaining about Ms. West getting
10 overtime; Ms. McDaniel being really close with Ms. Cook
11 and getting away with anything she wants; McDaniel
12 leaving pills out.  She knows that Cook is having a
13 relationship with an inmate; that Keidre Long is having
14 an relationship with an inmate.
15    Again, a complaint about Ms. Cook saying that
16 she says nasty things about Ms. Harrell.  Ashley Cook is
17 in on the relationship that McDaniel and Long is having
18 the inmates.  Long stays off the clock so she can be
19 with an inmate in the medical-records unit.
20    Cook orders McDaniel to pull pills for another
21 staff member.  Cook doesn't want Harrell to attend
22 training.  And, lastly, that Ms. Cook had told Ms. West
23 to sign a narcotic log without counting.
24    These are all serious issues that Ms. Harrell
25 was -- is reporting; would you agree?

Page 73

1  A   Yes.
2     I'd like to make a correction for you on one
3  of these.  On No. 5, you stated that she accused
4  Ms. Cook of saying nasty things towards Ms. Harrell.
5  The writer of this document is Ms. Johnson.  And I
6  interpreted that to mean that she's accusing Ms. Cook of
7  saying nasty things towards Ms. Johnson -- why is she
8  coming over here, what does she want now -- which I
9  could perfectly well see somebody questioning why their
10 supervisor is coming over there, what do they want.
11    So, my -- I may have interpreted that
12 differently than how you have interpreted it or how
13 Ms. Harrell interpreted it, but my interpretation was
14 that the accusation was Ms. Cook saying things towards
15 Ms. Johnson.  So, I do want to correct that.
16    Some of these are more serious than others,
17 but yes, there are certainly some serious issues that
18 were, indeed, investigated.
19 Q   So -- so, you're saying that you're
20 interpreting this as Ms. Cook -- or Ms. Harrell being
21 concerned about what Ms. Cook might be saying to
22 Ms. Johnson?
23 A   I interpreted that as Ms. Harrell was telling
24 Ms. Johnson that Ms. Cook says nasty things about
25 Ms. Johnson.  That was how I interpreted that sentence

Page 74

1 because "me" would refer to the same person who wrote
2 the document.
3    Q  And you don't think Ms. Johnson was just
4 quoting what Ms. Harrell was saying?
5    A  It's possible, but again, I interpreted it
6 at -- as, you know, understanding Ms. Johnson and
7 understanding -- again, I interpreted it that the word
8 "me" referred to the person writing the document, not to
9 Ms. Harrell.
10    Q  Did you ever ask Ms. Johnson for clarification
11 on that?
12    A  I did not because, again, I interpreted it as
13 Ms. John- -- as her making comments that Ms. Cook said
14 nasty things towards Ms. Johnson.
15    Q  Okay.  Any dispute about No. 9, that
16 Ms. Harrell was talking about Ms. Cook not wanting
17 Ms. Harrell to attend training?
18    A  I -- I'm not -- is that a question?  I'm not
19 sure I understood what you're asking.
20    Q  As it relates to No. 9, there's no -- no
21 confusion there, right, that Ms. Cook is talking about
22 Ms. -- or Ms. Harrell was talking about Ms. Cook not
23 wanting Ms. Harrell to attend training?
24    A  Sure, because when Ms. Johnson writes "her,"
25 she's referring to Ms. Harrell.  Ms. Cook --

Page 75

1    Q  Okay.
2    A  -- did not want her, meaning Ms. Harrell, to
3 attend the ADA training at Holmes and did not tell her,
4 meaning Ms. Harrell, about it until the night before,
5 which actually would go to what I was saying.  Where she
6 uses the word "me" would have meant Ms. Johnson, the
7 writer of document.  When she refers to "her," she would
8 have referred to Ms. Harrell, the person who was
9 reporting these to her.
10    Q  Okay.  And in your interpretation of No. 5 --
11 that's -- you're interpreting it the way you are, even
12 though, right above, in the -- the paragraph, it says
13 that Ms. Harrell doesn't feel comfortable speaking in
14 front of Ms. Cook and she feels like Ms. Cook is out to
15 get her -- even though there's no confusion there,
16 right, that Harrell is talking about Ms. Cook being out
17 to get Harrell, and Harrell talking about Ms. Cook
18 making her uncomfortable?
19      MS. PAGE:  Form.
20    Q  No confusion there, right?
21      MS. PAGE:  Form.
22    A  I'm -- I agree with your statement on the
23 paragraph where she says she proceeded to tell me that
24 she, meaning Ms. Harrell, did not feel comfortable
25 speaking in front of Ms. Cook and felt that Ms. Cook,

Page 76

1 quote, "... is out to get her" -- "her," meaning
2 Ms. Harrell.  So, again, she's using the term "her" to
3 refer to Ms. Harrell, and I would assume that the -- in
4 No. 5, that the "me" referred to Ms. Johnson.
5      Another reason for that is I can't imagine
6 Ms. Cook making a statement that Ms. Harrell would hear,
7 why is she coming over here, what does she want now.
8 And if she is reporting those as -- as, you know,
9 something someone else was reporting to her, I would
10 have expected her to say so-and-so told me that Ms. Cook
11 has -- has, you know, asked these questions when she
12 sees me coming.
13      Again, my interpretation of that was that the
14 "me" was Ms. Johnson and the "her"s are Ms. Harrell.
15    Q  Okay.  All right.  So, then, after the list of
16 ten complaints from Ms. Harrell -- well, strike that.
17      After getting this e-mail from Ms. Johnson,
18 did you do anything to look into these ten issues that
19 are -- are being reported in this e-mail?
20    A  Yes, of course, I did.
21    Q  Okay.  And what -- what did you do to look
22 into this?
23    A  Well, I did different things based upon
24 different issues, but they were all looked into.  As a
25 matter of fact, we -- because we received incident

Page 77

1 reports and as that was part of the conversation
2 Ms. Johnson had with her, was that she needed to submit
3 incident reports or statements, when we got the incident
4 reports with more detail, then they were investigated.
5      So, for instance -- let's take the Keidre Long
6 one, the Keidre Long issue where she reported her having
7 a relationship with a medical orderly.  When she
8 submitted the incident report, it had enough detail so
9 that we requested that Tara review camera footage to see
10 if she could see, you know, what was going on in the
11 manner that Ms. Harrell reported it.  And in reviewing
12 the video footage was when she encountered that same
13 video footage of Ms. Harrell.
14      As far as No. 10, Ms. Cook told West to sign
15 the narcotic log without counting -- we received
16 statements from three different individuals.  We got a
17 statement from Ms. Harrell, we got a statement from
18 Ms. Cook, and we got a statement from Ms. West.
19      I also saw the signed narcotic log after
20 that -- with that one.  Let's see.  I'm trying to
21 remember what we did with all of these.  You know,
22 "McDaniel is up Ms. Cook's butt and gets away with
23 anything," is a pretty non-specific statement; not a
24 whole lot that we did with that.
25      "West gets overtime anytime she wants" -- I

Page 78

1  know that was something that she had complained about
2  more than once. So, certainly, we talked about that and
3  what the procedures were for getting approval to work
4  overtime. If Ms. West is requesting and gaining
5  approval to get overtime and others aren't requesting
6  overtime, they may not be getting overtime. So, that
7  was simply a discussion.
8       "Long off the clock in medical records" --
9  again, that was looking at camera review.
10      I don't recall what we did with all of these,
11 but I specifically recall No. 10 and I specifically
12 recall video footage being reviewed to look at Keidre
13 Long and possibly McDaniel as far as leaving the -- the
14 pill-room door open and things like that. So, I believe
15 those were video-footage reviews.
16  Q   Okay.
17  A   Actually -- I may have actually discussed
18 No. 5 with Ms. Cook.
19  Q   Okay. Do you know whether any of these ten
20 issues resulted in any counseling?
21  A   Off the top of my head, I don't recall.
22  Q   Okay. All right. So, in the -- the bottom
23 paragraph of this e-mail, Ms. Johnson says: I think I
24 have listed all the complaints she voiced -- "she" being
25 Harrell; can we agree on that?

Page 79

1  A   I'm sorry. Can you repeat that?
2  Q   Last paragraph, after the list of ten issues
3  Ms. Harrell reported, it says, "I think I have listed
4  all the complaints she voiced." Can we agree that "she"
5  would be Ms. Harrell?
6  A   Yes.
7  Q   Okay. And then it goes on to say: She,
8  Ms. Harrell, said she had already begun to write
9  incident reports and would send them to me today.
10      Again, that would be Ms. Harrell, correct?
11  A   Ms. Harrell writing the reports, sending them
12 to "me," being Ms. Johnson.
13      (Exhibit No. 21 marked for identification.)
14 BY MR. FINNERTY:
15  Q   Right. Okay.
16      All right. Let's take a look at Exhibit 21.
17 Okay. So, it starts with e-mails between Ms. Johnson
18 and Ms. Harrell regarding Ms. Harrell wanting to
19 request -- or wanting to review some camera footage.
20      And then if you go -- go down to the bottom,
21 the last page -- I apologize. Go to -- go to Page 5 of
22 this e-mail chain. Oh, let's see. If you scroll -- all
23 right. So, Page 5 -- at the very bottom of Page 5,
24 there's an e-mail sent from you to Ms. Johnson,
25 Ms. Douin, and Ms. Barton on April 2nd, 2018.

Page 80

1       And then you've got to look on the next page,
2  and it says, "With all these issues Ms. Harrell is
3  suddenly bringing up, is anybody else thinking she's on
4  a manhunt or is it just me?" Why would you say that?
5  A   If I'm recalling correctly, she had received
6  counseling shortly before she raised all of these
7  issues. And in my experience, sometimes people, after
8  they've received counseling, start looking to, I guess,
9  get other people counseled as well.
10      It just seemed odd. We don't usually get a
11 whole host of various complaints at one time in the
12 manner that she was submitting them. It was just odd.
13 And -- and my terminology probably could have been
14 better, but it definitely was odd to be getting so many
15 complaints from one person all at one time.
16  Q   So, the only prior counseling was a verbal
17 counseling in December of 2017 for being tardy three
18 times.
19  A   Okay.
20  Q   So, what -- what counseling are you talking
21 about?
22  A   Okay. Then I may be wrong about this coming
23 after her getting counseling.
24  Q   Okay.
25  A   Again, it just seemed odd that all of this

Page 81

1  information was coming at one time. It's not a common
2  thing for one employee to send incident report after
3  incident report after incident report. So, it just
4  seemed very strange that this was going on.
5  Q   Well, you had just -- we just went over
6  Exhibit 25, which was the e-mail from Tara Johnson where
7  she outlined all of the issues Ms. -- Ms. Harrell had
8  just reported to her. And she says she's already begun
9  writing incident reports and she will send them that
10 day.
11      So, you knew that she was doing this. So
12 why -- why were you surprised that she did exactly what
13 she was told to do?
14  A   At the moment that I started receiving those
15 incident reports, I probably did not connect that e-mail
16 to this.
17      Understand that I have multiple sites that I
18 work with and I get many, many, many e-mails every
19 single day. And I probably just didn't connect the two.
20 It just seemed odd to be getting all of those reports
21 all at one time.
22  Q   So, now being able to see and have your
23 recollection refreshed with Exhibit 25, there shouldn't
24 have been an issue with Ms. Harrell submitting these
25 reports. She was told to do it. She had already voiced

Page 82

1  the -- her concerns with -- with Ms. Johnson, and
2  Ms. Johnson told her to submit incident reports.
3       You were told by Ms. Johnson that they would
4  be submitted.  So, I mean, can you agree that that
5  should not have been a surprise?
6       MS. PAGE:  Form.
7    A   It would not have been a surprise had I
8  connected the e-mail from Tara to the reports that I was
9  receiving individually.  And, you know, clearly, I did
10 not connect those at that time.
11   Q   Okay.  And -- and you, as an HR business
12 partner -- part of your job duties is to protect and
13 prevent employees from being retaliated against,
14 correct?
15   A   Yes.
16   Q   So, I mean, do you agree that it was improper
17 for you, as the person who Ms. Harrell is relying on to
18 protect her, to be accusing her of being on a manhunt?
19   A   I have already stated that my language in here
20 was not certainly what it should have been.
21   Q   Okay.  Have you discussed this particular
22 e-mail with Ms. Lynch?
23   A   I have not.
24   Q   Okay.
25   A   Not -- I may have at the time, but I certainly

Page 83

1  have not recently.
2    Q   Okay.  So, then you scroll up to Ms. Harrell's
3  e-mail in response to your e-mail.  Ms. Harrell says --
4  it would be Page 4 of the document.  All right.  The
5  bottom of Page 4, Ms. Johnson's response to your e-mail,
6  she starts with, "Definitely thinking she's on a
7  manhunt."  So, she -- she took the bait from you, right?
8       MS. PAGE:  Form.
9    A   She responded to my comment, yes.
10   Q   Okay.  And then -- so, you -- you testified
11 earlier you had no reason to suspect that Ms. Harrell
12 had any harbored -- or that Ms. Johnson harbored any
13 animus against Ms. Harrell.  This is evidence, right?
14 She's agreeing with you that she thinks Ms. Harrell is
15 on a manhunt.  That's evidence, right?
16       MS. PAGE:  Form.
17   A   It's evidence that she responded to my comment
18 and it's evidence that she also felt that it was unusual
19 to be receiving these -- this whole host of complaints;
20 the same as I thought it was unusual to receive a whole
21 host of things all at one time.
22   Q   I mean, unusual is a little different than --
23 than accusing someone of being on a manhunt.  You can
24 agree with that, right?
25       MS. PAGE:  Form.

Page 84

1    A   Yeah, and my choice of words was not the best.
2    Q   I mean, would you have preferred Ms. Harrell
3  to -- to just ignore her concerns that her co-workers
4  were sleeping with inmates?  I mean, she --
5    A   Of course not.
6    Q   That's something she -- she should report
7  that, right?
8    A   Of course.
9    Q   And I mean, the -- don't you have concern with
10 the effect that statements like that could have on an
11 employee coming forward?  I mean, if an employee is
12 going to be accused of being on a manhunt, who's ever
13 going to complain?
14       MS. PAGE:  Form.
15   A   Again, sir, I've already stated that it was
16 not an appropriate comment.
17   Q   Okay.  So, second paragraph, Ms. Johnson says
18 that -- second sentence, second paragraph, that she and
19 Frank Zurica looked at all the dates and times from the
20 incident reports sent by Ms. Harrell on Friday as well
21 as the corrected versions sent this morning.
22       So, there's no dispute, right, ma'am, that the
23 only reason Ms. Johnson was looking at video footage was
24 to investigate Ms. Harrell's complaints?
25   A   Correct.

Page 85

1    Q   Okay.  All right.  Then Ms. Johnson goes
2  through the things that she did and did not see on the
3  footage.  And that was sent to -- to you and Ms. Douin
4  and Ms. Barton.
5       Do you know whether you had reviewed -- well,
6  I'm assuming you had seen Ms. Harrell's -- by this time,
7  you had seen the incident reports submitted by
8  Ms. Harrell?
9    A   Yes.
10   Q   Okay.  So, a little bit up from Ms. Johnson's
11 e-mail --
12   A   Can -- can you enlarge the document?  I can't
13 see it and I can't get to my own version anymore, with
14 you --
15   Q   Okay.
16   A   -- sharing the screen.
17   Q   Okay.
18       MS. PAGE:  Just tell me when you -- when you
19 need it to be zoomed in.  I can do that.
20       THE WITNESS:  Okay.
21       MR. FINNERTY:  Yeah, Ms. -- Ms. Page is
22 actually the one with the -- the technical
23 expertise to --
24       THE WITNESS:  Okay.
25       MR. FINNERTY:  -- to share the screen, so --

Page 86

```
 1  but we'll -- I apologize.  We'll try to work with
 2  you.
 3       MS. PAGE:  Yeah, just let me know.  I can't
 4  see what you're seeing.  I just see --
 5       MR. FINNERTY:  No.
 6       MS. PAGE:  -- it on my monitor.
 7       MR. FINNERTY:  Okay.
 8  BY MR. FINNERTY:
 9       Q   All right.  So, Ms. Brus, you respond to
10  Ms. Johnson's e-mail by saying, you know:  Okay.  Thank
11  you.  We can discuss tomorrow -- but you do have
12  concerns with employees punching out and staying on-
13  site, correct?
14       A   Yes.
15       Q   And an employee would have no business staying
16  on-site once they've punched out, right?
17       A   They should not be staying on-site after
18  they've punched out.  They should leave.
19       Q   Okay.  But then Ms. Johnson responds by saying
20  she's discussed this with staff.  They told them they
21  can't stay early -- arrive early or stay late off the
22  clock.  They're aware of that.
23           And then you say -- you respond by saying:
24  Okay.  Then we need to consider getting counseling
25  because -- I mean, apparently -- I mean, you -- that --
```

Page 88

```
 1  got -- you've got Ms. Johnson saying that she had
 2  recently seen that as an issue.
 3           So, as it specifically relates to
 4  Ms. Harrell's complaints that she was concerned that
 5  employees were staying at the site after clocking out --
 6  I mean, that was a -- a legitimate, good-faith
 7  complaint.  Do you agree with that?
 8       A   Absolutely.
 9       Q   Okay.  All right.  So, the rest of this
10  exhibit talks about Ms. Harrell asking to see video
11  footage and then she being told that that was something
12  that had to come from her DON or from the HSA.
13           Is that a -- is that a policy that's site-to-
14  site or is that a -- a Centurion policy?
15       A   I believe it's a DOC policy.
16       Q   Okay.  Because, you know, Ms. Harrell's very
17  first e-mail, this eight-page e-mail chain, Ms. Harrell
18  indicates that, in the past, she had been able to
19  request video and -- and be able to see it.  You see
20  that?
21       A   I don't see where she says in the past she's
22  been able to view it.
23       Q   It says:  Previously, I have notified
24  security; a copy was burned and placed in the record.
25       A   Okay.  I'm not aware of that ever having
```

Page 87

```
 1  that's something -- like you just said, employees
 2  shouldn't be doing that.
 3       A   Correct.
 4       Q   All right.  And then Ms. Johnson responds by
 5  saying she recently saw Keidre and talked to her about
 6  this.  She saw Keidre was working late in medical
 7  records, asked her what she was doing.  Keidre
 8  responded, don't worry, I clocked out already.
 9           Johnson said she told her that wasn't allowed
10  and that she would remove Keidre Long's punch-out; told
11  her to wrap up what she was doing and clock out when she
12  leaves.
13           Is it appropriate for Ms. Johnson or an HSA to
14  remove someone's clock-out?
15       A   If she saw that the employee was still there
16  working, absolutely.
17       Q   Okay.  What about if the employee was there
18  to -- to hook up with an inmate?
19       MS. PAGE:  Form.
20       A   Well, I -- based on the fact that she said she
21  saw her, talked to her, I have to presume she was not
22  hooking up with an inmate and that she was performing
23  work.
24       Q   Okay.  So, as it relates to Ms. Harrell's
25  complaints about the employees staying -- I mean, you've
```

Page 89

```
 1  happened.  Since I have been working for MHM, I -- I
 2  don't recall any time that a disc was ever burned or
 3  given to an employee; that only leadership employees
 4  would view camera footage.  I'm not aware of any line-
 5  staff employee viewing footage or being allowed to view
 6  footage.  They're not supposed to be allowed to see it.
 7           (Exhibit No. 24 marked for identification.)
 8  BY MR. FINNERTY:
 9       Q   Okay.  So, I'm just going to go through some
10  of the complaints Ms. Harrell submitted.  Look at
11  Exhibit 24.  And -- so, we don't have the attachments,
12  but would you agree that this would -- this was a --
13  referencing --
14       A   Can you make it bigger?
15       MR. FINNERTY:  Yeah.
16       MS. PAGE:  Uh-huh.
17  BY MR. FINNERTY:
18       Q   Okay.  So, can we agree this would have
19  been -- so, if you look at the bottom of the first page,
20  Ms. Harrell would have submitted the complaint regarding
21  Ms. McDaniel to Ms. Johnson.  And then Ms. Johnson
22  forwarded it to Ms. Cook, you, Ms. Douin, and
23  Ms. Barton.
24           And then there's a response from Ms. Douin
25  saying, you know:  Isn't "blank" the orderly?  You know,
```

Page 90

1  she didn't really have a legitimate concerns, but then
2  she says:  But I do think there is an issue with the
3  employee writing these things.
4       Do you know what she's talking about, the
5  employee writing these things.
6       MS. PAGE:  Form.
7  A   Well, I didn't write the e-mail, but if I were
8  to make an assumption, she felt there was an issue with
9  Ms. Harrell.
10 Q   Okay.  But based on the exhibit we just went
11 through, Exhibit 25, you know, we know that Ms. Harrell
12 suspected that Ms. McDaniel was having a sexual
13 relationship with an employee -- or with an inmate,
14 correct?  We know that?
15 A   We know that she was concerned that she was
16 having a relationship with an inmate.  I don't see
17 anywhere where it says a sexual relationship.
18 Q   Okay.  And -- but we also can agree, based on
19 Exhibit 25, that Ms. Johnson told Ms. Harrell, well, it
20 needs to be put in a -- it needs to be submitted in
21 writing, either in a statement --
22 A   Correct --
23 Q   -- or -- okay.  So --
24 A   Correct.
25 Q   So, Ms. -- Ms. Harrell is being told to write

Page 91

1  these incident reports.  She's submitting them.  And
2  then, apparently, Ms. Douin is accusing her or --
3  putting something in writing that she doesn't agree
4  with; is that right?
5  A   Correct.
6       MS. PAGE:  Form.
7  Q   Okay.  And, again, there's no attachment to
8  this, but fair to say that this was a complaint by
9  Ms. Harrell regarding Ms. McDaniel and a relationship
10 with an inmate?
11      MS. PAGE:  Form.
12 A   Based -- based on what I'm seeing on the page,
13 possibly, yes.  I would presume so.
14      (Exhibit No. 26 marked for identification.)
15 BY MR. FINNERTY:
16 Q   Okay.  Look at Exhibit 26.  So, this is an
17 e-mail from -- at the bottom of the first page,
18 Ms. Harrell sending the complaint to -- or sending an
19 e-mail to Tara Johnson.  And the subject is "Long-
20 Montenez."  And then Ms. Johnson forwards it to you,
21 Ms. Barton, Ms. Douin, and Ms. Cook.  And then you
22 respond:  What do you think was happening here?  Has
23 anyone asked Ms. Long about it?
24      But -- but you know from Exhibit 25 that
25 Ms. -- what Ms. Harrell thinks is happening, correct?

