```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF FLORIDA
 2                 TALLAHASSEE DIVISION

 3

 4

 5   VIRGINIA E. HARRELL,

 6        Plaintiff,

 7   vs.                        CASE NO. 4:20-cv-30-AW-CAS

 8   MHM HEALTH PROFESSIONALS, LLC,
     f/k/a MHM HEALTH
 9   PROFESSIONALS, INC., and
     CENTURION OF FLORIDA, LLC,
10
          Defendants.
11   _____/

12

13

14   DEPOSITION OF:          VICTORIA LOVE

15   AT THE INSTANCE OF:     Plaintiff

16   DATE:                   August 11, 2020

17   TIME:                   Commenced: 9:00 a.m.
                             Concluded: 11:23 a.m.
18
     LOCATION:               VIDEOCONFERENCE
19
     REPORTED BY:            DANA W. REEVES
20                           Court Reporter and
                             Notary Public in and for the
21                           State of Florida at Large

22
                       PREMIER REPORTING
23                     114 W. 5TH AVENUE
                     TALLAHASSEE, FLORIDA
24                       (850) 894-0828

25
```

Page 2

APPEARANCES:

REPRESENTING THE PLAINTIFF:

BRIAN O. FINNERTY
The Law Office of Brian O. Finnerty, P.A.
541 Beverly Court
Tallahassee, FL 32301

REPRESENTING THE DEFENDANTS:

CAYLA M. PAGE
Greenberg Traurig, P.A.
101 East Kennedy Boulevard, Suite 1900
Tampa, FL 33602

Page 3

INDEX TO WITNESS

VICTORIA LOVE                          PAGE
Examination by Mr. Finnerty              5
Examination by Ms. Page                 92
Further Examination by Mr. Finnerty       97

INDEX TO EXHIBITS
NO.        DESCRIPTION              MARKED
1 - Plaintiff's notice of taking deposition      9
2 - Plaintiff's notice of taking Rule 30(b)(6)
       deposition                               11
3 - First amended complaint                     16
4 - Defendants' answer and affirmative defenses
       to first amended complaint               19
5 - Defendants' responses and objections to first
       set of interrogatories                   19
6 - E-mail chain Re:  Involuntary Termination
       Request                                  29
7 - Involuntary termination report              29
8 - Employee counseling form - termination      41
9 - Employee counseling form - final warning    41
10 - Employee counseling form - verbal counseling 41
11 - List of e-mails sent from work account to
       personal account                         41
12 - NWFRC shift assignments                    41
13 - Narcotic accounting log dated April 14, 2018  41
16 - 33.208.002 Rules of conduct                61
17 - E-mail from Tara Johnson to staff          55
18 - E-mail from Kathi Douin to staff           61
19 - E-mail from Lori Cook to Virginia Harrell  72
20 - E-mail from Tara Johnson to Virginia Harrell  72
21 - E-mail chain Re:  Camera footage           92
22 - MHM Services, Inc., employee handbook      95

Page 4

STIPULATIONS

The attorneys participating in this deposition acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely. This arrangement is pursuant to the Florida Supreme Court Administrative Order AOSC-20-16. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Page 5

DEPOSITION

Whereupon,

VICTORIA LOVE

was called as a witness, having been first duly sworn to speak the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. FINNERTY:

Q   Good morning, Ms. Love. My name is Brian Finnerty and I'm an attorney representing Virginia Harrell in a case that's been brought against MHM and Centurion. Could you please state your name for the record?

A   Victoria Love.

Q   And where are you currently employed?

A   Am employed with Centurion, or MHM Health Professionals, and my office is in Tallahassee, Florida.

Q   And so are you employed by Centurion and MHM?

A   Our employee entity is MHM Health Professionals.

Q   But your actual employer is Centurion, is that correct?

A   Right.

Q   Okay.

A   And that relationship, I'd let legal talk

**Page 6**

1 about.

2 **Q Sure. And have you ever had your deposition**

3 **taken before?**

4 A Yes.

5 **Q Do you know approximately how many times?**

6 A 10 to 15.

7 **Q And were those all related to your job?**

8 A Yes.

9 **Q Okay. When was the last time you had your**

10 **deposition taken?**

11 A Last week.

12 **Q Okay. So you -- I can assume that you're**

13 **familiar with how a deposition works?**

14 A Yes, sir.

15 **Q Okay. And I have a real problem with this as**

16 **well, but just to make it easier for the court reporter,**

17 **you know, in everyday talk when you're interacting with**

18 **people there's a lot of head nodding and uh-huh, uh-uh.**

19 **Just try to make sure to say yes or no and to have**

20 **verbal responses. Fair enough?**

21 A Yes.

22 **Q Good. And if you need a break at any time,**

23 **just let us know. That won't be a problem.**

24 A Okay.

25 **Q All right. So what is your job title?**

**Page 7**

1 A Regional Vice President.

2 **Q Okay. And what area does your region**

3 **encompass?**

4 A Florida.

5 **Q All of Florida?**

6 A Yes, sir.

7 **Q Okay. So is there a regional vice president**

8 **for every state that Centurion operates in?**

9 A Yes. Well -- but that regional vice president

10 may have a variety of states under them.

11 **Q And what are the duties and responsibilities**

12 **of a regional vice president?**

13 A Primarily to ensure that we are meeting the

14 criteria set forth in our contracts with our clients.

15 **Q Okay. And who do you report to?**

16 A Keith Lueking.

17 **Q And what's his job title?**

18 A COO.

19 **Q And is he with Centurion?**

20 A Yes.

21 **Q And then -- so would you -- does everyone that**

22 **works in your region for Centurion report to you?**

23 A There is a reporting structure. Some report

24 to me, yes, and others report -- there's an

25 organizational structure.

**Page 8**

1 **Q Sure. So would it be fair to say that they**

2 **may not directly report to you, but you're at the top of**

3 **that reporting chain?**

4 A Yes, sir.

5 **Q And do you have any health care licenses?**

6 A No.

7 **Q Okay. Any training in healthcare-related**

8 **field?**

9 A I started in Florida Department of Corrections

10 as a psychological specialist, so a Master's-prepared

11 counselor.

12 **Q Okay. And how long have you worked for**

13 **Centurion?**

14 A Fourteen years.

15 **Q So working as a psychological specialist with**

16 **the Florida Department of Corrections, I'm assuming you**

17 **have some experience working in correctional facilities?**

18 A Yes, sir.

19 **Q And you would be familiar with, you know,**

20 **certain rules as relates to providing health care to**

21 **incarcerated persons in Florida?**

22 A Yes, sir.

23 **Q So yesterday we sent over some documents.**

24 **Have you had a chance to review -- I think there were 21**

25 **exhibits. Did you get those?**

**Page 9**

1 A Yes.

2 **Q Okay.**

3 A If you wanted me to review them, I'd have to

4 pull them up on my computer, I mean, if you want to

5 reference anything specifically. I didn't -- I didn't

6 print them all.

7 **Q Yeah. I mean, I will have some questions, not**

8 **for every one, but it would, I think, would help to --**

9 **and the court reporter also has a copy of those**

10 **documents, but if you could pull them up on your**

11 **computer, that would be great.**

12 A Okay. You know, it's different now with the

13 whole Zoom, not having things in front of you. It

14 just -- Zoom depositions, so I'm like, oh, I don't know

15 what -- I kind of shut everything down just --

16 **Q Right.**

17 A But I got it. Okay.

18 **Q So the first exhibit is just a notice for**

19 **today's depo that lists you as one of the deponents. So**

20 **I'd like to attach that one as Exhibit 1.**

21 (Whereupon, Exhibit No. 1 was marked for

22 identification.)

23 BY MR. FINNERTY:

24 **Q And then Exhibit 2 is basically the same**

25 **thing, it's a notice for what's called 30(b)(6) depos.**

Page 10

1 And as relates to Exhibit 2, have you seen -- had you
2 seen it prior to, I guess yesterday, when those exhibits
3 were sent over?
4    A   Yes.
5    Q   Okay.  So you had a chance to review pages
6 four and five of -- it's marked as Exhibit A on, but has
7 now been marked as Exhibit 2, but pages four and five of
8 that document, had you seen those requests for matters
9 of examination?
10        MS. PAGE:  Brian, I think that I -- looking at
11    what I printed, I think I sent Vicki the wrong --
12    the initial July 7th letter.  So let me send her
13    quickly the longer list of the topics.
14        MR. FINNERTY:  Okay.
15        MS. PAGE:  I apologize.
16        THE WITNESS:  You sent me the 19th list of
17    topics.
18        MR. FINNERTY:  Yeah.  So, for purposes of the
19    questions that -- you know, I would like for
20    Exhibit 2 to be attached to the depo, but if she
21    has that letter, that would be -- that's fine as
22    far as the brief questions that I'll ask her.
23        MS. PAGE:  Vicki do you -- let me send that to
24    you.
25        THE WITNESS:  Okay.

Page 11

1        MS. PAGE:  Brian, this is the longer one that
2    has 15 topics?
3        MR. FINNERTY:  Yes.
4        MS. PAGE:  Okay.  All right.  Vicki, I just
5    sent that.
6        THE WITNESS:  There we go.  Yeah.  Now I have
7    that one.
8        MS. PAGE:  Okay.
9        MR. FINNERTY:  So I'd like to attach this as
10    Exhibit two.
11        (Whereupon, Exhibit No. 2 was marked for
12 identification.)
13 BY MR. FINNERTY:
14    Q   So it's my understanding that you basically
15 just -- your involvement with -- well, scratch that.
16        Have you ever met the plaintiff, Virginia
17 Harrell?  Have you ever met her?
18    A   Not to my knowledge.
19    Q   Okay.  It's my understanding that you
20 basically -- your involvement as relates to her
21 separation from employment was essentially that you were
22 the person at the top of the chain that basically just
23 approved a request for her termination, is that
24 accurate?
25    A   After a review of the information, yes.

Page 12

1    Q   Right.  So is it fair to say that you didn't
2 actually make the initial decision to terminate Ms.
3 Harrell?
4    A   Correct.
5    Q   Okay.  And do you know who did make that
6 decision?
7    A   It should have been Kathleen Douin, regional
8 director in consultation with our HR business partner
9 and the health services administrator.
10    Q   Wouldn't Ms. Harrell's direct supervisor
11 have -- be involved in the decision to terminate someone
12 under her supervision?
13    A   I forget that she's a nurse.  So, yes.
14    Q   Okay.  And if there was a document that was
15 produced in discovery that represented that it was Lori
16 Cook who was Ms. Harrell's director of nursing, as well
17 as Tara Johnson, who was the HSA health services
18 administrator, if those two individuals actually were
19 the persons that wanted her terminated, would you have
20 any reason to dispute that?
21        MS. PAGE:  Form.
22        THE WITNESS:  No.
23 BY MR. FINNERTY:
24    Q   And would that typically be who would have the
25 authority and who would be able to recommend the

Page 13

1 termination?
2        MS. PAGE:  Form.
3        THE WITNESS:  So they might recommend it to
4    the regional director and the human resource
5    business partner.
6 BY MR. FINNERTY:
7    Q   So they could recommend it, but they couldn't
8 say, Ms. Harrell, you're fired?
9    A   Correct.
10    Q   Okay.  And the number four on this matters of
11 examination list of several policies or rules and
12 procedures, MHM time and attendance policy, DOC
13 sensitive tools, public records policy, user security
14 information systems policy, and then Rule 33-208.002,
15 Florida Administrative Code.  Are these policies that
16 you're familiar with?
17    A   I would have to reference them directly if
18 you're going to question something out of them.  Do I
19 know that they exist?  Absolutely.  I know how to access
20 them, yes.
21    Q   Okay.  And from your experience working with
22 the Department of Corrections, you would be familiar
23 with public records procedures or rules, is that right?
24    A   Yes.
25    Q   Okay.  Do you know whether Ms. Harrell

8/11/2020
Deposition of Victoria Love

Case 4:20-cv-00030-AW-MJF   Document 37-6   Filed 10/14/20   Page 5 of 28
MHM Health Professionals, Inc. d/b/a MHM...

