8/11/2020 Case 4:20-cv-00030-AW-MJF   Virginia E. Harrell vs MHM Health Professionals, Inc., Centurion of Florida Document 37-7   Filed 10/14/20   Page 1 of 30

Deposition of Lisa Lynch                    18-CA-77                                    1 (1)

```
 1                   UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF FLORIDA
 2                       TALLAHASSEE DIVISION

 3

 4

 5    VIRGINIA E. HARRELL,

 6         Plaintiff,

 7    vs.                            CASE NO. 4:20-cv-30-AW-CAS

 8    MHM HEALTH PROFESSIONALS, LLC,
      f/k/a MHM HEALTH
 9    PROFESSIONALS, INC., and
      CENTURION OF FLORIDA, LLC,
10
           Defendants.
11    _____/

12

13

14    DEPOSITION OF:          LISA LYNCH

15    AT THE INSTANCE OF:     Plaintiff

16    DATE:                   August 11, 2020

17    TIME:                   Commenced: 1:00 p.m.
                              Concluded: 3:38 p.m.
18
      LOCATION:               VIDEOCONFERENCE
19
      REPORTED BY:            DANA W. REEVES
20                            Court Reporter and
                              Notary Public in and for the
21                            State of Florida at Large

22

                            PREMIER REPORTING
23                          114 W. 5TH AVENUE
                          TALLAHASSEE, FLORIDA
24                            (850) 894-0828

25
```

Page 2

1  APPEARANCES:

2      REPRESENTING THE PLAINTIFF:

3  BRIAN O. FINNERTY
   The Law Office of Brian O. Finnerty, P.A.
4  541 Beverly Court
   Tallahassee, FL 32301

5

6      REPRESENTING THE DEFENDANTS:

7  CAYLA M. PAGE
   Greenberg Traurig, P.A.
8  101 East Kennedy Boulevard, Suite 1900
   Tampa, FL 33602

Page 3

INDEX TO WITNESS

LISA LYNCH                               PAGE
Examination by Mr. Finnerty                5
Examination by Ms. Page                   99
Further Examination by Mr. Finnerty      101

INDEX TO EXHIBITS

NO.      DESCRIPTION                     MARKED
1 - Plaintiff's notice of taking deposition        12
2 - Plaintiff's notice of taking Rule 30(b)(6)
    deposition                                     12
3 - First amended complaint                        12
4 - Defendants' answer and affirmative defenses
    to first amended complaint                     12
5 - Defendants' responses and objections to first
    set of interrogatories                         12
6 - E-mail chain Re: Involuntary Termination
    Request                                        12
7 - Involuntary termination report                 12
8 - Employee counseling form - termination         12
9 - Employee counseling form - final warning       12
10 - Employee counseling form - verbal counseling  12
11 - List of e-mails sent from work account to
     personal account                              12
12 - NWFRC shift assignments                       12
13 - Narcotic accounting log dated April 14, 2018  12
14 - Narcotic accounting log and key exchange dated
     March 29, 2018                                12
15 - Narcotic accounting log and key exchange dated
     March 29, 2018                                12
16 - 33.208.002 Rules of conduct                   12
17 - E-mail from Tara Johnson to staff             12
18 - E-mail from Kathi Douin to staff              12
19 - E-mail from Lori Cook to Virginia Harrell     12
20 - E-mail from Tara Johnson to Virginia Harrell  12
21 - E-mail chain Re: Camera footage               12
22 - MHM Services, Inc., employee handbook         12

Page 4

STIPULATIONS

The attorneys participating in this deposition acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely. This arrangement is pursuant to the Florida Supreme Court Administrative Order AOSC-20-16. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Page 5

DEPOSITION

Whereupon,

LISA LYNCH

was called as a witness, having been first duly sworn to speak the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. FINNERTY:

Q   Good afternoon, Ms. Lynch. My name is Brian Finnerty, and I'm an attorney representing Virginia Harrell in a lawsuit that has been filed against MHM Health Professionals, LLC and Centurion of Florida, LLC. And I'm just going to take your depo today relating to any knowledge you might have about this case. Have you ever had your deposition taken before?

A   Yes.

Q   And about how many times, if you can recall?

A   Probably ten or more.

Q   And were those depositions relating to your employment with MHM or Centurion?

A   No, there have only been a few.

Q   Okay. So I'm assuming you're familiar with depositions, and just to kind of -- the rules to try to make it easier for the court reporter, in everyday conversation we do a lot of head nodding and shaking and

Page 6

1  uh-uh and uh-huh.  Just try to make it easier for the
2  court reporter, let's try to answer verbally and yes or
3  no, and try to avoid the things that I do all the time,
4  the uh-huh and uh-uh.  And then try to make sure that if
5  I'm asking a question, you may know exactly what I'm
6  about to say after I say three words, but try to let me
7  finish my question before you start answering, just
8  again to make it easier on the court reporter.
9      A   Okay.
10     Q   Fair enough?
11     A   Fair enough.
12     Q   All right.  So could you just state your full
13  name for the record, please?
14     A   It's Lisa Feltz Lynch.
15     Q   Okay.  And where are you currently employed?
16     A   I'm employed with MHM Health Professionals
17  with Centurion of Florida contract.
18     Q   And is your work email address
19  Llynch@centurionofflorida.com?
20     A   That is one of them, but we go by Llynch --
21  now it's Llynch@teamcenturion.com.
22     Q   And how long have you worked with Centurion?
23     A   I started my employment on December 1st, 2014.
24     Q   And you've worked with them continuously
25  through today?

Page 7

1      A   Yes.
2      Q   And what is your job title?
3      A   Regional Human Resources Manager.
4      Q   Okay.  And what area would your region
5  encompass?
6      A   It would be the State of Florida, for the
7  Centurion contract.
8      Q   All right.  And where is your -- I understand
9  you're probably working at home right now with the
10 pandemic.
11     A   Right.
12     Q   If you weren't working at home, where is your
13 office where you would normally report to?
14     A   It is in Tallahassee, Florida.
15     Q   Is that the Governor's Square Boulevard?
16     A   Yes.
17     Q   And is that also where Ms. Love, her office
18 is?
19     A   Vicki Love.
20     Q   Yes, ma'am.
21     A   Yes.
22     Q   And Sarah Brus, is that where her office is,
23 as well?
24     A   Correct.
25     Q   All right.  So what are what the duties and

Page 8

1  responsibilities of your job as regional HR manager?
2      A   I'm responsible for the HR business partners,
3  who we have assigned in each region.  It's for the daily
4  functions of any HR discipline, to include employee
5  relations, and overseeing the whole human resource
6  process, whether it is leave of absence, work comp.  We
7  have a total of six employees that report to me.
8      Q   And do you know who those six employees are
9  who report to you?
10     A   Yes.
11     Q   Do you mind telling me?
12     A   Okay.  It's Sarah Brus.
13     Q   Okay.
14     A   Carla Hanks.  April Sheldon.  Melissa Borak.
15 Alex Couey.  And Melissa Robinson.
16     Q   And how do you spell Couey?
17     A   C-O-U-E-Y.
18     Q   And those six individuals, do they all work at
19 the same office as you?
20     A   Yes.  Now, the HR business partners do work
21 remotely, occasionally.
22     Q   And that's even when there isn't a pandemic
23 going on?
24     A   Yes.
25     Q   All right.  So correct me if I'm wrong, none

Page 9

1  of the HR personnel, such as yourself or the people that
2  report to you, actually work in a correctional facility?
3      A   Correct.
4      Q   So is there -- as relates to Ms. Harrell, she
5  worked at Northwest Florida Reception Center.  Was there
6  an HR person that was at that prison, that if she had an
7  issue one day she could go and talk to the person that
8  day?
9      A   Not actually at the prison, no.
10     Q   Okay.  And is there ever an occasion where an
11 HR person would actually need to go to one of those
12 facilities and --
13     A   Yes, they do -- yeah, they do make visits.
14     Q   And have you ever been to the Northwest
15 Florida Reception Center?
16     A   That one I have not been to.
17     Q   Do you know if Sarah Brus has ever been there?
18     A   I do not know.
19     Q   And just from the documents that have been
20 produced in this case, there were -- it seems that my
21 client, Ms. Harrell, dealt pretty much exclusively with
22 Sarah Brus as relates to HR issues.  Is that -- was Ms.
23 Brus assigned to the Northwest Florida Reception Center?
24     A   Yes.
25     Q   All right.  And then the other five HR

Page 10

1 personnel that report to you, are they all assigned to
2 different facilities?
3     A   Yes.
4     Q   Okay. And then are you involved at all in any
5 training as relates to procedures or rules that
6 employees have to follow?
7     A   Training for whom? Can you be more specific?
8     Q   Well, we'll start with the HR personnel that
9 report to you. Do you provide specific training to
10 them?
11     A   Yes.
12     Q   Okay. And then as relates to the actual
13 employees that you all deal with, like Ms. Harrell, are
14 you all involved at all in training any of those
15 personnel, as relates to, like, health care staff that
16 actually work in the prisons?
17     A   Okay. We do have mandatory trainings that
18 they do attend, and occasionally HR business partners
19 will be there to support that training.
20     Q   And do you have any health care licenses?
21     A   No.
22     Q   And have you -- do you have any experience
23 working in corrections facilities?
24     A   Just what I obtained during my employment with
25 MHM.

Page 11

1     Q   And where did you work prior to beginning with
2 Centurion on December 1st, 2014?
3     A   For seven years prior to MHM I worked with a
4 company called Signature Health Care, which is a
5 long-term care facility, working as HR support, regional
6 director.
7     Q   Was that in Tallahassee?
8     A   No, that was in Nashville, Tennessee.
9     Q   And that was -- is Signature, are they
10 affiliated or related at all to Centurion?
11     A   No.
12     Q   And then how about prior to Signature?
13     A   I'm going to have to think back, see what I
14 did eleven years ago. Prior to that I had worked in
15 other industries as an HR director.
16     Q   Sure.
17     A   For -- you know, been doing this for 30 years,
18 so.
19     Q   Thirty years. Okay. So last night we sent
20 over some exhibits for your deposition. Have you had a
21 chance to review those documents?
22     A   I have looked at some of them. I have not
23 gone in detail.
24     Q   Okay. No problem. And a lot of them, I may
25 just kind of gloss over, but there may be some that I

Page 12

1 ask more specific questions on.
2     MR. FINNERTY: And, Ms. Page, the same
3     exhibits, you know, I think can we just agree that
4     the ones that we attached as exhibits to Ms. Love's
5     depo, that we can just attach -- I may not even ask
6     her about them, but any objection to that?
7     MS. PAGE: No.
8     (Whereupon, Exhibit Nos. 1 - 22 were marked
9 for identification.)
10 BY MR. FINNERTY:
11     Q   All right. So, Ms. Lynch, let's look at
12 Exhibit 2, which is notice for 30(b)(6) deposition. Do
13 you have that exhibit?
14     A   Yes.
15     Q   And if you look down at -- it's page four and
16 page five of Exhibit 2. And at the top of page four it
17 says Exhibit A and matter of examination. Do you have
18 that?
19     A   Okay. My number two doesn't have four pages.
20 It only has two pages. Maybe I'm on the wrong thing.
21     Q   It may have been the same issue with the prior
22 depo.
23     MS. PAGE: Lisa, this is the one I forwarded
24     earlier. This should be Exhibit 2. It's a 15
25     list -- 15-paragraph three-page document.

Page 13

1     MR. FINNERTY: And is she looking at the
2     letter? It's the same stuff. It's fine if you
3     just --
4     THE WITNESS: Yeah, the one that I have open.
5     And, Ms. Page, I may have the original one open
6     instead of the last one that you sent. So let me
7     see if --
8     MS. PAGE: It should have been -- come through
9     at 11:09. It's 2020-06-19 BOF letter to OC
10     regarding 30(b)(6) depos, is the name of the
11     document. For good measure, I'll just send it
12     again.
13     THE WITNESS: No, I have it.
14     MS. PAGE: You have it? Okay.
15     THE WITNESS: There it is, yes. Thank you for
16     your patience. And, sir, what page did you want me
17     to look at?
18 BY MR. FINNERTY:
19     Q   Starting at -- with page four and the header
20 is, says Exhibit A, matters of examination.
21     A   Well, now this one only has three pages.
22     MS. PAGE: Yeah, this is the one -- the one
23     that I'm looking at that we marked as 2, it's just
24     the -- it's 15 -- it's three pages and it's 15
25     paragraphs, 15 numbers.

Page 14

1   MR. FINNERTY:  All right.  So the rule
2  30(b)(6) depo notice that I have, it's ten pages
3  long.
4   MS. PAGE:  I don't think -- I don't know that
5  I ever received that.
6   MR. FINNERTY:  Okay.  We can send it to you,
7  but I think that the -- so, Ms. Lynch, what you're
8  looking at, you have a list of 15 different, I
9  guess, subject matters, matters of examination.  Do
10  you have that?
11   THE WITNESS:  Yes, sir.
12   MR. FINNERTY:  And starting with the decision
13  to terminate plaintiff Virginia Harrell?
14   THE WITNESS:  Yes, sir.
15   MR. FINNERTY:  Okay.  Ms. Page, we can send
16  you the Exhibit 2 that I'm looking at, but for the
17  purposes of this it's going to be the exact same
18  issues.
19   MS. PAGE:  Okay.  It's certainly possible it
20  came in, but I don't know that I was copied on it.
21   MR. FINNERTY:  Not a problem.
22  BY MR. FINNERTY:
23   Q   So, Ms. Lynch, were you involved at all in the
24  decision to terminate Ms. Harrell?
25   A   Yes.