Page 92

1  She thinks -- she thinks Ms. Long is having a
2  relationship with this inmate.
3       MS. PAGE:  Form.
4  A   Okay.
5  Q   So, why did -- why were you asking what you
6  thought was happening here?  You knew what Ms. Harrell
7  was alleging.
8  A   Without seeing the attachment, I can't answer
9  that question.  I would have to know exactly what was on
10 the attachment to know what I was commenting on because
11 the comment was related to the attachment, not just
12 based on the subject line.
13 Q   Okay.  Do you --
14 A   And the question about asking Ms. Long would
15 actually be a pretty standard piece of an investigation.
16 We oftentimes will ask the employee to explain, you
17 know, something that we've seen, heard, what have you.
18      (Exhibit No. 27 marked for identification.)
19 BY MR. FINNERTY:
20 Q   Okay.  All right.  So, we've looked at --
21 Exhibit 27, basically the same thing.  Ms. Harrell is
22 e-mailing Ms. Johnson, complaining about Ms. McDaniel
23 for an incident, apparently, that happened on
24 March 29th.  Ms. Johnson forwards it to you, Ms. Douin,
25 Ms. Barton, and Ms. Cook.  It says:  FYI, here is

Page 93

1  another report.
2       And then similar response from you, again:
3  What do you think was going on?  Have you spoken to
4  Ms. McDaniel?
5       And again, that -- that would be -- would that
6  be a typical response from you when -- when you've
7  received a complaint about an employee and a potential,
8  you know, relationship with an inmate?
9  A   This might be the potential beginning to an
10 investigation, yes, asking questions, asking questions
11 of the HSA or the DON as to what do they s- -- what do
12 they see, what are they thinking might be going on.
13      They certainly have more expertise about
14 what's supposed to go on and what isn't supposed to go
15 on within a prison site.  I don't work inside the -- the
16 prisons very often.
17 Q   Okay.  All right.  And then -- and we can
18 agree that part of what Ms. Johnson did to look into
19 Ms. Harrell's complaints -- or maybe exclusively what
20 she did was review the camera footage, correct?
21 A   I know --
22      MS. PAGE:  Form.
23 A   -- at least in the case of Ms. Long, I do
24 recall that we did request a statement from Ms. Long.  I
25 don't think we ever got the statement.  I believe she

Page 94

1  resigned at the time she was asked for a statement, but
2  that was -- so, the camera footage was at least one
3  piece of investigating it, not necessarily entirely what
4  she did.
5       I don't really recall McDaniel's situation
6  particularly clearly, so I don't -- I don't really know
7  exactly what was done there. I do remember Long being
8  asked for a statement and then, instead, resigning.
9       Q   So, do you know, when Ms. Long was asked to
10  provide a statement, was she told that Ms. Harrell is
11  the person who initiated a complaint regarding her and a
12  potential relationship with an inmate?
13      A   I highly doubt that that was the -- what was
14  stated to her, but I'm not the one who asked her for the
15  statement.
16      Q   And -- and you would agree that, if at all
17  possible, it's important to maintain the confidentiality
18  of a complainant, correct?
19      A   As much as possible, yes.
20      Q   And is that at least partly because you want
21  to prevent the possibility of any retaliation?
22      A   In most cases, yes.
23          (Exhibit No. 28 marked for identification.)
24  BY MR. FINNERTY:
25      Q   Okay. All right. Let's take a look at

Page 95

1  Exhibit 28. All right. This is documents relating to
2  Ms. Harrell's complaint, which is also referenced in the
3  e-mail that was Exhibit 25, relating to her allegation
4  that Ms. Cook had told Ms. West to just sign the
5  narcotic log without counting.
6          Do you recall this complaint from Ms. Harrell?
7      A   Yes.
8      Q   And I think you referenced it earlier. You
9  said that you -- you said statements from three people,
10  one being Ms. Harrell and then from Ms. Cook and from
11  Ms. West; is that right?
12      A   Yes.
13      Q   Okay. So, look at Page 2 of this Exhibit 28.
14  You know, Ms. Harrell says that, on March 29th, she was
15  in her office: Ms. Cook approached the doorway and
16  handed Ms. West a set of keys. Ms. West asks, what do I
17  need these for. Ms. Cook informed Ms. West she would
18  need to pass the keys to the next shift after the
19  narcotic count was conducted.
20          Ms. Cook advised Ms. West of her acceptance of
21  the keys prior to Ms. McDaniel's departure. Ms. Cook
22  informed Ms. West she did not count the narcotics, but
23  McDaniel signed everything before she left and Ms. West
24  was instructed to just sign beside her.
25          And then Ms. Cook advised Ms. West she would

Page 96

1  only need to pass the evening pills since McDaniel
2  pulled everything for you. Ms. West simply stated,
3  okay, and the two, then, departed the area.
4          So, this complaint -- would you agree that
5  what Ms. Harrell is complaining of is -- is serious? If
6  true, this is a serious allegation.
7      A   Yes.
8      Q   Okay. All right. So, if we go down to -- all
9  the way to the last page, Exhibit -- or Page 8 of
10  Exhibit 28 -- all right. So, you can see where
11  Ms. Harrell e-mails this to Ms. Johnson on March 30th,
12  correct?
13      A   Yes.
14      Q   So, then, just above that, you'll see where
15  Ms. Johnson forwards Ms. Harrell's complaint to
16  Ms. Cook, right? One of the people Ms. Harrell was
17  complaining about -- you see that?
18      A   Yes.
19      Q   And says "FYI" -- I mean, that's not proper,
20  is it?
21          MS. PAGE: Form.
22      A   She's a member of the leadership team. It's
23  not quite the same as if it had been forwarded to, say,
24  a co-worker. I -- I don't have a serious concern with
25  her sending it to Ms. Cook. We would have discussed it

Page 97

1  with Ms. Cook anyway. We would have -- obviously we did
2  because we got her statement about the event.
3      I -- I don't have a big, huge issue with it
4  going to Ms. Cook, again, because she was a member of
5  the leadership team.
6      Q   But wouldn't it have been possible to get a
7  statement from Ms. Cook without Ms. Cook knowing who had
8  submitted the complaint? I mean, you could have --
9      A   Actually --
10      Q   -- easily done that.
11          MS. PAGE: Form.
12      A   -- in this -- I'm sorry. You can -- was there
13  more to the question?
14      Q   I mean, you could have easily gotten -- you
15  could have said, Ms. Cook, we got a report that, you
16  know, you don't do the narcotic count and sign the log
17  properly on 3/29; you know, can you tell me what
18  happened.
19          You could have done that without her seeing
20  that it was Ms. Harrell that -- that initiated this
21  complaint. You could have done that, right?
22          MS. PAGE: Form. Calls for speculation.
23      A   And -- that's exactly -- I -- to speculate, if
24  I were to have told her about it, I might have indicated
25  to her that I understand that there was a discussion

Page 98

1  that took place in front of Ms. Harrell's office where
2  you and Ms. West were discussing the exchange of keys,
3  and, you know, what was stated so that she could respond
4  to it.
5        So, would she have found out anyway?  Very
6  possibly.  There's -- it's not always a hundred-percent
7  possible to keep a hundred-percent confidentiality.
8  Sometimes they need to understand the context of what
9  happened in order to be able to get their response and,
10 you know, is -- could it have been done that way?
11 Maybe.  It wasn't.  Could it have been done differently?
12 Possibly.
13      Q   Okay.  So -- so, you said that not all -- you
14 can't always 100 percent protect the confidentiality,
15 but there was nothing done in this situation to protect
16 Ms. Harrell's confidentiality.  You can agree with that,
17 right?
18      A   For this particular incident?
19          MS. PAGE:  Form.
20      A   No.
21      Q   Okay.
22      A   Although, I will say that I don't believe
23 Ms. West was told that it was Ms. Harrell who had
24 initiated the complaint.  So, her confidentiality with
25 her co-worker would have been protected, but with her

Page 99

1  supervisor -- her supervisor would have probably found
2  out anyway.
3        Q   Well, but Ms. West couldn't have initiated
4  a -- a request to terminate Ms. Harrell, could she?
5          MS. PAGE:  Form.
6        A   No.
7        Q   But Ms. Cook could, correct?
8        A   She could request it.  She doesn't get final
9  say in it, by any means, but yes, she could request it.
10       Q   So, wouldn't it be more important to protect
11 Harrell's confidentiality as it relates to somebody that
12 could retaliate against her as opposed to a co-worker?
13       A   Again, Ms. Cook was a member of the leadership
14 team.  I would not have considered it to be a huge issue
15 for her to see the actual complaint from Ms. Harrell.
16       Q   Okay.  All right.  So, Ms. Cook responds by
17 saying:  I did speak with Ms. West about the narcotic
18 keys in front of Ms. Harrell's office yesterday;
19 however, what was said is not what is stated in the
20 attached.
21          While in front of Ms. Harrell's office, I held
22 the keys up to Ms. West and advised her that it was her
23 turn to carry the keys and that we needed to go and
24 count.  There was some friendly back-and-forth banter
25 about, I don't want to.

Page 100

1        So, we can agree, based on Ms. Cook's
2  response, that she's -- she's admitting that she did
3  have the keys, correct?
4        A   Yes.
5        Q   And she's admitting that she gave the keys to
6  Ms. West, correct?
7        A   Correct.
8        Q   Okay.  So, then, right below that, Ms. Cook
9  says:  As this day moves for- -- moves on, I continue to
10 be amazed by what -- by what someone -- it looks like a
11 typo, but -- by what someone, when they are held to the
12 standards of anyone else.
13          Clearly, she's talking about Ms. Harrell,
14 right?
15          MS. PAGE:  Form.
16       A   I couldn't say because, honestly, the last
17 sentence made very little sentence to me and I would
18 have disregarded it because it wasn't relevant.
19       Q   Why would you disregard something that could
20 clearly constitute her having -- Ms. Cook having some
21 retaliatory animus towards Ms. -- Ms. Harrell?  Why
22 would you disregard that?
23          MS. PAGE:  Form.
24       A   Because it made no sense.  I couldn't -- I
25 couldn't determine what she was trying to say there.

Page 101

1  And, again, it was -- I guess I didn't see that as
2  retaliatory animus.
3        Q   What else could she possibly be talking about,
4  than -- than Ms. Harrell?
5          MS. PAGE:  Form.  Calls for speculation.
6        A   I -- and I can't speculate on what Ms. Cook
7  was thinking when she wrote that.  I -- I really don't
8  know what it meant.  It doesn't make sense to me at all.
9        Q   Did you ask Ms. Cook for clarification?
10       A   I don't recall if I asked her for
11 clarification two and a half years ago.
12       Q   Okay.  And your testimony was that you just
13 ig- -- disregarded that statement; is that right?
14       A   Yes.
15       Q   Okay.
16       A   I believe so.
17       Q   Okay.  So -- and so, Ms. Cook just sent that
18 statement just to Ms. Johnson.  And then, look a little
19 higher up on this e-mail.  Ms. Johnson then forwards it
20 to you, Ms. Douin, and Ms. Barton and says, Ms. Cook's
21 statement is below, correct?
22       A   Yes.
23       Q   Okay.  So, then you back up -- we'll go to the
24 top of Page 5.  Ms. Douin, when she gets a copy of the
25 forwarded e-mail from Ms. Johnson -- Ms. Douin says,

Page 102

1  this one we do need to look into.  And -- and, again,
2  Ms. Douin's e-mail includes Ms. Cook.
3      I mean, is that how -- is that how procedure
4  would dictate, that Ms. Douin would -- would notify a
5  subject of a complaint that, you know, this is something
6  we're going to look into?
7      MS. PAGE:  Objection to form.
8      A    She notified a member of the leadership team
9  that we would be looking into an incident.
10     Q    Okay.  So, now there's no doubt that Ms. Cook
11  knows, as a result of the complaint submitted by
12  Ms. Harrell, that people are looking into what she may
13  or may not have done, correct?
14     A    Yes.
15     Q    Okay.  And then if you go to the top of
16  Page 3, Ms. Johnson writes an e-mail to Ms. Douin,
17  Ms. Cook, you, and Ms. Barton.  She says:  West called
18  me back.  She said she counted the narcotics with
19  Ms. Cook, and she would send me an e-mail to that
20  effect.
21      Do you know what Ms. Johnson would have said
22  to Ms. West?
23     A    I wasn't part of that conversation, so, no.
24     Q    Okay.  And so, you don't know whether or not
25  Ms. Johnson told Ms. West that Ms. Harrell was the one

Page 103

1  that complained?
2      A    I do not know that for sure.
3      Q    Okay.  So, aside from Ms. Johnson's e-mail
4  saying what Ms. West -- well, strike that.
5      So, Ms. Johnson says Ms. West would send an
6  e-mail to that effect.  Did you ever receive an e-mail
7  from Ms. West explaining that she --
8      MS. PAGE:  Form.
9      Q    What happened?
10     A    I don't recall specifically.  For some reason,
11  I think we did, but I can't -- I don't recall anything
12  specific within it.
13     Q    Okay.  Do you recall ever requesting any
14  additional statements from either Ms. Cook or from
15  Ms. West?
16     MS. PAGE:  Form.
17     Q    Anything additional to what is stated in this
18  e-mail chain.
19     A    I don't recall.
20     (Exhibit No. 14 marked for identification.)
21  BY MR. FINNERTY:
22     Q    All right.  So, if you take a look at
23  Exhibit 14 -- okay.  So, I'll represent to you that
24  right after -- well, I guess -- let me see.
25      So, just to -- just looking back at

Page 104

1  Ms. Harrell's complaint about the narcotic-key
2  incident -- so, according Ms. Harrell's complaint, she
3  said it was approximately 16:00, which would be
4  4:00 in the afternoon, is when she overheard that
5  conversation.
6      And then I'll represent to you, at 4:50, at
7  that same day, Ms. Harrell made a copy of the narcotic-
8  accounting log for that -- for that date and
9  submitted -- and sent that to Ms. Johnson.
10      So, if we look at -- did you ever take a look
11  at this narcotic log from -- that Ms. Harrell made a
12  copy of?
13     A    I don't recall seeing this while we were doing
14  the investigation, no.  I do recall seeing the version
15  that had both signatures on it, at that time.
16     Q    Okay.  Are you familiar at all with how
17  narcotic-accounting logs are supposed to be filled out?
18     A    My understanding is that they are supposed to
19  count narcotics together and there should be two
20  signatures.
21     Q    Okay.  And we can agree that, under the 11:00
22  a.m. shift count, there's only one signature out beside
23  that count?
24     A    Yes.
25     Q    Do you see that?  Okay.

Page 105

1      And so, we -- we already discussed that --
2  that, according to Ms. Cook's statement, she admits that
3  she had possession of the keys, correct?
4      A    Yes.
5      Q    And Ms. Cook's signature is nowhere to be
6  found on this sheet.  Do you see that?
7      A    Yes.
8      Q    Okay.
9      A    I'm -- I'd have to talk to someone who does
10  this regularly, but I'm thinking it's also possible
11  that, if Ms. McDaniel were to count while she still had
12  the keys and then she handed the keys over to somebody
13  else and they did their own count, that they could sign
14  after her as long as they counted right after they got
15  the keys; that they would need to call Ms. McDaniel back
16  if they had had a discrepancy.  And I'm -- that's a
17  guess.  I'm speculating.
18     Q    Okay.
19     A    Because, again, this isn't part of my normal
20  job duties to do these counts.
21     Q    Okay.  And you never saw this particular
22  document when you were investigating Ms. Harrell's
23  complaint, though, correct?
24     A    I don't recall seeing it with only one
25  signature.  I'm fairly certain I saw it with both

**Page 106**

1  signatures on it --
2    Q   Okay.
3    A   -- at the time of the investigation.
4    Q   So, you know, based on Ms. Cook's response to
5  this complaint that she -- you know, she had the keys
6  and that she gave them to Ms. West, there should be a
7  signature on Exhibit 14 with Ms. McDaniel and Ms. Cook
8  signing together, correct?
9    A   I believe so.  Again, I'm not an expert on the
10 narcotic counts.
11   Q   Okay.  And then -- and then there would also
12 have to be another signature when Ms. Cook gave them to
13 Ms. West, correct?  So, it should be McDaniel-Cook and
14 then Cook-West, correct?
15   A   I believe that's correct, yes.
16   Q   Okay.  And you know, assuming that there
17 should never be -- and I understand this isn't really
18 your -- your expertise, but assuming there should never
19 be just one signature out beside a shift count, you
20 would agree that this document clearly shows that what
21 Ms. Harrell was alleging actually happened.
22        MS. PAGE:  Form.
23   A   I can't -- I can't agree with that because,
24 again, this is a clinical document that I am not an
25 expert on.  And as I stated earlier, I can envision that

**Page 107**

1  it would be possible for Ms. McDaniel to sign and then
2  say, I already counted and signed, here's the keys, you
3  need to go count and sign as well, call me if you've got
4  a discrepancy.  I can envision that happening.
5        Whether or not that's correct, I couldn't say
6  because I'm not clinical and this is not a procedure
7  that I'm an expert on.
8    Q   Okay.  So, if you look at Page 2 of
9  Exhibit 14 -- so, you know, it looks like there's places
10 where you can do a narcotic-key exchange or you could
11 document narcotic-key exchanges for -- for three
12 different shifts on one sheet.
13        You see -- I mean, it's basically the same
14 thing, just repeated three times.  You see that?
15   A   Yes.
16   Q   Okay.  So, then, at the bottom, it says:  Each
17 SRN/SLPN is to sign for the exchange of keys at the
18 beginning of the shift and at the transfer to the next
19 shift.
20        So, does that clarify the issue as to whether
21 both should sign at the beginning and end of every
22 shift?
23   A   Well, yes, I understand that they do sign when
24 they transfer keys.
25   Q   Okay.  So, again, do you see -- well, same

**Page 108**

1  thing here.  There's just one signature.  And it's the
2  same person, I think, Amanda McDaniel, but it's only one
3  signature on -- on this bottom entry on this document.
4        MS. PAGE:  Form.
5    A   Yes, there's only one signature.  That doesn't
6  really tell me anything as to why the other signature
7  isn't there yet.  It's entirely possible that she signed
8  it and then gave the keys and said, please go sign.
9        I -- I wasn't there.  I'm not an expert on
10 this document and how they do the key exchange.  This is
11 a clinical thing that I am not in any way an expert on
12 or able to comment on.
13   Q   Would you agree that, if what Ms. Harrell
14 alleged happened actually happened, that Ms. Cook,
15 Ms. West, and Ms. McDaniel all should have been
16 counseled for their failure to properly document the
17 narcotic exchange -- the narcotic-key exchange and the
18 narcotic pill count?
19   A   If that --
20        MS. PAGE:  Form.
21   A   -- in fact, happened, then they should have
22 been counseled; however, the information that I received
23 at that time did not indicate that that's what happened.
24   Q   Isn't it true you just relied on what Ms. Cook
25 said and what Ms. West -- or what Ms. Johnson said

**Page 109**

1  Ms. West said?
2        MS. PAGE:  Form.
3    A   Okay.  When I am conducting an investigation
4  into a clinical issue, that is how a determination is
5  made.  I have to rely on people with clinical knowledge
6  that I do not have.  I cannot make a determination on
7  whether something was done correctly if it's not
8  something that I have specific personal expertise on.  I
9  rely on the people who do have that expertise.
10        So, yes, that is how those -- how those things
11 happen.
12   Q   Well, what did you do to rely on what
13 Ms. Harrell reported?  Did you rely on anything she
14 said?
15        MS. PAGE:  Form.
16   A   Excuse me?  No, I didn't rely on what
17 Ms. Harrell reported.  We -- we asked for additional
18 information.  We investigated her reports.  She made an
19 initial report.  The report was investigated.
20   Q   Where -- where is there any documentation
21 showing that you asked Ms. Harrell for additional
22 information?
23        MS. PAGE:  Form.
24   A   If additional information wasn't needed, we
25 wouldn't have asked for additional information.  If we

Page 110

1  investigated and found that her initial complaint was
2  unsubstantiated, we would not go back to her for
3  additional information.  It wouldn't be necessary.
4      Q   Okay.
5          THE WITNESS:  I'm sorry.  Can I ask for a
6  short break?
7          MR. FINNERTY:  Sure.
8          THE WITNESS:  Thank you.
9          (Brief recess.)
10         (Whereupon, after a brief recess, the
11 deposition continues in Volume 2, and the witness did
12 not waive reading and signing.)