18-CA-77

5 (14 - 17)

Page 14

1  received any training as relates to these policies
2  listed under paragraph four?
3      A   I am not aware.
4      Q   And are you familiar with narcotic accounting
5  logs?
6      A   Yes.
7      Q   Have you ever had to fill one out?
8      A   No.
9      Q   Okay.  But you've seen them, I guess?
10     A   Yes.
11     Q   And do you know how they are supposed to be
12  filled out, or the proper way to do that?
13     A   Yes.  It's a combination of two nurses are
14  supposed to review, sign on and off, to ensure that
15  counts are maintained and that they can't be falsified
16  and that's really for -- primarily for diversion
17  purposes.  It's something that nurses are taught in
18  nursing school as a very basic, this has to be followed
19  every single time because of the liability of diversion
20  of narcotics.
21     Q   And that would apply in and out of a
22  correctional setting?
23     A   Yes.
24     Q   And then the same thing -- same question for
25  the narcotic key exchange log.  You're familiar with

Page 15

1  that?
2      A   The key exchange?  Yes.
3      Q   Is that more catered to a correctional
4  facility setting, or is that also just general health
5  care rule?
6      A   That I don't know.
7      Q   Okay.  And are you familiar with the various
8  assignments or shifts that nurses would work at the
9  Northwest Florida Reception Center?
10     A   High level familiarity.  I mean, I just know
11  that they do have shift -- I mean assignments and that
12  there is shifts.
13     Q   So you wouldn't be the best person to ask as
14  relates to what, for instance, an infirmary nurse's
15  duties would be?
16     A   Correct.
17     Q   Okay.  Fair enough.  Have you had a chance, or
18  at any time, have you seen any of the complaints that
19  Ms. Harrell alleges that she submitted prior to her
20  termination?
21     A   In all of this, that's the one thing that
22  wasn't there.  I read about them.
23     Q   Okay.
24     A   They have been in -- seems like I've read a
25  lot about them, but I don't know that I ever actually

Page 16

1  saw them.
2      Q   Okay.  And you wouldn't have been provided
3  those prior to your approval for Ms. Harrell to be
4  terminated?
5      A   I should have been.  I don't know that that
6  was contained in the email messages that I received to
7  review for this.
8      Q   Okay.  And we'll get to that later on.  I'm
9  just kind of going -- trying to briefly go through
10  these -- the matters of examination document.
11         All right.  So that's all I really have for
12  Exhibit 2.  Exhibit 3 is the first amended complaint in
13  this action.  I'd like to attach that as Exhibit 3.
14         (Whereupon, Exhibit No. 3 was marked for
15  identification.)
16  BY MR. FINNERTY:
17     Q   Have you had a chance to review the first
18  amended complaint?
19     A   I would say yes.  I have to jump back to that
20  email -- yes.
21     Q   And when would you have reviewed that?
22     A   I probably reviewed it a couple of times, and
23  I don't know originally when.
24     Q   And would reviewing complaints or lawsuits
25  filed against MHM or Centurion -- I just say MHM for

Page 17

1  short.  Is it MHM Health Services, LLC?  Is that what it
2  is?
3      A   No.
4      Q   MHM Health Professional, LLC.  And that was
5  formerly known as MHM Health Professionals, Inc. and
6  that changed to LLC.  MHM Health Professionals, Inc.
7  changed to MHM Health Professionals, LLC?
8      A   No.
9      Q   No?
10     A   No.
11     Q   Well correct me on how did that happen?
12     A   I'd rather have our general counsel go through
13  that whole process, but we were MHM Services.  So this
14  is, you know, high level.  I'm not the corporate
15  representative.
16     Q   Understood.
17     A   MHM Health Professionals was developed when
18  Centurion was developed.  They're the employing entity
19  for Centurion.
20     Q   All right.  So we were talking about the first
21  amended complaint.  Is reviewing complaints that are
22  filed against MHM Health Professionals, LLC and
23  Centurion of Florida, LLC, is that something that's --
24  you typically would do within the duties of your job as
25  a regional vice president?

Page 18

1    MS. PAGE: Form.

2      THE WITNESS: I'm sorry. What was the

3   question?

4 BY MR. FINNERTY:

5    Q   So you said that you had previously reviewed

6 the first amended complaint. Is reviewing complaints

7 that are filed against MHM Health Professionals, LLC

8 and/or Centurion of Florida, LLC, something that you

9 would typically in within your duties and

10 responsibilities as a regional vice president?

11    A   Not specifically. I think that's typically

12 handled more in our general counsel's office and human

13 resource department. I typically would become engaged

14 when and if, you know, additional information is needed,

15 if I have it.

16    Q   So do you know why you would have been

17 provided a copy of the first amended complaint?

18    A   I'm listed as a witness, so I needed to be

19 familiar with it.

20    Q   So would you have -- do you think you would

21 have first been provided the complaint within the past

22 month?

23    A   I don't know. I likely received it

24 previously.

25    Q   Okay. Exhibit 4 that I'd like to attach as

Page 19

1 the answer to the first amended complaint filed by MHM

2 Health Professionals, LLC, and Centurion of Florida,

3 LLC, have you seen that answer that was filed?

4      THE WITNESS: Yes.

5      (Whereupon, Exhibit No. 4 was marked for

6 identification.)

7 BY MR. FINNERTY:

8    Q   And were you involved at all in assisting with

9 providing answers to that complaint?

10    A   I don't know. Which -- and I'm -- is it the

11 objections? Is it the first amended complaint -- right.

12 There's the answers. I don't believe I was consulted on

13 this.

14    Q   Okay. So then moving to Exhibit 5, that I'd

15 like to attach, as well -- let's see -- the answers to

16 interrogatories that were served by the defendant. Were

17 you involving in providing any of the answers to the

18 interrogatories?

19    A   I'm sorry. I'm looking for it.

20      (Whereupon, Exhibit No. 5 was marked for

21 identification.)

22      MS. PAGE: If you don't mind, Vicki, I think

23 there should be a dash -- you know, a number and

24 then a dash. So it'll says five, dash, and that's

25 what they're referring to.

Page 20

1      THE WITNESS: Okay. Here we go. No, I don't

2   recall being asked about the responses to this.

3 BY MR. FINNERTY:

4    Q   And so in Interrogatory No. 11 it asks just to

5 identify the persons involved in the decision to

6 terminate Ms. Harrell on April 26th, 2018, and that your

7 name was listed in response to Interrogatory No. 11, and

8 I think that's basically what we just talked about. You

9 were sent an email and you gave the ultimate approval,

10 is that accurate?

11    A   Yes, sir.

12    Q   So then let's go to Exhibit 6. And this is

13 the email chain that I've been referring to. And if you

14 could scroll down to -- you know, emails go in reverse

15 order when they're printed out. So it would start with

16 the last page of that email, and it was -- well, first

17 of all, do you recall this email chain?

18    A   Only because of this review.

19    Q   Okay. So then it looks like Ms. Sarah Brus

20 initially sent an email to Lisa Lynch on April 20th,

21 2018 with the subject, it's involuntary termination

22 request, Virginia Harrell, NWFRC, Northwest Florida

23 Reception Center. Is it required for somebody -- for a

24 regional vice president to approve terminations? Is

25 that something that you all require?

Page 21

1      MS. PAGE: Form.

2      THE WITNESS: Yes.

3 BY MR. FINNERTY:

4    Q   So this was -- this email -- so who's Sarah

5 Brus?

6    A   She's our human resources business partner.

7    Q   And does she actually work -- is her office at

8 the Northwest Florida Reception Center?

9    A   No, sir.

10    Q   Do you know where her office is?

11    A   She would -- her office -- most of our

12 employees work from home. However, her official office

13 is in Tallahassee.

14    Q   Are you all in the same office?

15    A   Yes.

16    Q   When we're not in the middle of a pandemic and

17 you're working from home?

18    A   Right. Right.

19    Q   All right. So that was initially sent on

20 April 20th, and then Ms. Brus follows up on April 26th

21 in an email to Lisa Lynch basically just saying, we

22 still need approval. Who is Lisa Lynch?

23    A   She's my human resources manager.

24    Q   And does she report to you?

25    A   Dotted line.

Page 22

1    Q   Sure. And could Lisa Lynch have approved Ms.
2    Harrell's termination without you getting involved?
3    A   No.
4    Q   Okay. And is there a policy that requires
5    that any termination approvals go through you as -- in
6    your region?
7    A   I'm not sure. It's the way I have the overall
8    authority of the program, therefore I take
9    responsibility for that, those decisions.
10   Q   So have you -- do you approve every
11   termination for employees in your region?
12   A   I did at that time, yes.
13   Q   Okay. So it sounds like that's no longer
14   something that's within your job duties?
15   A   Correct.
16   Q   And who or what approves the terminations now?
17   A   Ruth Feltner.
18   Q   And what's her job title?
19   A   Program director.
20   Q   So did Ms. Brus, why would she have just sent,
21   if you know, why would she have just sent this
22   termination request to Lisa Lynch instead of to you
23   initially?
24       MS. PAGE: Form.
25       THE WITNESS: She would have sent it to Lisa

Page 23

1    Lynch as her direct supervisor for -- and as the HR
2    manager. My expectation was that she reviewed any
3    term -- terminations are serious and, you know, we
4    want to make sure that they've been reviewed on
5    multiple levels.
6    BY MR. FINNERTY:
7    Q   Okay. So then also on April 26th, after Ms.
8    Lynch gets the second email from Ms. Brus, she forwards
9    it on to you. She says, hi, Vicki, so you need
10   additional information to approve this termination. And
11   then you later, that same day, approved the termination,
12   is that correct?
13   A   I'm sorry. Was there a question?
14   Q   It was not a very good question, but I
15   basically was just saying, is it correct that Ms. Brus
16   sends the termination request to Ms. Lynch, Ms. Lynch
17   forwards it up the chain to you, and then you ultimately
18   approved it on April 26th?
19   A   Correct.
20   Q   And is there -- do you know why it took six
21   days after the initial request on April 20th for it to
22   finally be approved by you on April 26th?
23       MS. PAGE: Form.
24       THE WITNESS: I do not.
25   BY MR. FINNERTY:

Page 24

1    Q   And to be fair you to, it wasn't sent up the
2    chain to you until the 26th of -- it wasn't like -- I'm
3    not saying you sat on it or anything.
4    A   Actually, I think I did sit on it. I think it
5    was originally sent me several days prior.
6    Q   So that would have been in an email?
7    A   I didn't finish it or something. I don't know
8    what happened to it.
9    Q   So there would there be a separate email
10   that's not included in this chain where it would have
11   been sent to you prior to April 26 --
12   A   I guess I thought there was. I thought it was
13   all in here. Maybe there wasn't. I thought there was
14   one in between where Lisa had sent it to me prior to the
15   26th.
16   Q   Okay, but it's not in this chain, is that
17   fair?
18   A   Right.
19   Q   Okay. And what would have been included?
20   Were there attachments included with this termination
21   approval request?
22   A   Well, I wouldn't approve it just on an email.
23   So, yes, there would have been attachments.
24   Q   And do you recall what those attachments would
25   have been?

Page 25

1    A   Based on the review of the information, I
2    believe it was the involuntary termination summary. It
3    was the termination document and attachment of a list of
4    emails that Ms. Harrell sent to her private email.
5    Q   Okay. Anything else that you can recall?
6    A   Not that I can recall.
7    Q   Okay. And you would have reviewed all of
8    those documents prior to giving your ultimate approval?
9    A   Yes.
10   Q   And did you ever ask for any additional
11   information in addition to what was sent to you?
12   A   I do not know.
13       MS. PAGE: Form.
14   BY MR. FINNERTY:
15   Q   Did you ever ask to speak with Ms. Harrell's
16   direct supervisors prior to approving the termination?
17   A   No.
18   Q   Were you aware at the time that you approved
19   Ms. Harrell's termination that Ms. Harrell had recently
20   submitted some written complaints?
21   A   I don't know.
22   Q   Is that typically something you would inquire
23   about?
24   A   If the employees had complained prior to being
25   terminated? Typically, the regional director would keep

Page 26

1  me apprized of any difficult employee situations.  So I
2  likely knew, I just can't confirm or not confirm because
3  that's 2018.  I don't have recollection.  I don't have
4  any documentation other than emails about what I knew
5  and didn't know.
6      Q    Fair enough.  So the Centurion of Florida has
7  a contract with the Florida Department of Corrections,
8  is that correct?
9      A    Yes.
10     Q    And does MHM have a contract with the state,
11  State of Florida?
12     A    No.
13     Q    And does the State of Florida, are they aware
14  that MHM is the hiring, and I may not say this
15  correctly, but you said that it was the hiring entity
16  for Centurion, is that right?
17     A    Correct.
18     Q    Okay.  And the state is aware that MHM is the
19  hiring entity?
20     A    Right.
21     Q    And was Ms. Harrell, was she considered an
22  employee of Centurion?
23     A    Yes.
24     Q    So we've gone through the email chains where
25  you approved the termination.  Is there any circumstance

Page 27

1  where an employee could be terminated without having to
2  go up to you for approval?
3      A    Nope.
4      Q    Not even like an emergency situation,
5  employees threaten the safety of others, they couldn't
6  be removed without first getting your approval?
7      A    They would -- they could be suspended, but the
8  ultimate termination would not occur until they had my
9  approval.
10     Q    So could they -- do you all have a policy for
11  putting employees, like, on administrative leave, for
12  example?
13     A    Yes.
14     Q    Which is essentially a suspension, is that
15  right?
16     A    Correct.
17     Q    So there would be a way to get an employee out
18  of the job, even if only temporarily, if there were an
19  issue with safety or a concern that needed some
20  immediate attention?
21         MS. PAGE:  Form.
22         THE WITNESS:  Yes.
23  BY MR. FINNERTY:
24     Q    Okay.  And has there ever been a time where a
25  termination request or a termination approval request