Page 15

1   Q   And I've seen -- there was some emails -- an
2  email chain, which should be Exhibit 6 that you were
3  provided and --
4   A   Yes.
5   Q   And so looking at Exhibit 6, starting on page
6  two of this three-page document, at the very bottom of
7  page two there's an email from Sarah Brus to you and
8  that's -- that would be you at
9  Llynch@CenturionofFlorida.com?
10   A   Okay.  And so that was an email sent on
11  April 20th 2018.  Do you know if that was -- if the
12  subject was involuntary termination request?
13   MS. PAGE:  Form.
14   THE WITNESS:  By looking at this, I would have
15  to speculate on that.
16  BY MR. FINNERTY:
17   Q   Okay.  Well, so, when you said that you were
18  involved in the decision to terminate Ms. Harrell, could
19  you explain what your actual involvement was as related
20  to terminating Ms. Harrell?
21   A   Yes.  So the HR business partner is charged
22  with, you know, conducting investigations, and once
23  something is complete, she would send me the termination
24  documentation.  And I would review that to ensure that
25  we had everything, you know, that we may need or if

Page 16

1  anything needs to be looked at more thoroughly.
2   Q   And then in this case, that would have been
3  Ms. Brus that would have done that investigation?
4   A   Yes, Sarah Brus.
5   Q   Brus.  I'm sorry.  It's in my head as Brus and
6  I'm going to -- it's going to probably stay in my head,
7  but I'll try to remember it's Brus.  So Ms. Brus is
8  the -- I think we just talked about earlier, she would
9  have been the HR business partner that would have been
10  responsible for HR issues for people at the Northwest
11  Florida Reception Center?
12   A   Correct.
13   Q   So Ms. Brus, I guess, would have sent a -- she
14  would have done an investigation prior to requesting
15  approval to terminate Ms. Harrell, is that right?
16   A   Correct.
17   Q   Okay.  And then she -- so on 4-20, would that
18  have been the reason for her to email you with the
19  subject line, involuntary termination request, Virginia
20  Harrell, NWFRC?
21   A   It could have been, yes.
22   Q   So it doesn't look like there's anything in
23  the body of that email.  Do you know whether there were
24  some documents that would have been attached to this
25  email?

Page 17

1   A   I don't know if she was just following up on
2  an email where she had previously sent the information
3  or not.  Maybe that's what this is.  Again, I am
4  speculating without looking at the actual original
5  email.
6   Q   And so what typically would be provided to you
7  by an HR business partner for purposes of requesting
8  approval to terminate an employee?
9   A   Okay.  Typically, that would include an
10  internal document we have called an involuntary summary.
11   Q   Okay.
12   A   Along with a -- pardon me?
13   Q   I cut you off and I apologize.  Go ahead.  You
14  were -- involuntary summary, internal document and then
15  what else?
16   A   There would be a -- it's actually the
17  counseling document, but there is -- it is used to
18  summarize the termination.
19   Q   Okay.
20   A   And any supporting documentation she may have.
21  For example, if there were attendance issues or any
22  infractions, that would be presented, as well.
23   Q   And so as relates to terminating an employee,
24  such as Ms. Harrell, is it required that the termination
25  be approved by you, by the regional HR director?

Page 18

1    A   Yes.

2    Q   Okay.  And that's for all terminations, got to

3  go up through you?

4    A   Right.

5    Q   Okay.  And then do you then need to take it up

6  the chain to get further approval, or can you make that

7  determination?  Can you give that approval?

8    A   It is sent to -- at that time it would go to

9  Vicki Love, if it's an involuntary termination for

10  cause.

11    Q   And Vicki Love is the regional vice president?

12    A   Correct.

13    Q   And so you say at that time.  But what has

14  changed since April of 2018?

15    A   In September last year, so September -- I

16  think -- I believe it was September -- Vicki added a

17  position called a program director.

18    Q   Okay.  And that program director, is that

19  someone that would be between you and Vicki?

20    A   Correct.

21    Q   Okay.  So now if there -- if we were looking

22  at today, and you got a termination approval request,

23  you would go the program director and not go to Ms.

24  Love?

25    A   Correct.

Page 19

1    Q   Okay.  And can you approve terminations at any

2  time or -- strike that.

3        In 2018, April of 2018, could you have

4  approved it by yourself without having go to Ms. Love?

5    A   I'm trying to think if there was a time that I

6  did do that, but it would -- our standard was that, you

7  know, Vicki approve all involuntary terms.

8    Q   Is there a written policy that sets forth

9  that -- how you have to go up the line?

10    A   No.

11    Q   And is that just how you all have always done

12  it?

13    A   Right.  That's how it works in our program.

14    Q   So do you know what the purpose is of having

15  it go through -- go up the chain, all the way up to the

16  vice president, the regional vice president, I mean, at

17  that time?  I understand that it was changed.  But was

18  there -- do you know what the particular reason that it

19  would have to go through all those steps?

20      MS. PAGE:  Form.

21      THE WITNESS:  Well, we do that because of the

22  relationship with our client.  So they want to make

23  sure that, you know, senior management knows about

24  involuntary terminations.  So it's just an added

25  step that we put in place so that the communication

Page 20

1  was there.

2  BY MR. FINNERTY:

3    Q   And so who is your client?

4    A   The Department of Corrections and the State of

5  Florida.

6    Q   Okay.  And it's my understanding that the

7  Department of Corrections essentially entered into a

8  contract with Centurion to do what the Department used

9  to do as relates to providing health care for inmates in

10  the state of Florida?

11    A   Correct.

12    Q   Okay.  And does Centurion handle that for

13  every prison in Florida?

14    A   If they are State-operated.

15    Q   Okay.  And does Centurion provide health care

16  personnel in other states?

17    A   Yes.

18    Q   Do you know what those states are?

19    A   No.  I would not be able to -- I wouldn't be

20  the right person to give you that information.

21    Q   But certainly it's multiple states besides

22  Florida?

23    A   Correct.

24    Q   Okay.  And is Centurion your employer?

25    A   I'm employed by MHMP.

Page 21

1    Q   Are you employed by Centurion, as well?

2    A   You know, it probably gets complicated when

3  it -- we're determining, you know, what the specific

4  structure is, but I know that my paycheck says MHP --

5  MHMHP on it.

6    Q   And that's MHM Health Care Professionals?

7    A   Correct.

8    Q   All right.  So looking back at Exhibit 6, so

9  it looks like on -- so we just went through that on

10  April 20th Ms. Brus emailed the involuntary termination

11  request to you.  And then on April 26th she sent another

12  email to Lisa, any idea where this one is at, still

13  needing the approval.  Do you recall that at all?

14    A   I'm just looking at the dates.  No, I'm not --

15  except for looking at the email, no, sir, I don't

16  remember the specifics of that.

17    Q   Do you know why it would have taken six days

18  and a follow-up email for Ms. Brus to get a response?

19    A   No.  It could have been either I needed

20  additional information, or maybe Vicki was not

21  available.  I'm not sure.

22    Q   And then -- so it looks like on April 26th you

23  then forwarded the involuntary termination request to

24  Vicki for approval, is that right?

25    A   Correct.

Page 22

1   Q   And then later that same day, Ms. Love
2 responds back with, approved. And at that time, that's
3 how an approval for a termination would have happened?
4   A   Correct.
5   Q   Okay. I assume -- you were referencing some
6 documents that are typically provided with a termination
7 request, and I think one of the ones that you were
8 referencing, what has been provided as Exhibit 7. Take
9 a look at that.
10   A   Yes.
11   Q   Okay. And that is the -- as we sit here
12 today, is this same form used still for involuntary
13 termination requests or reports?
14   A   Yes.
15   Q   Okay. And so the top of this page it says,
16 last day worked, 4-20-2018. Do you know if that's
17 correct as it relates to Virginia Harrell?
18   A   I would say so if it's on the document.
19   Q   Okay. You have no way of knowing whether she
20 continued -- Ms. Harrell continued to work past
21 April 20, 2018?
22   A   No.
23   Q   Okay. So when you received this -- and would
24 this report have been prepared by Ms. Brus?
25   A   Yes.

Page 23

1   Q   Okay. So after you received this report from
2 Ms. Brus, did you -- or what did you do once you
3 received this or what -- I know you may not remember
4 what you did as relates to this specific report, but
5 what do you typically do when you receive a involuntary
6 termination report?
7    MS. PAGE: Form.
8    THE WITNESS: I go through the details and
9   then would look at any supporting documentation and
10   then contact Ms. Brus if I had any questions or
11   felt we needed additional information, or to make
12   changes.
13 BY MR. FINNERTY:
14   Q   And would you typically contact Ms. Brus by
15 email, or how would you do that?
16   A   Typically it's a phone call.
17   Q   Okay. And because you all work in the same
18 office, does she ever just walk over some documents to
19 you and hand them to you?
20   A   She probably was working remotely during this.
21 She does not go to the office everyday.
22   Q   Okay. So as relates to the specific issues
23 that are included in the summary of events that
24 precipitated the termination, did you do anything to
25 independently investigate any of these issues that are

Page 24

1 in the summary?
2   A   I don't recall on this one.
3   Q   On the first page of Exhibit 7 that we're
4 looking at, the third paragraph, it says, on or about
5 4-6-18, Ms. Johnson received a verbal report that Ms.
6 Harrell had sent information from her work email to her
7 personal email. Do you know who Ms. Johnson would have
8 received that verbal report from?
9   A   No.
10   Q   Do you know whether Ms. Brus knew who that was
11 from?
12   A   I wouldn't have that information.
13   Q   All right. Do you know if -- so the second
14 paragraph, it says, on 4-14-18, Ms. Harrell failed to
15 account for the narcotic keys during her shift and did
16 not do the narcotic count as required. Did you ever see
17 the narcotic key or the narcotic count documents for
18 4-14-2018?
19   A   They may been attached. I don't recall.
20   Q   And if they weren't attached, is that
21 something you would have asked to be provided?
22    MS. PAGE: Form.
23    THE WITNESS: Either that or for them to have
24   that verified through clinical leadership.
25 BY MR. FINNERTY:

Page 25

1   Q   And I understand that you receive the
2 involuntary termination request from Ms. Brus and then
3 you pass it up to Ms. Lynch for approval, but did you --
4 you didn't initially make the decision that Ms. Harrell
5 should be terminated, did you?
6   A   No.
7   Q   And if there -- I'll represent to you that
8 there's at least one document that's been produced in
9 discovery that represents that Lori Cook and Tara
10 Johnson made the decision to terminate Ms. Harrell.
11 Would you have any reason to dispute that?
12    MS. PAGE: Form.
13    THE WITNESS: No.
14 BY MR. FINNERTY:
15   Q   And do you know Lori Cook?
16   A   No.
17   Q   Do you know Tara Johnson?
18   A   No.
19   Q   And have you ever met Ms. Harrell?
20   A   No, not that I recall.
21   Q   All right. So if you look at Exhibit 8, do
22 you know what this document is, ma'am?
23   A   Yes.
24   Q   Is this something that would have been
25 provided to you by Ms. Brus as it relates to seeking

Page 26

1  approval to terminate Ms. Harrell?
2      A   Yes.
3      Q   And did you do anything to independently
4  investigate the reported issues in this termination
5  counseling form?
6      A   No.
7      Q   Would it be fair to say that you just relied
8  on the accuracy and veracity of the information reported
9  to you by Ms. Brus?
10     A   Yes.
11     Q   Okay.  And have you ever had any issues with
12  Ms. Brus providing inaccurate information to you in the
13  past?
14     A   No.
15     Q   She's -- you consider her reliable, you trust
16  her?
17     A   Yes.
18     Q   And how long has Ms. Brus worked for you?
19     A   Since May of -- I believe it was May of 2016.
20     Q   And so on this termination counseling form,
21  Exhibit 8, under the details of incident where it starts
22  with Ms. Harrell was assigned to the pill room, the last
23  sentence of that paragraph says, DC4-781E.  Do you know
24  what that's referring to?
25     A   It's probably a Department of Corrections

Page 27

1  either HSB or policy.
2      Q   Are you familiar with narcotic accounting
3  logs?  Do you know what that is?
4      A   I do know what it is, yes.
5      Q   Do you know the procedures for properly
6  filling those out?
7      A   No.  I would rely on clinical direction for
8  that.
9      Q   And have you ever filled one out yourself?
10     A   No.
11     Q   And so you would -- if it's reported to you
12  that, you know, Ms. Harrell didn't complete it or didn't
13  compete it properly, you would have no way, based on
14  your personal knowledge, of disagreeing with what was
15  reported to you?
16     A   Correct.
17     Q   And you don't recall whether the -- that
18  actual form for 4-14 was provided to you?
19     A   Not at this time, no.
20         MR. FINNERTY:  There's this alarm going off
21     right outside my door.  Give me one moment.  I'm
22     going to try to see if I can turn it off.  I'll be
23     right back.
24         (Discussion off the record.)
25  BY MR. FINNERTY:

Page 28

1      Q   Okay.  So just to kind of circle back to where
2  we were, you're not familiar with that form or you don't
3  recall if it was provided to you?
4      A   Was that two questions?  I'm sorry.
5      Q   It was and I apologize.  So you're not
6  familiar with form DC4-781E, and I've already asked
7  that, but I'm just trying to get back --
8      A   As titled, no.
9      Q   Okay.  And you don't recall if that was
10  actually provided for the date referenced here, 4-14-18?
11     A   No.
12     Q   All right.  But you believe that Exhibit 8
13  would have been something that was provided to you?
14         MS. PAGE:  Form.
15         THE WITNESS:  I'm sorry.  Could you repeat
16     that?  I didn't hear it clearly.
17  BY MR. FINNERTY:
18     Q   Exhibit 8, that would be something that would
19  be would -- would have been provided to you, though,
20  correct?
21     A   Yes.
22     Q   And --
23     A   I'm sorry.  I just had -- I've got something
24  going on with Windows all of a sudden.  Go ahead.
25     Q   So that termination counseling form that we

Page 29

1  were just talking about, Exhibit 8, that's something
2  that would have been provided to you?
3      A   Correct.
4      Q   And that's -- I mean, any time that there's a
5  termination request, is that typically something that's
6  always provided, the actual termination counseling form
7  that --
8      A   Typically.
9      Q   Okay.  And that would be a draft of a form
10  that, I guess, the supervisors of the employee that
11  they're seeking to terminate intends to present to the
12  employee, assuming it's approved by you or Ms. Love?
13     A   Correct.
14     Q   So this would have been -- at the time that it
15  would have been sent to you, it wouldn't have to yet
16  been given to Ms. Harrell?
17     A   Correct.
18     Q   So then it's only if the termination request
19  is approved that the supervisor or the HSA, or whoever
20  supervises that particular employee, would then present
21  to the employee to say, hey, you're terminated?
22     A   Correct.
23     Q   Okay.  So in a situation like this where
24  you're being asked to approve the termination for, you
25  know, alleged issues that an employee has committed or a