Page 111

CERTIFICATE OF OATH

4  STATE OF FLORIDA  )
5  COUNTY OF LEON    )

8      I, ANDREA KOMARIDIS WRAY, the undersigned
9  authority, certify that the above-named witness appeared
10 before me via videoconference pursuant to the Supreme
11 Court's Order AOSC20-13 and was duly sworn.

13     WITNESS my hand and official seal this 15th
14 day of September, 2020.

20     ANDREA KOMARIDIS WRAY
21     NOTARY PUBLIC
22     COMMISSION #GG365545
       EXPIRES February 9, 2021

Page 112

CERTIFICATE OF REPORTER

3  STATE OF FLORIDA  )
4  COUNTY OF LEON    )

6      I, ANDREA KOMARIDIS WRAY, Court Reporter,
7  certify that the foregoing proceedings were taken before
8  me at the time and place therein designated; that my
9  shorthand notes were thereafter translated under my
10 supervision; and the foregoing pages, numbered 1 through
11 110, are a true and correct record of the aforesaid
12 proceedings.

14     I further certify that I am not a relative,
15 employee, attorney or counsel of any of the parties, nor
16 am I a relative or employee of any of the parties'
17 attorney or counsel connected with the action, nor am I
18 financially interested in the action.

19     DATED this 15th day of September, 2020.

23     ANDREA KOMARIDIS WRAY
       NOTARY PUBLIC
24     COMMISSION #GG365545
       EXPIRES FEBRUARY 09, 2021

Page 113

ERRATA SHEET

2  I have read the transcript of my deposition, Pages 1
   through 110 and hereby subscribe to same, including any
3  corrections and/or amendments listed below.
4  DATE:_____
           SARAH BRUS
5  (HARRELL V. MHM HEALTH PROFESSIONALS, ET AL.)

6  PAGE/LINE  CORRECTION/AMENDMENT   REASON FOR CHANGE

22 DATE OF DEPOSITION: August 18, 2020

23 REPORTER: ANDREA KOMARIDIS WRAY

```
 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
 2                    TALLAHASSEE DIVISION

 3

 4

 5   VIRGINIA E. HARRELL,

 6        Plaintiff,

 7   vs.                      CASE NO. 4:20-cv-30-AW-CAS

 8   MHM HEALTH PROFESSIONALS,
     LLC, f/k/a MHM HEALTH
 9   PROFESSIONALS, INC., and
     CENTURION OF FLORIDA, LLC,
10
          Defendants.
11   _____/

12

13

14   DEPOSITION OF:          SARAH BRUS
                             Volume 2, Pages 114 - 226
15   AT THE INSTANCE OF:     Plaintiff

16   DATE:                   August 18, 2020

17   TIME:                   Commenced: 1:00 p.m.
                             Concluded: 5:57 p.m.
18
     LOCATION:               VIDEOCONFERENCE
19
     REPORTED BY:            ANDREA KOMARIDIS WRAY
20                           Court Reporter and
                             Notary Public in and for the
21                           State of Florida at Large

22
                       PREMIER REPORTING
23                     114 W. 5TH AVENUE
                     TALLAHASSEE, FLORIDA
24                      (850) 894-0828

25
```

**Page 115**

APPEARANCES:

REPRESENTING THE PLAINTIFF:

BRIAN O. FINNERTY
The Law Office of Brian O. Finnerty, P.A.
541 Beverly Court
Tallahassee, FL 32301

REPRESENTING THE DEFENDANTS:

CAYLA M. PAGE
Greenberg Traurig, P.A.
101 East Kennedy Boulevard, Suite 1900
Tampa, FL 33602

**Page 116**

INDEX TO WITNESS

SARAH BRUS                              PAGE

Continued Examination by Mr. Finnerty     118

Examination by Ms. Page                219

Further Examination by Mr. Finnerty     222

INDEX TO EXHIBITS

NO.        DESCRIPTION            MARKED

10 - Employee counseling form - verbal counseling  184
17 - E-mail from Tara Johnson to staff.           137
20 - E-mail from Tara Johnson to Virginia Harrell  157
     MHM Services, Inc., employee handbook         195
29 - E-mail chain Re: Harrell                     126
30 - DOC incident report                          135
31 - E-mail chain Re: 25 forwarded messages       159
32 - E-mail and complaint from Virginia Harrell to 162
     Sarah Brus
33 - Composite of letters from Centurion to Virginia  193
     Harrell Re: Employment status change
34 - Receipt of employee handbook                 192
37 - Notice for pill room door                    165
39 - E-mail from Virginia Harrell to Sarah Brus   165
     Re: Concerns
40 - Virginia Harrell's complaint about Lori Cook  177
41 - Employee counseling form - written warning for  178
     Lori Cook
43 - E-mail from Tara Johnson Re: Incident report  145
44 - Centurion 90-day check-in for Misty West     186
45 - Employee counseling form - verbal counseling  185
     for Misty West
46 - Employee counseling form - written warning for  186
     Misty West
47 - Employee counseling form - final warning for  187
     Misty West
48 - Employee counseling form - written warning for  188
     Dante McKinnie

*Huh-uh is a negative response
*Uh-huh is a positive response

**Page 117**

STIPULATIONS

The attorneys participating in this deposition acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely. This arrangement is pursuant to the Florida Supreme Court Administrative Order AOSC-20-16. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

**Page 118**

DEPOSITION

Whereupon,

SARAH BRUS

was called as a witness, having been first duly sworn to speak the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

CONTINUED EXAMINATION

BY MR. FINNERTY:

Q   So, Ms. Brus, how -- I -- I completely understand that, you know, medical issues are outside of the realm of your expertise. Did -- did you ever ask for someone to explain to you the proper procedure for counting narcotics and documenting a narcotic count?

A   I'm sure that I have at some point, yes.

Q   And same with the key exchange -- did you ever ask for someone to explain how that should have been done?

MS. PAGE: Form.

A   Probably.

Q   Okay. And if the explanation was that there should never be just one signature, you certainly would have looked into that, correct?

MS. PAGE: Form.

A   Probably.

Q   Did you ever ask Ms. Harrell for a response to

Page 119

1 Ms. Cook's explanation as to what happened?

2 A No, sir, I don't believe I did.

3 Q Why wouldn't you?

4  MS. PAGE: Form.

5 A Because it wasn't necessary.

6 Q Why is that?

7 A Because the explanation that Ms. Cook gave

8 concurred with what Ms. West stated, that they did sign;

9 because the documentation that was presented to me at

10 the time, showed that they both signed; also because

11 Ms. Harrell only witnessed a short snippet of what

12 happened with that narcotic count and key exchange.  She

13 just heard a portion of a conversation.  And she wasn't

14 there for the actual count or the key exchange.

15  So, she was basing her complaint on, again, a

16 very short moment in time of what she heard.  And the

17 documentation that would have been presented to me would

18 have shown that we have both signatures.

19 Q Well, so, you're saying that what Ms. Cook and

20 Ms. West said didn't coincide with what Ms. Harrell

21 said.  Is that basically what you're saying?

22 A That's correct.

23 Q And that all Ms. Harrell witnessed was a short

24 conversation between Ms. Cook and Ms. West, right?

25 A Yes.  She overheard a conversation, yes.

Page 120

1 Q Okay.  But the document I just showed you,

2 Exhibit 14, clearly shows that there's only one

3 signature and it clearly refutes what Ms. West and

4 Ms. Cook said.  We can agree with that, right?

5  MS. PAGE: Form.

6 A I did not see this document at that time, but

7 it potentially does show that, yes.

8 Q Well, do you think maybe you didn't see it

9 because you never followed up with Ms. Harrell?

10 A There was no need to follow up with

11 Ms. Harrell at that time.

12 Q Well, knowing -- having now seen this

13 document, do you think that -- you still think that

14 that's true; there was no reason to follow up with her?

15  MS. PAGE: Form.

16 A Based on the information I had received, there

17 was no need to follow up with Ms. Harrell.

18 Q I mean, is it fair to say you just trusted

19 Ms. Cook and Ms. West over Ms. Harrell?

20  MS. PAGE: Form.

21 A I trusted -- I would have trusted two

22 employees giving me the same information and producing a

23 document that showed me the -- that the narcotic count

24 was signed off on.

25 Q I mean, did you ever consider whether

Page 121

1 Ms. Harrell -- or did you ever consider whether

2 Ms. Cook and Ms. West were colluding to cover their own

3 butts?

4  MS. PAGE: Form.

5 A I may have considered that at the time.  I

6 don't know that I could have proved that.

7 Q Well, if you'd have spoken with Ms. Harrell,

8 she could have shown you this document, which would have

9 conclusively shown that exactly what she reported is

10 what happened, right?

11 A If --

12  MS. PAGE: Form.

13 A If Ms. Harrell had evidence that she failed to

14 submit to us, we didn't consider it because it was --

15 we did -- we had different evidence.  We were not aware

16 that this evidence existed at that time.

17 Q Well --

18 A And, again, we did not feel that it was --

19 there was a need to follow up with Ms. Harrell.

20 Q I mean, do you understand that the reason you

21 didn't have that evidence is because Ms. Johnson didn't

22 forward it to you?

23  MS. PAGE: Form.

24 A I don't know why I didn't have that evidence.

25 I -- if Ms. Johnson had that, I was not aware of it.

Page 122

1 Q And you didn't feel it was necessary to follow

2 up with Ms. Harrell and say, hey, you got any additional

3 evidence or additional information relating to this

4 complaint?  You didn't follow that up?

5 A No, because it -- no, I didn't feel it was

6 necessary to follow up.  If she had had evidence to

7 support her statement, I would have expected it to be

8 submitted at the same time.

9 Q And you had -- and -- but you have no way of

10 knowing whether it was or wasn't, right?  You just know

11 what was sent -- forwarded to you by Ms. Johnson.

12  MS. PAGE: Form.

13 Q Correct?

14 A I know it was forwarded to me by Ms. Johnson,

15 correct.

16 Q Okay.  So, you're just -- you're taking

17 Ms. Johnson, Ms. West, and Ms. Cook's word over

18 Ms. Harrell, fair?

19  MS. PAGE: Form.

20 A I -- I disagree with that.  It wasn't taking

21 their word.  It was reviewing statements and reviewing

22 the evidence that was presented to me.

23 Q Okay.  But you were satisfied with what

24 Ms. Cook said, right?

25 A I wouldn't say I was satisfied with that all

Page 123

1 by itself. In conjunction with Ms. West, in conjunction
2 with the document with two signatures, I was satisfied
3 with it.
4 Q I mean, would you agree that the document
5 you -- you're talking about that has two signatures --
6 if that was done after the fact and that the two people
7 signing next to each other didn't, in fact, count
8 together -- that that would be fraud? Would you agree
9 with that?
10 A I would agree with that.
11 MS. PAGE: Form.
12 Q Okay. And fraud is a serious, serious issue.
13 Would you -- would you agree with that?
14 A Yes, I would agree with that.
15 Q And falsifying a state record is a serious
16 issue; would you agree?
17 A Yes.
18 Q And Ms. Cook -- she was actually terminated,
19 wasn't she?
20 A At some point, yes.
21 Q And was she terminated for falsifying state
22 records?
23 A I don't recall the reason Ms. Cook was
24 terminated.
25 Q Wouldn't you have been involved with that?

Page 124

1 A Yes. I'm sorry, but I don't recall the
2 details of her termination. I would need to review
3 records.
4 Q Okay. Ms. Johnson -- she was terminated,
5 right?
6 A Yes.
7 Q And why was she terminated?
8 A I don't recall the specific details. I would
9 need to review the records.
10 Q I mean, do you think it's just a coincidence
11 that these two people that Ms. Harrell was complaining
12 about were later terminated?
13 A Without reviewing the records, I couldn't tell
14 you anything about that.
15 MS. PAGE: Form.
16 Q Did -- did you ever have concerns with
17 Ms. Cook's work performance?
18 A I was not her supervisor. So, I don't know
19 that I could say that I had concerns with her work
20 performance --
21 Q How about --
22 A -- other than what was presented to me by
23 others.
24 Q And how about Ms. Johnson -- did you ever have
25 concerns with her managerial or supervisory skills?

Page 125

1 A Yes, I did.
2 Q And what were those concerns?
3 A I had concerns with how she -- I'm trying to
4 think how to phrase this. I felt that she sometimes was
5 a little overexuberant in how she handled various
6 matters.
7 Q Okay. There's been testimony that the reason
8 for Ms. Johnson's termination was because of abuse of
9 authority. Would you have any reason to -- to dispute
10 that that was the reason she was terminated?
11 MS. PAGE: Form.
12 A No.
13 Q Okay. And Ms. West -- was she terminated?
14 A I don't recall. I don't know.
15 Q Okay. Keidre Long -- do you know what --
16 whether --
17 A Keidre Long resigned.
18 Q And why did she resign?
19 A As I stated earlier, when she was asked to
20 provide a statement about the things that we saw on
21 video and questions about her and the inmate, I believe
22 it was, she presented a resignation document.
23 Q And that was -- was -- that was initiated by
24 Ms. Harrell's complaint, correct?
25 A Correct.

Page 126

1 Q Okay. And then, Ms. McDaniel -- she was
2 terminated?
3 A I think so. I don't remember specific
4 details, though.
5 Q And what -- do you recall that she was
6 terminated as a result of Ms. Harrell's complaint as
7 well?
8 A I -- I really don't recall. It's possible.
9 Q Okay. And I think I may have already asked
10 you this, but I -- I'm -- you -- did you ever have any
11 concern that Ms. Harrell's complaints were not submitted
12 in good faith?
13 A At the time they were submitted, I don't think
14 so.
15 Q Okay. And I think I did ask you this: No --
16 no issue with Ms. Harrell reporting, you know, suspected
17 relationships between staff and inmates and her
18 suspected issue with narcotics -- no issue with her
19 reporting that, right?
20 A No, there was no issue with her reporting
21 things.
22 Q Okay. And you would expect an employee to
23 report those types of issues, correct?
24 A Yes.
25 (Exhibit No. 29 marked for identification.)

Page 127

BY MR. FINNERTY:

Q   Okay.  Take a look at Exhibit 29.  So, this was an e-mail initially from Brandi Blocker sent to Ms. Douin and Ms. Johnson that was later forwarded by Ms. Johnson to you and Ms. Barton.  And it's dated April 23rd, 2018.

So, four lines down, Ms. Blocker is saying that Ms. Harrell reported that a medical orderly had stopped her prior week and said:  Don't worry, Ms. Harrell.  This will all work itself out because the cameras would be reviewed on Monday.

And we -- we went over the e-mail chain earlier about what Ms. Johnson saw on the cameras.  Can you explain how an inmate would have cameras were going to be reviewed on Monday?  How -- how -- how could that possibly get down to an inmate?

MS. PAGE:  Form.

A   Well, you asked -- you're asking me to speculate on something related to an inmate.  I would have to ask that inmate how he got the information.  I have no idea how he would know that.

Q   Were you aware that, prior to Ms. Johnson reviewing the camera footage, that she was going to review camera footage?

A   Was I aware that she was going to before she

Page 128

actually did it?  Yes.

Q   You were?  Okay.  So, you would have known prior.  Ms. Johnson would have known prior.

Anyone else that you can recall that would have known this?

MS. PAGE:  Form.

A   Probably Ms. Douin, possibly Ms. Cook, Ms. Blocker.  Somebody in security would have known because she would have to request to sit down and review the video with them.  So, there's a number of people who would have known that the video was going to be reviewed.  Might have been multiple people in security that would have known that the video was going to be reviewed.

Q   Okay.  So, just to kind of wrap this up, you don't know who would have leaked that information that eventually got down to an inmate, correct?

MS. PAGE:  Form.

A   I -- I would have no way of knowing without talking to the inmate.

Q   And it -- and it turns out the inmate was right because camera footage was reviewed on Monday, correct?

MS. PAGE:  Form.

A   I don't -- I don't know what day of the week

Page 129

the camera footage was reviewed, at this point in time.

Q   Look back at Exhibit 21, I think we can confirm.  Page 4 of Exhibit 21, which is dated Monday, April 2nd, Ms. Johnson talks about was she saw on footage.  So -- so, we can agree that it did happen on Monday, April 2nd.

A   Okay.

Q   Okay.  No dispute, then?

A   No, I won't dispute that.

Q   Okay.  So, just based on Ms. Harrell's statement here, would you agree that it appears that an inmate is essentially, I guess, threatening Ms. Harrell or -- you know, the -- the way I read it, the inmate is saying, sarcastically, oh, don't worry, you know, you're about to get it because they're about to look at the footage.  Do you read it that same way?

MS. PAGE:  Form.

A   I can't -- I can't tell whether the inmate was sarcastic or factual because I didn't hear the inmate speak.  Based on the written word, all I can determine was that Ms. Harrell was told by an inmate that camera footage was being reviewed on Monday.  As far as what he meant by "this will be work itself out," I would be guessing.

Q   Okay.  And then, about halfway down

Page 130

Ms. Blocker's e-mail, she says:  Ms. Johnson, then, told her -- "her" being Ms. Harrell -- that she needed to know who this inmate was and that a statement and incident report had to be written on everything she had reported.

Do you see that?

A   Yes.

Q   Okay.  And then a couple of lines down from that, Ms. Harrell complains that she felt like she's about to get accused of doing something.  Ms. Johnson asked, "Who accused you of anything?"  And Harrell responded:  Cook, in your office the other day.  She said I was the reason for all the drama.

So, would you agree that, just based on this e-mail, that, again, Ms. Harrell is complaining that she feels like Ms. Cook is accusing her of things?  I mean, we can agree on that, right?

MS. PAGE:  Form.

A   Well, we can -- I guess I can agree that she -- her perception was that Ms. Cook was accusing her of things.

Q   And so, we can at least agree that there -- there were -- there was evidence present- -- presented to you that Ms. Harrell believed that Ms. Cook was out to get her.