Page 28

1  was sent to you where you didn't ultimately approve the
2  request to terminate an employee?
3      A    Yes.
4      Q    Do you know about how many times that would
5  have happened?
6      A    I'll say -- you know, so there's a variety.
7  Some I just would not approve at all based on current
8  documentation.  Others I would send back and ask for
9  more information.  So probably ten maybe times in that I
10  did not approve a termination.  Maybe not that high.
11     Q    Do you know about how many terminations you've
12  approved?
13     A    I do not.
14         MS. PAGE:  Form.
15  BY MR. FINNERTY:
16     Q    Over 100?
17         MS. PAGE:  Form.
18         THE WITNESS:  I would have to look at our
19     personnel records.  I have no idea.
20  BY MR. FINNERTY:
21     Q    Fair enough.  So if we look at some of these,
22  Exhibit 7, that's the involuntary termination report.
23  Is that the report that would have been provided to you
24  prior to you approving Ms. Harrell's termination?
25

Page 29

1         MR. FINNERTY:  I'd like to attach that as
2      Exhibit 7.  And in case I forgot, Exhibit 6, those
3      emails, I'd like to attach that, as well.
4         (Whereupon, Exhibit Nos. 6 - 7 were marked for
5      identification.)
6  BY MR. FINNERTY:
7      Q    So looking at Exhibit 7, at the top of that
8  first page, the second row, it says contract Florida
9  GAP.  What is Florida GAP?
10     A    So at this time we were under an emergency
11  procurement situation.  We were working on an invitation
12  to negotiate.  So we were in the middle of presentations
13  to be awarded a contract on a permanent basis with
14  the Florida Department of Corrections.
15     Q    Okay.  And is that information included on
16  this form, just to basically just to show that Ms.
17  Harrell's employment was pursuant to a contract that
18  Centurion had with the State of Florida?
19     A    Yes.
20     Q    Okay.  I mean, I'm not trying to trick you.  I
21  mean it --
22     A    Yeah, no.
23     Q    You had to have an agreement with the State to
24  hire --
25     A    It was more for our corporate office so they

Page 30

1 understood which region or contract this person worked
2 for.
3    Q   Okay. So then the third row, it's in the
4 middle. It says VPO-PM, and then Victoria Love. What's
5 VPO-PM?
6    A   VPO is vice president of operations and PM is
7 another -- is program manager. So that's used in some
8 of our contracts.
9    Q   And so the VPO, that would be you?
10   A   Right.
11   Q   Okay. And so it says on this document that
12 the last day Ms. Harrell worked was 4-20-2018. Do you
13 know if that's accurate?
14   A   I do not know other than based on this. I
15 didn't look through our Kronos records to see if that
16 was correct.
17   Q   And would it surprise you if I represented
18 that Ms. Harrell actually worked every day between
19 4-20-2018 and the date she was actually terminated on
20 4-26-18?
21       MS. PAGE: Form.
22       THE WITNESS: Would it surprise me?
23 BY MR. FINNERTY:
24   Q   Yes, ma'am.
25   A   It would not surprise me. It would disappoint

Page 31

1 me that the information provided to me was incorrect.
2    Q   And, just to be fair, I think that date says
3 4-20 because that's the date the initial information was
4 sent over by Ms. Brus.
5    A   Right.
6    Q   So I think it's an honest mistake, and
7 especially since there may be an amended version of
8 this. I'm not sure, but I think -- my belief, that's
9 probably just because that's the date it was first sent
10 up the chain.
11       So do you know whether any -- do termination
12 requests, to your knowledge, do they go through your
13 legal department at all prior to approval?
14   A   Doubtful.
15   Q   All right. So, going down this involuntary
16 termination report, the last paragraph on the first page
17 talks about Ms. Johnson receiving a verbal report, Ms.
18 Harrell has sent information from her work email to her
19 personal email. Do you know who would have given
20 that -- made that verbal report to Ms. Johnson?
21   A   I do not.
22   Q   And I'm assuming that's something you wouldn't
23 have inquired about prior to approving Ms. Harrell's
24 termination?
25   A   Correct.

Page 32

1    Q   And do you know in 2018 when these emails were
2 allegedly sent by Ms. Harrell from her work email
3 account to her private account, was that -- was sending
4 emails to yourself, essentially was that a violation of
5 policy?
6       MS. PAGE: Form.
7       THE WITNESS: Yes.
8 BY MR. FINNERTY:
9    Q   And why is that a violation?
10   A   Well, one, again, I don't have the policy in
11 front of me, but anything that contains an employee
12 information or inmate information, there's strict
13 guidance concerning how that information is handled, and
14 once it leaves the Centurion/Florida Department of
15 Corrections network, it is no longer protected. It's
16 not encrypted. It's not anything. So there are grave
17 concerns with that. Again, I don't know what exactly,
18 other than an itemization of the list, but based on
19 reviewing that list, those things should not have been
20 sent through public -- a public domain, which is
21 essentially once it leads to her personal email, it's
22 now public. Also, she's doing personal stuff on work
23 time, it appeared.
24   Q   I think you went to what would be one of my
25 follow-up questions, but simply just sending an email, I

Page 33

1 mean, just a blank email, you know, maybe a reminder,
2 I'm working tomorrow at 10:00 a.m. Would that be a
3 violation of policy?
4    A   Strict violation of policy, no. Discouraged.
5    Q   Okay. And does the -- do the policies and
6 procedures that were in place when Ms. Harrell was
7 working at Northwest Florida Reception Center, did they
8 allow for incidental internet use for, you know, briefly
9 sending an email to yourself if it doesn't interfere
10 with your job duties?
11       MS. PAGE: Form.
12       THE WITNESS: I do not know without
13 reviewing -- thoroughly reviewing the policy.
14 BY MR. FINNERTY:
15   Q   And so as it relates to some of the
16 allegations relating to Ms. Harrell's emails, I think
17 you were saying that you can't send -- so what kind of
18 information would be prohibited for an employee to send
19 outside of the protected network that Centurion has?
20   A   We discourage any sending of anything outside.
21 One, you know, I'm not IT, but I know they're always
22 very concerned about virus protection and, you know,
23 especially somehow or another whatever happens to those
24 messages, it's now no longer -- they're not in a secure
25 environment. Also, anything of an inmate nature, names,

Page 34

1  DC numbers, you know, we should not be including in our
2  emails to our personal accounts.  There's no need for
3  it.  In my knowledge, if you want to keep an incident
4  report, print it, and even that you shouldn't be
5  removing from the facility.  Incident reports are
6  confidential.  There may be other information contained
7  within them pertaining to the inmate's health care
8  status or security status that could be a risk to the
9  safety -- to the inmate safety or to the safety of the
10 institution.  I don't know what was in those incident
11 reports, but they should never be sent across unsecure
12 lines or to our personal emails.
13     Q    And so you mentioned inmate names and DC
14 numbers.  Aren't inmate names something that's public
15 record, you can look it up on the DOC website?
16     A    Correct.
17     Q    And same with their DOC number, that's public
18 record, is that right?
19     A    Yes.
20     Q    So do you have any knowledge of Ms. Harrell
21 sending anything to her personnel email account that
22 included any information related to inmate's health care
23 status?
24     A    Right.  I believe it mentioned incident
25 reports.  And I didn't see the copies of those incident

Page 35

1  reports, and not sure what could have been contained on
2  those incident reports, other than the incident report
3  itself is a confidential document.
4      Q    And is a draft of an incident report that has
5  not yet been submitted to DOC or to a direct supervisor,
6  is that still considered confidential?
7      A    I would say so.
8      Q    And is that even if it's a draft that was
9  actually prepared by Ms. Harrell?
10     A    Yes.  I don't see any reason for that to exit
11 the facility.
12     Q    To your knowledge, would a draft of an
13 incident report be considered a public record?
14     A    That I don't know.
15     Q    Do you know whether Ms. Harrell had access to
16 her Centurion email account on her cell phone or her
17 private home computer?
18     A    I do not know.
19     Q    And is that something that Centurion has the
20 capability of allowing employees to do?
21     A    So there is a mechanism on a cell phone to
22 access email.  Typically that is the company cell phone,
23 company-paid cell phone.  I'm not sure if you can get
24 them on your private -- get it on private cell phone or
25 not.  Maybe, but there's a policy surrounding that that

Page 36

1  then your phone has to meet certain standards in a --
2  you know, locked and security and access code and all
3  that stuff.
4      Q    And do you have -- have you seen anything or
5  do you have any information that would suggest that any
6  of the emails that Ms. Harrell sent from her work
7  account to her private account were disseminated to
8  anyone else, other than to herself?
9      A    No.
10     Q    And do you have any knowledge as to whether
11 anybody else, besides Ms. Harrell, had access to her
12 private email?
13     A    I am not aware.
14     Q    To your knowledge, prior to Ms. Harrell's
15 termination, had she ever been demoted?
16     A    Not that I'm aware.
17     Q    Do you know if she had ever been suspended?
18     A    Not based on my review.
19     Q    Do you know whether she had ever been
20 transferred to another facility or another position?
21     A    She worked PRN so she could have worked at a
22 variety of institutions.
23     Q    Okay.  So as far as like a form of discipline,
24 are you aware if she had ever been transferred for -- as
25 a form of discipline?

Page 37

1      A    No, I'm not aware of that.
2      Q    Do you know whether she ever had any bonuses
3  withheld?
4      A    Not aware of any bonuses.  So, no.
5      Q    Do you know whether Ms. Harrell ever had her
6  salary or benefits reduced at any time prior to her
7  termination?
8      A    So they would have been -- salaries or
9  benefits would have come and gone as she changed
10 statuses from PRN to full-time.
11     Q    And those status change would have been
12 because she wanted to make those changes, is that
13 correct?
14     A    Typically, yes.
15     Q    All right.  So, let's go now to Exhibit 8.  Do
16 you recognize this document, ma'am?
17     A    Based on my review, yes.
18     Q    And is this the termination counseling form
19 that would have been sent to you prior to your approval
20 of Ms. Harrell's termination?
21     A    Yes.
22     Q    Okay.  So at the top there's a list of
23 policies that Ms. Harrell has alleged to have violated.
24 The first one is procedure 602.037, tools and sensitive
25 item control, and that's subparagraph 13, drugs,

Page 38

1 hypodermic needles and medical, dental tools. Are you
2 familiar with that procedure?
3      A   I'm familiar with it.
4      Q   Okay.  And then so down under the details of
5 the incident, it says Ms. Harrell was assigned a pill
6 room on April 14th, 2018.  She neglected to account for
7 the narcotic key and count the narcotics during her
8 shift.  It says, see DC4-781E.  Do you know what a
9 DC4-781E form is?
10     A   I believe it's the narcotic accounting.
11     Q   And do you know whether that particular log
12 was included in the documents that were sent to you
13 prior to your approval of Ms. Harrell's termination?
14     A   I do not know.
15     Q   So if you would go to Exhibit 13.  I'll
16 represent that I believe this is the form that is
17 referenced in Exhibit 8, the termination counseling
18 form.
19     A   Right.
20     Q   And is that the narcotic accounting log form
21 that you believe, could DC --
22     A   Yes.
23     Q   Okay.  So, have you ever filled one of these
24 out?
25     A   No, I'm not a nurse.

Page 39

1      Q   Okay.  So we did briefly talk about this
2 earlier, but -- so correct me if I'm wrong, but it's my
3 understanding that an off-going nurse has to sit down
4 with the oncoming nurse at the end of their shift -- at
5 the end of the off-going nurse's shift, sit down
6 together, count all the narcotics and then both sign
7 together.  Is that accurate?
8      A   Yes.
9      Q   And then after that's done, then the keys --
10 the narcotic keys can be exchanged and then you know
11 that you've got a correct count and that there hasn't
12 been any pills that have shown up missing.  Is that
13 accurate?
14     A   Correct.
15     Q   Okay.  So it's something that the two nurses
16 have to do together, is that right?
17     A   Yes, sir.
18     Q   Okay.  So, based on this form, do you know who
19 would have been the nurse that was the off-going nurse
20 when Ms. Harrell was working on April 14th, 2018?
21         MS. PAGE:  Form.
22         THE WITNESS:  Is it Exhibit 13?
23         MR. FINNERTY:  Yes, ma'am.
24         THE WITNESS:  So I'm not super skilled at
25     reading these.  I'm just aware of it, and although

Page 40

1      they should print their names, I'm not seeing that
2      they've all printed their names.
3 BY MR. FINNERTY:
4      Q   So based on just looking at this form, is
5 there any way of knowing exactly who was the nurse that
6 was -- that worked the shift right before Ms. Harrell?
7      A   I can't tell.
8      Q   Okay.  And do you know -- so I'll represent to
9 you that Ms. Harrell, I think it's in the termination
10 form, as well, she was assigned to the pill room on
11 4-14-2018.  Do you know whether the duties of a pill
12 room shift required the person working that shift
13 has to account for narcotics?
14     A   I'm not -- somebody has been assigned to that
15 duty, and it would typically be the pill room nurse
16 because they're the ones overseeing the pharmacy
17 operations that day.
18     Q   And the specific job duties for shifts, is
19 that something that can change between facility and
20 facility, or is there one set list of strict duties that
21 every Centurion employee has to follow?
22     A   Every facility has specific operational
23 demands that might vary, but there are some things that
24 are the same across all facilities.
25     Q   Okay.  So if you take a look at Exhibit 12.