**Page 30**

1  policy violation that they've committed, does the
2  employee ever have an opportunity, you know, between the
3  time that the request is sent to you for approval and
4  the time it's actually presented to them and they're
5  terminated, do they ever get an opportunity to respond
6  to what the allegations are and the termination
7  counseling form?
8      A   Yes, they should.
9          MS. PAGE:  Form.
10 BY MR. FINNERTY:
11     Q   They should?  And as it relates to Ms.
12 Harrell, do you know, you know, whether she ever got
13 that opportunity to respond to the allegations as set
14 forth in this termination form before being told, you're
15 terminated?
16     A   I do not know.
17     Q   And do you know whether -- because, you know,
18 this termination counseling form says that -- at the top
19 it says that Ms. Harrell's supervisor was Lori Cook,
20 Director of Nursing, and the manager presenting the
21 counseling was Tara Johnson, HSA.  Do you have any way
22 of knowing whether Lori Cook and Tara Johnson had done
23 an investigation to determine whether or not what's
24 being alleged in this form actually happened?
25     A   I'm not aware of the actual steps of the

**Page 31**

1  investigation and who was involved.
2      Q   And I think we've kind of briefly talked about
3  it earlier, it would have been Ms. Brus' responsibility
4  to investigate this before sending it to you for your
5  approval --
6      A   Correct.
7      Q   -- is that something she would do?  Okay.  So
8  can we assume that since Ms. Brus sent the termination
9  request, or approval request to you, that she had
10 already done her investigative work prior to sending
11 this request to you?
12     A   Yes.
13     Q   Okay.  And have you ever -- okay.  So then
14 once you received the termination request from Ms. Brus,
15 did you review it to make sure everything, you know,
16 appeared to be in order before you then sent it up to
17 Ms. Love?
18     A   Yes.
19     Q   Okay.  And just simply -- is it just the idea
20 that as many eyes as you can have looking at it the better,
21 just to make sure all your ducks are in a row,
22 essentially?  I mean, is that the point?
23     A   Yes.
24     Q   All right.  And so were you, I guess,
25 satisfied with the documentation that you were provided

**Page 32**

1  as it relates to the request to terminate Ms. Harrell?
2      A   Yes.
3      Q   And have you ever been -- have you ever
4  received a termination request that you didn't approve?
5          MS. PAGE:  Form.
6          THE WITNESS:  Yes.  There have been times that
7      I've either sent them back to the HR business
8      partners for further information.
9  BY MR. FINNERTY:
10     Q   And have you ever gotten a termination request
11 from Ms. Brus that you denied?
12     A   I don't recall specifically who the -- HR
13 would have been --
14     Q   Are you -- you're breaking up a little bit on
15 my end.
16         (Discussion off the record.)
17 BY MR. FINNERTY:
18     Q   Okay.  So still looking at Exhibit 8, the
19 issues that Ms. Harrell was alleged to -- or the
20 policies she was alleged to have violated were Procedure
21 602.037; Public Records Request Procedure, 102.008;
22 Procedure 206.007, User Security for Information
23 Systems, and then time and attendance.  Are those
24 policies that you are familiar with, Ms. Lynch?
25     A   Yes.  And something's happened now on Windows.

**Page 33**

1  It won't let me open that document back up.  So I may
2  have to get you to say the names and everything again.
3  I can't see it.
4      Q   Okay.
5      A   The time and attendance, yes.
6      Q   Okay.  And you're familiar with that policy?
7      A   Yes.
8      Q   Okay.  Are you familiar with Procedure
9  602.037, Tools and Sensitive Item Control?
10     A   I'm familiar with it.  I would have to review
11 the policy, however, to be able to answer any specific
12 questions regarding it.  That is a DOC policy.
13     Q   Okay.  And are you familiar with Procedure
14 102.008, Public Records Request?
15     A   Same thing.  That's a DOC policy.  I would
16 reference that before trying to speak to the policy.
17     Q   Okay.  And then Procedure 206.007, User
18 Security for Information Systems.
19     A   Same thing.
20     Q   Okay.  And so during the time -- you know,
21 when you were asked to approve Ms. Harrell's
22 termination, would you have pulled up those policies and
23 looked at them to verify yourself whether there were
24 actual violations of those policies?
25     A   I would have either pulled them up or spoken

Page 34

1  directly to Sarah Brus about it and have her discuss the
2  policy.
3      Q   Okay.  And understanding that these procedures
4  are Department of Corrections procedures and -- so Ms.
5  Harrell, as a Centurion employee working at Northwest
6  Florida Reception Center, she would have been required
7  to comply with DOC policies?
8      A   Correct.
9      Q   And that would be in addition to the employee
10  policies that Centurion has?
11     A   Correct.
12     Q   And are you familiar with, you know, the
13  public records -- I mean, do you have to follow public
14  records procedures with, you know, your employment?
15     A   Yes.
16     Q   Okay.
17     A   If I'm -- public records typically is going to
18  be something that's coming specifically from the
19  Department of Corrections.
20     Q   Okay.  But that's something that you, because
21  of your job, you have to be familiar with those -- with
22  that policy, is that fair?
23     A   Correct.
24     Q   And did you ever speak with Lori Cook or Tara
25  Johnson relating to the request to terminate Ms.

Page 35

1  Harrell?
2      A   Not that I recall.
3      Q   And have you ever approved -- well, strike
4  that.
5          So by you forwarding the termination approval
6  request up to Ms. Love, is that essentially you -- your
7  way of approving the request that Ms. Brus sent to you?
8  I mean, stated differently, would you have forwarded the
9  request up to Ms. Love if you hadn't approved it
10  yourself?
11     A   Correct.
12     Q   Okay.  So by forwarding it up to Ms. Love, you
13  approved the request, based on the information Ms. Brus
14  provided?
15     A   Correct.
16     Q   Okay.  And did Ms. Brus indicate to you as
17  relates to the request to terminate Ms. Harrell, did Ms.
18  Brus indicate whether Ms. Harrell had submitted any
19  complaints to her prior to the day that you first
20  received a request to terminate Ms. Harrell?
21     A   I don't recall.
22     Q   And is that something that you would typically
23  do in -- when being asked to approve a termination?  Do
24  you ever inquire as to whether the particular employee
25  had recently complained about anything regarding her

Page 36

1  employment?
2          MS. PAGE:  Form.
3          THE WITNESS:  Not necessarily.
4  BY MR. FINNERTY:
5      Q   Are you familiar with whistleblower laws in
6  Florida?
7      A   Yes.
8      Q   Okay.  And is there anyone that you know of
9  that would do a review of a termination request to
10  determine if there could be an issue with potentially
11  violating whistleblower laws?
12         MS. PAGE:  Form.
13         THE WITNESS:  Yeah.  Could you maybe be more
14  specific on -- I didn't understand the question
15  exactly.
16  BY MR. FINNERTY:
17     Q   So as relates to Ms. Harrell, prior to the
18  request to terminate her being approved, do you know
19  whether anyone reviewed the information surrounding Ms.
20  Harrell's termination to determine whether terminating
21  her could potentially violate whistleblower laws?
22         MS. PAGE:  Form.
23         THE WITNESS:  No, I'm not aware.
24  BY MR. FINNERTY:
25     Q   And that's something -- have you ever done

Page 37

1  that as relates to your review of a termination request?
2          MS. PAGE:  Form.
3          THE WITNESS:  Possibly.
4  BY MR. FINNERTY:
5      Q   And do you know whether your legal department
6  reviewed any of the information relating to the
7  termination request with Ms. Harrell prior to the
8  approval of her termination?
9      A   I'm not aware.
10     Q   And do you have -- have you received any
11  training as relates to the policies that are Centurion
12  policies?
13         MS. PAGE:  Form.
14         THE WITNESS:  The Centurion policies?
15  BY MR. FINNERTY:
16     Q   Yes, ma'am.
17     A   Any specific policy you're referencing?
18     Q   No.  I mean, they're -- let me ask it this
19  way, there's -- Centurion has an employee manual, for
20  instance.
21     A   Correct.
22     Q   Okay.  And you're familiar with that, I would
23  assume?
24     A   Correct.
25     Q   And you are familiar with how, you know,

Page 38

1  complaints should be handled and investigated?

2    A   Correct.

3    Q   Okay.  And Ms. Brus, would she also be

4  familiar with, you know, the Centurion policies and how

5  to investigate and handle complaints?

6    A   Yes.

7    Q   So do you know whether anyone had told you

8  that Ms. Harrell had submitted written complaints prior

9  to --

10   A   No.

11   Q   Okay.  Is that something you would expect Ms.

12 Brus to inform you of?

13   A   Yes.

14   Q   And is that something you would expect Ms.

15 Brus to provide in her termination request?

16   A   Depends on the infractions that took place.  I

17 mean, there were supporting documents on the infractions

18 that they listed on her termination.

19   Q   And what supporting documents are you

20 referring to?  The counseling form, is that one?

21     MS. PAGE:  Form.

22     THE WITNESS:  Yes, the counseling documents.

23 BY MR. FINNERTY:

24   Q   But you had no way to know whether what's

25 being alleged in those counseling documents actually

Page 39

1  happened, right?

2      MS. PAGE:  Form.

3      THE WITNESS:  There would have been supporting

4  documentation especially on the time and

5  attendance, and -- I'm sorry.  Again, the form is

6  not pulled up for me, so I don't remember the

7  exacts on it.  So on the narcotic count and

8  everything that would have been provided,

9  supported, from a clinical leadership personnel,

10 and then supported so that it was authorized, you

11 know, through Sarah -- not authorized.  That's not

12 the right word.  They would have verified the

13 infraction and that would have been supported and

14 given to Sarah.

15     MS. PAGE:  Brian, do you mind if we just take

16 a minute and let Lisa pull up the document?

17     MR. FINNERTY:  Sure.  Sure.

18     MS. PAGE:  Lisa, why don't you see if you can

19 find those documents.

20     THE WITNESS:  It's allowing me to have the

21 involuntary termination, but not the actual

22 termination document.  So it may take me just a

23 minute to find that.

24     (Discussion off the record.)

25     THE WITNESS:  Okay.  I have 8 open now.

Page 40

1  BY MR. FINNERTY:

2    Q   So you were talking about documentation to

3  support what was actually alleged in this termination

4  counseling form.  So you would expect that DC4-718E

5  dated 4-14-18, you would have expected that to have been

6  included with the termination approval request?

7    A   Yes, if that is the actual count form.

8    Q   If that's the actual what?  I'm sorry.

9    A   The count form.  I don't know the form just by

10 the label they have on it here.

11   Q   So let me ask you this:  Do you have a way --

12 so if we were -- so like Exhibit 6, that email chain

13 that we were talking about, do you have a way of

14 searching your emails and going back and seeing, you

15 know, what actually would have been sent to you?

16   A   Yes.

17   Q   Can you go back to that date?  Do you mind

18 doing that?  It would be easier than just speculating as

19 to what would have been or what wouldn't have been

20 provided.

21     MS. PAGE:  Brian, I think it was produced to

22 you on the 28th.

23     MR. FINNERTY:  And I think you're right.  I

24 think the best way to know exactly what she was

25 given would be to look at the email.

Page 41

1      THE WITNESS:  Okay.  From 2018, I'll have to

2  archive.  So it could take a bit to do that.  Ms.

3  Page?  Okay.  Everyone is frozen again.

4      (Discussion off the record.)

5  BY MR. FINNERTY:

6    Q   So is there a way that you could search your

7  emails to see exactly what would have been provided to

8  you on April 20th, 2018?

9    A   I can.  Ms. Page, is that something you would

10 have that would be --

11     MS. PAGE:  I have --

12     MR. FINNERTY:  And I'll represent she provided

13 documents that, you know, appear to be what was --

14 what had been provided, but, you know, I just can't

15 tell from the actual email chain we went through

16 what exactly was provided.  And I have no reason to

17 suspect that what Ms. Page sent wasn't exactly what

18 was provided, but, you know, I think just to know

19 for certain -- because you know, it doesn't, like,

20 list the attachment.  So we have no way of

21 verifying it.  And, again, I'm not accusing Ms.

22 Page or her firm of --

23     MS. PAGE:  I'm happy to provide you the

24 document in native form, Brian, if you want that,

25 but I mean -- I think, you know, we've produced the

Page 42

1   attachment. I see what you're saying. It doesn't
2   say attachments. It says subject, but I'm happy to
3   produce that in native, but I don't --
4       MR. FINNERTY: Yeah, if you can do that. It
5   doesn't have to be right now. I'll move on and
6   just, you know, just assume that everything that
7   was provided is what you sent me, which I have no
8   reason to assume otherwise.
9   BY MR. FINNERTY:
10      Q   All right. So, Ms. Lynch, based on the
11  documents that have been provided to us, it appears that
12  the involuntary termination report, the termination
13  counseling form, which is Exhibit 7 and 8 we were just
14  looking at, were provided to you. And then if you could
15  look at Exhibit 9.
16      A   Okay.
17      Q   Okay. So do you recognize Exhibit 9?
18      A   In reviewing the -- for preparation I recall
19  looking at this again. So that would have been part of
20  the attachment, as well, if I recall correctly.
21      Q   I mean, it was your customary practice and
22  procedure in 2018 that, you know, if you're requesting
23  to terminate an employee, that you provide any prior
24  counseling, is that fair enough?
25      A   Yeah.