Page 131

1      MS. PAGE:  Form.
2      A   If you're referring to this e-mail, I have in
3  here that Ms. Harrell stated that she felt Ms. Cook
4  was -- made a statement about her being all the drama
5  and Ms. Johnson saying that that was not what was said.
6  So, I have two conflicting statements within this
7  e-mail.
8      Q   Well, and -- and my question was:  You can at
9  least agree that you had evidence as to what Ms. Harrell
10  believed.
11      MS. PAGE:  Form.
12      A   Yeah.
13      Q   Right.
14      A   Yes.
15      Q   Okay.  So, we have -- we have this e-mail,
16  Exhibit 29.  We have the -- the e-mail that we looked at
17  earlier where Ms. Harrell was reporting that she felt --
18  she didn't feel comfortable speaking in front of
19  Ms. Cook.  You recall that?  I believe it was
20  Exhibit 25.
21      And then Ms. Harrell went on to report that --
22  yeah, the bottom of the section of Paragraph --
23      A   Yes, I -- I -- yes.
24      Q   Okay.  So, we've got -- we've got the e-mail.
25  We just looked at Exhibit 29 where Harrell is saying

Page 132

1  Cook is accusing her of things.  And then we've got
2  Exhibit 25 where, again, Ms. Harrell is saying she
3  doesn't feel comfortable speaking in front of Ms. Cook
4  and that she feels Ms. Cook is out to get her.
5      Whether or not you believe Ms. Harrell, you
6  can at least agree that information was presented to you
7  that Ms. Harrell believed that Ms. Cook was out to get
8  her or that she didn't feel comfortable speaking in
9  front of Ms. Cook.  You can agree with that, right?
10      MS. PAGE:  Form.
11      A   Yes.
12      Q   Okay.  Did you ever look into these -- this --
13  these concerns that were -- that you were certainly made
14  aware of?
15      A   I'm sorry.  Can you restate that?
16      Q   Did you ever look into these concerns that
17  Ms. Harrell obviously had as it relates to Ms. Cook?
18      A   We certainly looked into her specific
19  allegations regarding Ms. Cook.
20      Q   Okay.  And what did you do to look into that?
21      MS. PAGE:  Form.
22      A   From -- okay.  I don't recall all of the
23  specific details of everything that happened in this
24  incident.  My -- actually, my memory of this particular
25  case is not super strong.  I do recall looking into the

Page 133

1  incident about the keys.
2      I don't recall any other super-specific things
3  about looking into, you know, complaints she made about
4  Cook, other than the complaint that went back to
5  Christmastime.  I -- I really don't recall.
6      Would we have looked into concerns that she
7  had had about Ms. Cook?  Yes.  What was done, I don't
8  really recall.
9      Q   Okay.
10      A   I'm going to add to that, it's hard to look
11  into a feeling, you know, that she's not comfortable.
12  It's easier to look into things like, there was a
13  conversation in front of my door about the keys.
14      Q   But even -- and I -- I accept your -- your
15  statement that you -- may not have been the easiest to
16  look into, but certainly that's something you could have
17  considered when Ms. Johnson and Ms. Cook were wanting
18  Ms. Harrell terminated, correct?  That's something you
19  could have at least considered before just taking
20  Ms. Johnson and Ms. Cook's word for -- for what they
21  were saying?
22      MS. PAGE:  Form.
23      A   Well, we're -- I did not just take Ms. Johnson
24  and Ms. Cook's word.  There was documentation to support
25  information that was presented.  Ms. Douin was also

Page 134

1  involved.  So, it wasn't just taking Ms. Cook's and
2  Ms. Johnson's word on any of this.
3      Q   Okay.  Well, let's talk about the
4  documentation that you say supported that, because we
5  looked at the -- for instance, the shift-assignment
6  sheet.  And what -- what we saw was documentation that
7  clearly -- clearly did not support the allegation of --
8  regarding what Ms. Harrell didn't do on 4/14/18, right?
9      I mean, there was -- there was documentation
10  that clearly disproved what was being reported to you;
11  you agree?
12      MS. PAGE:  Form.
13      A   Based on looking at that documentation, yes.
14      Q   Okay.  And then, there was also the e-mail
15  from Ms. Harrell or from -- from Ms. Johnson where she
16  straight-up says, "I'm not accusing you of having a
17  relationship with an inmate."  We -- we went over that,
18  right?  That was -- that's more documentation that
19  disproves what was being reported to you, correct?
20      MS. PAGE:  Form.
21      A   I disagree with you on that one because,
22  again, the issue was policy, and the policy was about a
23  relationship.  So, that is what that final warning was
24  about.
25      Q   I mean, I think we can agree on what the --

**Page 135**

1  the policy says.  But Ms. Johnson says to Ms. Harrell,
2  I'm not accusing you of having a relationship with an
3  inmate.
4       MS. PAGE:  Form.
5       A   And I -- I can't state as to what Ms. Johnson
6  meant by that.  I can't understand why she would have
7  put it to her that way.  I wasn't there.  All I can tell
8  you is what the policy says and what the warning was
9  about.  I concur with it being about a relationship with
10  an inmate.
11      Q   But wouldn't you approve Ms. Harrell's -- I
12  mean, fair to say, when you approved Ms. Harrell's
13  termination, you didn't consider that e-mail at that
14  time -- Ms. Johnson's e-mail at that time, correct?
15      MS. PAGE:  Form.
16      A   No, I did not.
17      (Exhibit No. 30 marked for identification.)
18  BY MR. FINNERTY:
19      Q   Okay.  Let's take a look at Exhibit 30.  Have
20  you ever seen Exhibit 30 before, ma'am?
21      A   I believe I've seen all of the exhibits at one
22  point.  As to what's in Exhibit 30, I would need to see
23  it to refresh my memory.
24      Q   Okay.  And just to kind of summarize, this is
25  an incident report prepared by Tara Johnson on

**Page 136**

1  April 3rd, 2018.  And I'll -- I mean, I'll represent
2  she's essentially going through what we discussed
3  earlier in the e-mail chain relating to what Ms. Johnson
4  and Ms. -- Mr. Zurica saw when they reviewed camera
5  footage.  And -- and I'll give you a chance to take a
6  look at it, but I'm not -- I'll tell you, I'm not trying
7  to mislead you.  That's the way I read it.
8       And so, just take a look at it and just tell
9  me if you agree that this is what -- that's what
10  Ms. Johnson is talking about here.
11      A   Yes, this is her summary of the review of
12  video footage.
13      Q   Okay.  And would you have been provided a copy
14  of this incident report?
15      A   I believe so.
16      Q   Okay.  Do you know whether this was ever
17  investigated by the Department of Corrections?
18      A   I would not be privy to any investigation by
19  the Department of Corrections, so I have no idea.
20      Q   Okay.  Just based on the first sentence of
21  this e-mail, you would agree that the reason Ms. Johnson
22  reviewed the camera footage was related to incident
23  reports submitted by Virginia Harrell.  You agree with
24  that?
25      MS. PAGE:  Form.  Asked and answered --

**Page 137**

1  A   Yes.
2       MS. PAGE:  -- a number of times.
3       (Exhibit No. 17 marked for identification.)
4  BY MR. FINNERTY:
5       Q   Okay.  All right.  Let's take a look at
6  Exhibit 17.  And so, this is an e-mail from Tara Johnson
7  dated April 3rd, 2018.  And it looks like you were one
8  of the people that was CCed on this e-mail.  Do you see
9  that?
10      A   I'm looking for my name and not seeing it --
11  oh, there it is.  Okay.  Got it.
12      Q   Okay.
13      A   Yes.
14      Q   Do you -- do you recall receiving this e-mail
15  at the time, now that --
16      A   Actually, yes, I do.
17      Q   You do?  Okay.
18      Were you involved at all in preparing this
19  e-mail or --
20      A   No.
21      Q   Or at least discussing with Ms. Johnson what
22  was put in this e-mail?
23      A   No.
24      Q   Okay.  So, this is April 3rd.  It's the day
25  after Ms. Johnson reviewed the -- camera footage,

**Page 138**

1  and it's the same day that Ms. Johnson prepared her
2  incident report that we just went over.
3       So, if you look at the first -- like, after,
4  "Good afternoon," Ms. Johnson says:  There are a few
5  items that will be discussed at the next staff meeting,
6  but I would like to bring some things to everyone's
7  attention immediately.
8       Going forward, be advised of the following.
9  First thing, staff is not allowed to be on the compound
10  if they are clock- -- if they are off the clock.  If you
11  clock out, go home.
12      Would you agree that that is one of the things
13  that Ms. Harrell had complained of, that staff members
14  were staying on -- at the facility after they had
15  clocked out?
16      A   I would say it was both something that
17  Ms. Harrell complained of and something that Tara had
18  also had an issue with when she had encountered an
19  employee working off the clock.
20      Q   Right.  Ms. Long, right?
21      A   Correct.
22      Q   Keidre?  Okay.
23      All right.  No. 2 is basically the same thing:
24  Staff are not allowed to clock out and remain on the
25  grounds working.  You must be paid for all hours worked.

Page 139

1  Overtime must be approved.
2       Basically, the same -- aside from the overtime
3  issue, basically the same as No. 1, correct?
4       A   Yes.
5       Q   Which is, again, something that Ms. Harrell
6  had -- had raised concerns about.
7       MS. PAGE:  Form.
8       A   Yes.
9       Q   Okay.  No. 3 talks about inmate orderlies are
10 not authorized in an office.  Not something, I don't
11 think, that Ms. Harrell specifically complained about,
12 but we can agree that that was basically the issue that
13 Ms. Harrell got her final warning for, for an inmate
14 coming in her office, correct?
15      MS. PAGE:  Form.
16      A   Yes.
17      Q   Okay.  No. 4, basically the same thing.  Talks
18 about the inmates, but it relates to medical exams.
19 Basically says that the only time that inmates are
20 allowed in an office by themselves is for medical exams,
21 fair?  You agree with that?
22      A   Actually, it would be for a mental-health
23 exam, as I understand it.  Medical exams are conducted
24 in an exam room.
25      Q   Okay.  You're right.

Page 140

1       Okay.  But it's basically providing an
2  exception for the no-inmates-allowed-in-an-office rule,
3  right?
4       A   Yes.
5       Q   Okay.  No. 5 specifically relates to:  Your
6  trash needs to be taken -- emptied, you should set it
7  out in the hallway.  Inmates shouldn't be coming in,
8  fair?
9       A   Correct.
10      Q   You agree with that?  Okay.
11      So, why is it -- as it relates to No. 5, if
12 this were already a policy, why would Ms. Johnson in her
13 e-mail say, "Going forward, be advised of the
14 following"?
15      MS. PAGE:  Form.
16      A   Why she chose the word "going forward," I'm
17 not sure.  I would have maybe put this more as a
18 reminder because my understanding is that all of these
19 things that she's stated are not new.  You know,
20 especially -- you know, you're looking at No. 1, right
21 off the bat, nobody should be on the compound if they
22 are not punched in and working.
23      No. 2, staff are not allowed to clock out and
24 remain on grounds working -- that's always been the
25 case, so I wouldn't say that any of this is going

Page 141

1  forward.  I would have worded it differently.
2       Why she chose the word "going forward,"
3  instead of "as a reminder," I couldn't say, but I would
4  say pretty much everything that's in here is reminders,
5  not anything new.
6       Q   All right.  So -- so, as it relates to No. 5,
7  about putting your trash in the hallway, can you point
8  to a specific, written policy that required staff to put
9  their trash in the hallway prior to the date of this
10 e-mail, April 3rd, 2018?  Can you -- can you point me to
11 a specific written policy that says that?
12      MS. PAGE:  Form.
13      A   There's -- there's no policy in our employee
14 handbook, but, for instance -- you know, you can't have
15 policies for every single thing, but you certainly would
16 have meetings and discuss how certain things are going
17 to be handled.  And this would probably be one of those
18 instances where they have had this discussion, and this
19 is a procedure that they follow.  It may not be in
20 writing, but it's something that everybody is supposed
21 to know.
22      And, again, that's why I would believe this is
23 a list of reminders, not anything new.  And like I said,
24 the first ones are prime examples of something that is
25 not new, and that these are reminders.

Page 142

1       The same thing -- No. 4 is obviously a
2  reminder because they've always had, you know, the rules
3  about not doing medical exams in anybody's office,
4  about, you know, the only exception being mental-health
5  staff interviewing inmates in their office.
6       So, again, I believe this is a reminder of
7  something that had probably been discussed previously in
8  a staff meeting.
9       Q   Okay.  I mean, you -- I think, when you say
10 "probably" -- I mean, it's fair to say that that's --
11 that's just your assumption, correct?
12      A   I'm sorry.  Can you repeat that?
13      Q   I mean, you know, haven't you said, multiple
14 times, you know, probably this, probably that?  So, I
15 mean, we can agree, this is your assumption.  You don't
16 know -- you haven't seen a written policy prior to
17 April 3rd, 2018, that said you've got to put your trash
18 in the hallway because an inmate can't come in and empty
19 it, correct?
20      A   Well, sir, I --
21      MS. PAGE:  Form.
22      A   I didn't write the e-mail.  So, you're asking
23 me to speculate on what was meant by what's in here.
24 That's all I can do is give you assumptions.  I didn't
25 write this e-mail.

Page 143

1   Q   Okay.  But I'm saying you don't have any --
2   you can't point to a written document that existed
3   before April 3rd that says an inmate can't come empty
4   your trash, correct?
5   A   Correct.
6   Q   Okay.  And, you know, your assumption that
7   that --
8   A   Can I --
9   Q   -- was already the policy --
10  A   I'm sorry.
11  Q   That's despite the fact that Ms. Johnson is
12  saying, going forward, this is what's going to happen,
13  right?
14      MS. PAGE:  Form.
15  A   Can I --
16      MS. PAGE:  Form.
17  A   Can I go backwards on that?  I have not seen a
18  document that says that you -- you know, you need to set
19  your trash can in the hallway.  That doesn't mean it
20  doesn't exist.  I didn't work inside that facility.  So,
21  that's a particular policy that would never have applied
22  to me.  So, I may never have seen that.
23      It's possible that they had, you know, meeting
24  minutes that were distributed that would have shown that
25  information, but I wouldn't have had that information.

Page 144

1   So, again, you're -- you're asking me to speculate on
2   what was meant by this document.  And that's all that I
3   can do is speculate and tell you what I believe was to
4   have been meant by this.
5       And, again:  Going forward, please be advised
6   of the following -- you could have easily said, please
7   be reminded or, going forward, please be reminded of the
8   following.
9       Her choice of words maybe was imperfect, but,
10  again, most of what I see in here were already existing
11  policies.  This was not new.  And you're asking me to
12  point to a policy or a document that may very well
13  exist, but that I've never seen --
14  Q   And --
15  A   -- because I don't work inside that facility.
16  Q   And you know, I'm -- I'm not asking you to
17  speculate when I say, are you aware of a policy.  I
18  mean, it's yes or no.  I'm not asking you to speculate.
19  I'm saying, were you aware of a policy relating to trash
20  cans prior to April 3rd, 2018.  I don't want your
21  speculation.  I'm asking you --
22  A   And the answer to that is no because I
23  don't --
24  Q   Okay.
25  A   -- work inside that facility.

Page 145

1   Q   All right.  No. 6:  If the inmate reports
2   something to you regarding another staff member, you
3   must notify the supervisor immediately and submit an
4   incident report.  I don't know if that's exactly what
5   Ms. Harrell -- actually, hold on.
6       (Exhibit No. 43 marked for identification.)
7   BY MR. FINNERTY:
8   Q   Let's take a look at Exhibit 43.  All right.
9   So, Exhibit 43, you can see on that first page that
10  Ms. Harrell e-mails Ms. Johnson on April 2nd.  Subject
11  says, "Incident."
12      And then it says:  Please note, these
13  statements were made at the end of my workday on Friday.
14  I was already present past my allowed time.  I submitted
15  this as soon as I had the opportunity to make you aware.
16      Then, Ms. Johnson forwards it to Ms. Douin,
17  Ms. Barton, and to you.  That's the same date.  So, you
18  look down, Page 2.  It's an incident report prepared by
19  Ms. Harrell.
20      She's saying that, on March 30th, an inmate
21  emptied her trash.  He informed Ms. Harrell of
22  accusations from another inmate who was allegedly
23  informed by Ms. McDaniel that I -- Ms. Harrell -- was
24  the reason for the drama within the medical department.
25      Inmate "blank" also stated that Ms. McDaniel

Page 146

1   informed the inmate that video cameras within the
2   medical department would be reviewed on Monday.  I think
3   this is in relation to the e-mail we just went over
4   where Ms. Harrell was complaining about what an inmate
5   told her, and this is just her putting it in an incident
6   report.
7       It goes on to say, the cameras will be
8   reviewed.  He also stated that the particular inmate was
9   upset that McDaniel wouldn't be working on the following
10  Saturday, which was allegedly also Ms. Harrell's fault.
11  She responded by telling the inmate she had no knowledge
12  of what he was talking about.
13      So, as it relates to that complaint, would you
14  agree that that is something -- or that -- No. 6 of --
15  of Exhibit 17 is referencing, you know, what an inmate
16  may have reported to a staff member?  Can we agree on
17  that?
18  A   Yes.
19      MS. PAGE:  Form.
20  Q   Okay.  Now, would you agree that, you know,
21  based on Exhibit 43, Ms. Harrell's incident report, that
22  if it's an inmate -- if an inmate is being told by an
23  employee, a health care provider, that Ms. Harrell is
24  the reason for all the drama, that that could certainly
25  create a potential security risk?  Can -- can you agree

Page 147

1  with that?
2      MS. PAGE:  Form.
3      A   I'm not a security expert.  I'm really not
4  sure how to answer that.  Could that be a security risk?
5  I guess so.
6      Q   I mean, you would agree that it -- it's not
7  good if an inmate is thinking that an -- an employee is
8  the reason that the person that they're seeing and
9  having a relationship with isn't going to work next
10 Saturday because of Ms. Harrell.  You could agree that
11 probably -- probably not good that an inmate thinks
12 that.
13     MS. PAGE:  Form.
14     A   Again, probably not good.
15     Q   Okay.  So, Ms. Harrell submits this incident
16 report on March 30th -- I'm sorry.  It looks like she
17 submitted it on April 2nd.  She talks about an inmate
18 emptying her trash -- you know, she wasn't written up
19 for that, was she?
20     MS. PAGE:  Form.
21     A   I don't -- I don't -- no, this was not part of
22 her write-up.  No.
23     Q   Okay.  Do you know whether you investigated
24 this complaint at all?
25     A   I don't specifically recall it.  No.