Page 41

1         MS. PAGE:  Brian, are you marking these?
2         MR. FINNERTY:  I believe I've marked those
3     through --
4         MS. PAGE:  Seven.
5         MR. FINNERTY:  Through seven, yes.  So just
6     while we're on it, I'd like to mark Exhibit 8, the
7     termination counseling form that we were just
8     talking about, No. 8.  And then so I guess now
9     we're on 12, the shift assignments.  I'd like to
10     mark that and attach it to the depo, but I
11     appreciate you keeping me straight.  I've never
12     done a Zoom depo and I appreciate you all's
13     understanding of the difficulty I'm having.
14         (Whereupon, Exhibit Nos. 8 through 13 were
15     marked for identification.)
16 BY MR. FINNERTY:
17     Q   All right.  So Exhibit 12, have you ever seen
18 a -- I call it a shift assignment sheet.  Have you ever
19 seen this form?
20     A   I can't say that I have.
21     Q   Okay.  So is this a form that would have been
22 created that's specific to Northwest Florida Reception
23 Center, if you know?
24         MS. PAGE:  Form; calls for speculation.
25         THE WITNESS:  It appears, based on the title

Page 42

1    of it.
2    BY MR. FINNERTY:
3    Q    All right. About midway down the page, and
4    there's some highlighting, I apologize, on this form,
5    but you'll see a description for pill room. Do you see
6    that?
7    A    I did a second ago. Okay.
8    Q    And do you see anywhere in the description for
9    pill room any reference to narcotics?
10   A    No.
11   Q    So if you go up a little bit to infirmary
12   nurse, do you see that, ma'am?
13   A    Yeah.
14   Q    The first thing under infirmary nurse is count
15   narcotics, is that right?
16   A    Right.
17   Q    And then right below pill room is pharm tech.
18   It says weekly count of all meds in unit, correct?
19   A    Okay.
20   Q    And I would assume that all meds would include
21   narcotic medications, is that fair?
22   A    I honestly don't know.
23   Q    Okay. So then going down a little bit more,
24   evening shift. Again, there's infirmary nurse. And on
25   the third line of that job description, again it says,

Page 43

1    count narcotics. Do you see that?
2    A    Yes.
3    Q    And then finally going down to night shift,
4    and RN, the first job description under night shift, the
5    third line of that item description again says count
6    narcotics and sharps count in ER with off-going nurse.
7    Do you see that, as well, right, ma'am?
8    A    Yep.
9    Q    So can we agree that the pill room does not
10   simply say that counting narcotics or accounting for the
11   narcotic key, it's not specifically listed as a duty of
12   the pill room? Can we agree on that?
13   A    Right.
14   Q    Okay. And, again, I understand this is a form
15   you haven't seen and that it appears to be specific to
16   Northwest Florida Reception Center. So, you know, I
17   understand this is something you're not intimately
18   familiar with. So I'd like to attach that as Exhibit
19   12, if I haven't already.
20        So the termination counseling form, Exhibit 8,
21   that we were just talking about, so essentially the
22   reasons listed on this termination are the allegation
23   regarding Ms. Harrell's failure to fill out the narcotic
24   accounting log and the key exchange log and then there
25   is the allegation regarding public records requests

Page 44

1    procedure, and then user security information systems
2    procedure. Are those policies that you have any
3    knowledge of without having to review them?
4    A    I would have to review it.
5    Q    Okay. And then finally there's an allegation
6    regarding Ms. Harrell's late arrivals. And are you
7    familiar with the time and attendance policy?
8    A    Yes.
9    Q    Prior to this termination document being
10   presented to Ms. Harrell, do you know whether Ms.
11   Harrell was ever given an opportunity to explain what
12   happened on April 14th when she was working at the pill
13   room -- in the pill room?
14   A    You mean why she didn't sign off on a narcotic
15   accounting log?
16   Q    Right.
17   A    I'm not -- I'm not aware.
18   Q    Okay. So would you agree that the day that
19   Ms. Harrell was assigned to the pill room, if the nurse
20   that was on the shift immediately prior to her left
21   before Ms. Harrell showed up to work, there would be no
22   way to properly fill out the narcotic accounting log,
23   would you agree with that?
24   A    No. I just -- the review of the shift
25   assignments, I know that -- actually, I'm pretty

Page 45

1    impressed with it, because it's something that I know
2    facilities do as a guide for each nurse. Like this is
3    your specific area. But at any given time if somebody
4    calls in or isn't there, there is a statement on that
5    one, actually, that says, and other duties as assigned.
6    Nurses know -- it has to be exchanged on the narcotics
7    and sensitive items and tools for every shift.
8    Q    Right. And my question was slightly
9    different, because I think you testified earlier that to
10   do the narcotic count the off-going nurse has to sit
11   down with the on-coming nurse, count them together and
12   then sign. So if the -- whoever was the off-going
13   nurse, whoever worked immediately prior to Ms. Harrell's
14   shift, if she left before Ms. Harrell got there, how
15   could Ms. Harrell have done the narcotic accounting log
16   the way it was supposed to be done?
17   A    I think it's -- the other component of that is
18   the exchange of keys. So the two go hand-in-hand. So
19   I'm not sure how the keys got from the off-going to the
20   on-coming.
21   Q    Do you know whether Ms. Harrell ever had
22   possession of the keys on April 14?
23   A    I do not know.
24   Q    Would you agree that if Ms. Harrell never was
25   given the keys, then she wouldn't have -- there would

Page 46

1  have been no reason for her to fill out the narcotic key
2  exchange log?
3      A   I probably have to say yes.
4      Q   And the same with doing the narcotic
5  accounting log, that that should be done immediately
6  prior to an exchange of keys, then if she wasn't given
7  the keys, would she also be able to do the narcotic
8  accounting log?
9      A   Yes.
10     Q   And prior to the request for your approval to
11 terminate Ms. Harrell, do you know whether anyone
12 attempted to find out who the nurse was on the shift
13 immediately prior to Ms. Harrell in the pill room on
14 April 14th, 2018?
15     A   I do not know.
16     Q   So would you agree that everyone who has
17 possession of the narcotic keys should sign the narcotic
18 key exchange form?  If you've got possession of the
19 keys, you should document that?
20         MS. PAGE:  Form.
21         THE WITNESS:  I believe that -- I'd have to
22 review the policy, but they should -- that should
23 follow the policy.
24 BY MR. FINNERTY:
25     Q   And it's good to have an accurate chain of

Page 47

1  custody or chain of authority, would you agree with
2  that?
3      A   Yes.
4      Q   And I may have already asked this, but you
5  don't know whether Ms. Harrell was given an opportunity
6  to explain what may have happened on April 14th, 2018
7  relating to the narcotic log?
8      A   I don't know.
9      Q   Okay.  Do you know whether Ms. Harrell ever
10 received any training specifically relating to the
11 narcotics or the narcotic key procedures?
12     A   I have not seen that in the documentation
13 specifically.
14     Q   Do you know whether there are cameras in the
15 pill room --
16     A   I do not know.
17     Q   -- at Northwest Florida Reception Center?  And
18 so looking at -- in Exhibit 13, of course, the bottom of
19 this page there's a space that says nurse supervisor
20 daily review:  Signature.  Do you know who that nurse
21 supervisor would have been for April 14th, 2018?
22     A   I do not.
23     Q   And is it your understanding that a nurse
24 supervisor is required to do a daily review of, I guess,
25 essentially this accounting log and then sign off on it?

Page 48

1      A   I am not certain.  I'd have to review the
2  policy.
3      Q   Okay.  And there's no signature under the
4  nurse supervisor daily review on Exhibit 13, is that
5  right?
6      A   Pardon me?
7      Q   There isn't a signature in that section, the
8  nurse supervisor, daily review section.  There's no
9  signature on Exhibit 13.
10     A   Nope.
11     Q   So still looking at Exhibit 13, there's two
12 entries.  There's a 7:00 a.m. shift count and then a
13 19:45 shift count, and then out at the end after there's
14 a documentation as to the specific number of each type
15 of narcotic medication, there's what appears to be two
16 signatures out to the side, is that accurate?
17     A   Yes.
18     Q   And so -- but that would be the two -- that
19 would be the off-going and the incoming nurses that
20 would have signed those -- for those two shifts?
21     A   I can assume.
22     Q   Okay.  Do you know what time Ms. Harrell's
23 shift would have been?
24     A   I do not.
25     Q   Okay.  And there isn't -- you didn't see

Page 49

1  anywhere where there's just one nurse's signature out
2  beside a particular shift time, you don't see that,
3  right?
4      A   On this form, no.
5      Q   Okay.  And there should never been just one
6  signature out beside a shift count, would you agree?
7      A   Correct.
8      Q   Okay.
9          MR. FINNERTY:  I'd like to attach Exhibit 12,
10     if I haven't already said that.
11 BY MR. FINNERTY:
12     Q   So we went through Exhibit 8, the termination
13 counseling form that listed the late arrivals, the
14 public record issue, and then the narcotic accounting
15 issue.  And then we'll go to Exhibit 9, the final
16 warning.  Have you seen this exhibit, ma'am?
17     A   Nine?
18     Q   Yes, ma'am.
19     A   Hold on.  Let me find it.  Yes.
20     Q   And would this have been included with the
21 documents that were sent to you prior to your approval
22 of Ms. Harrell's termination?
23     A   It should have been.
24     Q   Okay.
25         MR. FINNERTY:  And this counseling form, I'd

Page 50

1   like to attach it as Exhibit 9.
2   BY MR. FINNERTY:
3       Q   So it's the final warning dated April 9th,
4   2018, and then under the details of incident, it says
5   that there was an issue on March 28th, 2018.  Do
6   you know why there are 12 days between the date that
7   this alleged issue happened and the date that Ms.
8   Harrell was presented the final warning?
9       MS. PAGE:  Form; calls for speculation.
10      THE WITNESS:  Similar to our termination
11  process, all final written warnings need to be
12  reviewed by our human resource business partner and
13  the regional director before being submitted.
14  BY MR. FINNERTY:
15      Q   So that's before final warning, as well as for
16  a termination?
17      A   Yes.
18      Q   Okay.  So that's a policy that requires a
19  final warning to be reviewed by HR and who?
20      A   I'm not certain it's an official policy.  It's
21  one that we have for Florida.
22      Q   Okay.  So you said it had to be reviewed by HR
23  and then who was the other one?
24      A   The regional director.
25      Q   And that would have been you in this case?

Page 51

1       A   No, that would have been Kathleen -- Kathi
2   Douin.
3       Q   Okay.  And so the HR, would that have been Ms.
4   Brus or --
5       A   Yes.
6       Q   Okay.  And is that -- were you giving me that
7   information as a potential explanation as to the 12-day
8   gap?
9       A   Yes.
10      Q   Okay.  And have you had a chance to read over
11  this -- the details of the incident in this final
12  warning, Exhibit 9?
13      A   Yes.
14      Q   Okay.  In your experience, or to your
15  knowledge, is it a violation of policy for an inmate
16  orderly to empty an employee's trash can?
17      A   No, but there's guidelines that the orderlies
18  need to follow.  I mean, they should be escorted
19  typically by security.  If they're doing that -- I know
20  when I worked in an institution I put my trash can in
21  the hallway so that they could pick it up and take it.
22      Q   Was that just specific to the facility you
23  were in, putting the trash can in the hallway, or do you
24  know?
25      A   I don't know.

Page 52

1       Q   Okay.  And are all inmate orderlies required
2   to have security personnel supervising them at all
3   times?
4       A   I'm not sure.
5       Q   Do you know whether there are inmate orderlies
6   that are allowed to do particular tasks without having
7   supervision?
8       A   I would just have to speculate.  I don't know.
9   I mean, some are, you know, assigned to an area so that,
10  you know, they're monitored by security, but not
11  maybe -- security is not on their hip the whole time.
12      Q   In order to be -- I mean, being an orderly, an
13  inmate orderly, that's a privilege, would you agree, to
14  be able to have an assignment like that?
15      MS. PAGE:  Form.
16      THE WITNESS:  Yep.
17  BY MR. FINNERTY:
18      Q   And there are particular behavioral measures
19  they have to meet.  I mean, not just any inmate can be
20  an orderly, right?
21      MS. PAGE:  Form.
22      THE WITNESS:  I'm not a classification
23  officer, but I have been a health services
24  administrator and my orderly turned out to do some
25  of the most heinous things as an orderly, because

Page 53

1   they have to be watched all the time.
2   BY MR. FINNERTY:
3       Q   Well, were there some -- the orderly that you
4   are thinking of, they have to meet certain requirements
5   in order to be an orderly, is that right?
6       MS. PAGE:  Form.
7       THE WITNESS:  I'm not a classification
8   officer.
9   BY MR. FINNERTY:
10      Q   Fair enough.
11      A   They're the ones that determine that.
12      Q   So do you know at the time, as of March 28th,
13  2018, do you know whether there was a requirement at
14  North Florida Reception Center, that if you want your
15  tash taken out you have to put it out in the hallway?
16  Do you know whether -- one way or the other?
17      MS. PAGE:  Form.
18      THE WITNESS:  I did see -- all I know is that
19  from reviewing documentation, there had been a
20  staff meeting prior to -- I believe prior to that
21  date, detailing the expectations surrounding the
22  use of orderlies and taking out trash.
23  BY MR. FINNERTY:
24      Q   So I'm going to draw your attention to Exhibit
25  17.  Do you see that, ma'am?