Page 43

1       Q   So, in this case, they would have sent -- Ms.
2   Brus would have sent you a copy of this final warning
3   for Ms. Harrell dated April 9th, 2018?
4       A   Yes.
5       Q   Okay. And then so this is regarding an
6   alleged violation of Chapter 33-208.002, subparagraph
7   26. Are you familiar with that policy or that rule?
8       A   Yes.
9       Q   Okay. And just for your reference, that is
10  Exhibit 16.
11      A   Yes, I have it.
12      Q   So you just reviewed Exhibit 9. And what's
13  alleged, and I'll represent simply an inmate came into
14  Ms. Harrell's office to empty her trash and she was seen
15  on video -- the inmate was seen on video, but you don't
16  have to take my word for it. I'll let you review that,
17  and then just let me know when you've reviewed the final
18  warning, Exhibit 9.
19      A   Okay. I'm sorry. What is your request,
20  please?
21      Q   I just wanted you to review Exhibit 9, just so
22  I could ask you a question or two about it.
23      A   And I apologize, but again, now when I go back
24  to something that I've opened, it's not letting me open
25  it a second time. Okay. Is this the one that

Page 44

1   references her with an inmate and she's out of view? Is
2   that correct, or can you tell me what --
3       Q   Yeah. I mean, that's part of what's alleged
4   in here. It says that on 3-28-18, review of camera
5   footage indicates an inmate orderly entered Ms.
6   Harrell's office without a security escort, and picked
7   up her trash can. They engaged in a conversation for
8   approximately 30 seconds before he exited the doorway.
9   He came back in a minute later, returned the trash can,
10  and then moved to the right side of the office out of
11  the view of the camera. Ms. Harrell was observed
12  talking to the inmate while looking in his direction. I
13  think the whole incident lasted two to three minutes.
14      So, based on that, and I understand you're not
15  able to pull it back up, but based on what I've told you
16  and based on your prior review of this document, do you
17  see anything that -- is there anything referenced in
18  this final warning --
19      COURT REPORTER: Hold on. She just dropped
20  off again.
21      (Discussion off the record.)
22      THE WITNESS: And I now have the document
23  open, of No. 9. I will have to ask you to repeat
24  the question, though, that we were addressing prior
25  to.

Page 45

1       MR. FINNERTY: Sure. All right. And I'm also
2   having trouble trying to get those documents on my
3   laptop.
4   BY MR. FINNERTY:
5       Q   So while you have that document up, just take
6   a look at it, Exhibit 9, and then -- and the question's
7   going to be, do you see anything -- and we're back on
8   the record, right? So the question is, do you see
9   anything in Exhibit 9 that would constitute a violation
10  of Paragraph 26 of Rule 33-208.002, subparagraph 26,
11  which is Exhibit 16?
12      MS. PAGE: I'm going to object. Calls for
13  speculation.
14      THE WITNESS: I will now have to see if it
15  lets me switch over to the other document to -- at
16  the 26 -- line 26 of the code.
17  BY MR. FINNERTY:
18      Q   So the easiest thing -- line 26 is a lot
19  easier. Paragraph 26 is a lot easier to read to you
20  than the final warning. So stay on the final warning,
21  Exhibit 9, and I'll read Paragraph 26 of Exhibit 16,
22  Rule 33-208.002 states that employee shall maintain a
23  professional relationship with all persons in the
24  custody or under supervision of the Department, their
25  immediate family or visitors. No personal or business

Page 46

1  relationships are permitted.  Marriage between employees
2  and inmates is not permitted.  So based on what's
3  described in Exhibit 9, did Ms. Harrell violate
4  Paragraph 26 of Rule 33-208.002?
5      MS. PAGE:  Form; calls for speculation.
6      THE WITNESS:  Yes.  I don't know -- I wouldn't
7  be able to answer why that was referenced on there.
8  BY MR. FINNERTY:
9      Q   Okay.  I mean, Ms. Harrell wasn't accused of
10  having an unprofessional relationship with an inmate,
11  was she?
12      MS. PAGE:  Form; calls for speculation.
13      THE WITNESS:  Yeah, I don't have the answer to
14  that.
15  BY MR. FINNERTY:
16      Q   All right.  So now we'll look at exhibit --
17  no, let's stay on Exhibit 9.  So Exhibit 9, again, it
18  says that it was -- this final warning was presented to
19  Ms. Harrell by her supervisor, Lori Cook and her
20  manager, Tara Johnson, HSA.  Is that your -- do you have
21  any reason to dispute that that's who would have
22  presented this final warning to Ms. Harrell?
23      A   No.
24      Q   And this Exhibit 9, it only deals with the
25  Chapter 33-208.002 issue, correct?  There's no reference

Page 47

1  to late arrivals or public records violations; do you
2  agree with that?
3      A   Yes, based on how it's written.
4      Q   Right.  And so the very bottom of page one of
5  Exhibit 9, it does say dates of previous counseling and
6  it references a verbal counseling on 12-13-17 for time
7  and attendance.
8      A   Okay.
9      Q   But there's no specific counseling in this
10  final warning related to time and attendance or public
11  records; fair?
12      MS. PAGE:  Form.
13  BY MR. FINNERTY:
14      Q   And you've already answered that.  We can move
15  on.  So Exhibit 10, if you'd take a look at that.
16      A   Okay.
17      Q   So do you recognize this document?
18      A   Just from my review, yes.
19      Q   Okay.  And, again, this would have been, you
20  know, when a request to approve the termination of an
21  employee is sent up to you by Ms. Brus, she typically
22  would include prior counseling, correct?
23      A   Yes.
24      Q   And that would include verbal counseling?
25      A   Yes.

Page 48

1      Q   And so this particular document, it's the date
2  of counseling is 12-13-2017 and it references three
3  dates that Ms. Harrell was late to her 8:00 a.m. shift.
4  Have you ever seen a verbal counseling where the
5  employee is receiving a verbal counseling form for only
6  being late to work three days?
7      A   Probably.
8      Q   Is that unusual for an employee to be --
9      A   No.
10      Q   Not unusual?
11      A   Uh-uh.
12      Q   And have you ever approved the termination of
13  an employee solely because of tardiness issues?
14      A   Yes.
15      Q   You have?  Do you know how many times that
16  particular employee would have been tardy to work?
17      MS. PAGE:  Form; calls for speculation.
18      THE WITNESS:  No.
19  BY MR. FINNERTY:
20      Q   Would it have been a lot or a hundred times or
21  more?
22      MS. PAGE:  Form.
23      THE WITNESS:  I wouldn't be able to answer
24  that question.
25  BY MR. FINNERTY:

Page 49

1      Q   At what point does tardiness become such an
2  issue that it warrants termination?
3      A   That would be based on the -- it could be
4  site-specific due to the business needs.  So there may
5  be some, you know, something specific at each facility
6  based on their mission on how they measure that.
7      Q   So are different sites given leeway in how
8  they enforce the time and attendance policy?
9      A   Yes.
10      Q   And is there a policy that would require that
11  time and attendance policies be applied equally to
12  everyone?  In other words, you not give special
13  treatment to one employee over another?  I mean, policy
14  should be applied to everyone equally; would you agree?
15      MS. PAGE:  Form.
16      THE WITNESS:  At each location, yes.
17  BY MR. FINNERTY:
18      Q   But there may be variations between different
19  locations?
20      A   Yes.
21      Q   And so this verbal counseling form on the
22  second page, it lists two follow-up dates of
23  December 27th, 2017 and January 10, 2018.  Do you know
24  whether follow-ups occurred on those dates?
25      A   I do not.

Page 50

1   Q   And do you know whether Ms. Harrell ever had a
2   start time other than 8:00 a.m.?
3      MS. PAGE:  Form.
4      THE WITNESS:  I'm not familiar with her
5   specific schedule.
6   BY MR. FINNERTY:
7   Q   So now let's look at Exhibit 11.  Do you have
8   that, Ms. Lynch?
9   A   Oh, yes.
10  Q   Have you seen this document before?
11  A   Yes.
12  Q   And is this something that would have been
13  provided along with the other information, the other
14  documentation that was sent to you seeking approval to
15  terminate Ms. Harrell?
16  A   Possibly.
17  Q   Is it against Centurion policy for an employee
18  to send an email from their Centurion email account to
19  their personal account?  Is that a policy violation?
20  A   Yes.
21  Q   And is that -- why is that against policy?
22  A   Because of the confidential information,
23  private health information and HIPAA regarding our
24  patients, going outside the server of Centurion.
25  Q   And I understand that there may be certain

Page 51

1   information that could be included in the email that
2   would constitute a policy violation, but, I mean, for
3   instance, if Ms. Harrell sent an email from her work
4   account to her personal account saying, reminder, I work
5   tomorrow at 10:00 a.m.  I mean, would that be a policy
6   violation?
7   A   It would not be considered as serious of an
8   infraction, depending on the nature and content of the
9   email.
10  Q   So is there -- are you aware of a specific
11  policy that would say that it's prohibited for an
12  employee to send an email from their work account to
13  their personal account?
14  A   I'm not aware of the exact verbiage of the
15  policy.  I would have to reference that.
16  Q   But you can confirm that there was a policy in
17  2018 that prohibited, no matter what the email said,
18  prohibited an email from being sent from a work account
19  to a personal account?
20  A   It would have been more of a compliance issue
21  with HIPAA and protected health information going
22  outside of the company.
23  Q   But if there was no health information in the
24  email, you know -- because I understand what you're
25  saying.  You know, there's certain information that

Page 52

1   shouldn't be sent outside of the Centurion network, but
2   what -- you know, like, my example, if it was simply an
3   email saying, you know, reminder to self, I'll work
4   tomorrow at 10:00.  I mean, to your knowledge, would
5   that be a violation of any Centurion policy as of early
6   2018?
7   A   Again, that would be -- it would depend on the
8   nature -- I mean, the content of the email.  That would
9   have probably been -- I'm sorry.
10  Q   Just using my example of, you know, reminder
11  to self, I'm working tomorrow at 10:00, would that be a
12  violation of policy?
13  A   I wouldn't be able to answer that question.
14  Q   Okay.  And if it is, it's not a policy you
15  could quote to me or tell me as you sit here today?
16  A   I would have to reference the policy, yes.
17  Q   Okay.  So is it fair to say that there may or
18  may not have been a policy violation as of December --
19  or early 2018?
20     MS. PAGE:  Form.
21     THE WITNESS:  Well the -- you're referencing
22  what you stated, the content of the email would be?
23  Is that what you're asking?
24  BY MR. FINNERTY:
25  Q   Yes, ma'am.

Page 53

1   A   Would that be the violation?
2   Q   Would it be a violation to say, reminder to
3   self, I'm working at 10:00?
4   A   Again, that would not be something I could
5   answer right now.  That's speculating.  I would have to
6   look at the policy.
7   Q   And all I'm trying to get to is, I understand
8   there's certain things that, you know, shouldn't be sent
9   outside of work, and I understand where, you know -- how
10  you're answering that question, but, you know, I'm just
11  trying to ask, you know, is it absolutely prohibited to
12  send an email to yourself, irrespective of what may be
13  in the email?  And if you need to look at a policy, or
14  if you can't answer that, that's all we can ask, that's
15  fair enough.
16  A   Okay.
17  Q   And I accept that.  Not a problem.  So you
18  were provided with this list of 19 emails that Ms.
19  Harrell apparently -- or allegedly sent to herself.
20  Were you provided copies of any of these 19 emails
21  referenced in this?
22  A   I don't recall.
23  Q   Okay.  Would you expect for that to be -- if,
24  you know, if there -- if sending these emails was one of
25  the reasons that Ms. Harrell's supervisors wanted her

Page 54

1  terminated, would you expect for those actual emails to
2  be sent to you?
3      A    They -- or at least available.  I would rely
4  on -- if they said they had 19 emails, I would rely on
5  that.
6      Q    And if you got that, you know, receipt, this
7  list of 19 emails, would you have said, well, Ms. Brus,
8  can you -- do you have them?  Can I see them?  Is that
9  something you would have done?
10     MS. PAGE:  Form.
11     THE WITNESS:  That would have confirmed that
12     they had -- that she did have them.
13 BY MR. FINNERTY:
14     Q    Okay.
15     A    I may not go through all of them, but, you
16 know, it's her charge to do that.
17     Q    Fair enough.  I mean, would you agree that you
18 relied on Ms. Brus to provide you with accurate
19 information and to do her preliminary investigation
20 before she sent a termination request up the chain to
21 you?
22     A    Yes.
23     Q    And you had no reason to dispute that Ms. Brus
24 did her job, correct?
25     A    Correct.

Page 56

1  complaints regarding Tara Johnson?
2      A    Okay.  I do not recall.
3      Q    Okay.  And if Ms. Harrell had recently
4  submitted complaints against the two people that issued
5  the final warning and issued the termination, was that
6  something you would want to know about?
7      MS. PAGE:  Form.
8      THE WITNESS:  When it comes to the
9      termination, the termination would have been
10     reviewed based on the infractions of the situations
11     that were presented.  So that's what I would be
12     looking as the review of the termination to
13     determine if we should move forward with that.
14 BY MR. FINNERTY:
15     Q    Would you agree that it -- that determining
16 whether the supervisors that are writing up these
17 allegations in the termination document and the final
18 warning document, wouldn't it be good to know whether
19 those supervisors had motive to retaliate?
20     MS. PAGE:  Form.
21     THE WITNESS:  I wouldn't have any reason to
22     believe that they would be retaliating, unless it
23     had been brought to my attention.
24 BY MR. FINNERTY:
25     Q    If it had been brought to your attention, is

Page 55

1      MS. PAGE:  Form.
2  BY MR. FINNERTY:
3      Q    Have you ever had any issues with Ms. Brus or
4  her work performance?
5      THE WITNESS:  No.
6      MS. PAGE:  Form.
7  BY MR. FINNERTY:
8      Q    And, Ms. Brus, you know, in addition to being
9  involved in sending you this request to terminate Ms.
10 Harrell, do you know whether she was involved in
11 investigating any complaints that Ms. Harrell herself
12 may have made prior to Ms. Harrell's termination?
13     A    I don't know what she was involved in, but if
14 there was an investigation regarding those complaints,
15 she would have been involved.
16     Q    And would you have expected Ms. Harrell to
17 inform you of complaints submitted by Ms. Harrell prior
18 to her termination?
19     A    Not necessarily.
20     Q    Okay.  And do you know whether, prior to her
21 termination, do you know whether Ms. Harrell had
22 submitted complaints against Lori Cook?  Do you have any
23 way of knowing that?
24     A    I do not.  I don't recall.
25     Q    And do you know whether she submitted any

Page 57

1  that something you would have looked into?
2      A    Yes.
3      Q    And so -- well, strike that.
4      So just looking at number one on this list of
5  emails, it says that Ms. Harrell allegedly sent her
6  resume to her personal email account.  I mean, sending a
7  resume to yourself, is that a violation of policy that
8  you know of?
9      A    Again, I would not be able to confirm that
10 without looking at the policy.
11     Q    Okay.  And is it fair to assume that you
12 just -- that you took Ms. Brus for her word when she,
13 you know, sent this up to you, that she had done that
14 investigation?
15     A    Yes, but I'd be looking at the whole picture.
16 I want to add that, too, because look at number two.
17     Q    Right.  But have you ever seen that West Cook
18 narc key incident complaint that's referenced there?
19     A    I don't recall if I saw that at that time or
20 not.
21     Q    Well, so based on this, you can assume that
22 Ms. Harrell had complained about Ms. Cook relative to
23 the narc key incident, correct?  That's something --
24 that's information that would have been available to
25 you?