Page 148

1      Q   Okay.  I mean, does it --
2      A   Some things would not have been investigated
3  by human resources.  And what an inmate said is not
4  something that necessarily would be investigated by
5  human resources.  Human resources doesn't get involved
6  necessarily with, you know, things related to inmates.
7      That might have been -- this might be
8  something that we would expect would be turned over to
9  security to find out what's going on with that inmate or
10 why he's getting involved in that.
11     Q   But can we agree that Ms. McDaniel shouldn't
12 be telling inmates that Ms. Harrell is the reason that
13 there's drama or the reason that --
14     A   Absolutely.
15     Q   That's not something Ms. McDaniel should have
16 been doing, right?
17     A   Absolutely, yes.
18     Q   Okay.
19     A   And this may have been investigated as it
20 pertains to Ms. McDaniel.  I just don't specifically
21 recall it at this time.
22     Q   Okay.  And then, can we agree that Item No. 6
23 in Ms. Johnson's e-mail, which is Exhibit 17, basically
24 talks about what Ms. Harrell is complaining of?  I mean,
25 talks about, you know, if an inmate tells you something

Page 149

1  about another staff member, you should report it.  You
2  agree that those are related?
3      MS. PAGE:  Form.
4      A   I would agree they're potentially related,
5  yes.
6      Q   Okay.  And then No. 7:  Don't engage with
7  conversations of a personal nature with an inmate at any
8  time, and do not engage in conversations that inmates
9  might overhear.
10     A   Okay.  You -- you were buzzed out with some
11 electronic noise.  I only heard --
12     Q   Yeah.
13     A   -- bits and pieces of that.
14     Q   So, No. 7 on the document that's on the
15 screen:  Don't engage in conversations of a personal
16 nature with an inmate at any time -- you can agree that
17 that's something that's at least referenced in the
18 Ms. Harrell's incident report, which is Exhibit 43?
19     MS. PAGE:  Form.
20     A   It -- it could be.  It could be, but that's
21 also something that I believe is a -- is, you know,
22 standard.  I believe that they're trained that in DOC
23 orientation at the time of hire.  So, I could also see
24 that as a general reminder.
25     Q   Well, can you agree that No. 7, engaging in

Page 150

1  conversations of a personal nature with inmates is
2  exactly what Ms. Harrell received her final warning for?
3      A   Yes.
4      Q   Okay.  And, again, you know, I'm -- just based
5  on Ms. Johnson's wording, when she says "going
6  forward" -- I mean, can we at least agree that, if this
7  wasn't actually a policy prior to April 3rd, that
8  Ms. Harrell should not have gotten a final warning for
9  something that was not even a policy violation on the
10 alleged date, which was March 28th?  I mean, can you
11 agree with that?  I'm not saying --
12     MS. PAGE:  Form.  Calls --
13     Q   I'm not asking you to agree that she didn't
14 violate policy or to agree that there wasn't a policy at
15 that time, but if there wasn't a policy, can you agree
16 she shouldn't have been written up if that wasn't an
17 actual policy?
18     MS. PAGE:  Form.  Calls for speculation.
19     A   I'm -- I'm struggling with this question
20 because a policy did exist, and I know a policy did
21 exist.  So, you're asking me to say that, if something
22 didn't exist, would we have handled it differently?  If
23 there was no such policy, we probably would handle
24 things differently, but the policy exists.
25     Q   Okay.  So, you say the policy exists.  What --

Page 151

1  what policy is that?
2      A   I don't know policy numbers right off the top
3  of my head, but it's the same policy we reviewed
4  previously that discussed personal relationships with
5  inmates.
6      Q   Well, that policy -- Exhibit 16, that
7  policy -- Paragraph 26 of that policy does not say that
8  staff members can't talk to inmates; can you agree with
9  that?
10     A   I can't see it at the moment.
11         MS. PAGE:  Sorry.
12         Form.
13     Q   Paragraph 26.
14     A   It -- it doesn't say that you can't speak to
15  inmates, no.
16     Q   Okay.  And aside from this policy, can you
17  reference any other policy that existed prior to
18  April 3rd that prohibited staff from speaking to an
19  inmate?
20         MS. PAGE:  Form.
21     A   I don't believe there's any such policy that
22  prohibits them from ever speaking to an inmate because
23  that would be -- when you're working inside, that would
24  be pretty impossible.
25         If you're providing care, you have to speak to

Page 152

1  the inmate.  Even passing in the hallway, common
2  courtesy, you will say thank you to an inmate who holds
3  the door for you.  You will say good morning or good
4  afternoon when you pass them in the hallway.  So, no,
5  there is no policy that says you cannot speak to an
6  inmate.
7         It's the conversations that are more personal
8  in nature -- so, for instance, I should not be
9  discussing my children with an inmate.  That's a
10  personal conversation.  They don't need to know about my
11  children.
12     Q   So, Ms. Harrell's final warning -- the only
13  policy that it references is Exhibit 16.  I mean, would
14  you agree that, if there were some other policy, it
15  could have potentially covered speaking to an inmate,
16  that that should have been referenced --
17         MS. PAGE:  Form.
18     Q   -- in Ms. Harrell's final warning?  Can -- can
19  you agree with that?
20         MS. PAGE:  Form.
21     A   You're asking me to speculate about a possible
22  other policy.  If there is another policy that
23  references the specific issue in there, should it have
24  been referenced?  Yes.  But, again, you're talking "if."
25     Q   Okay.  Well, I mean, you told me that you know

Page 153

1  that's a policy, but you just can't tell me a policy
2  number.
3      A   Oh, I stated I -- I know there is no policy
4  that says you can't ever speak to an inmate because that
5  would be impossible.
6      Q   I mean, is there any other policy that you're
7  aware of that would have made it a violation for
8  Ms. Harrell to have done what is alleged in her final
9  warning?
10         MS. PAGE:  Form.
11     A   I would need to review the policies to
12  determine a -- a truly correct and a hundred-percent
13  accurate response to that question and I don't want to
14  give you misinformation.  I believe that there are
15  several policies that exist in regards to personal
16  relationships with inmates and dealing with inmates.
17         Some of those are DOC policies -- as a matter
18  of fact, most of those are DOC policies and I don't have
19  direct access to those.  I tend to get those from the
20  people at the site.
21     Q   And, you know, you've -- you've said a lot
22  about speculation.  I mean, that's -- that's
23  speculation, right, ma'am; that you believe that there's
24  a policy, but you don't know, you can't point to it, you
25  can't cite it.  I mean, that's pure speculation, right?

Page 154

1         MS. PAGE:  Form.
2      A   You -- you've asked me to speculate.  So, yes,
3  that is speculation.
4      Q   Okay.  Well, I asked you to cite a policy and
5  I -- I haven't heard one.
6      A   And as I explained, I don't have all of our
7  policies memorized.  I don't -- I couldn't possibly
8  memorize all of our policies.
9      Q   Understood.
10         No. 9 on the e-mail attached as Exhibit 17 --
11  no, I'm sorry -- No. 8:  Only a department head may
12  request to view camera footage -- that's something that
13  we looked at earlier.  Ms. Harrell has asked to see
14  footage.  She was said -- told that it had to come from
15  a department head.  That was something that was brought
16  up in the -- in the course of Ms. Harrell submitting
17  complaints, right?
18     A   Yes.
19     Q   Okay.  Smoke breaks wasn't part of any of her
20  complaints.
21         Propping open doors --
22         THE COURT REPORTER:  I'm sorry.
23  Mr. Finnerty -- Mr. Finnerty, I need you to back up
24  and slow down.
25         (Discussion off the record.)

Page 155

1  BY MR. FINNERTY:

2      Q   No. 10, Ms. Brus, says do not prop doors, do

3  not leave office doors, exam rooms unsecure when you

4  exit -- do you see that one, ma'am?

5      A   Yes, I see it.

6      Q   Okay. All right. So, then if we look back at

7  Exhibit 25, one of the things Ms. Harrell complained

8  about -- Item No. 3 in this e-mail was that McDaniel

9  leaves the pill-room door propped open and lets Inmate

10 "Blank" in the pill room.

11     So, would you agree that what Ms. Johnson is

12 talking about in Item No. 10 is something that

13 Ms. Harrell had specifically complained about recently?

14     A   Yes.

15     Q   Okay. All right. So, could you understand --

16 and Ms. Harrell was copied on this e-mail. Could you

17 understand that Ms. Harrell was -- that it was her

18 belief that this e-mail was sent to all staff because of

19 her complaints?

20     MS. PAGE: Form.

21     Q   I mean, could you see how that could be her --

22 her belief?

23     MS. PAGE: Form. Calls for speculation.

24     A   Yeah, I -- I mean, I can speculate on anything

25 you want to, but I -- my feeling would be that, if I

Page 156

1  were complaining about things and that they were wrong,

2  I would be happy to see that my supervisor is addressing

3  them with the whole staff and requesting that these

4  issues be corrected.

5      This would be certainly one of the things that

6  I would expect a supervisor to do, would be that, if

7  we're finding that these things are going on that

8  shouldn't be going on, that she should take steps to

9  correct.

10     And if she felt these needed to be addressed

11 before she had time for a staff meeting, where she would

12 be able to discuss and what have you, sending out an

13 e-mail with this information in it -- I don't think it

14 was a bad thing.

15     I think it was a re-- yes, a response to

16 what Ms. Harrell had -- had sent to her, at least in

17 part because some of this had nothing to do with what

18 she -- what she stated, but I -- I think a good

19 supervisor, a good leader is going to recognize that,

20 where there are issues, that rather than, you know,

21 waiting another two weeks where you can get everybody

22 together for a staff meeting to -- to bring up some

23 important issues, sending something out so that they see

24 it and it's in writing is not a bad thing.

25     And if I had issued a series of complaints and

Page 157

1  my -- I saw that my supervisor was addressing those

2  complaints, I actually would take that in a good light.

3  I would take that as, okay, they're taking my complaints

4  seriously. They're -- they're, you know, addressing it

5  with everybody and making sure that these things stop.

6      Q   Okay. Well, could you agree that, based on

7  this e-mail, which does contain a lot of the things that

8  Ms. Harrell had recently complained about -- would you

9  agree that, by sending this e-mail, Ms. Johnson is

10 basically agreeing that these are legitimate issues?

11     A   Yes, I would say she -- she was saying there

12 are legitimate issues there, yes.

13     Q   Okay. So, as it relates to whether

14 Ms. Harrell would have been terminated after receiving

15 the final warning on April 9th of -- prior to the

16 discovery of the alleged issue on April 14th, regarding

17 the -- the allegation that Ms. Harrell didn't account

18 for narcotics or sign the log -- I think you testified

19 earlier that she could have been terminated without the

20 narcotic issue; is that right? That was your testimony?

21     A   Yes.

22     MS. PAGE: Form.

23     (Exhibit No. 20 marked for identification.)

24 BY MR. FINNERTY:

25     Q   Do you know why -- look at Exhibit 20 -- do

Page 158

1  you know why, on April 17th, three days after the

2  alleged incident happened on April 14th, when

3  Ms. Harrell was assigned to the pill room -- do you know

4  why, three days later, she was being approved to work

5  overtime?

6      MS. PAGE: Form.

7      A   I don't get involved in who works overtime and

8  what have you. I wasn't involved in that particular

9  issue at all. So, you know, why did she approve it for

10 her? Sounds like there was something coming up that

11 needed to be prepared.

12     And, you know, from what I'm reading in the

13 e-mail, it just sounds like it made sense for her to

14 have done what needed to be done and have it done by a

15 deadline.

16     Q   And this e-mail is from Tara Johnson to

17 Ms. Harrell, and it's CCing Lori Cook. And Ms. Johnson

18 says: I spoke with Ms. Douin. Ms. Douin has approved

19 overtime.

20     So, would you agree that Ms. Douin and

21 Ms. Johnson -- if they had a serious concern at that

22 time, April 17th, 2018, as relates to Ms. Harrell, that

23 they wouldn't be giving her overtime?

24     MS. PAGE: Form.

25     A   I -- I don't make that decision. As far as

Page 159

1  what -- what she was doing in the overtime might have
2  been something to do with it.  So, I -- I really can't
3  testify to what -- what this was about.  That's not
4  something that I was involved in.
5      Q   Have you ever heard anybody voice any concerns
6  about Ms. Harrell's actual work performance?
7          MS. PAGE:  Form.
8      Q   The ability to do her job.
9      A   Other -- other than the specific issues that
10 were addressed, her attendance, the -- the key log
11 and -- and the e-mails, I don't recall anything other
12 than those.
13     Q   Okay.  Do you know who was hired to replace
14 Ms. Harrell after she was terminated?
15     A   I do not.  I'd have to look it up.
16         (Exhibit No. 31 marked for identification.)
17 BY MR. FINNERTY:
18     Q   Okay.  Let's look at Exhibit 31.  And so --
19 and we -- we kind of discussed this a little bit
20 earlier.  I know you referenced Louis Clark, the IT guy.
21 And if you go to the -- the last page of this e-mail
22 chain, Mr. Clark was able to -- to, I guess, go back and
23 search, which he was -- he was -- is -- is that a guy,
24 I'm assuming?  Is it Mr. Clark?
25     A   Yes.

Page 160

1      Q   Okay.  So, he was able to find some e-mails.
2  And then he sent them to Ms. Johnson.  And then
3  Ms. Johnson sent an e-mail to you, Ms. Douin -- well,
4  just you and Ms. Douin.  She kind of summarizes them.
5  One of them -- under No. 4 of Ms. Johnson's
6  e-mail to you and to Ms. Douin, where she's summarizing
7  them, there was, apparently, a day where it looks like
8  Ms. Harrell sent an e-mail from her work account on a
9  day that she wasn't working.  And then there were some
10 possible explanations.
11         Did you -- did y'all ever determine how that
12 could have possibly happened?
13         MS. PAGE:  Form.
14     A   I think the explanations for how it could have
15 happened are -- are right here in this exhibit, you
16 know, whether someone else accessed -- accessed her
17 e-mail, but I'll add that, if she gave her password is
18 the only way someone else could have accessed her
19 e-mail.  And that would be a different kind of policy
20 violation.
21         Reporting to work when she wasn't assigned was
22 probably the most likely unless she was accessing her
23 work e-mail from her phone or from her home computer,
24 but we don't really know a hundred percent how, you
25 know, she accesses the e-mails.  I mean, I know the

Page 161

1  answers that she gave in regards to that were pretty
2  vague.
3      Q   Well, I mean, my question was:  Do you know
4  how that actually happened.  I mean, it was --
5      A   Do I know -- do I know exactly how she
6  accessed her e-mail on that date?  I do not.
7      Q   Okay.  Do you know whether Ms. Harrell had
8  access to her e-mail on either her home computer or her
9  cell phone?
10     A   I don't.  I don't know that.
11     Q   Okay.  All right.  So, after Ms. Johnson sends
12 the e-mails and her summary of the e-mails, it looks
13 like a time is set up for you and Ms. Douin and
14 Ms. Johnson to -- to discuss the e-mail issue.  You see
15 that?
16     A   Yes.
17     Q   It looks like 1:30 on Monday.
18         Do you know what was discussed on that phone
19 call?
20     A   I believe we discussed the e-mails, the
21 content of the e-mails, what the issue would be with the
22 content of the e-mails that were being sent to her home,
23 any iss-- any e-mails that we had particular concern
24 having been sent to her -- her home e-mail.
25         We probably discussed as well how exactly did

Page 162

1  she access the e-mail to -- to send it to her home
2  e-mail because I know one of the concerns was did she
3  come in when she wasn't supposed to be at work.
4          We probably discussed the policy about using
5  your business computer for business use only, and
6  sending those things to her personal computer would, you
7  know, have violated that policy as well, of her personal
8  e-mail.
9          I -- I'm sure we had mostly discussion about
10 the content of the e-mails that she had sent from her
11 work e-mail to her home e-mail.
12     Q   Okay.  Do you know whether there was ever
13 any -- anything to docu- -- document what y'all actually
14 discussed in that phone call?
15     A   Not that I'm aware of.
16     Q   Okay.  Are you aware of any evidence that
17 would indicate that Ms. Harrell ever distributed or
18 allowed anyone other than herself to see the e-mails she
19 allegedly sent from her work account to her personal
20 account?
21     A   I wouldn't know that.  I wouldn't have -- I
22 wouldn't be able to know that without -- I mean, I would
23 have had to witness somebody else seeing her e-mails to
24 know that.
25         (Exhibit No. 32 marked for identification.)

Page 163

BY MR. FINNERTY:

1  Q   Okay.  Let's take a look at Exhibit 32.  All
2  right.  So, this is where Ms. Harrell is -- she sends
3  you a complaint on April 10th, 2018, which is attached
4  as the second page of Exhibit 32.
5      She complains that the final warning she had
6  just gotten was retaliation.  She talks about how she
7  had just -- Ms. Johnson had just tried to have her
8  removed by reporting that she had submitted a verbal
9  resignation.
10     It talks about how she was unable at that
11 time, when she was presented the final warning to -- to
12 recall the e-mails that she allegedly sent to herself
13 and wasn't able to provide a response.
14     But, I mean, essentially she's saying that
15 she's being retaliated against.  Would you agree with
16 that?
17     MS. PAGE:  Form.
18 A   That's her statement, yes.
19 Q   She's saying that she feels she's being
20 treated unfairly, right?
21 A   That's what she states, yes.
22 Q   And she's fearful of further retaliation,
23 correct?
24 A   That's what she states, yes.

Page 164

1  Q   And these are serious concerns or con--
2  con -- this is a serious complaint, correct?
3  A   Yes.
4  Q   And so, it looks like, after you received this
5  complaint, you forwarded it to Ms. Douin and said:  Call
6  me to discuss when you have a few minutes.
7      Did you have a discussion with Ms. Douin?
8  A   Yes.
9  Q   And did you ever respond to Ms. Harrell after
10 she submitted this complaint?
11 A   I really don't recall if I responded to her or
12 not.
13 Q   Would you agree that that's something you
14 should do as an HR business partner to say, you know,
15 I -- I understand your complaints, I'm going to look
16 into it, I'm going to make sure you're not being
17 retaliated against?  Isn't that part of your duties?
18     MS. PAGE:  Form.
19 A   It's -- it would be nice if I was able to do
20 that in every instance.  Sometimes we don't respond
21 to -- to everything in the manner that you're stating.
22 Q   Okay.  So, you don't know whether or not
23 you -- you ever did respond to Ms. Harrell?
24 A   If I did, I probably spoke to her on the
25 phone.  I would say, if I had responded to her in

Page 165

1  writing, we'd have record of it, but I don't recall
2  specifically whether I spoke to her about this or not.
3  Q   Okay.  And do you recall what -- what you and
4  Ms. Douin discussed?
5  A   I don't recall specifically the conversation
6  with -- with Ms. Douin about this.  I -- clearly we must
7  have talked about it, but I don't have a clear
8  recollection of that discussion.
9      (Exhibit No. 37 marked for identification.)
10 BY MR. FINNERTY:
11 Q   Okay.  Exhibit 37 -- I guess my only question
12 is:  Have you ever seen this -- this document?
13 A   This would be something I would imagine would
14 be posted on a door in one of the institutions.  I don't
15 recall seeing that other than in preparing for this
16 deposition.
17 Q   Okay.  And any -- any knowledge as to when
18 this would have been posted?
19 A   None.
20     (Exhibit No. 39 marked for identification.)
21 BY MR. FINNERTY:
22 Q   Okay.  Let's take a look at Exhibit 39.  So,
23 this is where Ms. Harrell e-mailed you a complaint on
24 December 15th.  It says:  Attached, you will find
25 correspondence regarding our conversation yesterday.

Page 166

1      The title of this -- or the subject is
2  "Concerns," and then attached to that is a two-page
3  document containing Ms. Harrell's concerns.  Do you
4  recall receiving this complaint?
5  A   Yes, I do.
6  Q   Okay.  Did you do anything to investigate this
7  complaint?
8  A   Yes, I did -- I did investigate this one.
9  Q   And what did you do to investigate this
10 complaint?
11 A   I spoke to someone -- and I'm not sure if I
12 spoke to -- whether it was Ms. Blocker or whether it was
13 possibly Lisa Barton.  I don't remember exactly who I
14 talked to, but I know that one of the things that we
15 talked to was in regards to -- I remember specifically
16 talking about how the vacancies are filled and whether
17 or not how that was handled was appropriate.
18 Q   Okay.  So, would you agree that, you know,
19 what Ms. Harrell was alleging were serious concerns?
20 A   Well, I need to read through all of the things
21 that she was alleging at that time.  I know the concern
22 about who gets what position and how that was handled --
23 I don't think of that as being a super-serious concern
24 because we do give our DONs and our HSAs a certain
25 amount of leeway to hire who they want to hire for

Page 167

1  various positions. We don't have a policy that says
2  someone who's been in this capacity for this long has
3  preference to be hired for this or what have you.
4        Some of the things that she references in
5  here -- let's just try to see what else is in here. I'm
6  scanning. Sorry.
7     Q   Well, I don't have the -- I don't have any
8  questions about this, and I think I can probably skip
9  through this pretty quickly. I mean, would you agree
10 that people shouldn't be hired for jobs for reasons
11 other than their -- their merit? I mean, you shouldn't
12 get a job just because you're friends with an HSA or
13 director of nursing.
14    MS. PAGE: Form.
15    Q   You would agree with that?
16    A   We should be hiring candidates who are
17 qualified to be perform the job.
18    Q   Right. And there shouldn't be, you know,
19 favoritism granted to certain employees for -- for no
20 reason other than that they just have friendship with
21 that person.
22    MS. PAGE: Form.
23    A   I guess I want to -- I want to phrase this a
24 little -- a little carefully because there is a value in
25 hiring someone that is a known entity. I might

Page 168

1  recommend, for instance, someone that I've worked with
2  in the past that is now a friend, but they're a known
3  entity to me.
4        So, would we give favoritism to someone who is
5  equally qualified for the position, but there's a known
6  entity in how they're going to perform? Maybe. There
7  would be certain --
8     Q   And can we --
9     A   -- that might be preferential, but as far as
10 just somebody who's a friend and they get hired
11 regardless of qualifications? No, that should not
12 happen.
13    Q   Okay. So, after the -- the bullets points --
14 well, strike that.
15        So, Ms. Harrell is complaining that she had
16 previously asked that, you know, if there's a shift that
17 becomes available or if there's a vacancy that comes
18 up -- opens up, to email me on my private email.
19        Do you see that? It's the second --
20    A   I'm sorry. Which bullet point are you looking
21 at?
22    Q   The second bullet point.
23    A   Okay. Okay.
24    Q   It says that there was a -- an email about a
25 night-shift vacancy that was sent to Ms. Harrell's work

Page 169

1  email, but two other employees' personal email, and it
2  says: Please note, I have previously requested on more
3  than one occasion email correspondence be sent to my
4  personal email because I don't always have access to my
5  work email account.
6        I mean, but if -- we've talked a lot about
7  personal email. I mean, that -- that wouldn't be a
8  violation, right, for -- for a director of nursing to
9  send an email to an employee on their private account,
10 to say, hey, I've got a vacancy. If you're
11 interested -- there's nothing wrong there, right?
12    A   There's especially nothing wrong there because
13 a lot of our employees do not have a company email.
14 So, if they need to communicate by email, they would
15 communicate through their personal email. Yeah,
16 there's nothing wrong with that.
17    Q   Okay. How about sending it to two other
18 employees' emails, but only sending it to Ms. Harrell's
19 work email?
20    A   Ms. Harrell may have been the only employee
21 who had a work email. That's the preferred place to
22 send it, if you're sending work-related email, to
23 someone who has a work email. We would send primarily
24 to people at their home if they don't have work email.
25 That would be my explanation.