Page 54

1 A Yep.
2 Q All right. So this is an email from Tara
3 Johnson. Do you know Tara Johnson?
4 A Yes.
5 Q Okay. And she was the HSA health services
6 administrator at Northwest Florida Reception Center?
7 A Right.
8 Q And. Ms. Harrell would have reported or been
9 under the supervision of Ms. Johnson?
10 A As administratively.
11 Q And so this email is dated April 3rd, 2018,
12 which is obviously after March 28th, 2018, when Ms.
13 Harrell allegedly allowed an inmate to empty her trash.
14 So in this email, Exhibit 17, it says, good afternoon.
15 There's an introductory paragraph. And then the second
16 sentence of that introductory paragraph says -- well,
17 the first thing it says, there are a few items that will
18 be discussed at the next staff meeting, and then, but I
19 want to bring some things to everyone's attention
20 immediately. And then it says, going forward, be
21 advised of the following. And then it lists 11 things.
22 And under paragraph five it says, if your trash needs to
23 be taken out, set your trash can in the hallway,
24 orderlies are not permitted to enter any office at any
25 time to pick up a trash can unless accompanied by a

Page 55

1 security staff member.
2 So, based on this email, would you agree this
3 was a policy going forward that had not been in place
4 prior to April 3rd, 2018?
5 MS. PAGE: Form.
6 THE WITNESS: It could have just been a
7 reiteration of something that was previously
8 discussed. I don't know.
9 BY MR. FINNERTY:
10 Q Okay. So you don't have any way of knowing
11 whether or not that was a policy prior to April 3rd?
12 A Right.
13 MR. FINNERTY: Okay. I'd like attach Exhibit
14 17 and then Exhibit 9, if I haven't already done
15 so.
16 (Whereupon, Exhibit No. 17 was marked for
17 identification.)
18 BY MR. FINNERTY:
19 Q So going back to this final warning, do you
20 see any reference in this final warning Exhibit 9, to an
21 issue with Ms. Harrell being tardy to work?
22 A I'm sorry. That question again.
23 Q In the final warning, Exhibit 9, dated
24 April 9th, 2018, do you see any reference to an issue
25 that Ms. Harrell was being -- showing up tardy to work?

Page 56

1 A No.
2 Q Okay. And then any reference to the alleged
3 emails that Ms. Harrell would have sent to herself?
4 A No.
5 Q Any reference to that?
6 A No.
7 Q And if those incidents had occurred prior to
8 April 9th, 2018, is that something you would expect to
9 have been included in this final warning?
10 A Likely.
11 Q And, I mean, if there's an issue with an
12 employee following particular policies, would you agree
13 that that's something that should be addressed as often
14 as possible?
15 A I mean, it's possible, yes.
16 Q And so do you know why there was no -- if
17 there was an issue with Ms. Harrell being tardy to work
18 prior to April 9th, 2018, do you know why that would not
19 have been included in this warning?
20 MS. PAGE: Form; calls for speculation.
21 THE WITNESS: I don't know.
22 BY MR. FINNERTY:
23 Q Okay. And a horrible question, but the same
24 question as to the email issue. Any reason why that
25 would not have been included in this counseling form?

Page 57

1 A I do not know.
2 Q And do you know -- so you said that final
3 warnings were required to be approved by HR and the
4 regional director. Do you know whether that happened as
5 relates to Exhibit 9?
6 A I don't know specifically, no.
7 Q And so under the details of incident in this,
8 in Exhibit 9, it references review of camera footage.
9 Were you aware that the camera footage that's referenced
10 in this form was reviewed as a result of a complaint
11 that Ms. Harrell had submitted? Were you aware of that?
12 A I guess I didn't put all that together.
13 Q Well, it doesn't reference that in the -- in
14 this counseling form. So is that something that you
15 were ever told, that the camera footage was reviewed
16 because Ms. Harrell had complained about other
17 employees?
18 MS. PAGE: Form.
19 THE WITNESS: I don't remember that.
20 BY MR. FINNERTY:
21 Q Okay. Is that something you would have liked
22 to have been told about?
23 A I may have been told about it. I just don't
24 remember.
25 Q Is that something you would expect to be told

8/11/2020    Case 4:20-cv-00030-AW-MJF   Victoria E. Love vs. Wellpath, LLC, et al.   Document 37-6   Filed 10/14/20   Page 16 of 28

Deposition of Victoria Love      18-CA-77      16 (58 - 61)

Page 58

1  about?
2    A  If Ms. Harrell was making complaints about
3  other employees?
4    Q  And then which was the basis for the cameras
5  being reviewed.  Is that something you would want to
6  know about?
7    A  I don't know.
8    Q  Sorry.  I'm kind of skipping around a little
9  bit.  As it relates to the narcotic issue on April 14th,
10 do you know who discovered that Ms. Harrell hadn't
11 signed those forms?
12   A  I do not.
13   Q  Do you know how it was discovered?
14   A  I do not.
15   Q  So now I'm going to look at Exhibit 10.  It's
16 a verbal counseling for December 13th, 2017.  Is this a
17 form that you would have been provided prior to your
18 approving Ms. Harrell's termination?
19   A  Yes.
20   Q  And this is for late arrivals, is that right?
21   A  Yes.
22   Q  And then it lists three days that Ms. Harrell
23 was apparently tardy to work.  Have you ever seen that,
24 a verbal counseling for an employee for late arrival
25 after arriving late to work, late only three times?

Page 59

1    A  Yes.
2    Q  You have?
3    A  Yes.
4    Q  Is that typical?
5    MS. PAGE:  Form.
6    THE WITNESS:  It's -- I don't know if it's
7  typical, but, yes, I've seen quite a few of them.
8  BY MR. FINNERTY:
9    Q  Okay.  So Ms. Harrell, would she have had
10 to -- when she got to work, would she have had to go
11 through the security screening at the prison to get into
12 work?
13   A  Yes.
14   Q  And from your experience working at a DOC
15 facility, is that something that, you know, can take 30
16 minutes one day or one minute one day?  Is that
17 something that can vary?
18   A  It can vary, but as an employee knowing that I
19 have duties at a work station, I arrive early enough to
20 make sure that I can accommodate for that.
21   Q  What's the latest you've ever had to wait to
22 get in through security?
23   A  One time it was about four hours because it
24 was a drug interdiction.
25   Q  Would you agree there are certain things that

Page 60

1  are out of the employee's control that can cause them to
2  show up a little late to work?
3    A  On occasion.
4    Q  Sure.  And are you familiar with a policy that
5  allowed for a seven-minute window, if you show up within
6  seven minutes of your start time, that you wouldn't be
7  considered tardy?  Is that a policy you're familiar
8  with?
9    A  That's not a time and attendance policy.  That
10 seven-minute window is typically a payroll policy.
11   Q  And is that -- is your response based on your
12 review of Exhibit 18?
13   A  No.  My response is that I establish, and with
14 payroll, what that window is as an impact of payment.
15   Q  So that seven-minute window policy is
16 something you were involved in, in creating?
17   A  Potentially, yes.
18   Q  Okay.  And so since I've moved to Exhibit 18,
19 is that -- were you copied on that email?  It doesn't
20 look like it.
21   A  I was not copied on it, but I have it.
22   Q  Okay.  And so would you agree, based on this
23 email, that there at least was some confusion as to
24 that, you know, whether the seven-minute applied to
25 whether or not you were tardy, as opposed to whether it

Page 61

1  affected your payroll or your clock-in time; you would
2  agree, just from review of this email, that there
3  apparently was some confusion as to that policy?
4    MS. PAGE:  Form.
5    THE WITNESS:  I don't know that it's confusion
6  as much as let's clarify.
7  BY MR. FINNERTY:
8    Q  Okay.  Fair enough.  Do you know whether this
9  email from Ms. Douin, dated January 22nd, 2018, it
10 wasn't sent to Ms. Harrell but it says basically for
11 supervisors to make sure their staff see that.  Do you
12 know whether this was ever given to Ms. Harrell?
13   A  I do not know.
14   MR. FINNERTY:  Okay.  I'd like to attach
15 Exhibit 18.  I'd also like to attach Exhibit 10,
16 which is the verbal counseling.
17   (Whereupon, Exhibit No. 18 was marked for
18 identification.)
19 BY MR. FINNERTY:
20   Q  So, as relates to counseling for time and
21 attendance, is it typical that if that's the only issue,
22 that you go through the chain of, you know, verbal,
23 written warning, final warning, that you go through all
24 those steps prior to terminating an employee?
25   A  That is the ideal situation.  Sometimes it

Page 62

doesn't happen exactly like that.

Q   Okay.  And is there a way for an employee to
have a party on a particular date excused, if they have,
like, a valid reason and their supervisor accepts that
explanation?

MS. PAGE:  Form.

THE WITNESS:  Well, you had mentioned, you
know, if there's a hold-up that is impacting
everybody at the gate, that could be an excuse for
arriving late, but that, you know, that would be an
across-the-board.  Everybody has been impacted by
that.  And sometimes supervisors, you know, do work
with their employees.

BY MR. FINNERTY:

Q   Sure.

A   If it's an occasional event, but I'm not --

Q   Are supervisors given some leeway as relates
to how they may enforce the time and attendance policy?

A   There is direction within our time and
attendance policy.

Q   And what are you talking about, ma'am?

A   I think there's guidance.  As a corporation we
recommend certain standards.  I would have to say, yes,
though, that they are -- supervisors are provided some
latitude regarding implementing that, you know.

Page 63

Q   And I've seen -- in some of the documents,
I've seen a reference to, I believe, it's TKE.  Do you
know who that is?  Or maybe timekeeper exemption or
something.  Do you know?

A   No, it's a form, timekeeping exception form.

Q   Okay.  So is that something that would allow
an exception to be made if there's a valid reason for a
tardy?

A   Yes.

Q   And I think I heard you just briefly reference
Kronos.  What's Kronos?

A   Our timekeeping system.

Q   And is that -- so, for instance, when Ms.
Harrell would show up to work, would she, like, go to a
computer?  How would she log in or clock in?

A   There is a time clock.

Q   Is it on a computer, do you know?

A   It's on the wall, a thing on the wall.

Q   And that would be on the -- after you had
already gone through the security check.  It wouldn't be
outside of the security checkpoint, correct?  It would
be --

A   They're not outside, no.  But every facility,
they're located some place different.

Q   Okay.  Are there any facilities where they

Page 64

would be located prior to getting to the checkpoint?

A   I'm not aware of anybody -- any.

Q   Have you ever been to Northwest Florida
Reception Center?

A   Yes, sir.

Q   Okay.  And, again, I apologize for jumping
around.  I have Exhibit 17.  If I haven't asked to
attach that, I'd like to do that.  That was the email
from Tara Johnson dated April 3rd, 2018 to all staff.
Stay with the verbal counseling, Exhibit 10, I think I
said that one, and the final warning, Exhibit 9.

So, as it relates to the final warning,
Exhibit 9, it says that Ms. Harrell, by allowing the
inmate to enter her office and empty her trash, she
violated Chapter 33-208.002, Paragraph 16.  And if you'd
take a look at that policy, it is --

MS. PAGE:  Sixteen.

MR. FINNERTY:  Sixteen.  Thank you.

BY MR. FINNERTY:

Q   Let me know when you've gotten to that, Ms.
Love.

A   Okay.

Q   And please look at Paragraph 26, which is the
third page of Exhibit 16.  Says, employees shall
maintain a professional relationship with all persons in

Page 65

the custody of -- under supervision of the Department
and their immediate family or visitor.  No personal or
business relationships are permitted.  Marriage between
employees and inmates is not permitted.

Can you tell me how the allegation that Ms.
Harrell allowed an inmate to come into her office and
empty her trash, how that constituted a violation of
Paragraph 26 of this policy, 33-208.002?

A   Not based on the documentation I've read.

Q   Okay.  So when you were reviewing these
documents, did that cause you any heartburn to see that
she was being issued a final warning for violating a
policy which, based on your testimony today, she did not
violate?

MS. PAGE:  Form.

THE WITNESS:  At the time, based on the
information I had received, there were concerns --
there could be concerns about inappropriate
relationship.

BY MR. FINNERTY:

Q   So you're talking about --

A   Maybe not inappropriate relationship, but a --
that, you know, some boundaries had been lapsed.

Q   But you would agree that based on the final
warning, Ms. Harrell didn't violate Paragraph 26 of

Page 66

1  33-208.002; we'd agree on that?
2       MS. PAGE:  Form.
3       THE WITNESS:  Other than there's a period of
4  time where we don't know what is happening, you
5  know, they're --
6  BY MR. FINNERTY:
7       Q   So are you saying that there was a period of
8  time where Ms. Harrell may have not been within view of
9  the camera that was being reviewed?
10      A   Correct.
11      Q   Okay.  Do you know whether there was another
12 camera that would have shown Ms. Harrell at all times?
13      A   I do not know.
14      Q   Okay.  And so -- but can you agree that there
15 was no -- nobody saw Ms. Harrell on camera engaged in a
16 inappropriate relationship with an inmate?  We can agree
17 on that, right?
18      A   Based on the review of the documentation, yes.
19      MS. PAGE:  Form.
20 BY MR. FINNERTY:
21      Q   Did you ever review the actual camera footage?
22      A   No.
23      Q   Okay.  Were you given -- did you ask to review
24 it?
25      A   No.