Page 58

1    MS. PAGE:  Form; calls for speculation.
2    THE WITNESS:  Because there's not enough
3  identified on there to tell me whether there was
4  issues with the actual supervisors.
5  BY MR. FINNERTY:
6    Q   And I agree, which is why, you know -- and I
7  think you've answered it, that you would expect that
8  that information be provided to you, correct?  You know,
9  if these supervisors are wanting to terminate an
10  employee, it would be good to know whether the employee
11  they're trying to terminate had recently complained
12  about them, correct?
13    MS. PAGE:  Form.
14    THE WITNESS:  I'm going to rely on the HR
15  business partners to provide me that information.
16  BY MR. FINNERTY:
17    Q   Okay.  Fair enough.  Do you know whether there
18  was a specific policy in place in 2018 that would have
19  prohibited an inmate orderly from emptying the trash can
20  in Ms. Harrell's office?
21    A   That would be a DOC policy.
22    Q   Okay.
23    A   So I would not -- you know, I would not know
24  that off the top of my head.
25    Q   And are you familiar with the requirements

Page 59

1  that inmates have to meet in order to be allowed to be
2  an orderly?
3    A   No.
4    Q   So we established that the initial email from
5  Ms. Brus was sent to you on April 20th.  Do you know
6  whether Ms. Harrell continued to work between April 20th
7  when that termination request was initially sent to you,
8  up though April 26th when it was eventually approved by
9  Ms. Love?  Do you know whether Ms. Harrell continued
10  working?
11    A   I don't know.
12    Q   Would it be surprising to you if she was
13  allowed to continue to work, even after her supervisors
14  wanted her terminated?
15    MS. PAGE:  Form.
16    THE WITNESS:  It wouldn't be surprising if
17  someone continued to work while they were
18  finalizing an investigation or waiting for a
19  request for a termination to be approved.
20  BY MR. FINNERTY:
21    Q   Would there have been a way for -- during that
22  period of time when they were waiting on the final
23  approval to come down from Ms. Love, could Ms. Harrell's
24  supervisors have suspended Ms. Harrell, for instance, or
25  putting -- put her on administrative leave or something?

Page 60

1    A   It is part of the disciplinary process if they
2  wanted to do that, but, I don't know -- again, I don't
3  know the specifics of why she continued to work, if she
4  did or if she was suspended.  I don't recall that
5  information.  I'd have to look at it.
6    Q   Sure, but there was procedures in place at
7  that time where, you know, if there was a serious issue,
8  they didn't want Ms. Harrell back, they could have had
9  her suspended or put on leave and not allowed to come
10  back to work until the approval had come back --
11    A   There is a suspension process, yes.
12    Q   And they could have done that?
13    A   Again, I don't know all the details around
14  that, on why they would have, you know, kept her
15  working.
16    Q   Okay.  And do you know whether any time prior
17  to Ms. Harrell's termination on April 26th, do you know
18  whether she had ever been demoted for alleged policy
19  violations?
20    A   And what do you -- demoted?  Is that the word
21  you used?
22    Q   Yes, ma'am.
23    A   Okay.  To my knowledge, she was an LPN and
24  there was no demotion, that I recall.
25    Q   Do you know whether she had ever been

Page 61

1  suspended for a policy violation?
2    A   I don't recall.
3    Q   So, based on the information you've been
4  provided, as relates to the alleged late arrival issue
5  that Ms. Harrell had, would she have been -- you know,
6  assuming that the other issues weren't a problem, you
7  know, the public records issue and the narcotic
8  accounting log issue or the, you know, issue with the
9  inmate emptying her trash, you know, ignore all those
10  for just for the sake of this question, would Ms.
11  Harrell have been -- would you have approved the
12  termination of Ms. Harrell just for her late arrival
13  issues as documented in the forms that were provided to
14  you?
15    MS. PAGE:  Form.
16    THE WITNESS:  I would have to go back and look
17  at the occurrences again to see exactly what the
18  details were on that.
19  BY MR. FINNERTY:
20    Q   Is there any, like, cut-off, just in your
21  mind, that, you know, as to the number of late arrival
22  that would, in your mind, constitute or warrant
23  termination?  And I know you've already said that it's,
24  you know, site specific and --
25    A   Right.

8/11/2020   Case 4:20-cv-00030-AW-MJF  Lisa E. Davis v. Centurion of Florida, Inc., et al.  Document 37-7  Filed 10/14/20  Page 17 of 30

Deposition of Lisa Lynch    18-CA-77    17 (62 - 65)

Page 62

1  Q  So and you would just rely on what that site
2  had done -- you would rely on her supervisors to make
3  that determination, is that accurate?
4    A  Correct.
5    Q  Okay.  And you wouldn't -- if it was
6  documented and you were satisfied with the
7  documentation, you wouldn't refuse to approve a
8  termination request for simply late arrivals if that's
9  what the site wanted, or if that's what the supervisors
10  wanted, is that fair?
11    A  If it was excessive nature, yes.
12    Q  But, you know, excessive, you can't really put
13  a number on what would be excessive, can you?
14    A  I would have to look at the site specific,
15  what they do there at that site to determine.
16    Q  So would you agree that if other employees had
17  50 late arrivals and they still weren't terminated, that
18  Ms. Harrell shouldn't be terminated if she only had 40,
19  is that fair?
20    MS. PAGE:  Form.
21    THE WITNESS:  I wouldn't want to answer that
22  question.  That would, you know, be speculating.
23  That's -- you know.
24  BY MR. FINNERTY:
25    Q  Yeah, but I think it just goes back to my

Page 63

1  prior question about the rules -- at each site, the
2  rules should be applied equally to everyone.  We can
3  agree on that, right?
4    A  Again, it depends on the nature of the mission
5  at that site.  It could be different.
6    Q  Sure, but then everybody should be treated the
7  same is all I'm trying to get to.
8    MS. PAGE:  Form; asked and answered.
9  BY MR. FINNERTY:
10    Q  Do you know whether Ms. Brus ever went out to
11  the Northwest Florida Reception Center to investigate
12  the allegations included in the request to terminate Ms.
13  Harrell?
14    A  I don't recall if she went out for that one or
15  not.
16    Q  Okay.  And as it relates to final warning
17  counseling, does that counseling have to be approved by
18  anyone prior to it being presented to an employee?
19    A  It would be approved by the HR business
20  partner and the regional director for that area.
21    Q  And that's always been the policy at
22  Centurion?
23    A  Yes.
24    Q  Do you know who those individuals would have
25  been in 2018?

Page 64

1    A  Well, Sarah Brus is the HR business partner.
2    Q  Okay.
3    A  I know we've had some changes since 2018, but
4  I'm thinking it was Kathy Douin, but I would have to
5  confirm that.
6    Q  Well, Ms. Love gave those same two names so I
7  think you're right.  Do you know who was hired to
8  replace Ms. Harrell after she was terminated?
9    A  No, I don't.
10    Q  Have you ever been provided with copies of
11  video footage to support allegations in a termination
12  request?
13    MS. PAGE:  Form.
14    THE WITNESS:  In this termination request?
15  BY MR. FINNERTY:
16    Q  I don't believe you were provided any video
17  footage in this instance, but have you ever been for
18  a --
19    A  No.
20    Q  Never?  If there were video footage that would
21  substantiate or refute allegations in a request to
22  terminate, is that something you want to see?
23    MS. PAGE:  Form.
24    THE WITNESS:  That is something that may not
25  be available to us, so.

Page 65

1  BY MR. FINNERTY:
2    Q  Well, but assuming that there was video
3  footage available, would you want to see it?
4    MS. PAGE:  Form.
5    THE WITNESS:  Not in every case, no.  Not for
6  me to see.
7  BY MR. FINNERTY:
8    Q  Okay.  How about -- would you expect Ms. Brus
9  to review all evidence that would either substantiate or
10  refute an allegation and a termination request?
11    A  Not in all cases.
12    Q  Okay.  And would it be fair to say that both
13  you and Ms. Brus rely on the accuracy and the veracity
14  of the allegations made against employees by their
15  supervisors?
16    A  Are we still talking about reviewing video or
17  just --
18    Q  No.  No, we're not.
19    A  Okay.
20    Q  Just as relates to the, you know, the verbal
21  counseling and the final warning that were issued to Ms.
22  Harrell by Lori Cook and Tara Johnson, I mean, would it
23  be fair to say that you and Ms. Brus relied on what was
24  represented in those counseling forms by Ms. Johnson and
25  Ms. Cook?

---

Page 66

A    That and the confirmation or it be validated by the regional director.

Q    Which would have been --

A    When we get to that level of a final warning or termination, the regional director would be involved in that.

Q    That was Ms. Douin?

A    Correct.

Q    Okay.  So do you know whether Ms. Douin, in fact, approved the final warning that was issued to Ms. Harrell?

A    I do not.

Q    And so for a verbal or written warning, is there any -- does anyone have to approve those other than just supervisors issuing that counseling?

A    In a verbal counseling, not necessarily.  When it gets to the level of written, then the HR business partner is involved and would also have the regional director involved in that, as well.

Q    And as relates to late arrivals, is it a policy that you first start with a written -- or a verbal counseling and then go to written and then go to final, and then, if necessary, go to termination?  Do you usually follow those steps?

A    For attendance, typically, yes.  Would we

---

Page 67

deviate from that depending on, you know, the severity of it?  Yes.  As with any counseling.

Q    If there's a particular issue that a supervisor feels that an employee is having, do you expect the supervisor to take every opportunity to try to address that issue, to try to correct that issue?

A    Yes.

Q    So as relates to the final warning counseling, that only references the issue with the inmate coming in and emptying Ms. Harrell's trash, do you know why there was no reference in that final warning to Ms. Harrell's alleged issues with late arrivals?  Do you know why that wouldn't have been included in that counseling form?

A    No, I don't.

MS. PAGE:  Form.

BY MR. FINNERTY:

Q    And if there was an issue with late arrivals at that time, would you expect that to be at least referenced or mentioned in the final warning?

MS. PAGE:  Form.

THE WITNESS:  No.

BY MR. FINNERTY:

Q    You wouldn't?  Why wouldn't you expect that to be -- a late arrival issue to be referenced in a final warning?  Why wouldn't that need to be in there?

---

Page 68

A    From what I can see, they're addressing the one issue about the safety issue of that employee.

Q    Sure, but then when you look at the termination form, it references dates when Ms. Harrell was allegedly late to work that well precedes -- go way back before the date of the final warning issued on April 9th.  So why wouldn't those have been mentioned in the final warning?

A    I wouldn't be able to answer why they didn't do that.

Q    Do you feel that that should have been addressed?

MS. PAGE:  Form.

THE WITNESS:  In that particular document, not necessarily.

BY MR. FINNERTY:

Q    And how about the allegation about Ms. Harrell sending emails to herself?  Do you know why that wasn't addressed in the final warning?

A    I don't -- I wouldn't know.

Q    Would you expect that to be addressed in the final warning?

A    You're -- you know, again, that's something that I wouldn't be able to answer as far as what was being addressed in one warning.

---

Page 69

Q    Do you think that Ms. Cook and Ms. Johnson may have been holding onto the issue about the late arrivals and the emails to include it in the termination to try to beef it up, to try to help their chances of getting Ms. Harrell fired?

A    I wouldn't be able to answer that question.

MS. PAGE:  Calls for speculation.

BY MR. FINNERTY:

Q    Would you agree that if there's an issue with an employee that it should be addressed as often as possible?

MS. PAGE:  Form; calls for speculation.

THE WITNESS:  Yes, but, you know, as far as -- I think that it is speculation because I can't answer for why they did not address that.

BY MR. FINNERTY:

Q    All right.  So let's take a look at -- and I know I've probably asked this already, but just to be clear, you're not familiar with the narcotic accounting logs?

A    I'm familiar with them.

Q    Have you ever seen one?

A    Yes.

Q    Okay.  And -- but that wasn't provided to you in the information that was sent relative to Ms. Harrell

---

Page 70

1 and the request to have her terminated?

2    A  I would have to look at the original -- you

3 know, the documentation that was sent.  I couldn't tell

4 you right now if it was actually part of it or not.

5    Q  Okay.  So you take a look at Exhibit 13.

6    A  Got it.

7    Q  So just by looking at that, is that something

8 that you recall being sent to you?

9    A  It could have been.  I don't -- again, I don't

10 recall all of the attachments.

11    Q  Okay.  And would you expect that if the

12 ultimate reason for wanting Ms. Harrell terminated was

13 relating to her alleged failure to fill out this form,

14 you would expect that to be provided to you when the

15 request to approve the termination of Ms. Harrell was

16 sent?

17    A  Or at least available if we needed to review.

18    Q  And you don't -- you can't recall if that was

19 actually sent to you, though?

20    A  I don't.

21    Q  Fair enough.  And I understand it was a while

22 back.  So take a look at Exhibit 17.

23    A  Seventeen?

24    Q  Yes, ma'am.

25    A  Okay.

Page 71

1    Q  So this is an email sent by Tara Johnson on

2 April 3rd, 2018 to -- I'll represent to you -- I think

3 it was basically all staff.