Page 170

1     Q   Okay. Would you agree that there shouldn't be
2  preferential -- or favoritism shown as relates to the
3  assignment of overtime?
4     MS. PAGE: Form.
5     A   The assignment of overtime is something that I
6  am not involved in, not at all. How --
7     Q   But --
8     A   -- they determine who gets overtime is not
9  anything that I have anything to do with.
10        As far as whether they give preferential -- I
11 mean, should they be giving preference to somebody
12 that's a friend and then saying, they get all the
13 overtime and somebody else gets none, even when they've
14 both said want it and they're both qualified to do the
15 work that's needed in that overtime -- my feeling is
16 that I would try very hard to assign the overtime
17 equally.
18        I -- I will say that sometimes employees -- I
19 hear complaints about this from time to time, where
20 somebody complains that, I wanted overtime, too, and I
21 didn't get any -- and actually I had one very recently
22 where the employee never requested the overtime. So the
23 person who was requesting it is the one who got it, but
24 the employee who was complaining about it just didn't
25 understand that they needed to request overtime; that

Page 171

1 they can't just get it.

2     Sometimes, too, it's the nature of the

3 position and where they need the overtime; whether it's

4 on a certain shift that the overtime is needed and it's

5 not needed on another shift.

6     But, you know, again, should it be given

7 because this person is my friend and this person isn't?

8 No. But, again, I think there's a lot of

9 misunderstanding that happens around the assignment of

10 overtime.

11     Q   And I -- I appreciate that long explanation,

12 but I -- my question was: You shouldn't just give

13 preferential treatment in assigning overtime. And I

14 think you said, you're right, no, you shouldn't, right?

15     MS. PAGE: Form.

16     Q   I'm trying to wrap this up.

17     A   This -- well, preferential treatment is, I

18 guess, a vague concept, if you think about it. You

19 should give preferential treatment to the person who has

20 either asked for overtime or is needed to do the work

21 that -- that they need at the time on that place,

22 whatever; so, the person who is most qualified to

23 perform the work in the overtime hours maybe.

24     So, sometimes preferential treatment does

25 happen, and it's okay. Other types of preferential

Page 172

1 treatment would not be okay, such as, you're my friend,

2 I'm giving you the overtime.

3     Q   Okay. Thank you.

4     After the bullet points, the first paragraph,

5 Ms. Harrell says that her day-to-day work environment is

6 very tense and intimidating. That's something that you

7 would want an employee to complain about, correct?

8     A   Correct.

9     Q   Did you ever look into why she felt

10 intimidated?

11     A   Yes.

12     Q   Okay.

13     A   This is something that we -- that was

14 discussed. I believe I discussed this with Ms. Douin --

15 it was either Ms. Douin or Ms. Barton. Again, I don't

16 have super-clear recollection. This goes back a pretty

17 far distance.

18     Q   Understood.

19     Would you agree that it would be inappropriate

20 for Ms. Blocker to tell one of her subordinate employees

21 that they were cute, and to twirl her hair?

22     A   You know, I would need to see it in context as

23 to how exactly that happened. If somebody told me I was

24 cute, I would not be offended.

25     Her twirling my hair -- you know, hey, this is

Page 173

1 a really cute new hairstyle or new color, I -- it's --

2 it's out of context. It sounds like it's inappropriate,

3 but in context I can see circumstances where it might

4 not be a big deal.

5     Q   Well, would you agree that if it's something

6 that made Ms. Harrell uncomfortable, that that's

7 something she should have reported?

8     A   Yes.

9     Q   Okay. How about a -- an emp- -- or a

10 supervisor saying to her subordinate employees, you're

11 not going to like me, and then referring to herself as

12 the devil; is that appropriate?

13     MS. PAGE: Form.

14     A   Again, context. Without having context, I

15 can't answer that question.

16     Q   Okay.

17     A   I can see telling somebody, you're not going

18 to like me, as you're handing them as an assignment, and

19 I can see it as no big deal. I can see someone joking

20 about calling herself -- you know, I know I'm coming

21 across as being the devil here because I'm giving you

22 work you don't want to or making you work hard.

23     Context -- without context, it's -- it's very

24 hard to say whether that was appropriate or

25 inappropriate.

Page 174

1     Q   All right. The last page -- so, there's --

2 Ms. Harrell is talking about the night-shift vacancy

3 that was filled by an employee that Ms. Blocker,

4 apparently, described as like her brother.

5     And we talked about this already, but you

6 would agree that it shouldn't be filled just because --

7 you know, without considering the actual merit of that

8 employee. You shouldn't fill a vacancy just because you

9 consider somebody would be like your brother.

10     MS. PAGE: Form.

11     Q   I mean, understood as to all the other stuff

12 you said. There is a benefit to hiring somebody you

13 already know. Like, I understand that, but it shouldn't

14 solely be based on somebody considering somebody so

15 close that they say that they're like their brother.

16     MS. PAGE: Form.

17     A   I agree.

18     Q   Okay. And then Ms. Harrell complains that

19 essentially -- well, she says that Ms. Taylor was hurt

20 that she didn't get -- didn't get that job and then

21 Ms. Blocker responds: Well, does Taylor think removing

22 herself from the schedule is forgotten.

23     Would you agree that, if Ms. Blocker didn't

24 give a job to Ms. -- to Ms. Taylor, out of retaliation

25 for Ms. Taylor removing herself from the schedule,

8/18/2020    Case 4:20-cv-00030-AW-MJF   Sara E. Tindall v. HH Florida, 37-24, Inc., et al. Dalton 10/21   Document 37-24   Filed 10/14/20   Page 46 of 58

Deposition of Sarah Brus - Volume 2    18-CA-77    17 (175 - 178)

**Page 175**

1  that that's -- that's -- that's not right?

2      MS. PAGE:  Form.  Calls for speculation.

3    A  Yeah, I was going to say, you're asking me for

4  speculation, but I could also understand that, if she

5  was someone who was scheduled to work, and they couldn't

6  count on her, that they're probably not likely to take

7  her from a PRN position to a full-time position because,

8  if you can't count on her to fill in the occasional

9  shift, why would you count on her to work full-time.

10      And, again, I'm speculating.  I don't know for

11  sure what she was -- what really went on.

12    Q  Okay.  And then, so the last thing --

13  Ms. Harrell says that Ms. Blocker made a statement about

14  Ms. Shivers calling Ms. Barton.  And, according to

15  Ms. Harrell, Ms. Blocker said, "Does Shivers think I

16  forgot she called Lisa Barton?"  I mean -- and, again,

17  there's not too much explanation as to what was going on

18  here, but would you agree that Ms. Blocker shouldn't

19  retaliate against somebody because they had complained

20  to another employee?

21    A  Well, if they -- I -- they shouldn't -- she

22  certainly shouldn't retaliate against someone for

23  complaining to her superior, no.

24    Q  Okay.  All right.  So, did you ever respond to

25  Ms. Harrell's complaint -- to this complaint?

**Page 176**

1    A  I -- I don't recall.  I do remember speaking

2  to her at one point in time.  And I -- actually, I

3  believe I may have spoken to her twice, but, again, this

4  was a long time back.  I don't have super-clear recall

5  of this particular incident.

6    Q  Okay.  And if Ms. -- if Ms. Harrell said that

7  she tried -- it does appear, based on Ms. Harrell's

8  e-mail, that y'all had had a verbal conversation the day

9  prior.  Do you -- you see that?

10    A  Yes.

11    Q  Do you recall having that verbal conversation?

12    A  Very vaguely.  If I -- if my -- if my memory

13  is correct, I was on my way to a site -- I believe I

14  went to Santa Rosa at that time and I was driving my

15  car, so I was not able to take down any information.

16      I would have asked her to put it in writing

17  anyway, just to make sure I got it in her words and that

18  I didn't, you know, leave anything out, misspeak, or

19  what have you, or misunderstand.  But yeah, I do vaguely

20  remember talking to her while I was driving.

21    Q  Okay.  And so, this was on a Friday.  Do

22  you -- do you recall Ms. Harrell trying to call you

23  on -- on Monday and Tuesday of this week to talk to you

24  about this and you were out of the office?  Any

25  recollection of that?

**Page 177**

1    A  From Dec- -- no, I don't specifically recall

2  that.  No.

3    Q  Okay.  And did you -- did you tell Ms. Blocker

4  about this complaint from Ms. Harrell?

5    A  I may have.  I don't recall.

6    Q  Okay.

7    A  I may have asked her questions about the

8  process for -- you know, the overtime process or for

9  filling the full-time position, but again, I don't

10  recall.

11    Q  Would you have said, hey, I've got a complaint

12  from Harrell, or would you have just said -- you know,

13  asked her specific questions about what was reported

14  without identifying Ms. Harrell as the complainant?

15      MS. PAGE:  Form.

16    A  I would probably -- I would not have

17  identified Ms. Harrell as the complainant.  I would

18  probably have said something to the effect that I've had

19  a complaint about how X, Y, Z was handled; can you

20  explain to me, you know, what you did.

21      And, again, I'm speculating because I don't

22  have clear recall of this particular conversation.

23      (Exhibit No. 40 marked for identification.)

24  BY MR. FINNERTY:

25    Q  Okay.  All right.  Exhibit 40, take a look at

**Page 178**

1  that.  Do you recall Ms. Harrell submitting this

2  complaint regarding Lori Cook?

3    A  Yes.

4    Q  Okay.  Did you investigate this at all?

5    A  Yes, I investigated.

6    Q  Okay.  And Ms. Cook was actually -- she

7  actually received a written warning for making these

8  comments, correct?

9    A  Correct.

10      (Exhibit No. 41 marked for identification.)

11  BY MR. FINNERTY:

12    Q  And that written warning is Exhibit 41.  Take

13  a look at that.  Would you have been involved in this

14  counseling?

15    A  Yes.

16    Q  Okay.  And do you know why there's no witness

17  that signed off on this counseling?

18    A  I don't know.  There should have been a

19  witness.

20    Q  Okay.  But you agree there isn't a witness?

21    A  Yes, I agree, there's no witness signature.

22    Q  Okay.  On the first page of this document, it

23  says -- well, strike that.

24      So, you would agree that Ms. Cook admitted

25  that she made those statements.

Page 179

1  A  Yes, she did.

2  Q  And noticed, too, she shouldn't have made

3  those statements about going to a sex-toy store; you

4  would agree with that?

5  A  Yes.

6  Q  Do you know whether Ms. Cook was told that

7  Ms. Harrell is the one that complained?

8  A  I don't believe so. I believe -- and I wasn't

9  the one to ask her for the statement. Again, this would

10  be a -- I would have spoken to either Ms. Johnson or

11  Ms. Douin or both, and they would have asked Ms. Cook to

12  provide a statement about the conversation in regards

13  to, you know, the sex toys.

14    There were more people than one in the room,

15  so --

16  Q  Right.

17  A  -- I presume we didn't tell her who it was,

18  but I didn't -- I'm not the one who asked her for the

19  statement.

20  Q  Would you agree there would have been no

21  reason to -- to tell Ms. Cook who had made the

22  complaint?

23    MS. PAGE: Form.

24  A  There would be no reason to tell her who made

25  the complaint, no.

Page 180

1  Q  Okay. And would you agree, though, that at

2  least by -- as of April 9th, when Ms. Harrell was asked

3  some questions about e-mails she had sent to herself,

4  when she had the -- when she was presented the final

5  warning by Ms. Johnson and Ms. Cook, one of the e-mails

6  being this complaint, you would agree that, at the

7  latest, on April 9th, Ms. Cook was aware that

8  Ms. Harrell had submitted this complaint.

9    MS. PAGE: Form.

10  A  At the point that we were discussing the

11  termination, yes, she had to have been aware -- well,

12  honestly, I don't know if she was aware of -- of this --

13  that it was Ms. Harrell who made this complaint. I

14  really don't.

15  Q  All right. Well, if we look at the

16  Exhibit 11 -- look at No. 16. Apparently, Mr. McKinnie

17  made the same complaint. And it's alleged that

18  Ms. Harrell drafted it, but that's -- you know, it's

19  dated 12/18, same date as Ms. Harrell's complaint.

20    Would you agree that that's -- No. 16 is

21  referencing that complaint about Ms. Cook?

22    MS. PAGE: Form.

23  A  I believe so, yes.

24  Q  Okay. So, now, can you agree that, at least

25  by 4/9, when Ms. Cook presented this counseling to

Page 181

1  Ms. Harrell, that Ms. Cook knew at least by that date?

2  A  I -- I can't say -- when she presented -- when

3  Ms. Cook presented what counseling?

4  Q  So, Ms. Cook and Ms. Johnson issued

5  Ms. Harrell the final warning on April 9th, 2018. And,

6  at the same time, they showed her this list of e-mails

7  and asked her questions about that; is that right?

8  A  Well, I guess she could have inferred that

9  from this.

10  Q  Okay. I mean -- I mean, are you disputing

11  that Ms. Cook was aware, as of 4/9, that Ms. Harrell

12  submitted the complaint regarding Ms. Cook's statements

13  about going to a sex-toy store?

14  A  She -- I never sent -- to my knowledge, I

15  never sent that statement from Ms. Harrell to Ms. Cook.

16  So, No. 16, McKinnie's statement regarding

17  Cook -- I don't know how -- how she would know that that

18  means Ms. Harrell is the one who -- who filed the

19  initial complaint.

20    And I know it says MS Word says Virginia

21  Harrell authored the documents at 12/18/17 at 17:23. I

22  still don't know that she would know that Jinny is the

23  one who submitted the initial complaint. And at that

24  time, that was well in the past.

25  Q  Okay.

Page 182

1  A  She may have -- she may not have even caught

2  that. Looking at that, she may not have noticed it at

3  all.

4  Q  That's -- you would agree that's speculation.

5  A  Yes, it's speculation.

6  Q  Okay. All right.

7    MS. PAGE: I'm going to -- I'm going to need a

8  couple-minute -- minutes -- a break, if we're going

9  much past 5:00, just to get up and stretch.

10    MR. FINNERTY: Yeah, let's just -- let's take

11  a break at 5:00. We try -- I'm really trying to

12  finish this up. Trust me.

13  BY MR. FINNERTY:

14  Q  All right. Let's look at Exhibit 40. I think

15  we were just looking at that. So, that's Ms. Harrell's

16  complaint regarding Ms. Cook and her statements. And

17  you see where it shows that this is -- this was

18  actually -- so, it's a forwarded e-mail -- if you look

19  at the first page of this document, it shows that

20  Ms. Harrell drafted this -- or it was sent from her

21  Yahoo account to her Yahoo account. You see that?

22  A  Yes.

23  Q  So, I mean, how -- would you agree that this

24  would not be a public record, if it was -- you know, if

25  she didn't do it on her work computer, didn't do it --

Page 183

1  didn't send it using her work e-mail -- do you agree
2  that that wouldn't be a public record?
3      MS. PAGE:  Form.
4      A   Well, I guess I would need to understand the
5  true, clear definition of what a public record is.
6  Would this particular have been a public record?  No, I
7  don't think so.
8      Q   Okay.  I mean, you would agree that all of the
9  things that Ms. Harrell was alleged to have sent from
10 her work e-mail to her private e-mail could have all
11 been created on her per- -- personal computer?
12     MS. PAGE:  Form.
13     A   Yeah, you're asking for speculation, again.  I
14 don't know where she created everything.  I don't know.
15 I don't believe she created the incident reports on her
16 personal computer.
17     Q   But you -- you don't know whether or not --
18 you don't know for certain.
19     A   I'm sorry?  I couldn't hear you.
20     Q   I mean, you don't know for certain, though,
21 where -- where she created those documents?
22     A   Of course I don't know for certain.
23     Q   Okay.
24     A   I wasn't there when she created all those
25 documents.

Page 184

1      MR. FINNERTY:  Okay.  So, I think this -- this
2  would be a good stopping point.  I mean, I'm -- I'm
3  going to -- I really think maybe 30 minutes at the
4  most and -- and we'll be done, if you want to take
5  a -- take a break.
6      (Discussion off the record.)
7      (Brief recess.)
8  BY MR. FINNERTY:
9      Q   I've just un-paused the recording and we are
10 back on the record.
11     And, Ms. Brus, I appreciate your patience and
12 I'm going to try to wrap this up in the next 30 minutes
13 at the most.  Okay?
14     A   Okay.
15     Q   All right.  So, would you agree that Centurion
16 or MHM policies specify that the rules should be applied
17 to everyone equally?
18     A   Yes.
19     (Exhibit No. 10 marked for identification.)
20 BY MR. FINNERTY:
21     Q   Okay.  So, I don't know that we've looked at
22 it previously, but Ms. Harrell's verbal counseling for
23 time and attendance, Exhibit 10 -- do you see where
24 she -- there's three dates referenced on this document
25 that Ms. Harrell was alleged to have shown up to work

Page 185

1  late.  Do you see that?
2      A   Yes.
3      (Exhibit No. 45 marked for identification.)
4  BY MR. FINNERTY:
5      Q   Okay.  Let's look at Exhibit 45.  This is a --
6  a verbal counseling that was issued to Misty West on
7  January 18, 2018.  Do you know why Harrell got a verbal
8  counseling after three alleged late arrivals, but it
9  wasn't until Ms. West got -- was late 17 times that she
10 got a verbal counseling?  Do -- do you know why that is?
11     MS. PAGE:  Form.
12     A   I don't know.
13     Q   I mean, would you agree that you shouldn't
14 counsel one person after three and then counsel another
15 one after 17 late arrivals?
16     MS. PAGE:  Form.
17     A   The policy isn't -- the policy is that, as of
18 three, counseling should be issued.  So, Ms. West
19 certainly should have been counseled sooner.
20     I do know that many of the sites tend to look
21 at their attendance on a periodic basis and they're not
22 able to catch every single one when they hit the three
23 mark.  So, I mean, again, I'm speculating as to why it
24 would be, but the policy is that three is the first
25 point at which we issue counseling.

Page 186

1      Q   Do you know whether --
2      A   -- for Ms. -- on Ms. Harrell's that she had
3  been spoken to previously.  And then, even after being
4  spoken to, there was additional tardies, so...
5      (Exhibit No. 44 marked for identification.)
6  BY MR. FINNERTY:
7      Q   Well, I mean, that wasn't my question, but if
8  you want to talk about previous counselings -- I mean,
9  if you look at Exhibit 44, in Ms. West's 90-day
10 check-in, her showing up to -- late was discussed
11 with -- with Ms. West at that time.  So, I mean --
12     A   Okay.
13     Q   No difference there.
14     But I mean, my -- my simple was question was:
15 You would agree that one person shouldn't get a verbal
16 counseling after three, when another one doesn't get it
17 until 17.  I mean --
18     MS. PAGE:  Form.
19     Q   -- simple yes-or-no question.
20     MS. PAGE:  Form.
21     A   Yes.
22     (Exhibit No. 46 marked for identification.)
23 BY MR. FINNERTY:
24     Q   Okay.  Exhibit 46, Misty West gets a written
25 warning.  According to this document, she was late 26 of

Page 187

1 30 shifts. And only after 26 additional tardies does

2 she get a written warning.