Page 67

1       Q   All right.  I'd like to attach Exhibit 16.
2       (Whereupon, Exhibit No. 16 was marked for
3  identification.)
4  BY MR. FINNERTY:
5       Q   Have you ever approved a termination of an
6  employee for late arrivals only, for that being the only
7  issue that the employee had?
8       A   For violation of time and attendance, yes, of
9  which late arrivals is.
10      Q   Okay.  But as it specifically relates just to
11 late arrivals, have you ever approved a termination for
12 an employee just for arriving to work late?
13      A   I would have to review all of the ones -- I
14 mean, I would approve it if it -- late arrivals impacts
15 our daily operations, just as an absence does sometimes.
16      Q   So, just off the top of your head, you
17 wouldn't know, you'd have to go back and review it?
18      A   Correct.
19      Q   Okay.  And if you did that review and you were
20 able to find an incident where there was an employee
21 terminated just for late arrivals, is that something you
22 could provide to your counsel?
23      A   Our HR department could find it and provide.
24      Q   Okay.  Fair enough.  Thank you.  Exhibit 11,
25 take a look at that.  And have you seen this document,

Page 68

1  ma'am?
2       A   Yes.
3       Q   And what is this?
4       A   This is -- according to the title of the
5  emails, from the work account to personal account.
6       Q   Okay.  And do you know when this would have
7  been given to Ms. Harrell, or do you know whether it was
8  given to Ms. Harrell?
9       A   I do not know.
10      Q   Do you know who created this document?
11      A   I don't know.
12      Q   Is it your understanding that these are emails
13 Ms. Harrell sent from her work email account to her
14 personal email account?
15      A   Yes.
16      Q   Okay.  So under No. 2, do you know what the
17 West/Cook narc key incident, do you know what that's
18 referring to?
19      A   I don't.
20      Q   So, under No. 10, the three incident reports,
21 have you seen those incident reports?
22      A   No.
23      Q   And No. 12, do you know what the pill window
24 incident is?
25      A   I do not.

Page 69

1       Q   And No. 15, forwarded email to Sarah Brus, do
2  you know what that is?
3       A   No.
4       Q   And No. 18, concerns about the locker, do you
5  know what that is?
6       A   No.
7       Q   And No. 19, copy of the incident report, do
8  you know what that is?
9       A   Only based on the title.
10      Q   Okay.  So were you provided this document
11 prior to your approval of Ms. Harrell's termination?
12      A   I believe so.
13      Q   And just based on your answers to my questions
14 regarding these 19 items listed here, sounds like you
15 weren't actually provided copies of the emails that are
16 referenced in this document, is that correct?
17      A   Yeah.  I don't -- I could not find evidence of
18 that.
19      Q   Do you know why you wouldn't have been
20 provided those emails?
21      A   I'm the final approver, and by the time
22 termination gets to me, you know, I expect that the
23 regional director and the human resource business
24 partner take -- go down to that level.  If I have
25 concerns about the high-level information that's being

Page 70

1  provided to me, then I push back and ask for more for --
2  or, as you asked, I don't approve the termination.
3  Based on this list, I had pretty grave concerns about
4  the types of information leaving the secure -- the
5  security of the DOC network when, you know, not knowing
6  exactly -- not sure why incident reports have to be sent
7  to a private, not sure why all of these types of things
8  have to be sent external to a private email.
9     Q   So you had --
10    A   I'm not sure. It's inappropriate.
11    Q   So you had some concerns about sending these
12 emails, but you never asked to actually see those emails
13 that were allegedly sent by Ms. Harrell, right?
14    A   That's right.
15    Q   So, I mean, would you agree that you basically
16 were just relying on what was being represented to you
17 by Ms. Brus and Ms. Douin when you approved Ms.
18 Harrell's termination?
19    A   Yes.
20    Q   And that's -- that would be within Ms. Brus
21 and Ms. Douin's job duties to make sure that what they
22 were representing to you is accurate, is that right?
23    A   Yes.
24    Q   So I think we're getting close to the end, and
25 sorry I'm taking up your time this morning. And, again,

Page 71

1  do you know why this wouldn't have been referenced in
2  the final warning? I mean, you said this was something
3  that you were concerned about. Why wasn't this
4  referenced in Ms. Harrell's final warning dated
5  April 9th, which is Exhibit 9?
6     A   I don't know.
7     Q   Okay. I'd like to attach the list of email,
8  it's Exhibit 11, if I haven't already, and -- I think I
9  asked to attach.
10       MR. FINNERTY: Ms. Page, are you the opposing
11    counsel?
12       MS. PAGE: Yes.
13       MR. FINNERTY: Do you have any objection to
14    any of these being attached? I just feel like
15    I'm --
16       MS. PAGE: Any of the exhibits we've gone over
17    being attached?
18       MR. FINNERTY: Yes.
19       MS. PAGE: No.
20       MR. FINNERTY: Okay. So Exhibit 16, the rules
21    of conduct, the Johnson email to all staff, Exhibit
22    17, the Douin email, Exhibit 18.
23       MS. PAGE: I think a number of these were
24    already attached to Ms. Harrell's deposition, I
25    think, so.

Page 72

1        MR. FINNERTY: All right. So let's look at
2  Exhibit 19. Are you there, Ms. Love?
3        THE WITNESS: No, I'm sorry. Checked out.
4  Was looking at No. 19, not Exhibit 19.
5  BY MR. FINNERTY:
6     Q   Okay. So this is an email dated April 13th
7  from Lori Cook to Virginia Harrell. And Ms. Harrell is
8  being approved to work some extra shifts. You would
9  agree that as of April 13th when this email was sent, if
10 there was a serious concern with Ms. Harrell or her job
11 performance, that she wouldn't be given extra shifts to
12 work?
13       MS. PAGE: Object to form; calls for
14    speculation.
15       THE WITNESS: Yeah, I can't say yay or nay on
16    that. I don't know.
17       MR. FINNERTY: Okay. I'd like to attach
18    Exhibit 19.
19       (Whereupon, Exhibit Nos. 19 and 20 were marked
20 for identification.)
21 BY MR. FINNERTY:
22    Q   Exhibit 20, this is an email from Tara Johnson
23 to Virginia Harrell, cc'ing Lori Cook. It's dated April
24 17, 2018. And this is, according to this email, Ms.
25 Douin has approved for Ms. Harrell to work a maximum of

Page 73

1  eight hours of overtime. And, you know, I'll represent
2  to you that this is three days after the April 14th pill
3  room incident report. I mean, do you know why Ms.
4  Harrell was being approved to work overtime after the
5  allegation that essentially led to her termination had
6  already occurred?
7     A   I don't know.
8        MS. PAGE: Object to form; calls for
9     speculation.
10 BY MR. FINNERTY:
11    Q   What was your answer, ma'am?
12    A   I don't know.
13    Q   You don't know. Would you expect that if
14 there was something an employee had done that was cause
15 for termination, that you wouldn't then turn around and
16 let that particular employee get overtime?
17    A   I think it depends.
18    Q   I mean, is there any explanation for that?
19    A   Not that I'm aware of.
20    Q   And have you heard anything that would suggest
21 that Ms. Harrell wasn't good at doing the duties and
22 responsibilities of her job? Have you heard any
23 complaints about her actual work performance, you know,
24 aside from the allegations she showed up late or that
25 she let an inmate empty her trash? I mean, have you

Page 74

1  heard that she wasn't good at doing her job?
2       MS. PAGE:  Form.
3       THE WITNESS:  I don't remember.
4  BY MR. FINNERTY:
5       Q   So Ms. Harrell, I'll represent to you, and
6  they're referenced in the amended complaint that we
7  reviewed earlier, but I'll represent that she complained
8  about numerous things and she submitted at least 12, I
9  think, written complaints.  Would you expect an employee
10  that had a reasonable expectation or reasonable
11  suspicion that another employee was violating policy,
12  would you want that employee to complain about that?
13       MS. PAGE:  Form.
14       THE WITNESS:  Complain is a strong word, but,
15  yes, it is everybody's responsibility to ensure the
16  safety and security of the institution, to report
17  things that do not appear to be okay.
18  BY MR. FINNERTY:
19       Q   And if an employee believes that their working
20  environment is hostile, you would want that employee to
21  document that and to report that?
22       A   Absolutely.
23       Q   Okay.  And if an employee feels that they're
24  being verbally abused or intimidated, you would want
25  them to report that?

Page 75

1       A   Yes.
2       Q   And if they see evidence of sexual harassment,
3  that should be reported, right?
4       A   Yes.
5       Q   So, as it relates to getting overtime and
6  getting, you know, additional shift assignments, does
7  Centurion or MHM policy allow for those decisions to be
8  made for reasons other than -- scratch that.
9       Is it a policy violation to show favoritism as
10  relates to who you're going to assign extra hours to?  I
11  mean, should that be done for a reason other than, you
12  know, maybe the employee is good friends with their
13  supervisor or has a personal relationship with a
14  supervisor?  I mean, is that allowed to give
15  preferential treatment to certain employees over others?
16       MS. PAGE:  Form.
17       THE WITNESS:  I think allowed is -- I mean,
18  it's not good supervisory skills.  That's for sure.
19  BY MR. FINNERTY:
20       Q   So you would certainly frown upon a supervisor
21  showing favoritism as relates to assigning extra shifts?
22       A   Correct.
23       Q   And if an employee feels that they are being
24  passed over because of a favoritism issue, you would
25  want them to report that, correct?

Page 76

1       A   Correct.
2       Q   And you would want an employee to report that
3  they were fearful of being retaliated against or that
4  they had been retaliated against?
5       A   Right.
6       Q   And would you want an employee to report that
7  a registered mental health counselor had refused to
8  evaluate an inmate that had declared a psychological
9  emergency?
10       A   Yes.
11       Q   And you would want an employee to report that
12  they suspected that nurses were creating fraudulent
13  narcotic accounting logs; that should be reported,
14  correct?
15       A   Correct.
16       Q   And how about nurses having sexual
17  relationship with inmates?  That's -- you would agree
18  that's a serious allegation?
19       A   Absolutely.
20       Q   And that should certainly be reported, would
21  you agree?
22       A   Yep.
23       Q   And would you agree that a nurse having sexual
24  relationship with inmates, that would be a cause for
25  termination of that employee immediately?

Page 77

1       A   Correct.  Well, after an investigation.
2       Q   Okay.  How about nurses clocking out and
3  staying on site so they could spend time with inmates?
4       A   You mean reporting that that's occurring?
5       Q   That should be reported, you would agree,
6  right?
7       A   Yes.
8       Q   How about leaving a pill room door open and
9  not secure?
10       A   Yep, or report the person at that time, I
11  guess would be more appropriate.
12       Q   And leaving pills out on the counter; that
13  should be reported if you observed?  Show up to work and
14  you see a bunch of pills out on the counter; that would
15  be something should be reported, would you agree?
16       A   Yeah, that or confront the person who's done
17  it, right at that point in time.
18       Q   Okay.  And so -- and you would expect that if
19  these issues we just went through are reported, you
20  would expect that those issues be investigated?
21       A   Yep.
22       Q   And Ms. Brus, would she be -- is part of her
23  job duties as HR business partner, that would be
24  something she would be charged with doing, investigating
25  complaints like what we just went through?

Page 78

1    A   Probably not every single one of those.  Some
2 are operational and the health services administrator
3 would be capable of reviewing them.  Things such as
4 hostile work environment or -- would absolutely require
5 sexual harassment, hostile work environment, all of
6 those type of things would be -- it would be an
7 expectation that the human resource business partner be
8 engaged.
9    Q   And, at the very least, at least someone,
10 whether Ms. Brus, Ms. Johnson, somebody should
11 investigate all those complaints that we just went
12 through?
13    A   Yes.
14    Q   Okay.  And if they were substantiated, there
15 should be some sort of corrective action taken, would
16 you agree with that?
17    A   Unless it's the first infraction, then maybe
18 it would not be, but, yes.  I mean, that would be
19 corrective action.
20    Q   So if --
21    A   And it depends.
22    Q   So can an employee receive counseling that's
23 not documented on one of the Centurion forms that --
24 we've looked at some of those today.  Can there be
25 counseling that, you know, just one employee sitting

Page 79

1 down with her supervisor and just saying, hey, you know,
2 you need to try to do a little better with this?
3    MS. PAGE:  Form.
4    THE WITNESS:  Yes.
5 BY MR. FINNERTY:
6    Q   So would you agree that an employee that
7 submits a complaint in good faith regarding another
8 employee, or an issue that concerns them, that they
9 shouldn't be retaliated against for reporting those
10 good-faith complaints?
11    A   Correct.
12    Q   And do you have any reason to believe that Ms.
13 Harrell didn't complain in good faith?
14    MS. PAGE:  Form.
15    THE WITNESS:  I don't know.
16 BY MR. FINNERTY:
17    Q   Do you have reason to believe that what she
18 complained about wasn't something she reasonably
19 perceived as being an issue?
20    A   I don't know.
21    Q   So do you know whether Ms. Tara Johnson is
22 still employed at Northwest Florida Reception Center, or
23 still employed by Centurion?
24    A   Not still employed by Centurion.
25    Q   She is not?