4    A  Okay.

5    Q  All security staff at the Northwest Florida

6 Reception Center.  I could be wrong, but Ms. Harrell is

7 one of the people that received this email.

8    A  Okay.

9    Q  And if you look on the first page up under

10 good afternoon, it says there are a few items that will

11 be discussed at the next staff meeting, but I would like

12 to bring some things to everyone's attention

13 immediately.  Going forward, be advised of the

14 following.  And then under number five it says, if your

15 trash needs taken out, set your trash can in the

16 hallway.  Orderlies are not permitted to enter any

17 office at any time to pick up a trash can unless

18 accompanied by a security staff member.

19         Now, would you agree that if this was a policy

20 that going forward was not initiated until April 3rd,

21 2018, that Ms. Harrell should not rightfully have been

22 written up and issued a final warning for something that

23 allegedly happened on March 28th?  Can you agree with

24 that?

25         MS. PAGE:  Form; calls for speculation.

Page 72

1         THE WITNESS:  Yeah, what I don't know is what

2    had been communicated with them prior to this.  So

3    I wouldn't be able to answer that.

4 BY MR. FINNERTY:

5    Q  Well how else can you read the, going forward

6 be advised of the following?  How else can you interpret

7 that?

8         MS. PAGE:  Form; calls for speculation.

9         THE WITNESS:  Yes, because this doesn't tell

10    me if this hasn't been addressed before or not.

11 BY MR. FINNERTY:

12    Q  But you can --

13    A  The reiterating of previous directive.

14    Q  But you can assume, based on the going forward

15 language, that this is something that is going -- is a

16 policy going forward?

17    A  That doesn't confirm -- doesn't confirm that

18 to me.

19    Q  Can we just --

20    A  There are times we say things just over and

21 over again, you know, so.

22    Q  Yeah.  Sure.  Sure.  Well, would you agree

23 that if that was not a policy as of 3-28, when the

24 alleged incident happened, that Ms. Harrell, you know,

25 shouldn't have been written up and counseled for a

Page 73

1 policy that didn't exist -- for violating a policy that

2 didn't exist?  I mean, we can agree on that, right?

3         MS. PAGE:  Form.

4         THE WITNESS:  I wouldn't be able to answer

5    that based on -- just on that information.

6 BY MR. FINNERTY:

7    Q  You can't answer a question as to whether

8 somebody should be written up for a policy that doesn't

9 exist, for violating a --

10    A  But I don't know that it didn't exist.  So

11 you're asking --

12    Q  I'm just -- hypothetical.  I mean, employees

13 shouldn't be counseled for violating policies that don't

14 exist?  I mean, can we agree on that?

15    A  No, I would agree with that.  Okay.

16    Q  That's all I --

17    A  Okay.  Because we don't know that -- I mean,

18 you know, being alone in an office with an orderly would

19 be a violation.  So they -- that's something they're

20 already familiar with.

21    Q  And what are you basing that statement on?  It

22 would be a violation of what?

23    A  Of the policies that we have for their safety.

24    Q  Can you reference a specific policy?

25    A  I couldn't tell you the number.  It's a DOC

Page 74

1  policy.
2      Q   If there were a policy, do you know why it
3  would not have been referenced in the final warning?
4  Why not reference that particular policy?
5      A   I wouldn't be able to answer that question why
6  they didn't -- you know, because it could have been part
7  of that. I'd have to look at it.
8      Q   Could have been part of the 33 --
9      A   Yeah, I'd have to look at that.
10     Q   Okay. Well --
11     A   But we were talking about a trash can. So I
12 can't answer -- I don't have specifics about how to put
13 a trash can in a hallway.
14     Q   So when counseling forms are written up and
15 presented to employees, does it require that the
16 particular policy that the employee is being alleged of
17 violating, are you supposed to reference that policy in
18 the counseling form?
19     A   You know, there's always other things that
20 could have been addressed in a counseling that, you
21 know, maybe was not picked up on that. So, yes, it
22 would be nice to have that.
23     Q   But it's not required?
24     A   No.
25     Q   Do you know whether Ms. Harrell had ever been

Page 75

1  provided with copies of the various policies she was
2  alleged to have violated?
3      A   I would not know. There were trainings,
4  however, that would have -- giving her some of that, the
5  directives regarding those issues.
6      Q   All right. So let's take a look at Exhibit
7  20. You got it?
8      A   I do.
9      Q   Okay. So this is an email from Tara Johnson
10 to Virginia Harrell, cc'ing Lori Cook, and the date of
11 this email is April 17th, 2018. And it says, good
12 morning, I spoke to Ms. Douin about your request for
13 overtime. You've being approved for a maximum of eight
14 hours of overtime.
15     So would you expect that if Ms. Harrell was
16 alleged -- you know, the final straw, if you will, that
17 led to her termination was the alleged incident relating
18 to her failure to count narcotics and fill out the
19 narcotic form when she worked on 4-14, do you know why
20 three days later if she had already committed a
21 terminable offense, why Tara Johnson is approving extra
22 overtime hours, which had already been approved by Ms.
23 Douin, do you know why that would happen?
24     A   I would not know.
25         MS. PAGE:  Form.

Page 76

1  BY MR. FINNERTY:
2      Q   Would you expect an employee to be given
3  approval to work overtime if they had just committed a
4  terminable offense three days prior?
5      A   I wouldn't be able to answer that question.
6      Q   Does it appear a little odd to you?
7          MS. PAGE:  Form.
8          THE WITNESS:  You're asking for an opinion.
9  BY MR. FINNERTY:
10     Q   Let's take a look at Exhibit 21. Do you know
11 whether there's a policy that would prohibit a Centurion
12 employee, like Ms. Harrell, from viewing video footage
13 if it pertained to a complaint that was either made
14 against them or a complaint they were lodging against
15 someone else? Do you know whether they're allowed to
16 request and view video footage?
17     A   Typically that decision is made at the site
18 level with the client.
19     Q   Sure. Fair enough. Okay. So let's take a
20 look at the bottom -- Exhibit 21, bottom of page five.
21 There's an email from Sarah Brus to Tara Johnson
22 Kathleen Douin and Lisa Barton. It says, with all of
23 these issues Ms. Harrell is suddenly bringing up, is
24 anyone else thinking she's on a manhunt.
25     What do you think about Ms. Brus accusing Ms.

Page 77

1  Harrell of being on a manhunt because she's submitting
2  complaints about, for instance, employees having sex
3  with inmates?
4          MS. PAGE:  Form.
5  BY MR. FINNERTY:
6      Q   I mean, do you think that's appropriate for
7  Ms. Brus to be accusing Ms. Harrell of being on a
8  manhunt for complaining that --
9      A   I don't know that she's accusing her of being
10 on a manhunt. Do I think this was appropriate to put in
11 writing? No.
12     Q   Okay. Well, she may not be accusing, she's
13 thinking. Is anyone thinking she's on a manhunt. So it
14 sounds like Ms. Brus -- it sounds like she isn't really
15 in Ms. Harrell's corner.
16         MS. PAGE:  Form.
17         THE WITNESS:  This is the first I've seen of
18     this, so I would not be able to, you know, comment
19     any further without speaking to Ms. Brus about it.
20 BY MR. FINNERTY:
21     Q   Does it make you doubt whether Ms. Brus
22 properly investigated Ms. Harrell's complaints?
23     A   No, I don't think this one email would be
24 something that would negate an entire investigation.
25     Q   So are there particular procedures that are in

Page 78

1  place, or that were in place back in 2017 and 2018, that
2  dealt with how a complaint by an employee should be
3  handled?  Are there particular policies relating to
4  that?
5      A   Yes, we do have processes that we go through
6  to an extent.
7      Q   So, for instance, if, you know, one of the
8  allegations in this case is that Ms. Harrell complained
9  of sexual harassment, is there a policy that, you know,
10 if you complained sexual harassment, that complaint
11 should be investigated?
12     A   Yes, we do have those processes for
13 investigations.
14     Q   And should -- is there a process in place for
15 protecting, you know, Ms. Harrell's confidentiality as
16 it relates to being a complainant against a supervisor?
17     A   Yes.
18     Q   Are there -- okay.  So would that policy, you
19 know, basically say that whatever measures possible
20 should be taken to try to protect the confidentiality of
21 a complainant?
22         MS. PAGE:  Form.
23         THE WITNESS:  Are you referencing some of this
24     may be have been -- the confidentiality may not
25     have been made?

Page 79

1  BY MR. FINNERTY:
2      Q   Absolutely.  I could tell you absolutely,
3  without a doubt.  I mean, I can show you documents where
4  Ms. Harrell complained about Lori Cook and the first
5  thing that happened was Lori Cook was provided a copy of
6  the actual complaint.  I mean, like, that day.
7      A   Okay.
8      Q   So, absolutely.
9      A   I'm not familiar with that.  That's the reason
10 I was asking the question.
11     Q   No.  That doesn't surprise me that that wasn't
12 provided to you.  So there is procedures that should
13 protect confidentiality of complainants?
14     A   Correct.
15     Q   And then, you know, assuming that the
16 complaint is, you know, credible, it should be
17 investigated, correct?
18     A   Correct.
19     Q   And should the employee also be, you know,
20 told, like, the status of any investigation?  Like, hey,
21 we're looking into it, we'll get back to you, we'll let
22 you know if we need additional information?
23         MS. PAGE:  Form.
24         THE WITNESS:  Yes.
25 BY MR. FINNERTY:

Page 80

1      Q   Keep them up to date on -- so they're not
2  just, you know, sitting there wondering, you know, is
3  anybody looking into it?
4      A   Right.
5      Q   Okay.  Do you know whether that happened with
6  any of Ms. Harrell's complaints?
7      A   I don't.
8      Q   And you would expect that that would happen,
9  correct?
10     A   Correct.
11     Q   And if there were -- the investigation
12 substantiated Ms. Harrell's complaint, you would expect
13 that there would be something done to try to correct
14 what she had complained of?
15         MS. PAGE:  Form.
16         THE WITNESS:  Correct.
17 BY MR. FINNERTY:
18     Q   And, again, do you know whether that ever
19 happened in this case?
20     A   I don't know, because I don't have that
21 information.
22     Q   So looking at -- staying on Exhibit 21, if you
23 scroll up to the middle of page four of this document,
24 it's an email from Tara Johnson where she's responding
25 to Ms. Brus' email, you know, basically asking is

Page 81

1  anybody else thinking Ms. Harrell's on a manhunt.  It
2  says, you know, Ms. Johnson says, definitely thinking
3  she's on a manhunt.  Again, I'm assuming that if it was
4  improper for Ms. Brus to say that, Ms. Johnson probably
5  shouldn't have been putting that in writing either?  Can
6  we agree with that?
7          MS. PAGE:  Form.
8  BY MR. FINNERTY:
9      Q   Fair enough, Ms. Lynch?
10     A   I agree it's not appropriate.
11     Q   Okay.  So then if we go down to the second
12 paragraph of Ms. Harrell's -- or Ms. Johnson's email of
13 April 2nd, it says, second paragraph, second sentence.
14 We looked at all of the dates, times of the incident
15 reports sent by Ms. Harrell on Friday, as well as the
16 corrected version sent this morning, this is what we
17 found, didn't find.
18         Would you agree that Ms. Harrell complains
19 about, you know, other employees having sex with
20 inmates, that her supervisor shouldn't use that as an
21 opportunity to go and look at camera footage to try and
22 see if she can find something against Harrell?  I mean,
23 that shouldn't work that way, should it?  Can you agree
24 with that?
25         MS. PAGE:  Form.

**Page 82**

1   THE WITNESS: Well, what this doesn't tell me

2 is what they were looking for, you know, if they

3 found something else during the review of the

4 videos, that wouldn't be something that we would be

5 able to change.

6 BY MR. FINNERTY:

7   Q   Well, sure, but you can assume Ms. Harrell

8 wasn't saying, hey, look at the camera that shows me

9 with an inmate emptying my trash. I mean, you can

10 assume she didn't say that.

11   MS. PAGE: Form.

12 BY MR. FINNERTY:

13   Q   I mean, it wouldn't be proper, would you

14 agree, for a supervisor to use one employee's complaint

15 as a basis to try to find issues with that complaining

16 employee? I mean, it shouldn't work that way, right?

17   A   I mean, that was the basis of looking at the

18 video, though.

19   Q   Okay. But you -- I mean, it's clear that the

20 purpose of Ms. Johnson looking at video was -- we looked

21 at all the dates, times from the incident reports sent

22 by Ms. Harrell. Clearly, the purpose of looking at that

23 video was to essentially investigate Ms. Harrell's

24 complaints?

25   A   I would agree with that. I mean --

**Page 83**

1   Q   And you could agree, too, that someone

2 shouldn't -- I mean, that essentially, you know,

3 assuming that, you know, my hypothetical is what

4 happened, that only because she complained did Ms.

5 Johnson go and start looking for issues maybe to write

6 up Ms. Harrell, that would be retaliation, if that's

7 what actually happened; can you agree with that?

8   MS. PAGE: Form.

9   THE WITNESS: Yeah, I wouldn't be able to

10 answer that that was the basis of the review of the

11 video.

12 BY MR. FINNERTY:

13   Q   But assuming it was?

14   MS. PAGE: Form.

15   THE WITNESS: But I can't assume that.

16 BY MR. FINNERTY:

17   Q   Okay. Okay. All right. Let's go up to page

18 three of the same email chain. The very top of page

19 three, it's an email from Tara Johnson to Sarah Brus,

20 Kathleen Douin and Lisa Barton, April 2nd at 4:56 p.m.

21 In this email she talks about seeing Keidre late while

22 still at work. And Keidre apparently says, don't worry,

23 I've already clocked out and says, you know, Ms. Johnson

24 tells Keidre that's not allowed. And then she goes and

25 removes Keidre's clock-out. Is that allowed by policy

**Page 84**

1 for a supervisor to go and un-clock-out an employee? Is

2 that allowed?

3   A   I wouldn't be able to speak to that. You

4 know, on this, this doesn't tell me enough about why she

5 would have done that. You know, unless she was still at

6 work. If she was still working, we can change the

7 punches, yes.