3     Again, I mean, Ms. Harrell never even got a

4 written warning. All she got was a verbal warning as it

5 relates to time. Would you agree that that -- that,

6 again, this would show that the time and attendance is

7 not being consistently enforced from employee to

8 employee?

9     MS. PAGE: Form.

10    A  Yes.

11       (Exhibit No. 47 marked for identification.)

12 BY MR. FINNERTY:

13    Q  Okay. Exhibit 47, Ms. West gets a final

14 warning where she was late another 18 times out of 22

15 shifts.

16       Again, I mean, is there any set -- I know you

17 said that there's policy you should get a verbal

18 counseling after three. I mean, is there anything that

19 says that you should only get a final warning after

20 you've had a combined 61 tardies? Any policy that says

21 that?

22       MS. PAGE: Form.

23    Q  Ma'am?

24    A  I said no.

25    Q  Okay. I mean, you would agree, based on those

Page 188

1 documents, Ms. West had a hard time showing up to work

2 on time, correct?

3    A  Yes.

4    Q  And this was a final warning. So, I'm

5 assuming you would have had to approve this warning?

6    A  Yes.

7    Q  Okay. And Ms. West -- she still works for

8 Centurion, correct?

9    A  I -- I don't know.

10       (Exhibit No. 48 marked for identification.)

11 BY MR. FINNERTY:

12    Q  Okay. All right. Let's look at Exhibit 48.

13 So, you can count them, if you want. I counted them

14 earlier. And it looks like, in the last 90 days,

15 Mr. McKinnie was late 45 times out of 90 days. Do you

16 know whether he had gotten a prior warning for verbal

17 counseling?

18    A  I would have to look it up, sir. I don't know

19 that off the top of my head.

20    Q  Okay. Do you think he -- he should have

21 gotten some kind of counseling before it got all the way

22 up to 45 late --

23    A  Yes, sir.

24    Q  -- arrivals -- ma'am?

25    A  Yes.

Page 189

1    Q  Okay. He should have -- they shouldn't have

2 waited until it got to 45 times, correct?

3    A  Correct.

4    Q  Okay. And then he's also alleged to have

5 violated the tools-and-sensitive-item-control policy,

6 which, as you recall, was what Ms. Harrell was alleged

7 to have violated when she was alleged to have not filled

8 out the narcotic-accounting log.

9       And these are two of the things that you, I

10 believe, testified earlier would have warranted

11 Ms. Harrell's termination, right: tardies and violating

12 procedure 602.037; is that right?

13    A  Yes. And actually, can -- can you scroll

14 down? That would show if there was prior counseling --

15 no, up.

16    Q  Yeah, it --

17    A  Yeah, it does- -- it doesn't show formal

18 counseling; just a memo. Okay.

19    Q  Okay. So, he may have -- they -- he may have

20 a meeting to discuss his attendance, but it's clear that

21 he never -- he wasn't given a verbal counseling on a

22 form.

23    A  Correct.

24    Q  Okay. So, back to the question I was

25 asking -- so, according to this document, Mr. McKinnie

Page 190

1 was late 45 times. And he also was accused of violating

2 the Procedure 602.037 for failing to count sharps,

3 tools, and equipment, and also is alleged that he took

4 home some -- where is it?

5       Okay. The very last thing on the first page,

6 it says: In addition to failing to count the sharps, he

7 took home the trauma shears from the nurse's station on

8 4/14 and did not notify the DON or the OIC.

9       So, I mean, I think your testimony earlier was

10 that, as relates to Ms. Harrell, who was also alleged to

11 have violated 602.037 as well as -- as well as being

12 alleged to have shown up to late -- shown up to work

13 late, you said that that would have warranted

14 Ms. Harrell's termination, but as it relates to

15 McKinn- -- McKinnie, he wasn't terminated, right?

16    A  I -- I don't know if he was terminated later

17 for this particular instance. Obviously, he was not

18 terminated.

19    Q  She was not terminated as of this date,

20 4/19/18, correct?

21    A  Correct.

22    Q  And, again, I mean, employees sh- -- you

23 shouldn't treat one employee differently than another

24 when you are enforcing policies or procedures, correct?

25    A  Correct.

Page 191

1   Q  So, why was Ms. Harrell different?

2     MS. PAGE: Form.

3   A  I -- honestly, I couldn't answer that question

4 without talking to the people who did the different

5 counselings as to why, you know, hers came up sooner

6 with only three where the other ones had many more

7 before they were, you know, written up.

8   Q  But we do know --

9   A  I'd have to --

10   Q  But as relates to Harrell, we do know that she

11 had complained about Ms. Cook, right?

12   A  Yes.

13   Q  And she had complained about Ms. Johnson,

14 correct?

15   A  I -- at the time of the -- at the time of her

16 first attendance counseling, I'm not sure.

17   Q  Well, no, at some time prior to her

18 termination.

19   A  Correct.

20   Q  And she had complained that she was being

21 retaliated against, correct?

22   A  Yes.

23   Q  So, I mean, did you ever consider that

24 unlawful retaliation could have been a motive for

25 Ms. Cook and Ms. Johnson wanting Ms. Harrell terminated?

Page 192

1     MS. PAGE: Form.

2   A  Again, based on the facts that were presented

3 to me, I did not believe that was a factor.

4   Q  But you can at least agree that that's

5 something Ms. Harrell complained of; that she was

6 fearful -- well, she felt that she had been retaliated

7 against and she was fearful of future retaliation. You

8 can agree with --

9   A  Yes.

10   Q  -- that, right?

11   A  Yes, I agree she reported that.

12     (Exhibit No. 34 marked for identification.)

13 BY MR. FINNERTY:

14   Q  Okay. So, let's take a look at Exhibit 34, I

15 believe -- I'm sorry -- well, okay. Let's look at

16 Exhibit 34 while we have it.

17     So, Ms. Harrell -- you said that -- you said

18 that she was employed -- as well as you -- employed by

19 MHM; is that right? MHM Health Professionals, LLC?

20   A  Yes.

21   Q  So, why is this -- why does this form say

22 Centurion at the top?

23   A  Well, because, again, Centurion -- MHM

24 provides employees to Centurion for the contract with

25 the state. And we follow the Centurion employee

Page 193

1 handbook.

2   Q  Okay. And it says that, you know, "By signing

3 below, I attest that I have been given the Centurion

4 employee handbook," correct?

5   A  Correct.

6   Q  So, would you agree that Centurion sets the --

7 the internal policies and procedures and rules that

8 Ms. Harrell would have had to have complied with?

9     MS. PAGE: Form.

10   A  Yes.

11     MR. FINNERTY: Okay. Look at Exhibit 33.

12 Do you have that pulled up?

13     MS. PAGE: Sorry. I was making a note.

14     (Exhibit No. 33 marked for identification.)

15 BY MR. FINNERTY:

16   Q  Essentially the same question here. Well --

17 let's see. This is a six-page document and -- let's

18 see. So, it's six different letters that were sent to

19 Ms. Harrell all on Centurion letterhead; would you agree

20 with that?

21   A  Yes.

22   Q  And you would agree that these were all -- I

23 mean, the first one is to confirm her employment status

24 changed from full-time -- to full-time. That's on

25 May 5th, 2017. Looks like it may be the same document

Page 194

1 again. I apologize for that. No. 1 and No. 2 appear to

2 be the same.

3     The third page, confirming your unemployment

4 status changed to full-time effective from March 4th,

5 2018.

6     Next one -- this looks like the same document

7 again.

8     And then the last one, again, it's the same

9 document, twice, but it's dated July 5th, 2017: To

10 confirm your status change to per diem effective

11 July 9th, 2017.

12     If MHM was -- was Ms. Harrell's employer, why

13 is Centurion sending her a letter every time there's an

14 employment change?

15   A  That's a question for someone, I guess, higher

16 up than me. They have always come as Centurion. And,

17 again, I believe it has to do with the fact that the

18 contract with the Department of Corrections is with

19 Centurion, and Centurion has the employment positions

20 filled through MHM.

21   Q  And Centurion -- excuse me. Centurion owns

22 MHM, doesn't it?

23     MS. PAGE: Form.

24   A  I -- sir, I'm not a hundred percent familiar

25 with exactly the details of that relationship. I know

Page 195

1 it's more complicated than a lot of other companies may
2 be.
3     Q   Fair enough.
4      (Exhibit No. 22 marked for identification.)
5 BY MR. FINNERTY:
6     Q   All right. Let's take a look at the --
7 Exhibit 22. So, this is -- appears to be an MHM
8 Services, Inc. Now, that's different than MHM Health
9 Professionals, LLC, right?
10     A   I believe --
11      MS. PAGE: Form.
12     A   -- they are separate official entities. I
13 would have to -- again, that's not something that I have
14 delved into, particularly. Yeah, I -- I would have to
15 ask someone else that question to be sure.
16     Q   Okay. So, this is the -- the MHM Services,
17 Inc., employee handbook and code of business conduct.
18 Do you know whether this is the handbook that
19 Ms. Harrell would have signed the form attesting that
20 she had been provided a copy? Is that referring to this
21 or is there a different one for Centurion?
22     A   I believe it's referring to this one.
23     Q   Okay. And you're familiar with the employee
24 handbook and code of business conduct, correct?
25     A   Yes.

Page 196

1     Q   And you would agree that, as a -- an HR
2 professional for Centurion or MHM, that part of your job
3 duties is the enforcement of the -- the code of business
4 conduct and the employee handbook. Would you agree with
5 that?
6     A   Yes.
7     Q   Okay. Just going to ask some brief questions
8 about this handbook and then I think we're going to wrap
9 up.
10     So, if you take a look at -- it's -- it will
11 have a Page No. 4 at the bottom, but it's actually
12 Page 8 of this document. It talks about sexual
13 harassment and says that, you know, sexual harassment
14 may include a ra- -- a range of different behaviors, but
15 one of them is -- and just so -- just so I'm clear,
16 I'm -- I'm going -- I'm talking about the --
17 specifically the -- Ms. Harrell's complaint about Lori
18 Cook and her comments about going to a sex-toy store.
19     Would you agree that, as it relates to
20 Ms. Harrell's complaint about what Ms. Cook said, that
21 persaunt to the sexual-harassment policy, that what
22 Ms. Harrell complained of would constitute sexual
23 harassment?
24      MS. PAGE: Form.
25     A   I could, certainly.

Page 197

1     Q   Okay. Which -- because according to the
2 handbook, it includes sexual jokes and innuendo,
3 correct?
4     A   Correct.
5     Q   Insulting or obscene comments or gestures,
6 right?
7     A   Yes.
8     Q   And you would agree that what Ms. Harrell
9 reported that Ms. Cook said would fall within what's
10 described under the sexual-harassment provision of the
11 employee handbook, correct?
12     A   Yes.
13     Q   Okay. Then, second-from-the-bottom paragraph,
14 it says that, you know, it's -- it's especially
15 important for supervisory employees, you know, avoid
16 anything that could be considered to be -- constitute
17 sexual harassment; you would agree with that?
18     A   Yes.
19     Q   And -- and no dispute that Ms. Cook was a --
20 held a supervisory position, correct?
21     A   That's correct.
22     Q   Okay. Look at the next page, Page 5, where it
23 talks about retaliation. It says retaliation is
24 prohibited. And then it says, second-to-the-bottom
25 line, you know, these are -- discrimination and

Page 198

1 retaliation is a serious violation. Do you see that?
2     A   Yes.
3     Q   Okay. And then look -- the two sections down
4 from that, investigations, any reported allegation of
5 harassment, discrimination, or retaliation will be
6 investigated promptly, thoroughly, and impartially by
7 the human-resources department.
8     As it relates to Ms. Harrell, did that happen?
9     A   Yes.
10     Q   Okay. It -- and you think all of her
11 complaints were investigated impartially?
12     A   Yes.
13     Q   All right. And then confidentiality -- the
14 next paragraph, confidentiality will be maintained
15 throughout the investigative -- investigatory process to
16 the extent consistent with adequate investigation and
17 appropriate corrective action.
18     We talked about this. And we know that didn't
19 happen, as relates to Ms. Harrell, correct?
20      MS. PAGE: Form.
21     A   I'm not sure we agree a hundred percent on
22 that one.
23     Q   Well, I'm -- I think, when we were talking
24 about Ms. Harrell's complaint -- and to be fair to you,
25 it was Ms. Johnson that immediately forwarded

Page 199

1  Ms. Harrell's complaint about the narc-key issue to
2  Ms. Cook.
3         And wouldn't you -- and I'm not saying that
4  that -- that was you, but we can certainly agree that,
5  essentially, what happened was Ms. Harrell made a
6  complaint to Ms. Johnson, and first thing Ms. Johnson
7  does is forward it to Ms. Cook and say, FYI.  We -- we
8  can agree on that, right?
9     A   That's what happened, yes.
10    Q   And no doubt that, once that happened,
11 Ms. Harrell lost all confidentiality in her complaint,
12 correct?
13        MS. PAGE:  Form.
14    A   No, because -- she didn't lose all
15 confidentiality because Ms. West was not informed of who
16 made the complaint.  So, that wouldn't --
17 confidentiality was maintained.
18    Q   Well, that -- that's speculation.  You
19 don't know what Ms. Johnson said to Ms. West.  I think
20 we've already gone over that, correct?
21        MS. PAGE:  Form.
22    Q   Correct, ma'am?
23    A   To my knowledge, she didn't send it to her.  I
24 suppose it's possible that she did, but I think it's
25 unlikely.

Page 200

1     Q   And -- but as relates to Ms. Harrell's
2  complaint against Ms. Cook, no doubt Ms. Cook
3  immediately knew that it was Ms. Harrell that
4  complained, correct?
5     A   Correct.
6         MR. FINNERTY:  Okay.  Look at Page 28 --
7  which, Cayla, it's Page 32 of the document.
8         MS. PAGE:  Thank you.
9         MR. FINNERTY:  You're welcome.
10 BY MR. FINNERTY:
11    Q   Under human resources, right in the middle,
12 pretty much -- this is something that we just kind of
13 went over a little bit, but it says here, human
14 resources, and then it says, "We shall" -- goes through
15 a bunch of things -- but right in the middle of it says:
16 We shall apply the code and personnel policies equally
17 to all employee -- employees, regardless of position in
18 the workplace.
19         No doubt -- I mean, you can agree that that's
20 a stated, written policy.  Not only is it good practice,
21 but it's actually a written policy, correct?
22    A   Yes.
23    Q   Okay.  Four or five bullet points down, says
24 you know, human resources:  We shall not permit any
25 action of retaliation or reprisal due to an employee's

Page 201

1  legitimate report of a violation of law, regulation,
2  company policy, or the code.
3         No doubt that it's MHM and Centurion's policy
4  that retaliation will not be permitted, correct?
5     A   Correct.
6     Q   Okay.  And we've talked about Ms. Harrell's
7  complaints of retaliation and -- and those are
8  complaints that you would have taken seriously, correct?
9     A   Correct.
10    Q   All right.  Down a little bit further on this
11 page, protection and use of information, property --
12 property, and assets.  Bullet point right in the middle,
13 it says:  We shall not communicate or transfer any
14 information or documents to any unauthorized person.
15         You would agree that there's no allegation
16 that Ms. Harrell ever transferred information to
17 unauthorized persons.  No -- no allegation of her doing
18 that, correct?
19        MS. PAGE:  Form.
20    A   Sorry.  Which bullet point are you referring
21 to again?  I want to read that again.
22    Q   It's right towards the middle -- yeah, right
23 there where Ms. Page has her cursor:  Not communicate or
24 transfer any information.
25    A   It was unauth-- the -- when she transferred

Page 202

1  information from her work computer to her home
2  computer -- her authorization to have those documents
3  ends at work.  So, she was authorized to have certain
4  documents in the workplace.  She was not authorized to
5  have those documents as a private citizen in her home.
6     Q   Okay.  And -- and I understand that it's your
7  position she shouldn't have sent e-mails from her work
8  account to her personal account, but this question is
9  different.  It's talking about transferring information
10 to an unauthorized person.  There's no dispute that
11 Ms. Harrell was authorized to have that information,
12 correct?
13        MS. PAGE:  Form.
14    A   I would have to look at the list again.  I
15 don't -- I don't a hundred percent know that she was
16 authorized to have certain pieces of information.
17    Q   Well, are you aware of her -- of any
18 allegation or any evidence to suggest that Ms. Harrell
19 subm-- -- transferred information to someone who was not
20 authorized to have that information?
21        MS. PAGE:  Form.
22    A   Not that -- not that she transferred from her
23 work computer.  What she did with it once she put it in
24 her personal e-mail, I don't know.  It's entirely
25 possible that she did.

Page 203

1  Q   And that's -- that's not my question.  Are you
2  aware of any information or any evidence that would
3  suggest that she transferred information to an
4  unauthorized person?
5      I'm not asking you to speculate.  I'm saying,
6  yes or no, do you have any information to suggest she
7  gave information to a unauthorized person.
8      MS. PAGE:  Form.
9  A   You know, I'm thinking back to some of the
10 information that she shared with Mr. McKinnie, and I'm
11 not sure that -- that she didn't.  There may have been
12 pieces of that information that he should not have --
13 have had.
14 Q   McKinnie worked with Ms. Harrell, correct?
15 A   Yes.
16 Q   So, what would Ms. Harrell have access to that
17 Mr. McKinnie wouldn't?
18 A   He would have -- she would have had access to,
19 you know, information that he wasn't privy to;
20 complaints of other employees, what have you.  He would
21 not necessarily have been privy to information about
22 complaints about other employees.
23 Q   And -- I mean, you -- your response was
24 possibly, maybe, who knows.  My question is:  Do you
25 have any evidence that Ms. Harrell sent information to

Page 204

1  an unauthorized person?
2      MS. PAGE:  Form.
3  A   None that I can think of at this moment.
4  Q   Thank you.
5      The next page, Page 29, 33 of this document,
6  top of the page, again, talks about confidentiality,
7  very top.  I mean, confidentiality is -- is important.
8  That's an important issue; would you agree?
9  A   Yes.
10 Q   Okay.  So, as it relates to the -- the
11 evidence that there -- that Ms. Cook or Ms. West may
12 have altered or made changes to a narcotic-accounting
13 log -- did you ever look into whether that was a
14 violation of federal, state, or local law?
15     MS. PAGE:  Form.
16 A   No.
17 Q   You didn't?
18 A   No, because I certainly was not invest- --
19 again, what was presented to me was a document with two
20 signatures on it.  I have no reason to believe that it
21 was a false document.
22 Q   Well, now that you --
23 A   And --
24 Q   Now that you've seen a copy of the -- the
25 document that Ms. Harrell made a copy of, are you going

Page 205

1  to back and look today to see if that was a potential
2  violation of federal, state, or local law?
3      MS. PAGE:  Form.
4  A   Well, I would have to talk to my boss about
5  whether that's something we need to do.
6  Q   Well, if I represented you that Ms. West still
7  works for Centurion, would that change your answer?
8  A   I -- I'm sorry.  Could you repeat that?
9  Q   If I represented to you that Ms. West
10 currently works for Centurion, would that change your
11 answer?  I mean, is that -- I mean, knowing that she
12 works for Centurion -- isn't that something you would
13 want to look into?
14     MS. PAGE:  Form.
15 A   Possibly.
16 Q   Okay.  Non-retaliation policy -- the same
17 page:  No disciplinary action or retaliation will be
18 taken against you when you report, in good faith, a
19 perceived issue, problem, concern, or violation, to HR,
20 your program manager, or the hotline.  And then it goes
21 on to define in good faith to mean that you actually
22 believe or perceive the information reported to be true.
23     Do you -- do you believe that Ms. Harrell's
24 complaints were made in good faith?
25 A   Do I believe her complaints were made in good

Page 206

1  faith?
2  Q   Yes, ma'am.
3  A   For the most part, yes.
4  Q   I mean, do you have any reason to believe that
5  she didn't actually believe or perceive that the
6  information she reported was true?
7  A   No.
8  Q   Okay.  So, therefore, as part of your duties
9  as an HR business partner, you were required to take
10 steps to ensure that Ms. Harrell was not being
11 disciplined or retaliated against for reporting her
12 good-faith concerns, correct?
13 A   Right.
14 Q   That's something that you were -- did you do
15 anything to make sure that that did not happen?
16 A   Well, it didn't happen.
17 Q   How do you know that?  More speculation?
18     MS. PAGE:  Form.
19 Q   How do you know that?
20 A   Based on the information that I was given, I
21 do not believe that she was retaliated against.
22 Q   I mean, we can go through it all again, but
23 you've got Ms. Cook's response to the -- the narc-key
24 complaint that was e-mailed to her, and she responds by
25 saying -- I mean, it's -- I agree with you it's

Page 207

1  confusing because there was a typo, evidently, but I
2  mean, she says:  As the day goes on, it -- it amazes me
3  what somebody would do when they're held to the
4  standards of someone else.
5      I mean, that's -- that's evidence; wouldn't
6  you agree, ma'am?
7      MS. PAGE:  Form.  Asked and answered.  We went
8  over this earlier.
9      Q  Well, I mean, I just -- how can you be so
10 certain that didn't happen when there's all this
11 evidence that there was retaliatory animus being
12 harbored by the two people that had -- that wanted
13 Ms. Harrell terminated, Ms. Johnson and Ms. Cook.  I
14 mean, there's --
15      MS. PAGE:  Form.
16      Q  You've given me no evidence --
17      MS. PAGE:  You're testifying.  You're
18 testifying.  Form.
19      MR. FINNERTY:  Okay.
20 BY MR. FINNERTY:
21      Q  Can you give me any evidence, other than your
22 speculation, that Ms. Harrell was not adversely
23 retaliated against?
24      MS. PAGE:  Form.
25      A  I don't know what evidence you've been looking

Page 208

1  for.  I don't know how I would give that to you.  So, I
2  guess I'm going to have to answer no.
3      Q  I mean, you said that you know it didn't
4  happen.  What -- what -- can you point to anything that
5  would support your opinion that you know it didn't
6  happen?
7      A  It is my opinion that --
8      MS. PAGE:  Form.
9      I'm sorry.  Go ahead.
10     A  No -- based on the information that I received
11 throughout the process of investigating the issues with
12 Ms. Harrell, that there were legitimate concerns and
13 legitimate issues and that she was not being retaliated
14 against.
15     Q  But -- but the answer that you already gave
16 was that you don't have any evidence that -- that she
17 was not unlawfully retaliated against.
18     MS. PAGE:  Form.  Misstates earlier record
19 testimony.
20     MR. FINNERTY:  I think she just said, I have
21 to say no.
22     I mean, isn't that your testimony, ma'am?
23     MS. PAGE:  She also testified earlier she was
24 involved in the investigation.  So, no, she
25 didn't -- she didn't believe so.