Page 80

1    A   No.
2    Q   Do you know what the reason for her separation
3 was?
4    A   Tara -- yeah, she had -- she had been given
5 corrective action, actually performance improvement plan
6 by Kathleen Douin, and did not meet the expectations set
7 forth in that plan.
8    Q   And do you know what the specific issues were
9 with her performance?
10    A   Not specifically, but it surrounded
11 professionalism and our ideals of what a, you know, a
12 strong, positive leader are.
13    Q   And so was she involuntarily terminated?
14    A   Yes.
15    Q   Do you know when?
16    A   I do not know the date.
17    Q   And were you involved in approving that
18 termination?
19    A   Yes.
20    Q   And how about Keidre Long?  Do you know what
21 the cause for her separation of employment was?
22    A   I do not.
23    Q   Okay.  And how about Misty West?  Do you know
24 if she's still employed by Centurion?
25    A   I do not.

Page 81

1    Q   What about Amanda McDaniel?
2    A   I'm not -- no, I don't know.
3    Q   How about Lori Cook?  Is she still employed by
4 Centurion?
5    A   I don't know.
6    Q   You don't know?
7    A   No.
8    Q   Do you know who was hired to replace Ms.
9 Harrell after she was terminated?
10    A   No.
11    Q   And, just to be clear, Ms. Harrell was
12 actually terminated.  She didn't resign or --
13    A   Right.
14    Q   She was involuntarily terminated, correct?
15    A   Based on this documentation, yes.
16    Q   Okay.  And you don't know who replaced Ms.
17 Harrell, right?
18    A   No.
19    Q   Do you know what a gate cut notification is?
20    A   Yes.
21    Q   What is a gate cut notification?
22    A   That's typically something we'll receive from
23 the warden, based on some sort of investigation the
24 warden has had going on, or suspicions regarding staff,
25 and after -- and the warden makes the decision that it's

---

**Page 82**

1  not safe to have that person inside the secure perimeter
2  any longer.
3     Q   And do you know whether there was a gate cut
4  notification issue as relates to Ms. Harrell?
5     A  I'm not aware of any.
6     Q  So when you talk about staff, Ms. Harrell
7  didn't report to the warden at Northwest Florida
8  Reception Center, did she?  I mean, she wasn't a DOC
9  employee.
10     A  Correct.
11     Q  But is it your understanding that a warden
12  could issue a gate cut notification for the termination
13  as relates to an employee of Centurion that has been
14  terminated?
15     A  Yes -- well, it -- the gate cut would
16  typically come prior to the termination.
17     Q  Okay.
18     A  Now, I don't know -- I'll leave it at that.
19  So that's a gate cut.  Now, if we've terminated
20  somebody, the HSA may alert the warden that we've
21  terminated somebody, and the warden may let the control
22  room know, don't let this person back on the compound
23  because they're no longer an employee.
24     Q  So a Centurion employee, did they have a badge
25  or something that they showed --

**Page 83**

1     A  Correct.
2     Q  So if Ms. Harrell, upon being terminated, had
3  returned her badge, would she be able to return to the
4  facility once she had returned her badge?
5     A  If she had another badge.
6     Q  Okay.  But aside from having a badge of some
7  sort, you have to have a badge to be able to get into
8  the facility, correct?
9     A  You should have to have a badge.
10     Q  Would you agree that if Ms. Harrell returned
11  her badge, there would have been really no need for a
12  gate cut notification?
13     MS. PAGE:  Form; calls for speculation.
14     THE WITNESS:  Yeah, I don't know.  That's up
15  to the wardens, how they handle that type of thing.
16  BY MR. FINNERTY:
17     Q  But there's no dispute, though, that absent a
18  badge, Ms. Harrell couldn't enter a prison?
19     A  We'd like to say that, I mean, but there are
20  no guarantees in any of that.
21     Q  But the only way to lawfully, and pursuant to
22  policy, to enter a prison would be to show your badge?
23     A  There are ways around if you don't have it.
24  Can you -- you know, can you say, hey, I don't have my
25  ID, you've seen me walk in every single day, you know,

**Page 84**

1  here's my driver's license.
2     Q  Sure.
3     MR. FINNERTY:  I think I'm done.  Just give me
4  one minute to kind of review my notes, but I think
5  we're done.
6     THE WITNESS:  Okay.
7     MR. FINNERTY:  And I just want to make sure
8  that we have all these exhibits attached.  So, Ms.
9  Page, 1 through 5, those all came in, is that
10  right?
11     MS. PAGE:  Let me check my notes.  I have -- I
12  don't have 1.  I have 2, 3, 4, 5, 10, 18, 16, 11.
13  That's what I have.
14     MR. FINNERTY:  So you don't have 15.  Yeah.
15  So Exhibit 1 is just a notice for today's depo.
16  I'd like to attach that one.  So that's 1 through
17  5.  So the -- I have the termination approval
18  emails coming in, or being attached, 6, 7, the
19  involuntary termination report; 8 the termination
20  counseling form.
21     MS. PAGE:  You're right.  I'm sorry.  I pulled
22  a page out.  I have 6, 7, 8, 13, 12, 9, 17 and then
23  16, as well.  14.
24     MR. FINNERTY:  All right.  I'm just going to
25  go down --

**Page 85**

1     THE WITNESS:  I'm just going based on all the
2  ones I have pulled up.
3     MR. FINNERTY:  So we got 1 through 5.  No. 6,
4  the termination emails, got that.  The involuntary
5  termination report, No. 7.  The termination
6  counseling form, No. 8.  No. 9, the final warning
7  counseling form.  No. 10, the verbal counseling.
8  No. 11, the list of emails.  No. 12, the shift
9  assignment sheet.  No. 13 the 4-14-18 narcotic log.
10  So 1 through 13.  We didn't do 14 and 15.  We did
11  16, the rules of conduct.  Seventeen, the email
12  from Tara Johnson to all staff.  Eighteen, Ms.
13  Douin's email regarding the seven-minute check-in
14  check-out rule.  The email from Lori Cook approving
15  extra shits, No. 19.  Johnson email approving
16  overtime was No. 20.  So the last one that I don't
17  think we talked about -- so it's -- I'm sorry.  So
18  it's 1 through 12 -- no, 1 through 13 and then 16
19  through 20.  Does that sound right to you, Ms.
20  Page?
21     MS. PAGE:  Uh-huh.  So the only ones we
22  didn't -- let's see.  You said --
23     MR. FINNERTY:  I want to briefly go over No.
24  21 and then I'll be done, I think.
25     MS. PAGE:  Okay.

Page 86

1    MR. FINNERTY:  But you have 1 through 13 and
2  16 through 20.  You're good with all those?
3    MS. PAGE:  Yeah.
4  BY MR. FINNERTY:
5    Q    So final exhibit, Ms. Love, is Exhibit No. 21.
6  And I think I briefly talked about this a little bit
7  earlier, but this is a -- it's an eight-page email
8  chain.  So I'm going to start with the bottom of page
9  five of this email chain.  It says email from Sarah Brus
10  to Tara Johnson.  It's April 2nd, 2018 at 11:46 a.m.  It
11  says, with all these issues Harrell is suddenly bringing
12  up, is anyone else thinking she's on a manhunt.
13    Do you think it would be proper for Ms. Brus,
14  human resource's business partner, to essentially
15  essentially Ms. Harrell of being on a manhunt for
16  reporting what she perceived to be policy violations?
17    MS. PAGE:  Form.
18    THE WITNESS:  It's certainly not something
19    that I would expect to see in an email.
20  BY MR. FINNERTY:
21    Q    Sure.  And I'll represent to you that there --
22  all of those issues I was asking you about earlier
23  about, you know, should an employee complains if she
24  suspects that an employee is having sex with an inmate,
25  I mean, I'll represent that those were the issues -- you

Page 87

1  know, that was one of the many issues Ms. Harrell
2  complained about.  I believe that you agreed that those
3  were issues that should be reported.  So, I think, you
4  know, you said that she -- Ms. Brus shouldn't be putting
5  this in an email that she, you know, essentially
6  accusing Ms. Harrell of being on a manhunt.  Is that
7  accurate?
8    MS. PAGE:  Form.
9    THE WITNESS:  Yeah.
10  BY MR. FINNERTY:
11    Q    So then if you look at the bottom of page
12  four, it's an email in response to Ms. Brus from Tara
13  Johnson, April 2nd at 4:37.  She says, definitely
14  thinking she's on a manhunt.
15    I'm assuming same would go for Ms. Johnson,
16  not appropriate to be accusing Ms. Harrell of being on a
17  manhunt for reporting the issues that we've discussed
18  today.  Would you agree?
19    MS. PAGE:  Form.
20    THE WITNESS:  I'm sorry.  I was reading and
21    didn't attend to you.
22  BY MR. FINNERTY:
23    Q    Essentially the same question that I asked
24  about Ms. Brus.  You know, Tara Johnson here saying,
25  definitely think that Ms. Harrell is on a manhunt, as

Page 88

1  well.  But basically the same question, that's something
2  that isn't proper or shouldn't be put in an email?
3    A    Correct.
4    Q    So then if you look at the second paragraph of
5  this email, second paragraph, second sentence, it says,
6  we looked at all the dates, times of the incident
7  reports sent by Ms. Harrell on Friday, as well as the
8  corrected versions sent this morning.  This is what we
9  found, didn't find, and then it goes through all these
10  things that we're seeing on the camera footage.
11    A    Right.
12    Q    So did anyone, you know, prior to your
13  approval of Ms. Harrell's termination, did anyone tell
14  you that the whole issue about the inmate emptying Ms.
15  Harrell's trash, that that was only discovered because
16  Ms. Harrell had complained about other inmates?  Did
17  anyone tell you that?
18    A    No.
19    Q    And is that something you think should have
20  been told to you?
21    A    I'm not certain it's applicable or not.  You
22  knew, sometimes we happen upon, you know, somebody doing
23  not the right thing by them -- I don't know -- so, no, I
24  don't know that that needed to be disclosed, how we
25  found it.

Page 89

1    Q    Well, would you agree that a supervisor in
2  this case, Tara Johnson the HSA, would you agree that it
3  would be improper for her to use Ms. Harrell's complaint
4  as a basis to start looking for potential issues Ms.
5  Harrell may have had, or potential violations?  I mean,
6  is it -- is that proper?
7    MS. PAGE:  Form.
8    THE WITNESS:  I don't know that it's
9    inappropriate.  I mean, if we identify an issue,
10    then the issue needs to be addressed.  I mean, it
11    appears as though she's investigating that -- the
12    concerns that Ms. Harrell brought forward, and in
13    so doing, finds something else.  I mean, that
14    happens.
15  BY MR. FINNERTY:
16    Q    Well, would you agree that if the camera that
17  supposedly showed Ms. Harrell in her office where the
18  inmate came in and emptied her trash, if that wasn't a
19  camera that needed to be reviewed as relates to Ms.
20  Harrell's complaints that there --
21    A    That I don't know.
22    Q    You would agree there would be no reason to --
23  well, would you agree that Ms. Johnson was going outside
24  of just simply investigating Ms. Harrell's complaints,
25  that she was looking at a camera that had nothing to do

Page 90

1  with what Ms. Harrell was complaining about?
2    A   Oh, one camera.  I know that there might be --
3       MS. PAGE:  Form.
4       THE WITNESS:  -- one camera down a long
5   hallway and you see everything.
6  BY MR. FINNERTY:
7    Q   We got your objection.  And, no, I understand
8  your answer and I appreciate that.  One email up on page
9  four is from Ms. Brus, April 2nd at 3:45 p.m.  Ms. Brus
10 is concerned with employees punching out and staying on
11 site.  That's something that employees shouldn't do,
12 correct?
13   A   Correct.
14   Q   Look at the email at the top of page three.
15 It's an email from Tara Johnson to Brus, Douin and
16 Barton.  Ms. Johnson talks about seeing an employee that
17 was still at the facility after she had clocked out, and
18 then Ms. Johnson indicates in this email that she
19 removed Ms. Keidre's punch-out.  Is that something that
20 a supervisor can do, go in an remove another employee's
21 clock-out?
22   A   Well, you can change them, hence that TKE,
23 because we asked that employees always clock in and out,
24 but then if something happens they can be adjusted with
25 a comment by the supervisor.