8   Q   If she was still working. Well, how about if

9 she was hooking up with an inmate?

10   A   Well, this doesn't tell me that's what was

11 happening, so --

12   Q   She shouldn't be getting paid for hooking up

13 with inmates, right? I mean, that's pretty --

14   MS. PAGE: Form.

15   THE WITNESS: I don't have that information, I

16 mean, to be able to confirm that's what she was

17 doing.

18 BY MR. FINNERTY:

19   Q   Okay. Do you know whether Keidre Long is

20 still employed at Northwest Florida Reception Center?

21   A   No, she is not.

22   Q   Do you know the reasons for her separation?

23   A   Just in reviewing this, I looked at it and it

24 showed that she had resigned. I don't have any details

25 of that, though.

**Page 85**

1   Q   Okay. Do you know when she resigned?

2   A   I probably have it in some notes somewhere.

3 It seems like it was in May of '18.

4   Q   Okay. Do you know whether her resignation had

5 anything to do with Ms. Harrell's complaints that Ms.

6 Long was in a relationship with an inmate?

7   A   I do not.

8   Q   Okay. How about Tara Johnson? Do you know

9 the reason for her termination?

10   A   Yes.

11   Q   And why was Ms. Johnson terminated?

12   A   If I remember correctly, it was based on

13 professionalism, because we had been working with Ms.

14 Johnson on a number of things.

15   Q   So are you saying --

16   A   When I say we, I don't mean me. I learned

17 from this, you know, there had been some issues

18 addressed from the regional director and Sarah Brus

19 would have been involved in that, as well.

20   Q   Were the issues with Johnson, were they --

21 would they relate to her supervisory skills or duties?

22   A   Yes, if recall correctly.

23   Q   And how about Misty West? Do you know what

24 happened to her?

25   A   I'm not familiar with that name.

Page 86

1  Q   Okay.  How about Amanda McDaniel?
2  A   Okay.  She was one was that was brought to my
3  attention during this, just on the review.  My
4  understanding is she's no longer with us either.
5  Q   And is that because she was having a
6  relationship with an inmate?
7  A   I don't know.  I don't have the details in
8  front of me.
9  Q   And was she terminated or did she resign?
10 A   I don't have the specifics on this.  I just
11 show a term date next to her name.
12 Q   What date is that?
13 A   4-17-18.
14 Q   Okay.  And what was the termination date for
15 Tara Johnson?
16 A   I believe it was June 27th, '18.
17 Q   And Lori Cook, was she terminated?
18 A   I believe so.  Yes.
19 Q   Do you know why?
20 A   I don't have that listed.  I'd have to go back
21 and review.
22 Q   Do you have the date of Lori Cook's
23 termination?
24     MS. PAGE:  Brian, she's not listed as a
25 corporate rep.  She doesn't have to.  If she

Page 87

1  doesn't know, she shouldn't be looking at
2  documents.  So if you know, you know, answer,
3  please, Ms. Lynch.
4     THE WITNESS:  Oh, okay.  So as far as the
5  reason, I don't know the reason Ms. Cook was
6  terminated.
7  BY MR. FINNERTY:
8  Q   Do you know the date that she was terminated?
9  A   No.
10    MR. FINNERTY:  Okay.  And, Ms. Page, it's my
11 understanding that these witnesses would be able to
12 cover all of the issues that we have requested in
13 our 30(b)(6) request, and that was --
14    MS. PAGE:  Yeah.  So my understanding is that
15 you should be able to get all of the information
16 from these six witnesses, but no one was required
17 to, you know, study all of the topics and know
18 everything because they weren't designated as a
19 Rule 30(b)(6) witness, and I think my
20 understanding, too, is, you know, if that becomes
21 necessary, we can do that.
22    MR. FINNERTY:  Okay.
23 BY MR. FINNERTY:
24 Q   How about Maria Paula Belcarlo?  Do you know
25 if she still works at Northwest Florida Reception Center

Page 88

1  or works for Centurion or MHM?
2  A   I do not.
3  Q   Okay.  But so as relates to Lori Cook, you can
4  confirm that she was terminated, you just don't recall
5  the reason or the day?
6  A   Correct.
7  Q   So is it just a coincidence that both of Ms.
8  Harrell's supervisors who she complained about, who
9  wrote up her counseling forms, just a coincidence that
10 those two were also terminated?
11    MS. PAGE:  Form.
12    THE WITNESS:  I wouldn't -- yeah, I wouldn't
13 be able to answer that.
14 BY MR. FINNERTY:
15 Q   Okay.  Do you recall there being issues with
16 Lori Cook's managerial skills, her supervisory skills?
17 A   I am not aware.
18 Q   And do you know whether there's an issue with
19 her falsifying documents?
20 A   I'm not familiar with that.
21 Q   Okay.  So have you been provided with the --
22 well, strike that.
23    Have you had a chance to review the first
24 amended complaint that was filed by Ms. Harrell in this
25 case?

Page 89

1  A   I don't recall the specifics of it.  I would
2  have to pull it.  I did receive it, yes.
3  Q   Okay.  And do you understand that Ms.
4  Harrell's alleged that she submitted certain complaints
5  and that she was later terminated and her complaint
6  includes whistleblower violation counts?  You're aware
7  of that?
8  A   Yes.
9  Q   So if Ms. Harrell, if she felt that during the
10 time of her employment that she was working in a hostile
11 working environment, you would expect her to report that
12 to her supervisor or to Sarah Brus, wouldn't you?
13 A   Yes.
14 Q   And so all these, I'm going to ask you
15 basically a brief summary of the things Ms. Harrell
16 complained about, and my question's going to be the same
17 for all of them, whether you would expect her to report
18 these issues.
19    So hostile work environment, you said yes.
20 How about being verbally abused or intimidated by her
21 supervisor?  She should report that?
22 A   Yes.
23 Q   She should report sexual harassment?
24 A   Yes.
25 Q   She should report that she felt that there was

Page 90

1  a pattern of favoritism as related to the assignment of
2  overtime, the hiring of vacant -- hiring of people to
3  fill vacancies or the filling of staff shortages.  She
4  felt there was some favoritism and discriminatory
5  treatment.  In that regard, she should report that,
6  would you agree?
7      A   Yes.
8      Q   And then about she felt she was being
9  retaliated against and that she was fearful of
10 additional retaliation in the future.  That's something
11 she could report, correct?
12     A   Yes.
13     Q   And if there was a registered mental health
14 counselor that refused to do an evaluation on an inmate
15 that had declared a psychological emergency, she should
16 report that, shouldn't she?
17     A   Yes.
18     Q   And if she felt that there were employees that
19 were falsifying narcotic accounts -- accounting logs and
20 refusing to account for narcotics when they were
21 required to, she should report that, correct?
22     A   Yes.
23     Q   And were you aware that Ms. Harrell complained
24 that Ms. Cook, her supervisor, was involved in
25 falsifying narcotic logs and failing to account for

Page 91

1  narcotics less than a month before she was terminated?
2  Were you aware of that?
3      A   No.
4      Q   Okay.  But -- and I apologize.  You did say
5  that should be reported, correct?
6      A   Yes.
7      Q   Falsifying documents.  Okay.  Nurses having
8  sex with inmates, that should be reported, correct?
9      A   Yes.
10     Q   And that -- I mean, you can understand how
11 that could create a potential safety issue, if you've
12 got an inmate having sex with an employee, right?
13     A   Yes.
14     Q   And that would be something that would be
15 grounds for immediate termination, right?
16     A   It would have to be proven, yes.
17     Q   Sure.  If proven.  I mean, I think that kind
18 of goes with all of this.  And then nurses clocking out,
19 staying on the clock so they can hook up with inmates,
20 that should be reported, correct?
21     A   Yes.
22     Q   And how about leaving pills out in the open
23 and the pill room door left open, that should by
24 reported, would you agree?
25     A   Yes.

Page 92

1      Q   And then another one we kind of addressed
2  earlier, but violating the confidentiality of
3  complainants, that should be reported, don't you think?
4      A   Yes.
5      Q   Okay.  And these -- and after these issues
6  were reported, they should be investigated by someone,
7  whether it be Ms. Brus, you know, the supervisor,
8  someone should have -- should at least look into these
9  allegations?
10     A   Correct.
11     Q   Okay.  And as relates to these issues that
12 I'll represent Ms. Harrell complained about, do you have
13 any evidence or any reason to believe that she didn't
14 reasonably suspect that these were issues that were, in
15 fact, happening?  Any reason to doubt, you know, that
16 she made these complaints in good faith?
17        MS. PAGE:  Form; calls for speculation.
18        THE WITNESS:  Yeah, I wouldn't be able to
19     support or deny that.  I'm not sure what her motive
20     was, or her intention.
21 BY MR. FINNERTY:
22     Q   But have you been provided any information
23 that would suggest that Ms. Harrell wasn't complaining
24 in good faith?  Are you aware of any information that
25 would suggest she was making it up or didn't really

Page 93

1  believe that any of this was really happening?
2        MS. PAGE:  Form; calls for speculation.
3        THE WITNESS:  I wouldn't be able to make a
4     fact-based decision on that.
5  BY MR. FINNERTY:
6      Q   And I don't think it calls for speculation.
7  I'm just asking, are you aware of any information to
8  suggest that Ms. Harrell wasn't -- didn't truly believe
9  that what she complained about was happening?  Either
10 you're aware of information or you're not.
11     A   I mean, I'm not aware of --
12     Q   Okay.  Sure.
13        MS. PAGE:  Form.
14 BY MR. FINNERTY:
15     Q   And as it relates to the complaints that Ms.
16 Harrell would have submitted -- that she submitted to
17 Ms. Brus, do you know whether Ms. Brus ever investigated
18 Ms. Harrell's complaints?
19     A   To my knowledge, she did.
20     Q   She did?  And what are you basing that on?
21     A   Well, you can look at, you know, just what
22 we've reviewed so far.  I mean, there were things that
23 they went back and looked at videos, things like that,
24 so --
25     Q   Well, we saw Ms. Johnson looked at video.

Page 94

1    A    So I don't know where that, you know, came
2  from.  So I wouldn't be able to give you a, you know, a
3  factual comment about how she investigated and what
4  steps were taken.
5    Q    But she should have investigated.  Can we
6  agree on that?
7    A    Of what she would have known about, yes.
8    Q    Okay.  Do you know whether there's a
9  particular -- so, say for instance an employee, you
10 know, has decided they want to go work somewhere else
11 and they want to resign, is there a particular policy
12 for, you know, is there like a two-week notice policy or
13 is there any policy that an employee has to follow if
14 they want to resign?
15        MS. PAGE:  Form.
16        THE WITNESS:  It is indicated in the employee
17     handbook for them to provide a two-week notice.
18 BY MR. FINNERTY:
19    Q    And that would be written notice?
20    A    We've taken verbal requests for transfers or
21 resignation.
22    Q    Okay.  If an employee verbally says, hey, I
23 want to resign, and then the next day says, you know,
24 either I didn't really say that or I changed my mind,
25 would you allow for that employee to rescind that verbal

Page 95

1  resignation?
2    A    It would depend on the circumstances.
3    Q    Okay.  If you didn't allow it, it would be
4  essentially akin to involuntary termination; would you
5  agree with that?
6        MS. PAGE:  Form.
7  BY MR. FINNERTY:
8    Q    Are you still with us, Ms. Lynch?
9    A    Oh, I'm sorry.  I thought were frozen again.
10   Q    And I can assure you, we're wrapping up.
11   A    Okay.
12   Q    But if an employee is, you know, apparently
13 are -- or somebody -- if it's believed that she
14 submitted a verbal resignation and then, you know, for
15 whatever reason either, you know, she claimed she didn't
16 really do that, didn't really submit that verbal
17 resignation or she changes her mind, if Centurion or MHM
18 went through with separating her when it was no longer
19 her desire to be separated, that would be an involuntary
20 separation.  Can we agree on that?
21   A    Again, it depends on the situation.
22   Q    Fair enough.  So if you are able to go and
23 find -- and, again, like I said before, I don't dispute
24 that we were given everything that was actually sent to
25 you on April 20th relating to Ms. Harrell and the

Page 96

1  request to terminate her, but if you're able to pull
2  that, was that something you could provide to your
3  counsel, specifically what was attached to the request
4  to terminate Ms. Harrell?  If that's something you
5  could -- if you're able to locate that, is that
6  something you could provide to your counsel, to your
7  attorney?
8    A    Yes, that's something we could look at.
9    Q    All right.  And if you could, you know, do
10 that, I would be very appreciative.
11        MS. PAGE:  And you're specifically
12     referencing -- what was the exhibit number now?
13        MR. FINNERTY:  It would have been for Exhibit
14     6, any documents that would have been --
15        MS. PAGE:  Exhibit No. 6, the April 20, 2018,
16     9:52 a.m. email?
17        MR. FINNERTY:  Well, it's my understanding it
18     was basically just an initial email from Brus to
19     Ms. Lynch and then it went up through Lynch to
20     Love.  I mean, I'm assuming it was the same
21     attachment that was just forwarded up the line.
22     So, you know, I guess anything that would have been
23     attached to Ms. Brus' 4-20 email or her 4-26 email.
24        MS. PAGE:  Okay.
25 BY MR. FINNERTY:

Page 97

1    Q    So, last question, Ms. Lynch, and it
2  relates -- it goes back to the
3  confidentiality-of-complainant issue.  And there's some
4  documents that have been produced that would suggest
5  that Ms. Harrell would be, like, on the phone with Tara
6  Johnson and Tara would call other employees to come into
7  her office and she would either put the phone on speaker
8  or she would have the other employee get right up next
9  to the headset and she would turn the volume up all the
10 way.  I mean, is that allowed?  I mean, is that
11 something that you feel should be done when an employee
12 is trying to talk to her supervisor about issues that
13 they're having with work?
14        MS. PAGE:  Form.
15        THE WITNESS:  Well, one, I don't know the
16     specifics of the situations you're talking about,
17     you know, if it was confirmed that that happened,
18     but, no, that would not be appropriate.
19 BY MR. FINNERTY:
20   Q    Okay.  At least without Ms. Harrell being
21 told, right that, hey, there's somebody else in here,
22 do you mind if they listen in.  I mean, there would be
23 ways, I guess, to correct that, but without Ms.
24 Harrell's knowledge, you can agree that it would be
25 proper to call other people in and to listen in on what