Page 209

1  BY MR. FINNERTY:
2      Q  All right.  Let's -- just to make sure we're
3  clear, you don't have any evidence that would -- other
4  than your personal belief that Ms. Harrell was not
5  retaliated against for making complaints.
6      MS. PAGE:  Form.
7      A  No.
8      Q  Okay.  Thank you.
9      Very bottom of that same page, responsibility
10 of management, the -- the very last two bullet points,
11 it says:  You've got to take steps to ensure that an
12 employee does not fear or experience retaliation.
13      No doubt that Ms. Harrell reported her fears
14 of retaliation, correct?
15     A  Yes.
16     Q  Did you do anything to ensure Ms. Harrell
17 didn't have those fears?
18     A  I -- there's not a whole lot I can do to -- to
19 change how someone feels.  That's not something that's
20 within my ability to necessarily do.
21     Q  And that may be --
22     A  I'm not sure --
23     Q  That may be true, but the -- your code book
24 still says that, though, correct?
25     A  I can't -- can we scroll up a little bit?

Page 210

1  Whoa.  I need to go to where -- "Responsibility of
2  management."
3      Okay.  Taking steps to ensure the employee
4  does not fear or experience retaliation is what the
5  handbook states, you're correct.
6      Q  Okay.  And you're saying there's nothing you
7  could have done to take those steps?
8      MS. PAGE:  Form.
9      A  Other than the steps that we took, I don't
10 know what other steps I could have taken.
11     Q  I mean, what -- what steps did you take -- did
12 you ever sit down with Ms. Harrell and say, look, I
13 understand your fears, and I'm doing this, this, this to
14 make sure that we address it?  Did you ever do that?
15     A  I spoke to Ms. Harrell on a couple of
16 different occasions.  I don't recall the specific
17 discussions.  I don't recall the specific words that
18 were spoken, but I did ensure her that her complaints
19 were being taken seriously.
20     Q  Okay.  So, Ms. Brus, I'll represent to you
21 that we've had over 1,300 documents that were produced
22 in discovery, and there's not a single document or
23 e-mail from you where you would have responded to any of
24 Ms. Harrell's complaints.  Do you know why that is?
25     A  We frequently don't respond to those kinds of

**Page 211**

1   complaints in writing, other than, when we do it's,

2   we've received your complaint and we'll look into it.

3   My response would more likely have been a verbal one.

4    Q   Okay. Very last bullet point on Page 29 --

5   again, confidentiality. Appears that that's a pretty

6   big issue; would you agree?

7     MS. PAGE: Form.

8    A   Yes.

9    Q   Okay. All right. Next page, top of -- Bullet

10   Point No. 3, at the top of -- it's Page 30, 34 of this

11   document. It says that, you know, one of the

12   responsibilities of management is informing the employee

13   that you have followed through on his or her report.

14     Did you ever do that with -- as relates to

15   Ms. Harrell?

16    A   Verbally, yes.

17    Q   Okay. And administration and enforcement of

18   the code, Paragraph 2: This code shall be administered

19   and monitored by MHM's HR department. That's you,

20   right?

21    A   I'm part of the HR department, yes.

22    Q   So, no -- no dispute that that was part of

23   your job duties as relates to Ms. Harrell's complaints.

24    A   No dispute.

25    Q   Okay. Same page -- a little more than halfway

**Page 212**

1   down, Paragraph 9 talks about examples of conduct that

2   violate various principles. No. 9: Willfully making a

3   false statement to your employer or to the client.

4     Again, as it goes -- as relates to Ms. Cook

5   and Ms. West, that's something that, if they -- if

6   Ms. Cook and Ms. West were lying when they wrote their

7   e-mail responses, that would be a violation of policy,

8   right?

9    A   Yes.

10    Q   Same thing as relates to Paragraph 17,

11   falsification of a company record. Again, serious

12   violation; would you agree?

13    A   Yes.

14    Q   No. 19, again, confidentiality is addressed?

15    A   Yes.

16    Q   All right. Page 31, 35 of this document,

17   Paragraph 21, it talks about, you know, again, it's

18   things that are violations of company policy. It says

19   "Excess-" -- you testified earlier that it was a

20   violation of policy for Ms. Harrell to send e-mails from

21   her work e-mail to her private e-mail.

22     But would you agree that, according to

23   Paragraph 21, it's only excessive personal use of

24   company computers during working hours that is

25   considered a violation.

**Page 213**

1    A   There is another policy that specifies that

2   company equipment is to be used for business purposes

3   only.

4    Q   Do you know --

5    A   So, yes --

6     (Simultaneous speakers.)

7    Q   -- why that policy was not referenced in

8   Ms. Harrell's termination?

9     MS. PAGE: Form.

10    A   I -- I'm sorry. Can you repeat the question?

11    Q   So, you -- you're saying that there's a

12   separate policy that -- that prohibits an employee from

13   sending an e-mail from their work account to their

14   private account. I mean -- and my question is: Why

15   wasn't that other policy referenced in Ms. Harrell's

16   termination?

17     MS. PAGE: Form.

18    A   Except for -- probably because we didn't want

19   to lay 15 different policies on the same document, so we

20   chose the one that we felt was a good fit for the

21   situation.

22    Q   I mean, you were unable to, earlier, point to

23   a single provision in the DOC public-records procedure

24   or the user-security-for-information-systems -- you were

25   unable to point to a single specific provision of either

**Page 214**

1   of those policies. And you're saying that you would --

2   you would put those two in and leave out one that,

3   according to you, specifically prohibited -- is that

4   your -- your testimony?

5     MS. PAGE: Form.

6    A   As I state- -- as I stated earlier, I

7   certainly don't have policies memorized. So, the ones

8   that you referred to in particular -- because they're

9   not our company policies -- why -- why we made a

10   decision two and a half years ago not to include the

11   policy that I'm thinking of, I don't know.

12    Q   I mean, wouldn't you agree that you have a

13   better understanding of this code, the employee

14   handbook, as opposed to DOC procedures? Is that fair?

15    A   I do, yes; others may not agree. Ms. Douin,

16   for instance, works with DOC code frequently.

17    Q   And -- but you were -- you were -- reviewed

18   and approved the termination counseling form, correct?

19    A   I'm not the person who made the final

20   approval.

21    Q   Right.

22    A   I sent it on for two more levels of approval,

23   myself, but yes, I looked at it and felt that it was

24   okay to send it on.

25    Q   And I mean, you certainly could have -- after

Page 215

1  reviewing the -- the termination-counseling form, you
2  certainly could have said, well, you know, this policy
3  actually addresses what -- what's happening. Why don't
4  we put that in -- you could have done that, right?
5        MS. PAGE: Form.
6     A  I -- I could have.
7     Q  And you didn't.
8        MS. PAGE: Form.
9     Q  As relates to the -- the issue with
10 Ms. Harrell and the allegation that she didn't count
11 narcotics, do you know whether she was ever in
12 possession of the narcotic key on the alleged date,
13 April 14th, 2018?
14    A  I -- I -- to -- to know a hundred percent for
15 sure that she had the key, I would have to see it handed
16 to her. So, no, I don't know that for sure.
17    Q  Okay. All right. I'm just reviewing my
18 notes. I think we -- if I'm not done, I'm very close to
19 done. Just give me one minute, if you don't mind.
20       Did you ever tell Ms. Harrell either verbally
21 or in writing that you were go- -- you were looking into
22 her -- the final complaint she made on April 10th?
23    A  I don't --
24       MS. PAGE: Form.
25    A  -- recall.

Page 216

1     Q  You don't recall?
2     A  I don't recall.
3     Q  Okay. Have you ever received any training on
4  the whistleblower laws for Florida?
5     A  Specifically for Florida, no, not that I can
6  think of.
7     Q  Okay. Because of the relationship between
8  Centurion and the Department of Corrections, do you --
9  would you agree that the public Whistleblower Act would
10 apply?
11       MS. PAGE: Form. Calls for a legal
12    conclusion.
13    A  I --
14    Q  Do you know, ma'am?
15    A  I can't answer the question. As Cayla said,
16 I'm not a lawyer.
17    Q  Well, I mean, she can -- you can still answer.
18 She didn't instruct you not to answer. So --
19    A  I'm not comfortable -- I'm not comfortable
20 giving you an answer to that question because, again,
21 I'm not a legal expert.
22    Q  Okay. But you don't recall ever getting any
23 specific training on the Florida public whistleblower
24 law?
25    A  I guess -- not -- not that I specifically

Page 217

1  recall. It doesn't mean I haven't. I just don't
2  specifically recall it.
3     Q  I mean, do you think it's a little odd that
4  public-records laws would, apparently, apply to
5  Ms. Harrell, but the public Whistleblower Act wouldn't?
6  Does that sound a little odd to you?
7        MS. PAGE: Form.
8     A  I -- I'm sorry, sir. That's -- that's not a
9  question that I understand or that I can answer.
10    Q  Okay. Would it be fair to say you don't
11 really know too much about public-records laws?
12    A  I don't know a ton about it, no.
13    Q  Do you know what a gate-cut notification is?
14    A  Yes, sir.
15    Q  Do you know if one was issued once Ms. Harrell
16 was terminated?
17    A  I don't know if -- whether one was or not.
18    Q  Okay. Are -- is that something you would have
19 recommended?
20    A  No.
21    Q  Okay. Do you have copies of Procedure
22 102.008, public-records requests? Is that something you
23 have a copy of?
24    A  Not handy, no.
25    Q  Okay. How about Procedure 206.007, user

Page 218

1  security for information systems?
2     A  Unless it's an exhibit, I don't have it handy.
3     Q  Okay. Do you recall the issue that -- where
4  Ms. Harrell was complaining that Ms. Johnson had told HR
5  that she had submitted a verbal resignation? Do you
6  recall --
7     A  Yes, I recall that. I do.
8     Q  Did you ever look into her complaint that, you
9  know, Ms. Johnson was -- reported that she submitted a
10 verbal resignation when she didn't, in fact, do that?
11    A  Actually, Ms. Johnson reported that to me
12 initially and my reaction was to tell Ms. Johnson, if
13 she was putting in a two-weeks notice, ask her to put it
14 in writing. She didn't put it in writing, so it wasn't
15 considered -- and at that point, she stated she was not
16 resigning. So, yes, it was investigated.
17    Q  Okay. Would you -- so, you would not have
18 accepted a -- a verbal resignation that -- especially in
19 this case because it wasn't coming actually from
20 Ms. Harrell, it was coming from Ms. Johnson. Is it your
21 testimony you would not have accepted a, a verbal --
22 report of a verbal resignation coming from Ms. Johnson?
23       MS. PAGE: Form.
24    A  In the way that it came through, no, I would
25 not have accepted that.

Page 219

1　Q　Okay.

2　A　That's why I asked Ms. Johnson to confirm it

3　and have her confirm the resignation in writing.

4　　　MR. FINNERTY:　Ms. Brus, that's all I have for

5　you at this time.　Your counsel may have some --

6　some additional questions for you, but I

7　appreciate -- appreciate your time and your

8　patience with me today.

9　　　MS. PAGE:　I do have a few questions.　So, I

10　apologize in advance, but I'll try to be quick

11　and -- and fly through these.

12　　　THE WITNESS:　No problem.

13　　　　　EXAMINATION

14　BY MS. PAGE:

15　Q　Okay.　Can you still -- strike that.　Can you

16　still see my screen?

17　A　Yes.

18　Q　Okay.　Do you see a date on this document?

19　A　I do not.

20　Q　Do you know one way or another whether this

21　was in effect at the time that Ms. Harrell was assigned

22　to the pill room on -- I believe it was April 14th.

23　A　No, I do not.

24　Q　Okay.　With regard to Exhibit No. 14 -- and

25　I'm sorry.　For the record, the last exhibit that I was

Page 220

1　referencing was Exhibit 12.

2　　　With regard to Exhibit No. 14, do you know one

3　way or another, whether this was a final document -- the

4　final log for this day, March 29th, 2018?

5　A　I don't believe that it was because I believe

6　there's another version of it that has both signatures.

7　Q　Looking at Exhibit No. 17 -- No. 7 here:　Do

8　not engage in conversations of a personal nature with

9　inmates at any time and do not engage in conversations

10　that inmates might overhear.

11　　　Now, looking at Exhibit 20- -- I'm sorry --

12　16, would engaging in a personal conversation with an

13　inmate violate what I'm highlighting here, 26?

14　A　Yes.

15　　　MR. FINNERTY:　Form.

16　Q　Now, looking at Exhibit 39 at the -- can you

17　still see the exhibits on your screen?

18　A　Yes.

19　Q　At the second bullet point:　On 11/28/2017, at

20　6:40, an e-mail was sent by Ms. Blocker to my work

21　e-mail and the personal e-mail of two other -- and the

22　personal e-mail of two other PRN LPNs to inform of a

23　full-time night-shift vacancy.　Please note, I have

24　previously requested on more than one occasion e-mail

25　correspondence be sent to my personal e-mail.

Page 221

1　　　Does Exhibit No. 39 indicate anywhere in this

2　paragraph or otherwise that Ms. Harrell had previously

3　requested this of Ms. Blocker?

4　A　It does not state that.

5　Q　Do you have any personal knowledge whether or

6　not Ms. Harrell had previously requested from

7　Ms. Blocker to send e-mails to her personal e-mail

8　address?

9　A　I do not.

10　Q　With regard to Exhibit No. 40- -- 45, and　in

11　time-and-attendance violations, is it up to the

12　discretion of the supervisor whether or not to enforce

13　the time-and-attendance policy to discipline an employee

14　for violation of that policy?

15　A　Can you -- can you restate that question?

16　Q　Yes.　That was a bad question.　Is it the

17　supervisor's -- within the supervisor's discretion

18　whether or not to issue discipline as a result of time-

19　and-attendance violations?

20　A　How do I answer that.　They're -- they're

21　supposed to follow the policy and issue it consistently;

22　however -- how do I want to explain this.　There's a

23　certain amount of discretion as to, you know, how

24　serious are the violations, but we do strongly prefer

25　that they issue that type of discipline consistently.

Page 222

1　Q　Okay.　And with regard to -- and I'm going to

2　click through them quickly so just, if you don't get it,

3　let me know.　But with regard to 45, 44 -- I'm sorry, 45

4　and 46 as well as 47, did Misty West receive discipline

5　for her time-and-attendance violations?

6　A　Yes, she did.

7　　　MS. PAGE:　That's all I have.

8　　　MR. FINNERTY:　Very, very brief follow-up,

9　Ms. Brus.　I apologize.

10　　　FURTHER EXAMINATION

11　BY MR. FINNERTY:

12　Q　As relates to Exhibit 39, you were asked about

13　if you had any personal knowledge whether Ms. Harrell

14　had requested that Ms. Blocker e-mail her on her private

15　e-mail account -- you recall that question?

16　A　Yes.

17　Q　That's something you would have asked of

18　Ms. Blocker during your investigation of this complaint,

19　right?

20　A　I -- I don't know whether I asked her that or

21　not.

22　Q　Okay.　As relates to the questioning about

23　Exhibit 45 regarding Misty West and her verbal

24　counseling, the question was whether it was up to the

25　discretion of the supervisor as it relates to issuing

Page 223

1  counseling.
2      My -- I believe I recall you testifying that,
3  if there's three late arrivals within a three-month
4  period, that there should be counseling issued; is that
5  right?
6      A    That is the policy, yes.
7      Q    Okay.  So, although there may be some
8  discretion, as -- as you testified, as to the severity
9  of any counseling, there is clearly a policy that there
10 should be counseling after three late arrivals within
11 a -- a three-month period, right?
12     A    It's after three occurrences within a --
13 within a three-month period, yes.
14     MR. FINNERTY:  Thank you, Ms. Brus.  I don't
15 have any -- any more questions.
16     (Whereupon, the deposition was concluded at
17 5:57 p.m., and the witness did not waive reading and
18 signing.)
19
20
21
22
23
24
25

---

Page 224

CERTIFICATE OF OATH

4  STATE OF FLORIDA  )
5  COUNTY OF LEON    )

8      I, ANDREA KOMARIDIS WRAY, the undersigned
9  authority, certify that the above-named witness appeared
10 before me via videoconference pursuant to the Supreme
11 Court's Order AOSC20-13 and was duly sworn.

13     WITNESS my hand and official seal this 15th
14 day of September, 2020.

20     ANDREA KOMARIDIS WRAY
21     NOTARY PUBLIC
22     COMMISSION #GG365545
23     EXPIRES February 9, 2021

---

Page 225

CERTIFICATE OF REPORTER

3  STATE OF FLORIDA  )
4  COUNTY OF LEON    )

6      I, ANDREA KOMARIDIS WRAY, Court Reporter,
7  certify that the foregoing proceedings were taken before
8  me at the time and place therein designated; that my
9  shorthand notes were thereafter translated under my
10 supervision; and the foregoing pages, numbered 114
11 through 223, are a true and correct record of the
12 aforesaid proceedings.

14     I further certify that I am not a relative,
15 employee, attorney or counsel of any of the parties, nor
16 am I a relative or employee of any of the parties'
17 attorney or counsel connected with the action, nor am I
18 financially interested in the action.

19     DATED this 15th day of September, 2020.

23     ANDREA KOMARIDIS WRAY
24     NOTARY PUBLIC
25     COMMISSION #GG365545
       EXPIRES FEBRUARY 09, 2021

---

Page 226

ERRATA SHEET

2  I have read the transcript of my deposition, Pages 114
   through 223 and hereby subscribe to same, including any
3  corrections and/or amendments listed below.

4  DATE:_____
       SARAH BRUS
5  (HARRELL V. MHM HEALTH PROFESSIONALS, ET AL.)

6  PAGE/LINE  CORRECTION/AMENDMENT   REASON FOR CHANGE

22 DATE OF DEPOSITION: August 18, 2020

23 REPORTER: ANDREA KOMARIDIS WRAY

---