Page 92

1  have done -- have happened in front of this, but if Ms.
2  Johnson actually did go in and remove the clock-out,
3  there should have been some sort of -- something
4  documenting that, correct?
5    A   Typically, yes.
6       MR. FINNERTY:  I'd like to attach Exhibit 21.
7       (Whereupon, Exhibit No. 21 was marked for
8  identification.)
9       MR. FINNERTY:  Ms. Love, I that's all the
10 questions I have for you today.  I appreciate your
11 time and your patience.  Your counsel may have some
12 questions for you, but I'm done.
13      MS. PAGE:  I do have a few questions.
14          EXAMINATION
15 BY MS. PAGE:
16   Q   Okay.  You testified earlier that MHM is the
17 employee -- employing body with regard to Centurion and
18 MHM, is that correct?
19   A   Yes.
20   Q   Does Centurion have the contract with the DOC?
21   A   Yes.
22   Q   And does MHM subcontract with Centurion under
23 that contract with the DOC?
24   A   So these legal terms have changed from 2018 to
25 today, and I get very confused with them.  So not it's a

Page 91

1    Q   Would there need to be -- would that TKE,
2  would there need to be some form filled out to show
3  that, you know, I, as the supervisor, went in and did
4  this to correct this employee's time?  I mean, isn't
5  there -- is there a procedure for doing this?
6    A   It could typically be a comment within the
7  Kronos system, but I don't know what happened here.
8    Q   All right.  So there would be a way to --
9  there could be some documentation put in?
10   A   Right.
11   Q   But typically wouldn't an employee, just for,
12 you know, HR purposes, employees should be responsible
13 for their own time.  You don't want to -- would you
14 agree you don't want to create a situation where an
15 employee is saying that, well, no, I was here at this
16 time or, you know, just as an example, you want to let
17 the employee be responsible for their own time so they
18 wouldn't be able to say, well, somebody else must have
19 done that.  I mean, if you're following me.  I mean --
20      MS. PAGE:  Form.
21 BY MR. FINNERTY:
22   Q   It's a not good question, but employees should
23 be responsible for their own clock-in and clock-outs?
24   A   That's right.
25   Q   And there should be -- we don't know what may

Page 93

1  subcontract.  It's a -- I don't think.  Honestly, I
2  don't know what it's called.
3    Q   Okay.  And as you testified, MHM is the
4  employing entity of the two.  Are all the employees
5  under the Florida contract employed by MHM?
6    A   Yes.
7    Q   Does that include yourself?
8    A   Yes.
9    Q   Okay.  I'm going to flip to Exhibit 11.
10   A   Okay.
11   Q   Okay.  And you were asked earlier a question
12 regarding whether or not you were aware if Ms. Harrell
13 sent these emails to anyone else once she sent them to
14 herself.  Does that matter?
15   A   No.
16   Q   It's a policy -- is it a policy violation
17 regardless whether or not she forwards them to someone
18 else once they're sent outside of the DOC's system?
19   A   Correct.
20   Q   Okay.  And I'm going to go to Exhibit No. 12.
21   A   Okay.
22   Q   Do you see a date on this document?
23   A   No.
24   Q   Are you aware one way or the other whether
25 this document was in effect during Ms. Harrell's

Page 94

1  employment with MHM?

2      A   I'm not aware.

3      Q   Okay.  And to clarify, when you refer to

4  Centurion as employing Ms. Harrell or other people, did

5  you actually mean MHM, the employing body and you called

6  it Centurion because Centurion had the contract?

7      MR. FINNERTY:  Form.

8      THE WITNESS:  Yes.

9  BY MS. PAGE:

10     Q   Okay.  And I want to flip to the narcotics

11 log, which I think is Exhibit 13.

12     A   Okay.

13     Q   Can you tell from this document, one way or

14 another whether -- strike that.

15         If true that Ms. Harrell couldn't complete

16 this log because another nurse didn't complete it with

17 her, can you tell one way or another from this log

18 whether or not the other nurse also received discipline

19 for the same issue?

20     A   No.

21     MS. PAGE:  Okay.  And I'd like to -- Brian,

22 are you okay if we use -- I think it was in

23 Harrell's deposition, the handbook was an exhibit

24 to that deposition.  Are you okay with --

25     MR. FINNERTY:  I have no problem with that.

Page 95

1  That's fine.  Do you know what exhibit number that

2  was?

3      MS. PAGE:  Let me pull that up and I can tell

4  you.

5      MR. FINNERTY:  Would it be the entire -- it's

6  the employee handbook?

7      MS. PAGE:  I think it's the entire handbook

8  was entered as an exhibit in that case -- in that

9  deposition.  The handbook was entered as

10 Defendant's Exhibit No. 5 in Ms. Harrell's

11 deposition.

12     MR. FINNERTY:  Okay.  So you want to just make

13 22 to these depos?  I mean, it can also be

14 Harrell's 5, but just to kind of keep all these

15 together?

16     MS. PAGE:  That's fine.

17     (Whereupon, Exhibit No. 22 was marked for

18 identification.)

19     (Discussion off the record.)

20 BY MS. PAGE:

21     Q   Are you familiar whether or not you're

22 required in terms of disciplinary steps, does it require

23 that every different violation go through a three-step

24 process, or based on the severity or situation you can

25 go straight from, you know, no counseling to

Page 96

1  termination?

2      A   Correct.  It's -- the preferred methodology is

3  going through their three-step process, but it's not

4  always applicable based on the severity of the

5  infraction.

6      Q   Okay.  You're not required to go through a

7  three-step process or four-step process for every

8  violation?

9      A   No.

10     Q   Okay.  Turning to Exhibit 9, I believe, is the

11 final.  You were asked earlier whether or not, based on

12 the rules of conduct, you thought that this incident

13 described the inmate in her office was a violation.  I

14 just want to clarify your testimony.  Did you testify

15 that you didn't know if this was a violation or that

16 this was not a violation?

17     A   Referenced it specifically to the phrase in

18 the violation of the policy.

19     Q   Okay.

20     A   I believe this is a violation of policy.

21     Q   Okay.  And with regard to the final, you're

22 not required to approve finals, correct?

23     A   Correct.

24     Q   Ask when you review a final, or any sort of

25 written discipline at the termination stage, you're

Page 97

1  reviewing whether or not there's enough evidence to

2  support termination, correct?

3      A   Correct.

4      MS. PAGE:  I think that's all I have.

5      MR. FINNERTY:  Okay.  I have just a couple

6  follow-ups.  I apologize, Ms. Love.

7      FURTHER EXAMINATION

8  BY MR. FINNERTY:

9      Q   So, as it relates to the MHM versus Centurion,

10 you were, I felt, very clear in testifying multiple

11 times that Centurion is your employer.  Is that -- are

12 you saying that's not the case?

13     A   I'm sorry.  MHMHP employs everyone.  And then,

14 for lack of a better term, they subcontract to Centurion

15 those employees.

16     Q   But who is your employer?

17     A   MHMHP is the name on the check.

18     Q   Okay.  And so I'll just represent to you, I

19 looked you up yesterday on LinkedIn and your LinkedIn

20 profile says since, like, February of 2016 you've worked

21 for Centurion.  Is that not accurate?

22     A   Centurion is the organization by which people

23 recognize us.

24     Q   And you said that there's, for lack of a

25 better term, that Centurion subcontracts with MHM.  But

Page 98

1 doesn't Centurion own MHM?
2   A   Yeah, it might not -- you're right.  Like I
3 said, this is really a question for our general
4 counsel's office, because I've become confused through
5 the years.  I know how it started and then it's changed
6 through the years.  So, yes.
7   Q   Does MHM employ anybody in Florida if
8 Centurion didn't have a contract with the State of
9 Florida?
10   A   Only the fact that we have another contract.
11   Q   What other contract is that?
12   A   Actually, now you're really -- we have a
13 contract with the Volusia County Commissioners for the
14 provision of healthcare services at Volusia County
15 Detention Services, the jail and detention center.
16   Q   So, but --
17   A   But that's a different -- actually, I'd have
18 to go see who they're employed by.  I don't pay that
19 much attention.  I'm sorry.
20   Q   So, as it relates specifically to Ms. Harrell,
21 if it weren't for Centurion's contract with the State of
22 Florida, Ms. Harrell wouldn't have worked at Northwest
23 Florida Reception Center in 2016 through 2018, is that
24 accurate?
25       MS. PAGE:  Form.

Page 100

1   A   Right.
2   Q   Okay.  So I've got to ask you -- got to follow
3 up on the question you were asked about Exhibit 9, the
4 final warning.  And I think you were very clear on your
5 direct exam that the allegation regarding Ms. Harrell
6 and the inmate emptying her trash did not violate
7 Paragraph 26 of Policy 33-208.002.  I mean, is that no
8 longer your testimony?
9   A   I don't think I -- I said yes, but then I also
10 said we didn't know what they were doing.  It could
11 have.
12   Q   So based on the description of what happened,
13 based on the details of the incident as described in
14 Exhibit 9, I mean, what is described in Exhibit 9, you
15 would agree, does not constitute a violation of Chapter
16 33-208.002?
17       MS. PAGE:  Form; asked and answered.
18 BY MR. FINNERTY:
19   Q   What was your answer, ma'am?  I'm sorry.
20   A   Unknown.
21   Q   Unknown?  Okay.  All right.  But there's no
22 evidence that you're aware of that Ms. Harrell violated
23 Paragraph 26 of Rule 33-208.002?
24       MS. PAGE:  Form; calls for speculation.
25       THE WITNESS:  Right.

Page 99

1       THE WITNESS:  Not for us, correct.
2 BY MR. FINNERTY:
3   Q   All right.  So as relates to Exhibit 11, you
4 were asked about that list of emails.  Is there -- do
5 you have any reason to believe that Ms. Harrell
6 wasn't -- as an employee of Centurion, MHM, whatever you
7 want to call it, there's -- you're not saying she wasn't
8 authorized to have any of those items listed in that
9 Exhibit 11, right?  I mean, for instance, incident
10 reports that she actually drafted, I mean, there's no
11 allegation that she wasn't lawfully in possession of
12 those incident reports actually drafted by her, right?
13 I mean, you're not -- that's not what you're saying as
14 relates to those emails?
15   A   Right.
16       MS. PAGE:  Form.
17 BY MR. FINNERTY:
18   Q   There's no doubt that she was authorized to
19 have those documents in her possession, the issue is
20 that she, according -- you know, the allegation's that
21 she shouldn't have been, you know, sending them outside
22 of Centurion's secured email?
23   A   Correct.
24   Q   But there was no issue with her actually
25 having them, you know, pursuant to her employment.

Page 101

1 BY MR. FINNERTY:
2   Q   So then as it relates to -- I think you were
3 asked one last question about approving the termination,
4 and I think your answer was basically that you just
5 verified that there is evidence to support a
6 termination, is that right?  That's basically what you
7 do when you do your review and approve, just to make
8 sure there is sufficient evidence to support --
9   A   Correct.
10   Q   -- termination?  Okay.  But does your review
11 include determining the veracity of the evidence, or
12 determining the accuracy of the allegations that are
13 being presented to you to support the termination?
14   A   My expectation is that it's provided to me and
15 has been reviewed, and if I have questions, I'll reach
16 out typically verbally by phone to question -- any of my
17 questions.  And I don't know that I did that or not,
18 because I don't have it documented.
19   Q   So would it be fair to say that you assumed
20 that everything that Ms. Harrell was alleged to have
21 done was truthful?
22   A   Yes.
23   Q   That it actually happened?
24   A   Yes.
25   Q   And you relied on Ms. Douin, or Ms. Brus, or

Page 102

1  whoever, to verify that what they were saying Ms.
2  Harrell had done had actually happened?
3        A    Yes.
4        MR. FINNERTY:  Okay.  I think that's all I
5  have.
6        (Whereupon, the deposition was concluded at
7  11:25 a.m., and the witness Victoria Love did not waive
8  reading and signing.)

Page 103

1
2                 CERTIFICATE OF OATH
3
4  STATE OF FLORIDA   )
5  COUNTY OF LEON     )
6
7        I, the undersigned authority, certify that the
8  above-named witness appeared before me via
9  videoconference pursuant to the Supreme Court's Order
10 AOSC20-13 and was duly sworn.
11
12       WITNESS my hand and official seal this 14th
13 day of September, 2020.
14
15
16
17
18
19       DANA W. REEVES
         NOTARY PUBLIC
20       COMMISSION #GG970595
         EXPIRES MARCH 22, 2024

Page 104

1             CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA   )
   COUNTY OF LEON     )
4
5        I, DANA W. REEVES, Professional Court
6  Reporter, certify that the foregoing proceedings were
7  taken before me at the time and place therein
8  designated; that my shorthand notes were thereafter
9  translated under my supervision; and the foregoing
10 pages, numbered 4 through 102, are a true and correct
11 record of the aforesaid proceedings.
12       I further certify that I am not a relative,
13 employee, attorney or counsel of any of the parties, nor
14 am I a relative or employee of any of the parties'
15 attorney or counsel connected with the action, nor am I
16 financially interested in the action.
17       DATED this 14th day of September, 2020.
18
19
20
21       DANA W. REEVES
22       NOTARY PUBLIC
23       COMMISSION #GG970595
         EXPIRES MARCH 22, 2024
24
25

1                          ERRATA SHEET

2    I have read the transcript of my deposition, pages 4
     through 102 and hereby subscribe to same, including any
3    corrections and/or amendments listed below.

4

5    DATE:_____  _____
                                    VICTORIA LOVE
6    (Virginia Harrell vs. MHM Health Professionals, LLC., et
     al.)
7

8    PAGE/LINE   CORRECTION/AMENDMENT   REASON FOR CHANGE

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   DATE OF DEPOSITION: August 11, 2020

25   REPORTER: DANA REEVES