Page 98

1  Ms. Harrell -- or what she thought was a personal
2  conversation?  That shouldn't be happening.
3      MS. PAGE:  Form.
4      THE WITNESS:  Again, I don't know that, you
5  know, that really happened, so.
6  BY MR. FINNERTY:
7      Q  But it wouldn't be appropriate if it did
8  happen?
9      MS. PAGE:  Form.
10      MR. FINNERTY:  Ms. Lynch, thank you very much
11  for your time.
12      THE WITNESS:  Thank you.
13      MR. FINNERTY:  I appreciate it and I
14  appreciate you working with me with the technology
15  issues.  It's all we've got during this pandemic.
16      THE WITNESS:  Exactly.
17      MR. FINNERTY:  And I appreciate it.  Well,
18  appreciate your time and I hope you have a good
19  rest of your day.
20      MS. PAGE:  I actually -- I have a couple of
21  questions.
22      MR. FINNERTY:  I apologize.  Sorry.
23      MS. PAGE:  That's okay.  And I just wanted to
24  say for the record that this is actually going
25  pretty smooth compared to some other Zoom video

Page 99

1  depositions I've done.  Technical difficulties are
2  expected nowadays, but I won't take much time.
3  I just have a couple questions.
4      EXAMINATION
5  BY MS. PAGE:
6      Q  You testified earlier, and I'm using Mr.
7  Finnerty's words, "Centurion policies," or the Centurion
8  handbook.  Were you referring to the MHM, which was
9  marked as Exhibit 22 in Ms. Love's deposition, the MHM
10  Services, Inc. employee handbook and code of business
11  conduct?
12      A  Are you asking me that question?
13      Q  Yes.
14      A  Okay.  Yes.
15      Q  Do you need me to repeat it?
16      A  No.  It is the MHM Services.
17      Q  So are you aware that Centurion has its own
18  policies, or are you exclusively referring to the MHM
19  handbook and its policies?
20      A  I was referencing the MHM handbook and
21  policies.
22      Q  Okay.  And with regard to counseling forms,
23  the employee counseling forms, are you required to
24  record every sort of deficiency an employee has on the
25  counseling form?

Page 100

1      A  All on the same form?  Is that the question or
2  could --
3      Q  Let me walk that back.  So if you're approving
4  a final warning or a termination -- or, for instance,
5  just a verbal that's being given to an employee, if
6  there are multiple deficiencies that this employee has,
7  are they all required to be documented?
8      A  No.
9      Q  And with regard to the progressive discipline
10  policy, if there is one, are you required to, with every
11  violation, you know, are you required to have a verbal,
12  a written, a final before termination?
13      A  No.
14      Q  You were asked about status of complaints and
15  informing employees about the status of complaints.  Are
16  you required to inform an employee the outcome of a
17  complaint?
18      A  No.
19      Q  And, in fact, would you inform a complainant
20  about the outcome of their complaint?
21      A  We would not give specifics.  For example, if
22  disciplinary action or anything like that was given, we
23  would just let them know it had been addressed.
24      MS. PAGE:  That's all I have.
25      FURTHER EXAMINATION

Page 101

1  BY MR. FINNERTY:
2      Q  Just a couple follow-ups.  Ms. Lynch, I
3  apologize for getting your hopes up that we were done.
4  It's absolutely my fault.  As it relates to that last
5  question about, you know, giving a complainant, an
6  employee the outcome of a complaint, you would agree
7  that the employee should at least be told, hey, we're
8  following -- we're following up on your complaint, we're
9  looking into it, we haven't just ignored it, or brushed
10  you off.  I mean, the complainant should at least be
11  told or informed that they're following through, that
12  someone is following through with their complaint?
13      A  Yes.  I know that, you know, that is something
14  that we do try to do.
15      Q  And is that something that's actually required
16  under your -- under your employee handbook?
17      A  Yes.
18      Q  Okay.  And so is maintaining an employee's
19  confidentiality whenever possible, that's required under
20  the employee handbook, correct?
21      A  It is.
22      Q  All right.  So -- and these haven't -- these
23  weren't provided to you as exhibits that we're going to
24  use today, another disadvantage of the pandemic in doing
25  this via Zoom, but, I'll represent to you that Ms.

Page 102

1  Harrell changed a good bit between -- she would be, you
2  know, PRN and full-time and back to PRN, full-time. She
3  did a good bit of that. And I'll tell you that every
4  single time that there was one of those employment
5  status changes, she would get a letter from Centurion,
6  not MHM, not, you know, anybody else but Centurion. Do
7  you know why she would be getting letters from Centurion
8  if Centurion wasn't her employer?
9     A   So, again, that would be a question, as far as
10 the structure goes, I would refer that question to
11 someone else. I mean, Centurion does have the contract
12 with Florida, but we are paid by MHMHP.
13    Q   And so --
14       MS. PAGE: Just for the record, can you
15    identify the Bates numbers of the letter you're
16    referencing?
17       MR. FINNERTY: Yeah, sure. Page 88, 89 --
18       MS. PAGE: Of defendant's production?
19       MR. FINNERTY: Yes. 88, 89, 90, 91, 95, 96,
20    97, 98, 99 and 100.
21       MS. PAGE: So 88 through 100?
22       MR. FINNERTY: Eighty-eight to 91 and 95 to
23    100.
24 BY MR. FINNERTY:
25    Q   And, Ms. Lynch, do you know a person by the

Page 103

1  name of -- I'm going to butcher this, I know. Adede
2  Rojua (sic)? Do you know who that is?
3     A   Yes.
4     Q   Who is that Adede Rojua?
5     A   She's no longer with the company, but she's --
6  at that time, she would have been in the HR system
7  administrative group that produces letters or status
8  change letters. She would be like an HR administrator.
9     Q   Did she work for Centurion?
10    A   To my knowledge, she was under MHMHP, as well.
11 We've gone through some structure changes since that
12 time, so that's why I don't want to commit to exactly
13 what that structure was in 2018.
14    Q   Isn't it true that Centurion owns MHM? It's
15 MHM is wholly owned by Centurion?
16    A   Again, I don't want to answer the question
17 because of it being a corporate structure.
18    Q   Sure.
19    A   That's just not my specialty.
20    Q   Understood. Understood. So you said that
21 Centurion has the contract with the State of Florida,
22 but MHM is who cuts your paychecks, right?
23    A   Right. The contract is staffed by MHM.
24    Q   Okay. So would it be fair to say that the
25 State of Florida pays Centurion who then turns around

Page 104

1  and pays MHM so that they can make payroll for the
2  employees that are hired to fulfill the contract
3  Centurion has --
4     A   I'm not -- yeah, I'm not sure how that payment
5  process works.
6     Q   Could you agree that there would be no MHM in
7  Florida if it weren't for the Centurion contract with
8  the State of Florida?
9     A   Again, I would not be able to answer that.
10    Q   Fair enough. How about Alexis Pettis? Do you
11 know who that is?
12    A   It seems like she was sort of in a similar
13 position, if not the same as Adede would have been. She
14 would have been in the HR systems and processing group.
15    Q   So I'll represent to you she sent a letter to
16 Ms. Harrell dated March 16, 2018 on a Centurion
17 letterhead informing Ms. Harrell of her employment
18 status change to full-time. Is that something that --
19 is that policy, that whenever there's a change in
20 employment status that a letter be sent out saying, you
21 know, this is informing you of your change?
22    A   To my knowledge that -- yeah, to my knowledge
23 that's what they were doing in '18.
24    Q   Okay. And how about Valary Ohler, do you know
25 who that is? It's V-A-L-A-R-Y, O-H-L-E-R. Oh, this is

Page 105

1  back in 2016. According to her letter she was a senior
2  HRIS data administrator?
3     A   Okay. That would have been part of the same
4  group at the corporate office.
5        MS. PAGE: Can you identify the Bates there?
6     Is this 23 and 24?
7        MR. FINNERTY: I'm sorry. What was that?
8        MS. PAGE: Can you identify the Bates that
9     you're referring to?
10       MR. FINNERTY: Yeah. So it was the one I just
11    gave you, which is 95 -- well, I'm sorry. It's 88
12    through 91, and then 96 -- 95, 96. That's it, 95
13    and 96.
14 BY MR. FINNERTY:
15    Q   All right. Last question -- well, no. Maybe
16 two more. I'm always saying last question, but I'm
17 never -- it never really happens that way.
18       So you were asked a question about whether Ms.
19 Harrell -- or whether Centurion had its own employee
20 policies, or whether you were referring to just MHM
21 policies. Do you remember that question, Ms. Lynch?
22    A   I do.
23       MR. FINNERTY: And so, Ms. Page, the Bates
24    stamp number on this document I'm about to ask one
25    simple question on is Defendant's Production 54,

8/11/2020 Case 4:20-cv-00030-AW-MJF Document 37-7 Filed 10/14/20 Page 28 of 30
Lisa E. Harrell v. Centurion of Florida, Inc., et al.
Deposition of Lisa Lynch                18-CA-77                28 (106 - 109)

Page 106

1   and it shows Ms. Harrell signing for the receipt of
2   a Centurion employee handbook.
3   BY MR. FINNERTY:
4       Q   So, would you agree that Centurion also has
5   its own employee handbook?
6       A   I'm not sure at that time if there was a
7   separate handbook or not.  I mean, we --
8       Q   The document I'm referring to is -- it's
9   signed by Virginia Harrell and dated May 26, 2016.  And
10  it says, by signing below, I attest that I have been
11  given the Centurion employee handbook.  So --
12      A   To my knowledge, it would have been the MHM
13  handbook.
14      Q   Okay.  So would you agree that they're
15  essentially the same, to the extent there is a
16  Centurion, as opposed to MHM, that I mean, the same
17  rules, same --
18      MS. PAGE:  Form; calls for speculation.
19  BY MR. FINNERTY:
20      Q   You can answer if you can, Ms. Lynch.
21      A   I really don't know.
22      Q   Okay.  Fair enough.  One last thing I wanted
23  to ask you about.  Have you seen any -- have you been
24  provided copies of any of the discovery requests that
25  were submitted on behalf of Ms. Harrell, like

Page 107

1   interrogatories or request to produce or request for
2   admissions and -- they weren't sent over to you -- and
3   then, you know --
4       A   Yeah.  You know, there's a lot of documents on
5   this one.  So I wouldn't be able to --
6       Q   Sure.  Let me just ask this question:  Do you
7   know who Carla Hanks is?
8       A   Yes.
9       Q   Okay.  Do you know why, after Ms. Harrell was
10  terminated, Ms. Harrell was terminated April 26th, 2018
11  you, do you know why on May 8th, 2018 Carla Hanks would
12  have sent an email to Ms. Harrell, the subject was,
13  Centurion of Florida separation documents, and then in
14  the body of the email it says, please see attached
15  documents to assist you and your separation from
16  employment with Centurion of Florida?
17      Do you know -- I mean, if Ms. Harrell wasn't
18  employed by Centurion of Florida, do you know why this
19  Carla would have been sending an email saying, here's
20  some documents to help you with -- assist you with your
21  separation from Centurion of Florida?
22      A   Again, I can understand the confusion about
23  Centurion and MHM.  That would have been the standard
24  form letter that we would send to any terminated
25  employee to assist them with COBRA or anything, you

Page 108

1   know, following their separation.
2       Q   Do you -- go ahead.  I'm sorry.
3       A   I was just going to say as far as
4   differentiating between Centurion and MHM, I would need
5   assistance from somebody else to answer that question.
6       Q   Well, isn't it true that it's confusing
7   because they're the same company?  I mean, they --
8   Centurion owns MHM?  I mean, can we agree on that?
9       MS. PAGE:  Form; asked and answered.
10      MR. FINNERTY:  I'm confused, too, Ms. Lynch.
11      THE WITNESS:  I would prefer that that, you
12  know, come from someone else.
13  BY MR. FINNERTY:
14      Q   But do you think that --
15      A   They could give you the structure.
16      Q   Do you think Centurion set up MHM to try to
17  avoid being an independent contractor of the Department
18  of Corrections?
19      MS. PAGE:  Form.
20      THE WITNESS:  Yeah, that's asking an opinion
21  about information I wouldn't have knowledge of.
22      MR. FINNERTY:  Thank you very much.  I have no
23  more questions unless Ms. Page has some follow-up.
24      MS. PAGE:  I don't either.
25      MR. FINNERTY:  Thank you very much.

Page 109

1       (Whereupon, the deposition was concluded at
2   3:38 p.m., and the witness Lisa Lynch waived reading and
3   signing.)

Page 110

CERTIFICATE OF OATH

STATE OF FLORIDA  )

COUNTY OF LEON    )

I, the undersigned authority, certify that the above-named witness appeared before me via videoconference pursuant to the Supreme Court's Order AOSC20-13 and was duly sworn.

WITNESS my hand and official seal this 14th day of September, 2020.

DANA W. REEVES
NOTARY PUBLIC
COMMISSION #GG970595
EXPIRES MARCH 22, 2024

```
 1                    CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA    )
      COUNTY OF LEON      )
 4

 5            I, DANA W. REEVES, Professional Court

 6    Reporter, certify that the foregoing proceedings were

 7    taken before me at the time and place therein

 8    designated; that my shorthand notes were thereafter

 9    translated under my supervision; and the foregoing

10    pages, numbered 4 through 109, are a true and correct

11    record of the aforesaid proceedings.

12            I further certify that I am not a relative,

13    employee, attorney or counsel of any of the parties, nor

14    am I a relative or employee of any of the parties'

15    attorney or counsel connected with the action, nor am I

16    financially interested in the action.

17            DATED this 14th day of September, 2020.

18

19

20

21            _____
              DANA W. REEVES
22            NOTARY PUBLIC
              COMMISSION #GG970595
23            EXPIRES MARCH 22, 2024

24

25
```